## Case No. 14,693.

UNITED STATES v. BURR.[1]

[Coombs' Trial of Aaron Burr, 1.]

Circuit Court, D. Virginia. Aug. 31, 1807.

JURORS—QUALIFICATIONS—CHALLENGE—BAIL—MOTION FOR ATTACHMENT FOR CONTEMPT—PENDING CRIMINAL PROSECUTION — EVIDENCE BEFORE GRAND JURY — WITNESS — REFRESHING RECOLLECTION BY MEMORANDA — TREASON — PROOF OF INTENTION BEFORE PROOF OF OVERT ACT—FACTS OUT OF DISTRICT—LEVYING WAR—WHAT CONSTITUTES — PRINCIPALS —INDICTMENT—EVIDENCE—PLEADING AS WAIVER—VERDICT.

[1. A man must not only have formed but declared an opinion to disqualify him as a juror.]

[2. A person accused should be retained in custody or required to give security for his appearance while his examination is pending, but only on evidence sufficient to furnish probable cause.]

[3. The pendency of a criminal prosecution is no objection to the hearing of a motion for attachment for a contempt in obstructing the administration of the justice of the court, in the irregular examination of witnesses prior to the hearing, practicing on their fears, and forcibly deporting them from another district to testify against accused.]

[4. A paper to go before the grand jury must be relevant to the case; but the fact that it is referred to by a witness and wanted by the grand jury is sufficient to establish its relevancy.]

[Distinguished in U. S. v. Watkins, Case No. 16,649, on the point as to the power and duty of the court to instruct the grand jury as to the admissibility and competency of evidence to be offered.]

[5. The prosecution may challenge a juror for cause.]

[Cited in U. S. v. Douglass, Case No. 14,989.]

[6. A witness cannot refresh his memory as to conversations by reference to memoranda copied by himself from notes made by him at the times of the conversations.]

[7. On the trial of an indictment for treason in levying war against the United States, any proof of intention formed before the overt act charged, if relevant thereto, may be admitted before proof of the act itself. Proof of remote intentions may be relevant by proof of the continuance of the intentions, and consequently is admissible.]

[Cited in U. S. v. Doebler, Case No. 14,977.]

[8. Facts out of the district may be proved after the overt act, as corroborative evidence of the intention.]

[9. When war is actually levied by an assemblage of men in a posture of war, for a treasonable object, any one who, being leagued in the general conspiracy, performs any overt act constituting a part in such fact of levying war. however remote from the scene of action, or however minute that part, is guilty as a principal traitor, for the fact of levying war may consist of a multiplicity of acts performed in different places by different persons.]

[Cited in U. S. v. Greathouse, Case No. 15,254.]

[10. Quære, whether a person who advises or procures a treasonable warlike assemblage, and does nothing more, is guilty of treason under the constitution.]

[11. To constitute the assemblage of a body of men for the purpose of making war against

the government an act of levying war, it must be a warlike assemblage, carrying the appearance of force, and in a situation to practice hostility.]

[Cited in U. S. v. Hanway, Case No. 15,299.]

[12. An indictment for treason in levying war against the United States must specify an overt act. It is not sufficient if it merely charge defendant in general terms with having levied war, omitting the expression of place or circumstance. And the charge must be proved as laid.]

[13. An indictment for treason in levying war against the United States, charging defendant with being present at the place of the treasonable assemblage charged as the overt act, cannot be sustained if defendant was not with the assemblage at any time before it reached such place; if he did not join it there, or intend to join it there; if his personal co-operation in the general plan was to be afforded elsewhere, at a great distance, in a different state; and if the overt acts of treason to be performed by him were to be distinct overt acts.]

[14. Proof of procurement of a warlike assemblage, if admissible to establish a charge of actual presence under an indictment for treason in levying war against the United States, must be made in the same manner and by the same kind of testimony which would be required to prove actual presence.]

[15. A person who advised or procured the warlike assemblage charged as the overt act of treason cannot be convicted of treason until after the conviction of one of those charged with the overt act.]

[16. Pleading to an indictment in which a person is charged as having committed an act cannot be construed to waive a right which he would have possessed had he been charged with having advised the act.]

[17. On the trial of an indictment for treason in levying war against the United States, no testimony relative to the conduct or declarations of the prisoner elsewhere and subsequent to the overt act charged is admissible, in the absence of proof of the overt act by two witnesses.]

[18. A verdict "We of the jury say that A. B. is not proved to be guilty under this indictment by any evidence submitted to us. We therefore find him not guilty,"—is, in effect, a verdict of acquittal, and will be allowed to stand as rendered, an entry being made on the record of "Not guilty."]

[2] Before MARSHALL, Chief Justice, and GRIFFIN, District Judge.

The court was opened at half past twelve o'clock. when Col. Aaron Burr appeared, with his counsel, Edmund Randolph, John Wickham, Benjamin Botts and John Baker. [Luther Martin also appeared as counsel at a later stage of the trial.]

George Hay. Dist. Atty., William Wirt, and Alexander MacRae, counsel for the prosecution.

The clerk having called the names of the gentlemen who had been summoned on the grand jury, Mr. Burr's counsel demanded a sight of the panel, which was shown to them.

Mr. Burr addressed the court, pointing out some irregularities in summoning a part of the panel. The marshal. he said, by the law of Virginia under which he acted, was re-

---

1 [For references to the various cases in this series, which, together, embrace a full report of the entire proceedings against Aaron Burr, see footnote to Case No. 14,692a.]

2 [Prior proceedings on the examination for commitment will be found reported as Case No. 14,692a.]

quired to summon twenty-four freeholders of the state to compose the grand jury. When he has summoned that/number his function is completed. He proposed to inquire of the marshal and his deputies what persons they had summoned, and at what periods, to ascertain whether some had not been substituted in the place of others stricken off the panel. After some discussion as to the authority of the marshal to excuse grand jurors who had once been summoned, and to substitute others on the panel in lieu of them,

MARSHALL, Chief Justice, remarked that it was not in the power of the marshal to summon more than twenty-four, as the act of assembly authorized only that number. If he should summon twenty-five, the last would not have power to act; and the marshal would have no power to displace any one of the others, to put the last in his place. When the panel had been completed by the marshal, its deficiencies could only be supplied from the bystanders, under the directions of the court.

Mr. Burr said. the court having established the principle, we must ask their aid to come at the facts. We wish to know when certain persons were summoned, when discharged, and whether other persons were substituted in their stead.

Major Scott, the marshal, said he had not the least objection to state all the facts. A few days ago he had received a letter from Col. John Taylor, of Caroline, one of those whom he had summoned on the jury, stating that a hurricane had destroyed his carriage-house, and with it his carriages, so that he could not use them; and that indisposition would prevent him from riding to Richmond on horseback. This letter he had laid before their honors, and the chief justice had deemed his excuse reasonable. He had then summoned Mr. Barbour to serve in Col. Taylor's place. He had also received a letter from Mr. John MacRae, informing him that he was going to leave the state for his health. He had, in consequence, summoned Doctor Foushee in his place. He added, that he felt it his duty to bring twenty-four jurymen into court, and acted upon that principle.

THE COURT decided that Mr. Barbour and Dr. Foushee were not on the grand jury.

Mr. Burr said, the panel being now reduced to sixteen, he understood it to be the proper time to make any other exceptions to the panel. With regret he should proceed to exercise the privilege of challenging for favor; and in the exercise of this right he should perhaps appeal to the authority of the court to try the jurors challenged.

Mr. Hay called for the law justifying the application.

Mr. Burr said he desired it to be distinctly understood that he claimed the same right of challenging the grand jury for favor that he had of challenging the petit jury. He admitted it was not a peremptory challenge, but that he must show good cause to support it.

It would, of course, be necessary to appoint triers to decide. and before whom the party and the witnesses to prove or disprove the favor must appear.

Mr. Botts argued and cited authorities in support of the motion.

Mr. Hay disavowed the intention of opposing substantial exceptions, and admitted the law to be as stated by the opposite counsel.[3]

Mr. Burr.—I shall, then, proceed to name the persons and causes of challenge. The first I shall mention is William B. Giles, against whom there are two causes of challenge. The first is a matter of some notoriety, because dependent on certain documents or records; the second is a matter of fact. which must be substantiated by witnesses. As to the first, Mr. Giles, when in the senate of the United States, had occasion to pronounce his opinion on certain documents by which I was considered to be particularly implicated. Upon those documents he advocated the propriety of suspending the writ of habeas corpus. The constitution however, forbids such suspension, except in cases of invasion or insurrection, when the public safety requires it. It was therefore to be inferred that Mr. Giles did

[3] This is in accordance with both Robertson's and Carpenter's reports. But in his speech on the motion to arrest the evidence, Mr. Hay said the challenge of grand jurors was "not warranted by any English precedent," and intimated that he had acquiesced in it because he was indifferent "whether A, B and C, or D, E and F composed a part" of the grand jury. Mr. Martin, in his reply to Mr. Hay, said, "if he had examined Hawkins's Pleas of the Crown, even in the index, he would have found that grand jurors may be challenged. It is there briefly stated that any person under prosecution may, before he is indicted, challenge a grand juror, as being outlawed for felony. &c.. a villein, or returned at the instance of the prosecutor, or not returned by the proper officer." He also referred to the "American Museum," where, he said, it would be seen "that in a case that came before Judge Grimke, in South Carolina, it was expressly decided that the counsel of the accused have a right to challenge, for good cause, all or any of the grand jury." These authorities do not seem to sustain Mr. Burr's position, that he had the same right to challenge the grand jury "for favor" that he had of challenging the petit jury. Hawkins says, "it seems" that grand jurors may be challenged as aforesaid, but refers to no decision on that subject. At most the authority goes no further than this: that a grand juror may be challenged for incompetency, or for being irregularly or improperly returned. This is a very different thing from a general right of challenge "for favor." It is believed that no authority, anterior to this trial, can be found extending the right to challenge grand jurors further than the citation from Hawkins goes. Later decisions and dicta may be found, admitting the right of challenge for favor; but it is believed they are all based upon the authority of Burr's Case. or on special statutory provisions. In Com. v. Clark, 2 Browne, 325, Judges Tilghman and Breckenridge allowed a challenge for favor. In U. S. v. White [Case No. 16,679], the court said that "an exception for favor which might be a good cause of challenge, cannot be pleaded to the indictment." The decision in the former case. and the implication in the latter. are both based upon the authority of Burr's Case

suppose that there was a rebellion or insurrection, and a public danger of no common kind. It is hardly necessary to observe that with this rebellion, and this supposed danger, I myself had been supposed to be connected. Perhaps this may be a sufficient reason to set aside Mr. Giles. But if not, I shall endeavor to establish by evidence that he has confirmed these opinions by public declarations; that he has declared that these documents, involving me, contained guilt of the highest grade.

Mr. Botts.—There is no necessity of adding anything to the observations of Colonel Burr. If the right of challenge exists, the right to try the challenge exists also. But while I am up, I will declare that no reflection is intended to be made on the character or conduct of Mr. Giles. That gentleman will be candid enough to admit that there is not the least design to wound his feelings. It is with the utmost reluctance that Colonel Burr has prevailed upon himself to advance this exception. I have authorities, however, to prove that these two causes are sufficient to disqualify Mr. Giles. The first relates to his public, the second to his individual conduct.

Mr. Giles.—As to exceptions to myself personally, I can have no objection to have them tried. The court will, however, perceive the delicate situation in which I shall be placed. The triers will have to interrogate witnesses, and the result either way is ineligible. I have no objection to state to the court every impression I have ever had upon this subject. But to calling witnesses to detail loose conversations, so liable to be misunderstood, forgotten, or misrepresented, I am certainly opposed.

Mr. Hay.—I was about to make a proposition which might relieve us from all this useless embarrassment, and which might gratify the views of the accused. If the gentlemen who are challenged on the jury will consent to withdraw themselves, I can have no objection. I am content that every one who has made declarations expressive of a decisive opinion should be withdrawn from the jury. I am not disposed to spend time on such points as these.

Mr. Burr.—It will certainly save time, and I assent to the proposition.

Mr. Giles.—The circumstances which have just occurred place me in an unpleasant situation. I have no objection to disclose in the usual way, with candor, the real state of my mind in relation to the accused. But I have an objection to the introduction of witnesses to prove casual expressions, which are so liable to be misconceived. In the present state of things, expressions might be imputed to me which I never used, or expressions which I really used might be mistaken or misrepresented by the witness; or the witness might deduce inferences from my expressions which they did not justify. It was by no means agreeable to me to have been summoned on this grand jury. But

for some time past I have invariably pursued this maxim: "Neither to avoid nor to solicit any public appointment; but when called to the discharge of any public duty by the proper authority, conscientiously to attempt its execution." In undertaking to serve on the present grand jury, I was influenced by the same consideration. With respect to my public conduct, I presume it is of public notoriety, and it will speak for itself. I not only voted for the suspension of the privilege of the writ of habeas corpus, in certain cases, but I proposed that measure. I then thought, and I still think, that the emergency demanded it; that it was fully justified by the evidence before the senate; and I now regret that the nation had not energy enough to support the senate in that measure. This opinion was formed upon the state of the evidence before the senate, which, in all questions of a general nature, is of a very different character from the legal evidence necessary in a judicial investigation. My mind is, however, free to receive impressions from judicial evidence. In relation to the accused, I feel very desirous, and have often so expressed myself, that the various transactions imputed to him should undergo a full and fair judicial investigation; and that, through that medium, they should receive their just and true character, whatever in point of fact they might be, and that he should be presented in that character to the world. I have no personal resentments against the accused; and if he has received any information inconsistent with this statement, it is not true. However, as it is left to me to elect whether to serve on the grand jury or not, I will certainly withdraw.

The CHIEF JUSTICE.—The court thinks that if any gentleman has made up and declared his mind it would be best to withdraw.

Mr. Burr.—A gentleman who has prejudged this cause is certainly unfit to be a juryman. It would be an effort above human nature for this gentleman to divest himself of all prepossessions. I believe his mind to be as pure and unbiased as that of any gentleman under such circumstances. But the decisive opinion he has formed upon this subject, though in his public character, disqualifies him for a juryman. But he is one of the last men on whom I would wish to cast any reflections. So far from having any animosity against him, he would have been one of those whom I should have ranked among my personal friends. The other gentleman whom I shall challenge is Wilson Cary Nicholas.

Mr. Nicholas desired that the objection against him should be stated.

Mr. Burr.—The objection is, that he has entertained a bitter personal animosity against me; and therefore I cannot expect from him that pure impartiality of mind which is necessary to a correct decision. I feel the deli-

cacy of my situation; but if the gentleman will consent to withdraw, I will waive any further inquiry.

Col. Wilson C. Nicholas rose and addressed the court as follows: My being in this situation certainly was not a thing of choice. When I was summoned by the marshal, I urged him in the strongest manner to excuse me. I mentioned to him that it would be extremely inconvenient to me to attend the court, and that it would be very unpleasant to serve on the jury, on account of the various relations in which I had stood to Colonel Burr. I had been in congress at the time when the attempt was made to elect Colonel Burr president of the United States. My feelings and opinions on that occasion are well known. I had served three years in the senate while Colonel Burr was president of that body, and was one of those who, previous to the last election, had taken a very decided part in favor of the nomination of the present vice president, for the office at that time filled by Colonel Burr. Moreover, from the time that Colonel Burr first went to the Western country, my suspicions were very much excited as to his probable objects in that part of the United States; in consequence of which I gave early, and perhaps too great, credit to the charges which were brought against him. Such was my opinion of the importance of New Orleans, not only to the prosperity, but to the union of the states, that I felt uncommon anxiety at what I believed to be the state of our affairs in the West, and had expressed my impressions very freely in conversation, and in letters to my friends during the last winter. Under these circumstances, I doubted the propriety of my being put on the jury; but I felt no distrust of myself, as I was confident that I could discharge the duty under just impression of what I owe to my country, to the accused, and to my own character. The marshal assured me that he felt the strongest disposition to oblige me, but that he thought he could not do it consistently with his duty. He supposed there was scarcely a man to be found who had not formed and expressed opinions about Colonel Burr. That he, too, was in a situation of great delicacy and responsibility, and that without the utmost circumspection on his part, he would be exposed to censure. I renewed my application to the marshal several times, and always received the same answer. Thus situated, I determined to attend the court, both from a sense of duty and because I would not put it in the power of the malicious and those disposed to slander me to assign motives for absenting myself which had no kind of influence on me. Another reason for pursuing this course presented itself some time after I had formed this determination. I conceived that an attempt had been made to deter me from attending this court. I was informed by a friend in the city, that he had heard that one of the most severe pieces which had ever been seen was preparing for publication, if I did attend, and serve on the grand jury. From what quarter this attack was to come, I do not know. The only influence which that circumstance had was to confirm me in the determination I had made, as I was much more inclined to defy my enemies than to ask their mercy or forbearance. From the first I hesitated whether I ought not to make the same representation to the court that I had made to the marshal. As I was in doubt on the subject before I came from home, I committed to paper the substance of what I have now said, and consulted three gentlemen who were lawyers, men of honor, and my personal friends. Their advice to me was not to mention it, for they did not believe that the court would or ought to discharge me for the reasons I had mentioned. As I was in doubt myself I determined to follow their advice, and the more readily as they seemed confident that I would not be discharged, and I was not ambitious of acquiring in this way a reputation for scrupulous delicacy. I was perfectly willing that my reputation should rest on the general tenor of my life, and did not believe that my character required such a prop. At present I feel myself embarrassed how to act. I certainly was, and am, anxious not to serve on the jury, but am unwilling to withdraw, lest it should be thought that I shrink from the discharge of public duty of great responsibility, and am not willing to be driven from the discharge of that duty in a way which should lead to a belief that the objection to me is either acknowledged to be well founded or has been sustained by the court. Upon this subject, the example of Mr. Giles has great weight with me. That consideration, and a hope that my motives cannot now be misunderstood or misrepresented, will induce me to do as he has done.

Colonel Burr.—The circumstance mentioned by the gentleman, that an attempt has been made to intimidate him, must have been a contrivance of some of my enemies for the purpose of irritating him, and increasing the public prejudice against me, since it was calculated to throw a suspicion on my cause. Such an act was never sanctioned by me, nor by any of my friends. I view it with indignation, and disclaim any knowledge of the fact in question.

THE COURT established the following as being the proper questions to be put to jurors: First, have you made up your mind on the case, or on the guilt of Colonel Burr, from the statements you have seen in the papers or otherwise? and finally, have you formed and expressed (or delivered) an opinion on the guilt or innocence of Colonel Burr (or the accused?)

Mr. Joseph Eggleston asked to be excused from serving on the grand jury. He had, on reading the deposition of Gen. Eaton in the newspapers, expressed considerable warmth

and indignation on the subject likely to come before the grand jury, and on that account it might be both indelicate and improper for him to serve on that body. But after being examined by the CHIEF JUSTICE as to the nature of the opinions he had formed, Mr. Burr remarked, that the industry which had been used to prejudice the public mind against him left him very little chance of an impartial jury, and that on the subject of Major Eggleston's application to be excused he should remain perfectly passive. The court did not excuse him.

The panel was here called over, and fourteen only appeared. The marshal then summoned from the bystanders John Randolph, Jr., and William Foushee. The court appointed Mr. John Randolph foreman of the grand jury. Being called upon to take the foreman's oath, Mr. Randolph asked to be excused from serving, on the ground that he had formed an opinion concerning the nature and tendency of certain transactions imputed to Col. Burr.

Mr. Burr remarked that he was really afraid they should not be able to find any man without such prepossessions.

The CHIEF JUSTICE remarked that a man must not only have formed, but declared an opinion, to disqualify him. Mr. Randolph said he did not recollect of having declared one; and he was not excused.

Mr. John Randolph was then sworn as foreman; and the rest of the panel being called to the book, when the name of Dr. Foushee was called he stated that from reading the president's message, Gen. Eaton's deposition, and other publications, he had formed an opinion of Col. Burr's guilt. After some discussion, Dr. Foushee was permitted to withdraw, and Col. James Barbour was summoned in his place.

The grand jury were then sworn, as follows: John Randolph, Junior, Foreman, Joseph Eggleston. Joseph C. Cabell, Littleton W. Tazewell, Robert Taylor, James Pleasants, James M. Garnett, William Daniel, John Brockenbrough, John Mercer, Edward Pegram, Mumford Beverly, John Ambler, Thomas Harrison, Alexander Shephard, and James Barbour.

The CHIEF JUSTICE delivered an appropriate charge to the grand jury, in which he particularly dwelt upon the nature of treason, and the testimony requisite to prove it; after which the jury retired.

Mr. Burr then stated his desire that the court should instruct the grand jury on certain leading points, as to the admissibility of certain evidence which he supposed would be laid before the grand jury by the attorney for the United States.

Mr. Hay objected to the proposition as unprecedented. After some discussion, in which Messrs. Burr, Hay, Randolph, and Botts participated,

The CHIEF JUSTICE observed that he was not prepared at present to say whether the same evidence was necessary before the grand jury as before the petit jury; whether two witnesses to an overt act were required to satisfy a grand jury. This was a point he would have to consider. That he had not made up his mind on the evidence of facts said to be done in different districts; how far the one could be adduced as evidence in proof or confirmation of the others; but his present impression was, that facts done without the district may be brought in to prove the material fact said to be done within the district, when that fact was charged.

The question was postponed for further discussion, on Mr. Hay's pledging himself that no evidence should be laid before the grand jury without notice being first given to Mr. Burr and his counsel.

Saturday, May 23, 1807.

The counsel for Col. Burr observed that, if it met the approbation of the court, the discussion of the propriety of giving special instructions to the grand jury would take place on Monday next. This proposition was assented to, and it was understood that Mr. Burr's counsel were to give due notice of the propositions they intended to submit.

The grand jury appearing pursuant to adjournment, the CHIEF JUSTICE informed them that the absence of Gen. Wilkinson, a witness deemed important by the counsel for the United States, and the uncertainty of his arrival at any particular period, made it necessary that they should be adjourned.

After some conversation between the court and bar as to the propriety of adjourning the grand jury to some future day of the term, they were finally adjourned till the Monday following.

Monday, May 25, 1807.

The grand jury appeared in court, and on its being stated by their foreman that they had been two days confined to their chambers, and had no presentment to make, or bill before them, Mr. Hay observed that he had two bills prepared, but wished to postpone the delivering of them till the witnesses were present, and until it was ascertained that all the evidence relied upon by the counsel for the prosecution could be had. He thought it probable that in the course of a week he should hear of Gen. Wilkinson, who was still absent, and whose testimony was deemed very important. After some conversation as to the propriety of adjourning the grand jury to a distant day of the term,

Mr. Hay gave notice of his intention to submit a motion to commit Mr. Burr on a charge of high treason. On the previous examination, he said, there was no evidence of an overt act, and he was committed for a misdemeanor only. The evidence is different now.

Some remarks having been made as to the impropriety of discussing the subject in the presence of the grand jury, they were requested to withdraw.

[The argument and opinion delivered on the

motion to commit will be found reported as Case No. 14,692b. The opinion was delivered on Tuesday, May 26, 1807. It closed with these words: "If it is the choice of the prosecutor on the part of the United States to proceed with this motion, it is the opinion of the court that he may open his testimony."]

Mr. Hay then rose, and observed that he was struck with the observations of the court relative to "publications," and he would attempt, if possible, to make some arrangement with the counsel on the other side, to obviate that inconvenience; and he understood they were disposed to do the same.

The counsel on both sides then retired by permission of the court for this purpose. They returned in a short time, and Mr. Hay informed the court that the counsel for the United States and for Colonel Burr, not having yet been able to agree upon any arrangement which would attain his object, namely, that of having Colonel Burr recognized in a sum sufficiently large to insure his appearance to answer the charge of high treason against the United States, without incurring the inconvenience resulting from a public disclosure of the evidence at this early stage of the proceeding, wished to have further time for that desirable purpose. This was granted by the court, and it then adjourned till next day.

Wednesday, May 27, 1807.

Mr. Hay informed the court that all hopes of the arrangement which he had mentioned yesterday were at an end; for he had received a letter from Colonel Burr's counsel positively refusing to give additional bail. He therefore deemed it his duty to go on with the examination of the witnesses in support of his motion to commit Mr. Burr. He observed, that he regretted extremely that it became necessary in his judgment to pursue this course. He felt the full force of the objections to a disclosure of the evidence, and to the necessity of the court's declaring its opinion, before the case was laid before a jury; but those considerations must yield to a sense of what his engagements to the United States imperiously demanded of him; that in adducing the evidence, he should observe something like chronological order. He should first read the depositions of the witnesses who were absent, and afterwards bring forward those who were present, so as to disclose all the events, as they successively happened.

Mr. Wickham stated that there were two distinct charges against Colonel Burr. The first was for a misdemeanor, for which he had already entered into recognizance; the second was a charge of high treason against the United States, which was once proposed without success, and is now again repeated. On this charge the United States must substantiate two essential points: first, that there was an overt act committed; and secondly, that Colonel Burr was concerned in it.

Everything that does not bear upon these points is of course inadmissible; the course therefore laid down by the attorney for the United States is obviously improper. He proposes to examine his witnesses in a kind of chronological order.

Colonel Burr required that the evidence should be taken in strict legal order. The court and even the opposite counsel will see the propriety of observing this order. If the attorney for the United States has affidavits to produce, let him first demonstrate that they have a right to produce them. We first call upon him to prove by strict legal evidence, that an overt act of treason has been committed. If he cannot establish that one point, all the evidence which he can produce is nugatory and unavailing.

Mr. Hay protested against the right of counsel for the accused to dictate to him the order of introducing his testimony. The two charges against Aaron Burr, he said, were naturally and intimately blended. They form distinct parts of one great design. What that great design was, in all its bearings and ramifications, he was not absolutely certain; but had always conceived that before Mexico was invaded New Orleans was to be taken. How, then, was it possible to separate these two allegations? How could the prosecution separate, line by line, and word by word, the evidence produced to prove these two distinct allegations? It appeared to him as though the counsel for the defence were determined to stop him at the very threshold of everything which he attempted to do. How could he advance if every inch of ground was to be measured out to him with such strictness and objections? The proposition was wholly unprecedented, that the counsel before an examining court should be instructed how to bring out his evidence. He claimed the right to bring it forward in its chronological order.

After some remarks by Mr. Wickham and Mr. Burr

The CHIEF JUSTICE said it would certainly be better, if the evidence was produced to prove the fact first, and that to show their coloring afterwards; for no evidence certainly has any bearing on the present case unless an overt act be proved. However, if the attorney for the United States thinks the chronological order the best, he may pursue his own course; but the court trusts to him, that he will produce nothing which does not bear upon the case.

After some further remarks by Mr. Hay and Mr. Randolph, Mr. Hay produced Gen. Wilkinson's affidavit.

Mr. Botts objected to the admissibility of the paper, on the ground that it was not competent evidence. He said on this question the supreme court were divided.

The CHIEF JUSTICE here interposed, and remarked that the supreme court were divided on the question of the competency of

the letter annexed to the affidavit, not as to the admissibility of the affidavit itself.

Mr. Botts proceeded to state his objections to the competency of the affidavit in this court in the present proceeding. First, he objected that an ex parte affidavit ought not to be received when the witness himself could be produced in court. General Wilkinson could and ought to have been here, and this being the case, his affidavit ought not to be received. But the proposition which he mainly pressed was, that no evidence of any nature whatever, ought to be taken until there is indubitable proof that there was war levied in this district, (Virginia,) and until it is proved that an overt act was committed by Mr. Burr.

Mr. Hay, interrupting, observed that the gentleman was renewing a proposition which had been decided by the court.

Mr. Burr said he had understood the gentleman who spoke first apprized the court that the evidence should come forward subject to discussion, which would be made as the evidence went on. The gentleman was only going into the nature of the evidence presented.

Mr. Botts resumed. He quoted the constitutional definition of treason, and asked if it meant that, if one-half of the crime of treason was to be found in this district, you might look for the other half elsewhere? If the affidavit imported anything, it was a declaration or confession; and no declaration or confession could constitute any ingredient of an overt act, unless that confession be made "in open court." He enforced his views at considerable length.

Messrs. Wickham and Randolph followed, in support of the motion to exclude the testimony at this stage of the proceeding.

The CHIEF JUSTICE stated that the supreme court had already decided, that the affidavit might be admitted under certain circumstances; but they had also determined that General Wilkinson's affidavit did not contain any proof of an overt act; that he was certainly extremely willing to permit the attorney for the United States to pursue his own course in the order of drawing out his evidence, under a full confidence that he would not waste the time of the court by producing any extraneous matters; but where was the necessity of producing General Wilkinson's affidavit first? If there was no other evidence to prove the overt act, General Wilkinson's affidavit goes for nothing, for so the supreme court have already decided; and by that decision he should consider himself bound, even if he had dissented from it. Why, then, introduce this affidavit?

After some further discussion by counsel, the CHIEF JUSTICE said that unless there was a fact to be proved, he was of opinion that no testimony ought to be produced. The question before the court was not whether there had been a treasonable intent, but an overt act. That fact must be proved before there can be any treason, or any commitment for treason.

Mr. Hay then called Peter Taylor, who was Mr. Blennerhassett's gardener, and Jacob Allbright, a laborer, who had worked on his island, who gave their testimony. [This testimony is more fully detailed hereafter, and, in consequence, is omitted here.]

[After these witnesses were examined, the affidavit of Jacob Dunbaugh was offered. The argument on the motion to exclude it, which took up the balance of the day, and the opinion of the court excluding the affidavit, delivered the following day, are reported as Case No. 14,692c.]

Mr. Hay observed that as the examination of Colonel Burr for treason had already taken up much time without any progress in the business, and, from the disposition manifested by his counsel, it might last not only ten days, but even ten years longer, he considered it his duty, from information which he had received that morning, to suggest to the court the propriety of binding Colonel Burr in a further recognizance from day to day till the examination could be ended. He stated, on the authority of a letter just come to hand from the secretary at war, that General Wilkinson, with several other witnesses, might be expected here between the 28th and 30th of this month. This circumstance, said he, renders it essential that he should be considered in custody until he gives security that his person shall be forthcoming to answer the charge of treason against the United States. The gentlemen who appear as counsel for Colonel Burr may be, and no doubt are sincere, in the opinion they have expressed, that he will not shrink from the charges exhibited against him, and will not, in any conjuncture of circumstances which may occur, fly from a trial; but those gentlemen must pardon me for saying that I entertain a very different opinion. I must believe that his regard for the safety of his own life, would, if he perceived it in danger, prevail over his regard for the interest of his securities. I give notice, therefore, that I consider him as being already in custody to answer the motion I have made for his commitment, and that he cannot be permitted to go at large without giving security for his appearance from day to day. His situation now is the same as that when he was first apprehended and brought before a single judge for the purpose of examination. Your honor at that time considered him as in custody, and bound him over from day to day; and I only contend that the same course should be pursued at this time.

Mr. Wickham.—The gentleman thinks he has obtained the effect of his motion merely by having made it. I cannot perceive the propriety of a motion to compel Colonel Burr to give bail in any sum before the probable cause to believe him guilty of treason has

been shown. When he was brought before your honor for examination, you conceived the sum of $5,000 sufficient security for his daily appearance. But a recognizance has already been given in double that sum, binding him not to depart without the leave of this court. Yet now, although no probable proof of treason has been exhibited, Mr. Hay requires the court to demand of Colonel Burr additional security! I trust that such a motion will not prevail.

Mr. Martin.—It has already been decided by the supreme court of the United States, that not a single expression in Wilkinson's affidavit amounts to any proof of the charge of treason. The motion of the gentleman amounts to this: "We have no evidence of treason, and are not ready to go to trial for the purpose of proving it; we therefore move the court to increase the bail."

Mr. Randolph. — The first motion of the counsel for the United States was to commit Colonel Burr on the ground of probable cause only. This goes a step farther, and wishes the same thing to be done on the ground of a probable cause of a probable cause; but we trust that we shall not be deprived of our liberty or held to bail on a mere uncertain expectation of evidence.

Some further remarks were made by Mr. MacRae, Mr. Wirt, Mr. Botts, and Mr. Hay.

The CHIEF JUSTICE delivered the opinion of the court, the substance of which was as follows: It is certainly necessary that a person accused should be retained in custody, or required to give security for his appearance while his examination is depending. The amount of the security to be required must depend, however, upon the weight of the testimony against him. On a former occasion, Colonel Burr was held to bail for his daily appearance in the sum of five thousand dollars only, because there was no evidence before the judge to prove the probability of his having been guilty of treason. When the examination was completed, the sum of ten thousand dollars was considered sufficient to bind him to answer the charge of a misdemeanor only, because the constitution requires that excessive bail should not be taken; but that recognizance had no application to the charge of treason. Yet, whether additional security ought to be required in the present stage of this business, before any evidence has appeared to make the charge of treason probable, is a question of some difficulty. It would seem that evidence sufficient to furnish probable cause must first be examined before the accused can be deprived of his liberty or any security can be required of him. Yet, before this could be done, he might escape and defeat the very end of the examination. In common cases, where a person charged with a crime is arrested and brought before a magistrate, the arrest itself is preceded by an affidavit, which furnishes grounds of probable cause. The prisoner therefore is continued in custody, or bailed until the examination is finished: but here there has been no arrest for treason, and Colonel Burr is not in custody for that offence. The evidence then must be heard, to determine whether he ought to be taken into custody; but as the present public and solemn examination is very different from that before a single magistrate; as very improper effects on the public mind may be produced by it, I wish that the court could be relieved from the embarrassing situation in which it is placed, and exempted from the necessity of giving any opinion upon the case, previously to its being acted upon by the grand jury. It is the wish of the court, that the personal appearance of Colonel Burr could be secured without the necessity of proceeding in this inquiry.

Colonel Burr rose and observed, that he denied the right of the court to hold him to bail in this stage of the proceedings; that the constitution of the United States was against it—declaring that no person shall be arrested without probable cause made out by oath or affirmation. But if the court were embarrassed, he would relieve them by consenting to give bail; provided it should be understood that no opinion on the question even of probable cause was pronounced by the court by the circumstance of his giving bail.

The CHIEF JUSTICE said, that such was the meaning of the court.

Mr. Martin said, for his part, he should prefer that all the evidence should be fully gone into. Instead of fearing that public prejudice would thereby be excited against Colonel Burr, he believed it would remove all the prejudices of that sort which now prevailed.

The CHIEF JUSTICE.—As a bill would probably be sent up to the grand jury, the court wishes to declare no opinion either way.

Some conversation then occurred relative to the quantum of bail; and Colonel Burr mentioned, that he would propose that the sum should be ten thousand dollars, if he should be able to find security to that amount, of which he expressed himself to be doubtful. Mr. Hay contended that fifty thousand dollars would not be too much. But the court finally accepted of the offer, made by Colonel Burr, who, after a short interval, entered into a recognizance with four sureties, to wit: Messrs. Wm. Langburn, Thomas Taylor, John G. Gamble, and Luther Martin; himself in the sum of ten thousand dollars, and each surety in the sum of two thousand five hundred dollars, conditioned, that he would not depart without leave of the court.

Mr. Martin, when offered as surety for Colonel Burr, said, that he had lands in the district of Virginia, the value of which was more than double the sum; and that he was happy to have this opportunity to give a public proof of his confidence in the honor of Colonel Burr, and of his conviction that he-

was innocent. All further proceedings in the case were thereupon postponed until the next day.

On Friday, the 29th of May, and on Monday, Tuesday, and Wednesday, the 1st, 2d, and 3d of June, the court met and adjourned without taking up the case, on account of the non-arrival of General Wilkinson. On the last mentioned day the district attorney stated that he did not think it probable that General Wilkinson would arrive for ten or twelve days, and suggested an adjournment of the grand jury for that length of time. Finally, they were adjourned to Tuesday, the 9th of June.

Tuesday, June 9, 1807.

The court met pursuant to adjournment, and all the grand jurors appeared. General Wilkinson not having yet arrived, after some conversation between the court and bar as to the probable time of his arrival, the grand jury were further adjourned to Thursday following.

[Immediately upon the adjournment of the grand jury a question arose as to the production of certain papers by the government, and was followed by a motion for a subpœna duces tecum directed to the president of the United States, which will be found reported as Case No. 14,692d. The argument consumed several days, and an opinion was delivered Saturday, June 13, 1807. After which]

Mr. Burr called up the motion for a supplemental charge to the grand jury, in support of which he had, on yesterday, submitted a series of propositions, with citations of authorities.

The CHIEF JUSTICE stated that he had drawn up a supplemental charge, which he had submitted to the attorney for the United States, with a request that it should also be put into the hands of Colonel Burr's counsel; that Mr. Hay had, however, informed him that he had been too much occupied to inspect the charge with attention, and deliver it to the opposite counsel; but another reason was, that there was one point in the charge which he did not fully approve. He should not, therefore, deliver his charge at present, but should reserve it until Monday. In the meantime, Colonel Burr's counsel could have an opportunity of inspecting it, and an argument might be held on the points which had produced an objection from the attorney for the United States.

(After some conversation between the court and bar, as to whether the arguments on the supplemental charge should be submitted in writing or orally, the subject was passed over, and it appears never to have been again called up.)

At the instance of the district attorney, four witnesses, viz. Thomas Truxton, William Eaton, Benjamin Stoddert, and Stephen Decatur, were sworn to testify before the grand jury. The clerk then proceeded to call four other witnesses to the book, but when Erick Bollman appeared, Mr. Hay addressed the court to the following effect: Before Mr. Bollman is sworn I must inform the court of a particular, and not an immaterial circumstance. He, sir, has made a full communication to the government of the plans, the designs, and views of Aaron Burr. As these communications might criminate Dr. Bollman before the grand jury, the president of the United States has communicated to me this pardon (holding it in his hands) which I have already offered to Dr. Bollman. He received it in a very hesitating manner, and I think informed me that he knew not whether he should or should not accept it. He took it from me, however, as he informed me, to take the advice of counsel. He returned it in the same hesitating manner; he would neither positively accept nor refuse it. My own opinion is that Dr. Bollman, under these circumstances, cannot possibly criminate himself. This pardon will completely exonerate him from all the penalties of the law. I believe his evidence to be extremely material. In the presence of this court I offer this pardon to him, and if he refuses, I shall deposit it with the clerk for his use. Will you (addressing himself to Dr. Bollman) accept this pardon?

Dr. Bollman.—No, I will not, sir.

Mr. Hay then observed that Dr. Bollman must be carried up to the grand jury with an intimation that he had been pardoned.

Mr. Martin.—It has always been Dr. Bollman's intention to refuse this pardon; but he has not positively refused it before, because he wished to have this opportunity of publicly rejecting it.

Several other witnesses were sworn.

Mr. Martin did not suppose that the pardon was real or effectual; if he made any confessions before the grand jury, they might find an indictment against him, which would be valid, notwithstanding the pardon; that the pardon could not be effectual before it was pleaded to an indictment in open court.

Mr. Hay inquired whether Dr. Bollman might not go to the grand jury.

The CHIEF JUSTICE suggested that it would be better to settle the question about the validity of the pardon before he was sent to the grand jury.

Mr. Hay.—I am anxious to introduce the evidence before the grand jury in a chronological order, and the suspension of Dr. Bollman's testimony will make a chasm in my arrangement. He added that, however, it was not very important whether he was sent now or some time hence to the grand jury.

Mr. Martin.—Dr. Bollman is not pardoned, and no man is bound to criminate himself.

The CHIEF JUSTICE required his authorities.

Mr. Martin.—I am prepared to show that a party even possessed of a pardon is still indictable by the grand jury, unless he has pleaded it in court.

The other witnesses were sent to the grand jury, and Dr. Bollman was suspended. Four other witnesses were then sworn.

Mr. Hay.—I again propose to send Dr. Bollman to the grand jury.

At this time the marshal entered, and Mr. Hay informed the court that the grand jury had sent for the article of the constitution and the laws of congress relating to treason, and the law relating to the misdemeanor.

Jacob Dunbaugh was sworn and sent to the grand jury.

Some desultory conversation here ensued between the bar and the court respecting Dr. Bollman, when Mr. Hay addressed the opposite counsel: Are you then willing to have Dr. Bollman indicted? Take care in what an awful condition you are placing this gentleman.

Mr. Martin.—Doctor Bollman, sir, has lived too long to be alarmed by such menaces. He is a man of too much honor to trust his reputation to the course which you prescribe for him.

The CHIEF JUSTICE.—There can be no question but Dr. Bollman can go up to the jury; but the question is, whether he is pardoned or not? If the executive should refuse to pardon him, he is certainly not pardoned.

Mr. Martin.—But there can be no doubt, if he chooses to decline his pardon, that he stands in the same situation with every other witness, who cannot be forced to criminate himself.

Some desultory conversation here ensued, when Mr. Hay observed that he should extremely regret the loss of Dr. Bollman's testimony. He believed it to be material. He trusted that he should obtain it, however reluctantly given. The court would perceive, that Dr. Bollman now possessed so much zeal as even to encounter the risk of an indictment for treason. Whether he should appear before the grand jury under the circumstances of a pardon being annexed to his name, might hereafter become the object of a distinct inquiry. In the meantime he might go up without any such notification. The counsel of Mr. Burr acquiesced.

The CHIEF JUSTICE.—Whether he be really pardoned or not, I cannot at present declare. I must take time to deliberate.

Mr. Hay.—Categorically then I ask you, Mr. Bollman, do you accept your pardon?

Mr. Bollman.—I have already answered that question several times. I say no. I repeat, that I would have refused it before, but that I wished this opportunity of publicly declaring it.

Mr. Hay.—If the grand jury have any doubts about the questions that they put to Dr. Bollman, they can apply to the court for instructions. I assert, sir, that Mr. Bollman is a pardoned man. I wish the opposite counsel to prove that he is not. I therefore move, sir, that he be sent up to the grand jury, certified by you, that he is pardoned. I make this motion that gentlemen who wish to discuss the question may have an opportunity of adducing their arguments.

Mr. Williams appeared as counsel for Dr. Bollman, and addressed the court in his behalf, insisting he was not bound to criminate or calumniate himself, although pardoned. He claimed, however, that the pardon having been refused, the court could take no notice of it. He also insisted that no pardon except by statute could protect a party against a criminal prosecution, as a pardon under the great seal was not effectual until it had been pleaded and allowed in court. He cited numerous authorities in support of his positions.

Mr. Martin supported the same positions. He said, another reason why Dr. Bollman had refused the pardon was. that it would be considered an admission of guilt. He did not consider a pardon necessary for an innocent man. Dr. Bollman, sir, knows what he has to fear from the prosecution of an angry government, but he will brave. it all. The man who did so much to rescue the Marquis La Fayette from his imprisonment, and who has been known at so many courts, bears too great a regard for his reputation, to wish to have it sounded throughout Europe that he was compelled to abandon his honor through a fear of unjust prosecution.

After some remarks by Messrs. MacRae and Hay, Dr. Bollman was sent up to the grand jury without any particular notification; the questions as to the effect of the pardon tendered to him, and how far he could be compelled to testify, being reserved for future discussion and decision.

Mr. Hay requested leave to inform the grand jury that fatigue alone had prevented General Wilkinson from attending them on that day, but that he should appear before them on Monday. The court then adjourned to Monday.

Monday, June 15, 1807.

The court met pursuant to adjournment.

Gen. Wilkinson was sworn and sent to the grand jury, with a notification that it would facilitate their inquiries if they would examine him immediately.

Mr. Wickham reminded the court that the attorney for the United States had pledged himself to send up no papers to the grand jury which had not previously passed the inspection of the court; but it had since occurred to Col. Burr's counsel that the witnesses themselves might carry up improper papers. He submitted to the court whether they ought not to instruct the grand jury to receive no papers, except through the medium of the court.

Upon this motion a running debate of considerable length ensued.

Finally, the CHIEF JUSTICE remarked that he was not satisfied that a court ought to inspect the papers which form a part of a witness's testimony before he is sent to the grand jury. He had reduced to writing an opinion to be sent to the grand jury. It instructed them not to inspect any papers, but such as formed a part of the narrative of the witness, and proved to be the papers of the person against whom an indictment was exhibited.

At the instance of Mr. Hay, the instruction

was so amended as to submit such papers as tend to justify the witness, but not to bear upon the accused.

Mr. Hay informed the court that the grand jury had sent for Dr. Bollman; that they wanted him to decipher, if he could, a ciphered letter annexed to Mr. Willie's affidavit, and which he held in his hand; that Mr. Willie, the reputed secretary of Mr. Burr, would prove the identity of the paper, and Dr. Bollman, it was expected, would interpret it.

At the suggestion of Mr. Martin, the affidavit was severed from the letter.

Mr. Willie appearing in court, Mr. Hay produced the ciphered letter annexed to his affidavit, and said: This is the letter which I wish to transmit to the grand jury. It is addressed, I understand, to Dr. Bollman, under a fictitious name, and is all in the handwriting of Mr. Willie.

Mr. Botts objected to its being sent up to the grand jury until both its materiality and its authenticity had been proved.

Mr. Hay said that was a hard proposition, as it was written partly in ciphers and partly in German. He deemed it material, because he understood it was either dictated by the accused, or first written by him and afterwards written by his secretary, and at his request. It was addressed to Henry Wilbourn, alias Erick Bollman. He wished it to be sent up while Dr. Bollman was before the grand jury.

After considerable sparring between counsel, Mr. Willie was called to the stand.

[The argument of the question of the right to compel Willie to testify took up the balance of the day, and will be found reported in Case No. 14,692e.]

Tuesday, June 16, 1807.

As soon as the court met, Mr. Hay produced and read the following letter from the president of the United States, in answer to his letter on the subject of the subpoena duces tecum, observing, at the same time, that he read it to show the disposition of the government not to withhold any necessary papers, and that if gentlemen would specify what orders they wanted, they would be furnished without the necessity of expresses:

"Washington, June 12, 1807.

"Sir: Your letter of the 9th is this moment received. Reserving the necessary right of the president of the United States to decide, independently of all other authority, what papers coming to him as president the public interest permits to be communicated, and to whom. I assure you of my readiness under that restriction. voluntarily to furnish on all occasions whatever the purposes of justice may require. But the letter of General Wilkinson, of October 21st, requested for the defence of Colonel Burr, with every other paper relating to the charges against him, which were in my possession when the attorney general went on to Richmond in March. I then delivered to him; and I have always

taken for granted he left the whole with you. If he did, and the bundle retains the order in which I had arranged it, you will readily find the letter desired under the date of its receipt which was November 25th; but lest the attorney general should not have left those papers with you, I this day write to him to forward this one by post. An uncertainty whether he be at Philadelphia, Wilmington, or New Castle. may produce delay in his receiving my letter, of which it is proper you should be apprised. But as I do not recollect the whole contents of that letter, I must beg leave to devolve on you the exercise of that discretion which it would be my right and duty to exercise, by withholding the communication of any parts of the letter which are not directly material for the purposes of justice. With this application. which is specific, a prompt compliance is practicable; but when the request goes to copies of the orders issued in relation to Colonel Burr to the officers at Orleans and Natchez, and by the secretaries of the war and navy departments, it seems to cover a correspondence of many months, with such a variety of officers civil and military, all over the United States, as would amount to the laying open of the whole executive books. I have desired the secretary of war to examine his official communications, and on a view of these we may be able to judge what can and ought to be done towards a compliance with the request. If the defendant allege that there was any particular order which, as a cause, produced any particular act on his part, then he must know what this order was, can specify it, and a prompt answer can be given. If the object had been specified, we might then have had some guide for our conjectures, as to what part of the executive records might be useful to him. But with a perfect willingness to do what is right, we are without the indications which may enable us to do it. If the researches of the secretary at war should produce anything proper for communication. and pertinent to any point we can conceive in the defence before the court, it shall be forwarded to you. I salute you with esteem and respect

"Thomas Jefferson.

"George Hay, Esq."

Some conversation ensued about the specification of the papers wanted from the executive.

Mr. Hay stated that in his communication to the president, to which this letter was a reply, he had mentioned these papers in the terms by which he thought the opposite counsel would probably have described them. The president. however did not deem this description sufficient.

Colonel Burr's counsel then stated that they had sent an express to Washington for these papers. with a subpoena to the president, and that it would appear on the return whether they could obtain them or not.

Here a desultory conversation ensued, in

which Mr. Hay insisted that Dr. Bollman was a pardoned man, and ought to communicate all he knew to the grand jury, which was denied by the other side; when Dr. Bollman, addressing himself to the court, said: I have answered every question that was put to me by the grand jury.

The CHIEF JUSTICE inquired if there was any objection to asking Dr. Bollman if he could decipher the letter.

Mr. Martin said it would be time enough to discuss that question after the letter shall have been before the grand jury.

Mr. MacRae.—I wish the question now put. I asked Willie whether he understood that part of the letter which is in cipher; he could not be criminal if he did not understand it. I wish the part which is written in German now to be explained, to show that there is nothing criminal in it. I wish Bollman to translate that part

The CHIEF JUSTICE said he would prefer to proceed with the other point; how far a witness may refuse to answer a question which he thinks would criminate himself.

Mr. Botts then addressed the court at some length on that point. In the course of his remarks he intimated that the letter in question had been obtained by the robbery of the post office, and referred to the mark "25" on its back, (which he said was the only post mark of many of the country post offices,) as evidence that it had been taken from the post office.

Mr. Williams, counsel for Mr. Willie, followed Mr. Botts in support of the position that the witness was not bound to answer any question, the answer to which he believed would tend to criminate himself.

Messrs. MacRae and Hay replied at some length, after which the court adjourned.

Wednesday, June 17, 1807.

At the meeting of the court Mr. Hay referred to the insinuations that had been thrown out yesterday, that the ciphered letter in question had been taken improperly if not feloniously from the post office; and said this was evidently done to affect the character of Gen. Wilkinson. He read a note which he had just received from Gen. Wilkinson, stating that the letter was delivered to him by Charles Patton, of the house of "Meeker, Williamson & Patton," New Orleans.

Mr. Martin then addressed the court on the question of the right of Mr. Willie to decline answering the questions propounded to him by the counsel for the prosecution. He contended that "a witness is not compelled to answer when it tends to criminate him, nor where it does not relate to the issue," and cited authorities in support of the proposition.

Mr. Wickham followed in an argument on the same side.

After some further desultory conversation, the CHIEF JUSTICE asked whether there were any other questions before the court.

Mr. MacRae requested a decision on Dr. Bollman's case, as he wished to interrogate him about the ciphered letter.

Mr. Williams said he was ready to discuss the question.

Mr. Burr.—There will arise some very important questions, affecting the very source of the jurisdiction of this country. I have several affidavits to produce to show that improper means have been used to procure witnesses, and thereby contaminate the public justice. When these proofs have been duly exhibited, it will be the province of the court to decide whether they will not arrest the progress of such improper conduct, and prevent the introduction of such evidence.

Mr. Botts rose to apprise the opposite counsel that there were three or four questions of importance which the counsel for Mr. Burr should bring forward as soon as possible. Two or three days ago he had commented on the plunder of the post office, and he assured the counsel for the prosecution that he should probe that subject to the bottom, as no man could be more anxious than himself that the stigma which this transaction attaches to the inferior or superior officers of the government should be wiped off.

CHIEF JUSTICE.—Unless these allegations affected some testimony that was about to be delivered, how can you introduce this subject?

Mr. Burr.—The court has very properly demanded some proof of the relevancy of our proposition. Sir, we are ready to prove the violation of the post office. We are ready to fasten it on individuals now here, and we are ready to name the post offices if the court require it, which have been thus plundered. When it comes out that evidence has been thus improperly obtained, we shall say, sir, that it is contaminated by fraud. I will name three persons who have been guilty of improper conduct, in improperly obtaining letters from the post office to be evidence against me. These are Judge Toulmin, of the Mississippi territory, John G. Jackson, a member of congress, and General Wilkinson. Two of these persons are within the reach of this court. As well as the improper manner in which they have procured affidavits and witnesses against me. I mention these circumstances for two reasons: first, that the facts may be proved to the satisfaction of the court; and second, that the court may lay their hands on testimony thus procured.

Mr. Botts.—The circumstance of the post mark proves that the post office was robbed of that letter; therefore it is not evidence.

The CHIEF JUSTICE said, let the consequences be as they may, this court cannot take cognizance of any act which has not been committed within this district. That mark is not necessarily a post mark. The court can only know the fact, in a case to which it applies, except to commit and send for trial.

Mr. Hay.—Let some specific motion be

made, and the evidence procured; and if there have been any crime committed, let the offenders be prosecuted according to law. These gentlemen know the course, and I most solemnly promise to discharge the duties of my office, whether they bear against General Wilkinson, or the man at the bar. If the crime have been committed, it is not the province of the court to notice it till after an indictment has been found.

Mr. Botts.—We only wish to prove and prevent a repetition and continuance of this improper mode of proceeding. The proof will affect General Wilkinson.

CHIEF JUSTICE.—If it did affect General Wilkinson it could not prevent him from being a witness.

Some desultory conversation here ensued, when Mr. Burr observed that he was afraid he was not sufficiently understood, from mingling two distinct propositions together. As to the subject of the post offices, it might rest for the present; but as to the improper means employed in obtaining testimony, they were at this moment in actual operation. Some witnesses had been brought here by this practice, and it was one which ought immediately to be checked; he did not particularly level his observations against General Wilkinson. He did not say that the attorney for the United States ought to indict, or that such a crime, if committed out of this district, was cognizable by the court, unless it be going on while the court is in session, or the cause depending; in those cases improper practices relative to crimes committed out of the limits of this court may be examined, and the persons committing them attached. Such practices have been since I have been recognized here, and they ought to be punished by attachment.

Mr. Wirt.—I do not yet understand the gentlemen. What is the object of their motion?

Mr. Botts.—We shall hereafter make it; we have no other object by the present annunciation than to give gentlemen a timely notice of our intentions.

Mr. Burr.—We have sufficient evidence on which to found our motion.

What motion? demanded Mr. Hay.

Mr. Burr.—I thought, sir, I had sufficiently explained my intentions. I may either move for a rule to show cause why an attachment should not issue against Judge Toulmin, John G. Jackson, and General Wilkinson, or what is sometimes, though not so frequently practiced, I may directly move for an attachment itself.

Mr. MacRae.—At whose instance?

Mr. Burr.—At the public's.

Mr. MacRae.—A pretty proceeding, indeed! that the public prosecution should thus be taken out of the hands of the public prosecutor, and that the accused should supersede the attorney for the United States!

Mr. Burr.—A strange remark indeed! As if it were not the business of the injured person himself to institute the complaint.

Mr. Hay.—I wish for further explanation.

Let the specific charge on which their motion is founded be clearly pointed out and reduced to writing.

Mr. Burr.—The motion will be for an attachment for the irregular examination of witnesses, practicing on their fears, forcing them to come to this place, and transporting them from New Orleans to Norfolk.

At this moment Mr. Randolph entered the court, and observed that if he had been present he would have himself opened this motion, which was intended to operate immediately upon General Wilkinson, and ultimately upon some other persons. Mr. Randolph here read the motion which he would have submitted to the court.

Mr. Hay protested against this proceeding, which, he said, was calculated to interrupt the course of the prosecution, and was levelled at General Wilkinson alone.

After some further remarks from Mr. Hay and from Messrs. Randolph and Martin—Mr. Hay said he should move to postpone the motion of the gentlemen till the prosecution was over, because it would necessarily interrupt the business before the court, because it was intended to impeach the credit of a witness, and because this inquiry could as well be conducted after as before the prosecution.

Mr. Wickham replied to Mr. Hay. He said, among other things, that General Wilkinson had brought witnesses with him from New Orleans by military force. He had taken their depositions entirely ex parte at the point of the bayonet, for the purpose of keeping their testimony straight. He would lay down the broad proposition that the man who goes about collecting affidavits upon affidavits in relation to a matter to be investigated in this court corrupts the fountains of justice. We have already seen a volume of such at this bar. He particularly referred to Mr. Jackson, who comes here with the depositions of witnesses who are thus bound hand and foot, thus tongue-tied, because their depositions had been taken. He had seen them in this very court examining witnesses with affidavits in their hands, and comparing the one with the other; depositions taken not by commissions, but ex parte. When an interested agent thus goes about collecting depositions, and with ignorant men shaping them just as he pleases, he acts contrary to law and to the spirit and genius of our government; and such acts are a contempt of this court, if done during the prosecution, by interfering with the purposes of justice. Such men are liable to attachment from the very moment that the government took possession of Colonel Burr's person; not from the moment of first arrest, but from the time when they ordered Perkins to conduct his prisoner from Fredericksburg to Richmond. It was necessary to institute this proceeding now to prevent the repetition of such practices during the progress of the trial. At the conclusion of Mr. Wickham's remarks

The CHIEF JUSTICE said that the pend-

ency of the prosecution was no objection to hearing the motion, but it was another question whether there were any grounds for it or not, and that the court would not say that a motion relating to the justice of the case ought not to be heard.

The court then adjourned.

[Thursday, June 18, 1807. As soon as the court met, the CHIEF JUSTICE delivered an opinion in the case of Willie. This will be found. reported as Case No. 14,692e. After the delivery of such opinion]

Mr. Williams (counsel for Mr. Willie) stated that he had misunderstood him the other day in court, and in a subsequent conversation had obtained more accurate information. He does understand a part of that letter.

Mr. Hay requested that Mr. Willie should be called into court. When he appeared Mr. Hay interrogated him. Do you understand the contents of that letter? Answer. No. Mr. Willie afterwards said that he understood the part of the letter which is written in Dutch.

Mr. Hay.—Was this letter written by the hand or the direction of Aaron Burr?

Mr. Wickham objected to the question.

The CHIEF JUSTICE.—The witness and his counsel will consult.

Mr. Hay repeated the question. Mr. Willie. Yes. Mr. Hay. Which? by his hand or his direction? Mr. Willie. By his direction. It was copied from a paper written by himself.

Mr. Hay.—I wish this paper to be carried to the grand jury. I presume there can be no objection.

Mr. Botts.—No objection! We call upon you to show the materiality of that letter.

Mr. Hay.—I deny the necessity of any such thing. Until this letter be deciphered it will be perfectly unintelligible to me and to the grand jury. It is no more than a blank piece of paper.

Mr. Wickham.—I had always understood before that the testimony which is laid before a grand jury must not only be legal in itself, but proved to be material.

Mr. Williams begged leave to interrupt the gentleman. Mr. Willie is anxious to be particularly understood. He says that this ciphered letter was first written by Colonel Burr, and afterwards copied. But it is the cipher only which has been copied from Colonel Burr's original.

Mr. Hay.—It is quite sufficient. sir. If Colonel Burr wrote the ciphered part, he will be considered the author of the whole.

Mr. Wickham.—The gentleman has stated a curious proposition indeed! I had always understood before that the whole included the part; but it seems now that the part is to comprehend the whole.

After some further discussion, in which several of the counsel participated,

The CHIEF JUSTICE said he had in some measure anticipated this question, and had reflected upon it; his opinion was, that a paper to go before the grand or petit jury must be relevant to the case, even if its materiality were not proved. Why send this paper before the grand jury, if it cannot be deciphered? If it can be deciphered before the grand jury, why not before the court? Let it, then, be deciphered, and its relevancy may at once be established.

Mr. Hay then requested Dr. Bollman to be called, that he might be interrogated as to its contents; but before he appeared, Mr. John Randolph entered at the head of the grand jury, and addressed the court as follows: May it please the court: One of the witnesses under examination before the grand jury has answered certain questions touching a letter in ciphers. The grand jury understand that this letter is in the possession of the court, or of the counsel for the prosecution. They have thought proper to appear before you, to know whether the letter referred to by the witness be in the possession of the court?

The CHIEF JUSTICE then remarked that as the letter was wanted by the grand jury, a witness having referred to it, that was sufficient to establish its relevancy, and directed it to be delivered to them.

Mr. MacRae hoped that before the grand jury retired they would be informed that a witness had proved that this letter was originally written by Aaron Burr.

Mr. Wickham hoped that they would also be informed that the superscription on that letter has not been proved to have been written by Colonel Burr. The witness did not and would not say that he knew the superscription to have been written by him. The grand jury retired and the court adjourned.

Friday, June 19, 1807.

As soon as the court met, Mr. Burr addressed them. He stated that the express that he had sent on to Washington with the subpoena duces tecum had returned to this city on Wednesday last, but had received no other than a verbal reply from the president of the United States that the papers. wanted would not be sent by him, from which I have inferred, said Mr. Burr, that he intends to send them in some other way. I did not mention this circumstance yesterday to the court, under an expectation that the last night's mail might give us further intelligence on the subject. I now rise to give notice that unless I receive a satisfactory intimation on this subject before the meeting of the court, I shall to-morrow move the court to enforce its process.

[Motion was then made for an attachment against General Wilkinson "for a contempt in obstructing the administration of the justice of this court," the argument on which occupied the balance of the day. Case No. 14,692f.]

Saturday, June 20, 1807.

The court met according to adjournment. Present, the same judges as yesterday.

Mr. Randolph rose to proceed with his motion, when he was interrupted by Mr. Hay, who spoke to this effect:

I have a communication to make to the court, and to the counsel of the accused. The court will recollect the answer which I received from the president, to my letter respecting certain papers. He stated in that letter that General Wilkinson's letter of the 21st October had been delivered to Mr. Rodney, the attorney general, from whom he would endeavor to obtain it. By the last mail I have received this letter from the president on the same subject.

"Washington, June 17, 1807.

"Sir: In answering your letter of the 9th, which desired a communication of one to me from General Wilkinson, specified by its date. I informed you in mine of the 12th that I had delivered it, with all other papers respecting the charges against Aaron Burr, to the attorney general when he went to Richmond; that I had supposed he had left them in your possession, but would immediately write to him, if he had not, to forward that particular letter without delay. I wrote to him accordingly on the same day, but having no answer I know not whether he has forwarded the letter. I stated in the same letter that I had desired the secretary of war to examine his office in order to comply with your further request to furnish copies of the orders which had been given respecting Aaron Burr and his property; and, in a subsequent letter of the same day, I forwarded you copies of two letters from the secretary at war, which appeared to be within the description expressed in your letter. The order from the secretary of the navy you said you were in possession of. The receipt of these papers has, I presume, so far anticipated, and others this day forwarded, will have substantially fulfilled the object of a subpœna from the district court of Richmond, requiring that those officers and myself should attend the court in Richmond, with the letter of General Wilkinson, the answer to that letter, and the orders of the department of war and the navy therein generally described. No answer to General Wilkinson's letter, other than a mere acknowledgement of its receipt in a letter written for a different purpose, was ever written by myself or any other. To these communications of papers I will add, that if the defendant suppose there are any facts within the knowledge of the heads of departments or of myself, which can be useful for his defence, from a desire of doing anything our situation will permit in furtherance of justice, we shall be ready to give him the benefit of it, by way of deposition through any persons whom the court shall authorize to take our testimony at this place. I know indeed that this cannot be done but by consent of parties, and I therefore authorize you to give consent on the part of the United States. Mr. Burr's consent will be given of course, if he suppose the testimony useful.

"As to our personal attendance at Richmond, I am persuaded the court is sensible that paramount duties to the nation at large control the obligation of compliance with its summons in this case, as it would should we receive a similar one to attend the trials of Blennerhassett and others in the Mississippi territory, those instituted at St. Louis and other places on the western waters, or at any place other than the seat of government. To comply with such calls would leave the nation without an executive branch, whose agency nevertheless is understood to be so constantly necessary that it is the sole branch which the constitution requires to be always in function. It could not, then, intend that it should be withdrawn from its station by any co-ordinate authority.

"With respect to papers, there is certainly a public and private side to our offices. To the former belong grants of land, patents for inventions, certain commissions, proclamations, and other papers patent in their nature. To the other belong mere executive proceedings. All nations have found it necessary that, for the advantageous conduct of their affairs, some of these proceedings, at least, should remain known to their executive functionary only. He, of course, from the nature of the case, must be the sole judge of which of them the public interest will permit publication. Hence, under our constitution, in requests of papers from the legislative to the executive branch, an exception is carefully expressed, 'as to those which he may deem the public welfare may require not to be disclosed,' as you will see in the inclosed resolution of the house of representatives, which produced the message of January 22d, respecting this case. The respect mutually due between the constituted authorities in their official intercourse, as well as sincere dispositions to do for every one what is just, will always insure from the executive, in exercising the duty of discrimination confided to him, the same candor and integrity to which the nation has, in like manner, trusted in the disposal of its judiciary authorities. Considering you as the organ for communicating these sentiments to the court, I address them to you for that purpose, and salute you with esteem and respect. Thos. Jefferson."

Accompanying this letter is a copy of the resolution of the house of representatives containing the exception to which the president refers. I have also received a letter from Mr. Smith, the secretary of the navy, containing an authentic copy of the order which was wanted, precisely corresponding with the unauthenticated copy in my possession.

Mr. Wickham.—I presume that these must be considered and noted as the return to the "subpœna duces tecum."

Mr. Hay.—So far as they go. When we receive General Wilkinson's, the return will be complete. I have also received a letter

from the secretary of war, which contains all the orders of his department relative to Aaron Burr. All which papers I shall deposit with the clerk of this court.

The following is the order of the navy department:

"I certify that the annexed is a true copy from the records in the office of the department of the navy of the United States of the letter from the secretary of the navy to Captain John Shaw, dated 20th December, 1806. In faith whereof, I, Robert Smith, secretary of the navy of the United States of America, have signed these presents, and caused the seal of my office to be affixed hereto, at the city of Washington, this 17th day of June, Anno Domini 1807, and in the 31st year of the independence of the said states.

"(Registered,)                    Rt. Smith,"
                              "Secretary of the Navy.

"Ch. W. Goldsborough,
"Ch. Clk., N. D."
                                    "(Copy.)

"Navy Department, 20th December, 1806.

"Sir: A military expedition formed on the western waters by Colonel Burr will soon proceed down the Mississippi, and by the time you receive this letter will probably be near New Orleans. You will, by all the means in your power, aid the army and militia in suppressing this enterprise. You will, with your boats, take the best position to intercept and to take, and, if necessary, to destroy, the boats descending under the command of Colonel Burr, or of any person holding an appointment under him. There is great reliance on your vigilance and exertions. I have the honor to be, sir, your most obedient,

"(Signed)                          Rt. Smith.

"Captain John Shaw, or the Commanding Naval Officer at New Orleans."

[Thereupon the motion for attachment was brought on and argued. The argument and opinion will be found reported as Case No. 14,692f.]

On Wednesday, the 24th of June, while Mr. Botts was speaking on the motion for an attachment, the grand jury entered, when Mr. John Randolph, their foreman, addressed the court, and stated that they had agreed upon several indictments, which he handed in at the clerk's table. The clerk then read the endorsements upon them as follows: "An indictment against Aaron Burr for treason. A true bill." "An indictment against Aaron Burr for a misdemeanor. A true bill." "An indictment against Herman Blannerhasset [4] for treason. A true bill." "An indictment against Herman Blannerhassett for a misdemeanor. A true bill." The foreman then stated that the grand jury had still other subjects for their consideration, and had adjourned themselves to meet to-morrow at ten o'clock.

[4] So in the indictment. The correct spelling is "Harman Blennerhassett."

After Mr. Botts had concluded his argument, Mr. Burr addressed the court, and observed that as bills had been found against him, it was probable the public prosecutors would move his commitment. He would, however, suggest two ideas for the consideration of the court: the one was, that it is within their discretion to bail in certain cases, even when the punishment was death; and the other was, that it was expedient for the court to exercise their discretion in this instance, as he should prove that the indictment against him had been obtained by perjury.

Mr. Hay moved for the commitment of Aaron Burr. He stated that if the court had power to bail by the 33d section of the judicial act, it was only to be exercised according to their sound discretion, and that the prisoner was not to demand bail as a matter of right.

Mr. Martin said the counsel for the prosecution had admitted the right of the court to give bail according to its discretion.

Mr. MacRae did not understand from the judicial act that the discretion was to be exercised at this stage of the business, but only at the time of making the arrest.

After some further remarks by Messrs. Martin, Wirt, and Wickham, the CHIEF JUSTICE said: Mr. Martin, have you any precedents where a court has bailed for treason, after the finding of a grand jury, on either of these grounds; that the testimony laid before the grand jury had been impeached for perjury, or that other testimony had been laid before the court, which had not been in possession of the grand jury?

Mr. Martin said that he had not anticipated this case, and had not, therefore, prepared his authorities; but he had no doubt that such existed.

Mr. Burr said, if the court have no discretion, it is unnecessary to produce evidence. That question ought, therefore, to be previously settled.

Some further discussion ensued, as to the question whether the court had any discretion, when Mr. Burr said, that if the court thought it had the power to bail in any case after bill found, it would then be necessary to show that it ought to exercise its discretion in this instance. That the finding of the jury was founded on the testimony of a perjured witness. That General Tupper would prove that there had been no such resistance of his authority as had been stated by that witness.

After same further conversation between counsel, Mr. Burr wished to know whether the court would go into testimony extrinsic to the indictment.

The CHIEF JUSTICE said he had never known a case similar to the present when such an examination had taken place. [5]

[5] The court will in no instance inquire into the character of the testimony which has influenced the grand jury in finding an indictment. State v. Boyd, 2 Hill (S. C.) 288.

Mr. Martin would produce authorities if he had time allowed him.

The CHIEF JUSTICE insisted upon the necessity of producing adjudged cases to prove that the court could bail a party against whom an indictment had been found.

Mr. Burr did not wish to protract the session of the court to suit his own personal convenience. There was no time at present to look for authorities.

The CHIEF JUSTICE observed that he was then under the necessity of committing Colonel Burr.

Mr. Burr stated that he was willing to be committed, but hoped that the court had not forestalled its opinion.

The CHIEF JUSTICE.—I have only stated my present impression. This subject is open for argument hereafter. Mr. Burr stands committed to the custody of the marshal.

He was accordingly committed to the gaol, and the court adjourned.

On Thursday, the 25th of June, while Mr. Hay was addressing the court on the motion for an attachment against General Wilkinson, the grand jury entered, and their foreman, Mr. John Randolph, addressed the court as follows: "May it please the court: The grand jury have been informed that there is in the possession of Aaron Burr a certain letter, with the post mark of May 13th, from James Wilkinson, in ciphers, which they deem to be material to certain inquiries now pending before them. The grand jury are perfectly aware that they have no right to demand any evidence from the prisoner under prosecution which may tend to criminate himself. But the grand jury have thought proper to appear in court to ask its assistance, if it think proper to grant it, to obtain the letter with his consent."

Mr. Burr rose and asked whether the court were about to give an opinion?

The CHIEF JUSTICE stated that the court was about to say that the grand jury were perfectly right in the opinion, that no man can be forced to furnish evidence against himself; he presumed that the grand jury wished also to know whether the person under prosecution could be examined on other questions not criminating himself?

Mr. Burr declared that it would be impossible for him, under certain circumstances, to expose any letter which had been communicated to him confidentially; how far the extremity of circumstances might compel him to such a conduct, he was not prepared to decide; but it was impossible for him even to deliberate on the proposition to deliver up anything which had been confided to his honor, unless it were extorted from him by law.

Mr. Randolph.—We will withdraw to our chamber, and when the court has decided upon the question it will announce it to the grand jury.

The CHIEF JUSTICE knew not that there was any objection to the grand jury calling before them and examining any man as a witness who laid under an indictment.

Mr. Martin said there could be no objection.

Mr. Randolph said he was afraid that the object of the grand jury had been misunderstood by the court. The grand jury had not appeared before the court to apply for the person of Aaron Burr, to obtain evidence from him, but for a certain paper which might or might not be in his possession; and upon that paper being or not being in his possession, and upon its being possible or not possible to identify that paper, it might depend whether Aaron Burr himself were or were not a material evidence before them; and then the grand jury withdrew.

When Mr. Hay had concluded his argument, Mr. MacRae addressed the court. He was solicitous he said, to lay a communication before it, on a circumstance which had lately transpired. The grand jury had asked for a certain letter in ciphers, which was supposed to have been addressed by General Wilkinson to the accused. The court had understood the ground on which the accused had refused to put it in their possession, to be an apprehension lest his honor should be wounded by his thus betraying matters of confidence. I have seen General Wilkinson, sir, since this declaration was made. I have informed him of the communication which has thus been made, and the general has expressed his wishes to me, and requested me to express those wishes, that the whole of the correspondence between Aaron Burr and himself may be exhibited before the court. The accused has now, therefore, a fair opportunity of producing this letter; he is absolved from all possible imputation; his honor is perfectly safe.

Mr. Burr.—The court will probably expect from me some reply. The communication which I made to the court, has led, it seems, to the present invitation. I have only to say, sir, that this letter will not be produced. The letter is not at this time in my possession, and General Wilkinson knows it.

Mr. MacRae hoped that notice of his communication would be sent to the grand jury.

Mr. Martin hoped that Colonel Burr's communication also would go along with it.

The CHIEF JUSTICE was unwilling to make the court the medium of such communications.

Mr. MacRae hoped the court would notify his communication to the grand jury, and for an obvious reason. When the grand jury came into court to ask for the paper, what did the accused say? Did he declare that it was not in his possession? No: he merely said that honor forbade him to disclose it. The inference undoubtedly was, that he had the paper, but could not persuade himself to disclose it. And what then must have been the impression of the grand

jury? A cloud of suspicions must have fastened itself upon their minds; suspicions unjustly injurious to the character of General Wilkinson and which the present communication may at once disperse. It is but justice, therefore, to General Wilkinson, to whom the inquiries of the grand jury may at present relate, to give them the benefit of this information.

Mr. Burr.—General Wilkinson, sir, is extremely welcome to all the eclat which he may expect to derive from this challenge; but as it is a challenge from him, it is a sufficient reason why I should not accept it. But as the remarks of the last gentleman seem to convey some reproach against me, (which no man who knows me can believe me to deserve) it may be proper to say, that I did voluntarily, and in the presence of a witness, put the letter out of my hands, with the express view that it should not be used improperly against any one. I wished, sir, to disable any person, even myself, from laying it before the grand jury. General Wilkinson knows this fact.

The CHIEF JUSTICE then reduced these communications to writing, and transmitted them to the grand jury.

Mr. Burr.—Let it be understood, that I did not put this letter out of my possession because I expected the grand jury would take up this subject but from a supposition that they might do so.

Mr. Wickham, about to speak, was interrupted by the entrance of the grand jury when Mr. Randolph, their foreman, informed the court that they had agreed upon some presentments, which he then delivered into the hands of the clerk. The clerk then read as follows:

"The grand inquest of the United States, for the district of Virginia, upon their oaths, present, that Jonathan Dayton, late a senator in the congress of the United States, from the state of New Jersey; John Smith, a senator in the congress of the United States, from the state of Ohio; Comfort Tyler, late of the state of New York; Israel Smith, late of the state of New York; and Davis Floyd, late of the territory of Indiana, are guilty of treason against the United States, in levying war against the same, to wit: at Blennerhassett's Island, in the county of Wood, and state of Virginia, on the 13th day of December, 1806."

Friday, June 26, 1807.

The court met about nine o'clock, and, about ten o'clock, the grand jury entered, and Mr. Randolph, their foreman, presented ten indictments, found true bills; that is, one indictment for treason, and another for a misdemeanor, against each of the following individuals, viz.: Jonathan Dayton, John Smith, Comfort Tyler, Israel Smith, and Davis Floyd.

The CHIEF JUSTICE then made a short address to the grand jury, in which he complimented them upon the great patience and cheerful attention with which they had performed the arduous and laborious duties in which they had been so long engaged, and concluded, by discharging them from all further attendance.

The court then adjourned till twelve o'clock. As soon as it met again, Mr. Botts requested the court to remove Mr. Burr from the public gaol, to some comfortable and convenient place of confinement. He depicted, in very strong terms, the miserable state of the prison where he was then confined. The grounds of this motion are to be found in the following affidavit made by some of Mr. Burr's counsel, and laid before the court:

"We, who are counsel in the defence of Colonel Burr, at the suit of the United States, beg leave to represent to the court, that in pursuance of our duty to him, we have visited him in his confinement in the city gaol: that we could not avoid remarking the danger, which will most probably result to his health, from the situation, inconveniences and circumstances attending the place of his confinement; but we cannot forbear to declare our conviction, that we ourselves cannot freely and fully perform what we have undertaken for his defence, if he remain in the gaol aforesaid, deprived, as he is, of a room to himself, it being scarcely possible for us to consult with him upon the various necessary occasions which must occur, from all which we believe that he will be deprived of that assistance from counsel, which is given to him by the constitution of the United States, unless he be removed.                    Edmund Randolph.
                    "John Wickham.
                    "Benjamin Botts.

"Sworn to in open court, by Edmund Randolph, John Wickham, and Benjamin Botts, Esquires.   June 25th, 1807.

                    "William Marshall, Clerk."

The counsel for the prosecution were perfectly silent on the motion. After a long and desultory argument by Mr. Burr's counsel, the court determined that the prisoner should be removed to his former lodgings near the capitol, provided they could be made sufficiently strong for his safe keeping, being of opinion that the act of congress authorized it, on the foregoing affidavit, to make the order of removal.

Mr. Latrobe, surveyor of the public buildings of the United States, was requested to inspect them: and upon his report the court passed the following order: "Whereupon, it is ordered, that the marshal of this district do cause the front room of the house now occupied by Luther Martin, Esq., which room has been and is used as a dining room, to be prepared for the reception and safe keeping of Colonel Aaron Burr, by securing the shutters to the windows of the said room by bars, and the door by a strong bar or padlock. And that he employ a guard of seven men to be placed on the floor of the adjoining unfinished house, and on the same story with the before described front room, and also at the door

opening into the said front room; and upon the marshal's reporting to the court that the said room has been so fitted up and the guard employed, that then the said marshal be directed, and he is hereby directed, to remove to the said room, the body of the said Aaron Burr from the public gaol, there to be by him safely kept."

Mr. Hay.—My only wish is, that this prosecution should be regularly conducted. Is it not the usual practice to read the indictment first and then move for the venire?

Mr. Burr.—I have been furnished with a copy of the indictment; I have perused it and I am ready to plead not guilty to it.

Mr. Wirt.—The usual form requires the actual arraignment of the prisoner; however, the court may dispense with it, if it think proper.

Mr. Hay was indifferent about the form, if the law could be substantially executed. He supposed that a simple acknowledgment of the prisoner was sufficient, without the customary form of holding up his hand.

CHIEF JUSTICE.—It is enough, if he appear to the indictment, and plead not guilty.

The clerk then read the indictment against Aaron Burr, for treason against the United States; which specifies the place of the overt act, to be at Blennerhassett's Island; and the time, the 10th day of December, 1806.

When he had concluded, Mr. Burr addressed the court: I acknowledge myself to be the person named in the indictment. I plead not guilty; and put myself upon my country for trial.

Mr. Hay then addressed the court on the venire that was to try the issue between the prisoner and the United States. He expressed some doubt whether the 29th section of the act of congress called the judicial act [1 Stat. 88], was still in force, which required twelve jurors, at least, to be summoned from the county where the offence was committed. If this law was still in force, it would be necessary to summon twelve petit jurors from the county of Wood, which would render it impossible to have the trial at an early day.

The CHIEF JUSTICE said he had no doubt the law was still in force.

Mr. Burr said as this law was most probably intended for the benefit of the accused, he consented to waive the right.

Mr. Wirt suggested a doubt whether consent in such a case could take away error.

The CHIEF JUSTICE believed that the provision was not absolutely obligatory, if both parties would waive the right.

Mr. Hay said he felt no disposition to delay the trial; but he could not think of pledging himself to such a measure without due deliberation. He would consult the gentlemen associated with him, and inform the court of the result.

The counsel for the prosecution then retired to consult. On their return, Mr. Hay informed the court that they could not assume the responsibility of consenting to such a proposition, as the law seemed imperative. He must therefore request the court to direct a venire of twelve men, at least, to be summoned from Wood county.

A long conversation ensued as to the time that would be necessary to summon the venire from Wood county, as it would be necessary to postpone the trial accordingly; opinions varying from twenty to thirty-five days. The court made an order for a venire of forty-eight jurors, twelve of whom, at least, were to be summoned from Wood county. Without fixing the time for the trial, the court adjourned.

On Saturday, the 27th of June, an order was made postponing the trial to the third day of August, and for the return of the venire on that day.

### Monday, June 29, 1807.

Mr. Hay laid the following order of the executive council before the court:

"In Council, June 29, 1807. The board being informed that an affidavit has been filed in the circuit court of the United States, for the Virginia district, which states that the gaol for the county of Henrico and city of Richmond is inconvenient and unhealthy, and so crowded with state offenders and debtors that there are no private apartments therein for the reception of persons charged with offences against the laws of the United States, it is therefore advised that the governor be requested to tender the said court, (through the federal attorney of the district of Virginia,) apartments in the third story of the public gaol and penitentiary house for the reception of such persons as shall be directed under the authority of the United States to be confined therein.

"Extract from the minutes.

"Daniel L. Hylton, Clerk of the Council."

The following was the order of the court on this subject: "Which tender the court doth accept for the purpose above mentioned."

The final decision of the motion to commit Aaron Burr to the penitentiary was postponed until to-morrow.

### Tuesday, June 30, 1807.

After the court met the motion to commit Aaron Burr to the penitentiary was renewed. It was objected to by his counsel, on the ground (and an affidavit was made by them to the same effect) that in so important a case it was essentially necessary for the most uninterrupted intercourse to subsist between the prisoner and his counsel; but that the distance of the penitentiary, combined with their own professional avocations, would necessarily narrow and interrupt this intercourse. It was also said that, by particular regulations of the penitentiary, the custody of the prisoner would be transferred from the marshal to the superintendent, and that the communications of the prisoner with his counsel would be limited to the very same short period which was allowed to the other visitants: that is, from eleven to one o'clock.

The attorney for the United States replied to these objections.

The CHIEF JUSTICE said when there was a public gaol not unreasonable distant or unfit for the reception of the prisoner, and when the court was called upon on the part of the United States to commit a prisoner to its keeping, that he conceived himself bound to comply with the requisition; that when he had given the order for his removal from the gaol to his own lodgings, it was under an expectation that the trial would be prosecuted immediately, and that the intercourse between the prisoner and his counsel would be necessarily incessant; but as a postponement had taken place, such an intercourse would not be absolutely necessary; under such circumstances, therefore, he should direct the removal of the prisoner to the penitentiary, if he were still to continue in the possession of the marshal, and if his counsel were to have free and uninterrupted access to him.

Some difficulty having thus occurred on these points, the executive council was immediately convened. In a short time the following letter was submitted to the court:

"Council Chamber, June 30, 1807.

"Sir: In pursuance of an advice of the council of state, I beg leave, through you, to inform the circuit court of the United States, now sitting, that any persons who may be confined in the gaol and penitentiary house, on the part of the United States, will be considered as in the custody, and under the sole control of the marshal of the district; that he will have authority to admit any person or persons to visit the confined that he may think proper, and that he will be authorized to select for the purposes aforesaid, any apartment in the penitentiary now unoccupied, that he may deem most conducive to safety, health, and convenience. I am, with great respect, sir, your obedient servant,

"Wm. H. Cabell.
"George Hay, Esq."

The court then made the following order: "In consequence of the offer made by the executive of apartments in the third story of penitentiary and state prison, for persons who may be confined therein, under the authority of the United States, and of the foregoing letter from the governor of this commonwealth, it is ordered, on the motion of the attorney for the United States, that so soon as the apartments in the third story of the public gaol and penitentiary shall be fit for the reception and safe keeping of Aaron Burr, that he be removed thereto, and safely kept therein by the marshal, until the second day of August next, when he shall be brought back to the prison where he is now placed, there to be guarded in like manner as at present, until the further order of the court."

Monday, August 3, 1807.

On this day the circuit court of the United States for the Fifth circuit and district of Virginia, was held according to adjournment. Present: the CHIEF JUSTICE of the United States; George Hay, William Wirt, and Alexander MacRae, Esquires, counsel for the prosecution.

The prisoner was brought into court from his apartment, near the Swan Tavern, to which he had been removed on Saturday.

Edmund Randolph, John Wickham, Benjamin Botts, John Baker, and Luther Martin, Esquires, appeared as his counsel.

The court assembled at twelve o'clock. An immense concourse of citizens attended to witness the proceedings of this important trial.

Mr. Hay observed that he could take no steps in this business until he had ascertained whether the witnesses summoned on the part of the United States were present; he therefore requested that their names might be called over; they were more than one hundred in number. Their names were accordingly called.

Mr. Hay begged leave to mention that he had nothing more to submit to the court this day. There were many of the witnesses of whose places of residence he was ignorant; several had not appeared; many had been merely pointed out to him by the attorney general of the United States. He observed that, therefore, he had not yet been able to furnish Colonel Burr with a list of the witnesses, and a statement of the places of their residence, as the law requires; that, as many of those who had been summoned and recognized had failed to appear, he was not ready to proceed with the trial immediately. He also informed the court that a list of the venire had been delivered on Saturday to Colonel Burr, but had since been discovered to be inaccurate. It became, therefore, necessary (an act of congress having directed this to be done at least three days before the trial) to deliver a correct list on this day; and, of course, the trial would be postponed until the requisite time should have elapsed.

The CHIEF JUSTICE inquired, then, to what day it would be proper to adjourn the court.

Mr. Hay could not possibly state by what day he should be able to prepare his lists.

Mr. Burr observed that it was not probable that he should avail himself of any privileges to which he might be entitled from any delay in furnishing him with the list of jurors, or of any incorrectness in the list; and therefore the court might adjourn to any day which was convenient to the attorney for the United States. If the day of adjournment depended on his own consent, he should not object to any adjournment, provided it did not extend further than Wednesday.

Mr. Hay had no objection to that day.

At the instance of Mr. Hay the names of the jurors were called, when forty-six answered to their names, two only being absent.

Mr. Burr reminded the court of the motion which he had made, on a former occasion, for a subpoena duces tecum, addressed to the president of the United States. That mo-

tion had been partly complied with. He wished to know of the court whether it were not a matter of right for him to obtain a subpœna duces tecum. If it were not, he should then lay a specific motion before the court.

The CHIEF JUSTICE did not believe it to be the practice in Virginia to obtain such a subpœna upon a mere application to the clerk. The motion must be brought before the court itself.

Mr. Hay said that he would say nothing on this subject until he understood the object of the application: that if it were to obtain the letter which was not formerly furnished, he would inform the opposite counsel that he had it now among his papers, and was ready to produce it.

Mr. Burr.—That is one object of the application. Another is, to obtain a certain communication from General Eaton to the president of the United States, which is mentioned in his deposition.

Mr. Hay said that he was not certain whether he had that communication, but believed that it was among his papers. If it were there, he would certainly produce it.

Mr. Burr.—But if, after a search, the gentleman finds that he has not that paper, will he consent, out of court, to issue a subpœna to the president of the United States, under the qualification I have mentioned? I wish not, at the present exigency, to derange the affairs of the government, or to demand the presence of the executive officers at this place. All that I want are certain papers.

Mr. Hay said that he could not consent to it; he would rather that a regular application should be made for it to the court.

Mr. Burr.—Then, sir, I shall move for a subpœna duces tecum, to the president of the United States, directing him to attend with certain papers. This subpœna will issue as in the former instance. I shall furnish the clerk with the necessary specification of the paper which I require.

The court was then adjourned till Wednesday, twelve o'clock.

### Wednesday, August 5, 1807.

The court met, according to adjournment. Present: JOHN MARSHALL, Chief Justice of the United States.

The names of the witnesses being called over, and many being still absent, Mr. Hay was not ready to proceed. He presumed all of the witnesses would be present in a few days.

After some conversation as to the time to which the court should adjourn, Mr. Hay proposed an arrangement as to the mode of conducting the trial, in respect to the order in which counsel should speak.

The CHIEF JUSTICE said the best mode appeared to him to be this: that the case should be opened fully by one of the gentlemen on the part of the United States; then opened fully by one of the counsel on the other side; that the evidence should be next gone through, and the whole commented upon by another of the gentlemen employed by the United States, who should be answered by the rest of the counsel for Colonel Burr; and one only of the counsel for the United States should conclude the argument.

Without coming to any arrangement, the court adjourned till Friday, twelve o'clock.

### Friday, August 7, 1807.

The court met according to adjournment. Present: JOHN MARSHALL, Chief Justice of the United States, and CYRUS GRIFFIN, Judge of the District of Virginia.

The witnesses were again called over, and several who had not been present before, appeared, and were recognized to attend until discharged by the court. The counsel for the United States, however, not being as well prepared to go into the trial as they expected to be, (many of their witnesses being still absent,) the trial was farther postponed, and the court adjourned until Monday next, at twelve o'clock.

In the course of this day, a difficulty was suggested by Major Scott, the marshal of the Virginia district, as arising out of the order of the court, by virtue of which Colonel Burr had been removed from the penitentiary house to his present lodgings. He stated that he had been informed from good authority, that the secretary of the treasury had declared that he would not allow his charge of seven dollars per day, for the guards employed for the safe-keeping of the prisoner; and, therefore, he might lose that sum, which he had hitherto been advancing out of his own pocket.

The CHIEF JUSTICE declared the firm conviction of the court, that the order, heretofore made, was legal and proper; that the payments made in pursuance thereof would be sanctioned by the court, and ought to be allowed by the secretary of the treasury. He could not believe that the secretary would finally disallow those items in the marshal's account. But, as the officer of the court ought not to be subjected to any risk in obeying its directions, and if the secretary should refuse to allow him a credit for the money paid, the court had no power to compel him to do so, and the situation of the marshal was such that he dared not enter into a controversy with the secretary; the court was disposed to rescind the order, unless some arrangement could be made by Colonel Burr and his counsel, for the indemnification of the marshal.

Colonel Burr declared that an offer had already been made on his part to indemnify the marshal, and that he was still ready and willing to give him satisfactory security that the money should be paid him, in case the secretary of the treasury should refuse to allow the credit.

Some desultory conversation ensued, but nothing positive was agreed upon; but it ap-

peared to be understood that security was to be given to Major Scott, and that Colonel Burr was to remain in his apartment near the Swan Tavern.

Monday, August 10. 1807.

The court met pursuant to adjournment.

Harman Blennerhassett was brought into court, and Mr. Hay moved that he be arraigned for treason. Mr. Botts objected, on the ground that he had not been furnished with a copy of the indictment three days previously; and he was reconducted to his prison. Four of the venire were excused on account of indisposition.. The clerk informed Mr. Burr that he was at liberty to challenge such of the venire as he might object to.

Mr. Burr begged leave to inform the jurors, who were within hearing, that a great number of them may have formed and expressed opinions about him which might disqualify them from serv'ng on this occasion. He expected that, as they came up, they would discharge the duties of conscientious men, and candidly answer the questions put to them, and state all their objections against him. The deputy marshal then summoned first, Hezekiah Bucky.

Mr. Botts.—We challenge you for cause. Have you ever formed and expressed an opinion about the guilt of Colonel Burr? Mr. Bucky. I have not, sir, since I have been subpœnæd. Question. Had you before? Answer. I had formed one before in my own mind.

Mr. Hay wished that the question of the opposite counsel could assume a more precise and definite form. If this question were proposed to this man, and to every other man of the panel, he would venture to predict that there could not be a jury selected in the state of Virginia, because he did not believe that there was a single man in the state, qualified to become a juryman, who had not, in some form or other, made up, and declared an opinion on the conduct of the prisoner. The transactions in the West had excited universal curiosity; and there was no man who had not seen and decided on the documents relative to them. Do gentlemen contend that in a case so peculiarly interesting to all, the mere declaration of an opinion is sufficient to disqualify a juryman? A doctrine of this sort would at once acquit the prisoner; for where is the jury that could try him? Such a doctrine amounts to this: that a man need only to do enough to draw down the public attention upon him, and he would immediately effect his discharge. Mr. Hay concluded with a hope that the question would assume a more definite form; he should not pretend to decide the form in which it should be proposed, for that was the province of the court; it was a privilege to which every court is entitled, and one which the court had exercised in the case of James T. Callender.

Mr. Botts considered it as a misfortune ever to be deplored, that in this country, and in this case, there had been too general an expression of the public sentiment, and that this generality of opinion would disqualify many, but he had never entertained a doubt, until the gentleman for the prosecution had avowed it, that twelve men might be found in Virginia, capable of deciding this question with the strictest impartiality. He still trusted that the attorney for the United States was mistaken, that the catastrophe was not completely fixed, and that every man in the state had not pledged himself to convict Colonel Burr whether right or wrong. He was not present at the trial of James T. Callender; but all America had heard the question which was then propounded to the juryman, and that was, whether he had made up and expressed an opinion respecting the guilt of the prisoner.

Mr. Hay said that he would put Mr. Botts right as to matter of fact. The court would recollect that on the trial of Callender, the question was, not whether the juryman had formed and expressed an opinion on that case generally, but on the subject-matter that was to be tried, and contained in the indictment. The question then in the present case should be, have you formed and expressed an opinion on the point at issue: that is, whether Aaron Burr be guilty of treason? On the trial of Callender, the court would particularly recollect that Mr. John Bassett having objected to himself, because he had read the libellous publication, was actually overruled, because it was not on the book itself, but on the subject-matter of the indictment, that he was called upon to say whether he had ever expressed an opinion?

Mr. Burr declared that there was a material distinction between that and the present case. Mr. Bassett's acknowledging that he had seen the book did not disqualify him from serving on the jury; in the same manner the person who had seen a murder committed would not be an incompetent juror in the prosecution for that crime. But if a man pretended to decide upon the guilt of a prisoner, upon mere rumor, he would manifest such a levity and bias of mind as would effectually disqualify him. Mr. Bucky, however, has not yet come out completely with his declarations. Let him be further interrogated.

Mr. Hay observed that the question would still be too general and vague, if it were even to be "Have you expressed any opinion on the treason of Aaron Burr?" for the case stated in the indictment was infinitely more specific. It was treason in levying war against the United States at Blennerhassett's Island. Unless this particular allegation be proved, it defeats all the other parts of the accusation; and it was probably on this point that the juror had never made up any opinion.

Mr. Martin contended that it was the duty of every juryman to come to the trial of any case with the most perfect impartiality, and

more particularly one where life and reputation were at stake; that it was a libel upon Virginia, a blot upon the whole state, to assert, that twelve men could not be found to decide such a case, with no other knowledge that what they had picked up from newspapers; that there was a material distinction between this and Callender's Case [Fed. Cas. No. 14,709]; the libel was a book in every man's hand, but does any juryman in the present case pretend to know the testimony on which this charge depends? The gentleman proposes to ask the juryman whether he has made up an opinion on Colonel Burr's treason? But it is expressly probable that most of them knew not what treason is; and though they may decide upon the guilt of Colonel Burr, they may be ignorant whether it come under the name and description of treason.

The CHIEF JUSTICE observed that it might save some altercation if the court were to deliver its opinion at the present time; that it was certainly one of the clearest principles of natural justice, that a juryman should come to a trial of a man for life with a perfect freedom from previous impressions, that it was clearly the duty of the court to obtain, if possible, men free from such bias; but that if it were not possible from the very circumstances of the case—if rumors had reached and prepossessed their judgments, still the court was bound to obtain as large a portion of impartiality as possible, that this was not more a principle of natural justice, than a maxim of the common law, which we have inherited from our forefathers, that the same right was secured by the constitution of the United States, which entitles every man under a criminal prosecution, to a fair trial by "an impartial jury." Can it be said however, that any man is an impartial juryman who has declared the prisoner to be guilty and to have deserved punishment? If it be said that he has made up this opinion, but has not heard the testimony, such an excuse only makes the case worse; for if the man has decided upon insufficient testimony, it manifests a bias that completely disqualifies himself from the functions of a juryman. It is too general a question to ask, whether he has any impressions about Colonel Burr. The impressions may be so light that they do not amount to an opinion of guilt, nor do they go to the extent of believing that the prisoner deserves capital punishment. With respect to Mr. Bassett's opinion, it was true he had read "The Prospect Before Us;" and he had declared that it was a libel, but Mr. Bassett had formed no opinion about James T. Callender's being the author. It was the same principle in the present case. If a juryman were to declare that the attempt to achieve the dismemberment of the Union, was treason, it would not be a complete objection or disqualification; but it would be the application of that crime to a particular individual; it would be the fixing it on Aaron Burr that would disable him from serving in this case. Let the counsel then proceed with the inquiry.

Mr. Botts.—Have you said that Colonel Burr was guilty of treason? Mr. Bucky.—No. I only declared that the man who acted as Colonel Burr was said to have done, deserves to be hung. Question. Did you believe that Colonel Burr was that man? Answer. I did, from what I had heard.

Mr. Hay.—I understand then, that the question proposed in Callender's Case is to be overruled?

The CHIEF JUSTICE.—My Brother, Judge GRIFFIN, does not recollect whether it particularly went to the indictment or not.

GRIFFIN, District Judge.—I think the question was "relative to the matter in issue."

Mr. Hay.—The very position that I have laid down.

The CHIEF JUSTICE.—The simple question is, whether the having formed an opinion, not upon the evidence in court, but upon common rumor, renders a man incompetent to decide upon the real testimony of the case?

Mr. Wirt (addressing Mr. Bucky).—Did I understand you to say that you concluded upon certain rumors you had heard, that Colonel Burr deserved to be hung? Mr. Bucky.—I did. Question. Did you believe these rumors? Answer. I did. Question. Would you, if you were a juryman, form your opinion upon such rumors? Answer. Certainly not.

Mr. MacRae.—Did you form and express your opinion upon the question, whether an overt act of treason had been committed at Blennerhassett's Island? Answer. It was upon other rumors, and not upon that, that I had formed an opinion.

Mr. Martin submitted it to the court, whether he could be considered an impartial juryman.

THE COURT decided that he ought not to be so considered, and he was accordingly rejected.

James G. Laidly stated that he had formed and expressed some opinions unfavorable to Colonel Burr; that he could not pretend to decide upon the charges in the indictment, which he had not heard; that he had principally taken his opinions from newspaper statements; and that he had not, as far as he recollected, expressed an opinion that Colonel Burr deserved hanging; but that his impression was, that he was guilty. He was therefore set aside.

James Compton being challenged for cause and sworn, stated that he had formed and expressed an opinion from hearsay that Colonel Burr was guilty of treason, and of that particular treason of which he stood charged, as far as he understood. He was rejected.

Mr. Burr observed, that as gentlemen on the part of the prosecution had expressed a willingness to have an impartial jury, they could not refuse that any juryman should state all his objections to himself; and that he had no doubt, in spite of the contrary asser-

tions which had been made, that they could get a jury from this panel.

Hamilton Morrison, upon being called, said that he had frequently thought and declared that Colonel Burr was guilty, if the statements which he had heard were true; that he did not know whether they were so, but only thought, from the great clamor which had been made, that it might be possible that they were true; that he had not passed any positive opinion, nor was he certain that he had always qualified it by saying, "if these things were true;" that he does not recollect to have said that Colonel Burr ought to be punished, without stating at the same time, "if he were guilty." Mr. Morrison was suspended for further examination.

Yates S. Conwell had formed and expressed an opinion, from the reports he had heard, that Colonel Burr must be guilty of high treason. He was accordingly set aside.

Jacob Beeson declared that he had for some time past formed an opinion, as well from newspaper publications as from the boats which had been built on the Ohio, that Colonel Burr was guilty; and that he himself had borne arms to suppress this insurrection. He was therefore set aside as incompetent.

William Prince declared he had nearly the same impressions as Mr. Beeson; that he too had borne arms, as well on Blennerhassett's Island as on descending the river in search of Blennerhassett. He was set aside in like manner.

Nimrod Saunders declared that he had expressed an opinion previously to his being summoned on the jury, that the prisoner had been guilty of treason. He was therefore set aside as incompetent.

Thomas Creel had no declaration to make, and he was challenged for cause. Upon being interrogated, he stated that he had never asserted that the prisoner ought to be punished; that he had said that he was a sensible man, and if there were any hole left he would creep out of it; that he had conceived that Colonel Burr had seduced Blennerhassett into some acts that were not right; that he had never positively said that Colonel Burr was guilty; that he had said that Blennerhassett was the most blamable, because he was in good circumstances and well off in life, whereas Colonel Burr's situation was desperate, and that he had little to lose; that he had not said that Colonel Burr had directly misled Mr. Blennerhassett, but through the medium of Mrs. Blennerhassett; in short, that there was no determinate impression on his mind respecting the guilt of the prisoner.

The CHIEF JUSTICE did not think that this was sufficient to set him aside, and suspended his case for further examination.

Anthony Buckner had frequently said that the prisoner deserved to be hung. He was therefore set aside.

David Creel had formed an opinion from the statements in the newspapers, and if these were true the prisoner was certainly guilty. He had expressed a belief that he was guilty of the charges now brought against him, and that he ought to be hanged. He was therefore rejected.

The above named jurors were all from Wood county.

Jurors from the body of the district:

John Horace Upshaw declared that he conceived himself to stand there as an unprejudiced juryman, for he was ready to attend to the evidence; but that as he had formed opinions hostile to the prisoner, (if opinions they can be called which are formed from newspaper testimony,) and had, he believed, frequently expressed them, that he was unwilling to subject himself to the imputation of having prejudged the cause.

Mr. Burr.—We challenge Mr. Upshaw for cause.

Mr. Hay.—Then, sir, I most seriously apprehend that we shall have no jury at all. I solemnly believe Mr. Upshaw is an intelligent and upright man, and can give a correct verdict on the evidence; and I will venture to assert, (whatever credit my friends on the other side will allow to my assertion,) that I myself could do justice to the accused. I believe that any man can who is blessed with a sound judgment and integrity. We might as well enter at once a nolle prosequi, if he is to be rejected.

Mr. Wickham.—Then according to the gentleman's doctrine, any honest man, no matter what his impressions may be, is a competent juryman. Is this agreeable to the principles of law? Does the gentleman mean to insinuate that when we object to a juryman it is for his want of honesty? No, sir, every man is subject to partialities and aversions, which may unconsciously sway his judgment. Mr. Upshaw does no doubt deem himself an impartial juryman; but Mr. Upshaw may be deceived.

After some desultory argument between Messrs. Hay and Wickham, Mr. Wirt proceeded to ask Mr. Upshaw whether he had understood him to say that notwithstanding the hostile impressions he had taken up from newspaper reports, these impressions had not received that determinate character which might entitle them to the name of opinions? Answer. I have received impressions hostile to Colonel Burr, and have expressed them with some warmth, but my impressions have not been induced by anything like evidence They were predicated on the deposition of General Eaton and the communications of General Wilkinson, to the president of the United States. I had conceived that the prisoner had been guilty of some criminal act against the public, and ought to be punished; and I believe, also, that I went on further to vindicate the conduct of those gentlemen who would appear as the principal witnesses against him, and also of the government in the measures which it had taken to suppress his plans. After some further and animated discussion on this point, Mr. Upshaw's case was suspended for subsequent examination.

William Pope declared that his impressions

were nearly the same with those of the gentleman who had preceded him; that he had thought at first, from newspaper representations, that it was Colonel Burr's intention to make his fortune in the west by the settlement of lands; that when he had afterwards understood that he had formed a union with Wilkinson to proceed to Mexico, he had regarded the prisoner's conduct in such a light that, if he had proceeded to Mexico, he would have considered it as an excusable offence; but when he had afterwards understood that there was treason mixed with his projects, it was impossible for him to view his conduct without the deepest indignation. If these impressions could be called prejudices, he trusted that he should always retain them. What other sentiments could he feel against such a crime, perpetrated against the very best government on the surface of the earth? But Mr. Pope declared that from his heart he believed that he could divest himself of these unfavorable impressions, and give Colonel Burr a fair and honorable trial. He would add that, in pursuance of the spirit manifested by the constitution which required two witnesses to an overt act of treason, he should think it necessary that the evidence for the United States should be so strong as to make the scale preponderate.

Mr. Wickham.—You will not misunderstand me, Mr. Pope, when I ask you whether you have not been a candidate for your county, and whether you be not now a delegate? Answer. Yes. Question. In canvassing among the people, have you not declared that the government had acted properly in commencing this prosecution? Answer. Yes; I believe I have said generally that I thought Colonel Burr was guilty of high treason. Mr. Pope was therefore set aside.

Peyton Randolph declared that it had never been his wish or intention to shrink from the discharge of a public duty, but that he had peculiar objections to serve on this occasion, one of which only he should state. He had been enrolled and was qualified as a lawyer in this court; and he would submit it to the court whether this did not exempt, if not disqualify, him from serving?

The CHIEF JUSTICE admitted Mr. Randolph's privilege, unless there were an express interposition on the part of the prisoner to retain him and others of the venire who had privileges; for this would call a conflicting privilege into operation.

Mr. Burr said that he should be passive.

John Bowe did not recollect to have said that the prisoner was guilty of treason, but of something hostile to the peace and happiness of the United States. Upon being interrogated, he observed that he was a delegate from the county of Hanover, that there had been a competition at the last election, that he had had occasion to speak at that time of the views of the prisoner, but had always done it cautiously; had never asserted that he ought to be hung, but that he was guilty

of something unfriendly to the peace of the United States.

Mr. Wickham.—You have said that the prisoner was guilty? Answer. Yes.

The CHIEF JUSTICE.—Did you ever make up an opinion about his levying troops and making war against the United States? Answer. Yes; but I have never expressed it.

Mr. Burr.—Take the whole together, and it amounts to an opinion of treason. Mr. Bowe has said that Colonel Burr was guilty; and of what? Of that which in Mr. Bowe's mind amounts to the definition of treason. He was therefore set aside.

John Roberts had thought and declared, from the reports in the public newspapers, that the prisoner was guilty of treason, though he had no doubt that his opinion might be changed by the production of other testimony. He was set aside as incompetent.

Joshua Chaffin excused from indisposition.

7. Jervis Storrs observed that the state of his mind was like that of the gentleman who had gone before him, (Mr. Bowe;) he was in the habit of reading newspapers, and could not but examine their statements relative to those transactions. If he could believe General Eaton's assertion, that the prisoner had threatened to turn congress out of doors, and assassinate the president, he had said, and would still say, that Colonel Burr was guilty of treason. If General Wilkinson's letter were true, he had surely been guilty of something in the West that was hostile to the interest of the United States. He did not know whether in the multifarious conversations he had had on this subject he had always expressed this opinion of his guilt with that reservation. He had very often communicated his impressions, that he was plotting some hostile designs against the United States. Mr. Storrs confessed that he might be prejudiced against the prisoner, and that he might be judging too highly of his own mind to entertain the belief that he could divest himself of all his impressions; and upon the whole, he expressed a wish not to serve. He was then rejected.

8. Miles Selden declared that it was impossible not to have entered into the frequent conversations which had occurred on this topic, and to have declared some opinion; that he had always said that Colonel Burr was guilty of something, and that if he was guilty of treason against such a government as that of the United States, he would deserve to be hung; that he could not assert that he had always accompanied his opinions with this reservation, but that he was not afraid to trust himself in the rendering of a verdict. Upon being interrogated, he said that he had frequently jested on this subject, and particularly recollected to have said in a sportive conversation with Colonel Mayo, that this was a Federal plot, and that Burr had been set on by the Federalists. Colonel Selden was therefore suspended for further consideration.

9. Lewis Trueheart had said that if the reports were correct, Colonel Burr had been

guilty of something inimical to the country, and that he always qualified his opinions in that manner.

Colonel Tinsley was then called in as a witness, who stated that from a conversation with Mr. Truehart, he thought that he had discovered that he had a general prepossession against Colonel Burr. He did not expect to be called on, and had no very distinct recollection of the particulars; that this was before any of the proceedings of the trial; and when he heard that he was summoned as one of the venire, he then recollected their conversation and happened casually to mention it. Mr. Truehart suspended.

William Yancey had expressed an opinion on newspaper testimony that Colonel Burr was guilty; that he had frequently said that he would believe the statements of newspapers till the contrary was proved, but that he had no doubt he should entertain a different sentiment, if other testimony were produced. He was set aside.

Thomas Prosser was next called. He said that he had made numberless declarations about Colonel Burr; that he had believed him to be guilty of a treasonable intention, but not of the overt act; on this point he had suspended his opinion, but he was rather inclined to believe that he had not committed it.

Mr. Martin.—Can this gentleman be considered as an impartial juryman, when he thus comes with his mind made up on one half of the guilt? He was suspended for further consideration.

John Staples had been under the same impressions which had been described by others; that he dared to say that he had said Colonel Burr was guilty of levying troops and making war upon the United States.. He was set aside.

Edward C. Stanard acknowledged that his prejudices against Colonel Burr had been deep-rooted; that he had no doubt of the criminality of his motives, but that he had doubts of the commission of an overt act; he regretted that a man of his talents and energetic mind should be lost to his country. Upon being interrogated, he observed that he had doubts as to the overt act, because he believed him to be a man of such deep intrigue as never to jeopardize his own life till thousands fell before him. He was rejected.

Richard B. Goode was then called. I have never seen, neither do I believe that I have heard correctly, the evidence in this prosecution. From common report and newspaper information I have formed an opinion unfavorable to Colonel Burr. That opinion has been strengthened by what I have heard from the lips of Colonel Burr in this court; but without arrogating to myself more virtue than belongs to other men, if I know myself, I have formed no opinion which cannot be altered by the evidence.

Mr. Baker.—Did you not endeavor to displace Mr. Heth as captain of the Manchester cavalry, for becoming the bail of Colonel Burr? Answer. I never did. (Here sundry witnesses were directed to be called.)

Mr. Goode.—I will state the circumstance to which you allude, unless you prefer to prove it.

THE COURT.—Do so, if you please.

Mr. Goode.—On the 4th of July, 1806, I was a member of a committee with Captain Heth, appointed to prepare toasts to be drunk on that day by the Manchester cavalry. I profess to be attached to the present administration of the general government, and wished to express such a sentiment. Captain Heth declared that he had not confidence in the executive, and rather than express such a sentiment he would resign his commission. At that time, I thought Captain Heth and myself differed only as to measures, and not as to principles; and that it was an honest opinion. But in a few months after, when I understood that Captain Heth had become bail for Colonel Burr, and was his zealous friend, with whom he was neither connected nor acquainted, but a stranger, who, three years ago, would have been consigned to the grave by Captain Heth, and those thinking with him upon political subjects, and when I recollected the charge preferred against Colonel Burr, I confess that the declaration and conduct of Captain Heth made such impressions upon my mind, that I refused to trust my person with him as a military commander, and I would do it again.

Colonel Burr.—Pray, sir, did you not write a letter to Captain Heth? Answer. I did; and I have reasons to believe that that letter is in your possession, or in the possession of your counsel. You are at liberty to show it to the court, or I will repeat that part of it which relates to Captain Heth and yourself.

THE COURT.—Do, sir.

Mr. Goode.—A few weeks past, I received a letter from Captain Heth, commanding me to appear at a certain time and place, in order to take my proper command in the troop. I wrote him, in answer, that my post as a soldier would never be abandoned, and that my duty as a citizen forbade that I should silently approve of the conduct of those who had extended a favor to a traitor, which the justice of my country denied to an unfortunate debtor, or words to that effect.

Mr. Goode was then rejected.

Nathaniel Selden stated he had formed an opinion, particularly from General Eaton's deposition, that the intentions of the prisoner were hostile to the United States, but that he had also said he had seen no evidence to satisfy him that he had been guilty of an overt act. He was suspended for further consideration.

16. Esme Smock declared that he had formed and expressed an opinion that Colonel Burr had treasonable designs.

CHIEF JUSTICE.—To what time did your opinion relate?

Mr. Smock.—I formed my opinion from newspaper publications and common report;

but I have constantly conceived that Colonel Burr's intentions were treasonable throughout. Mr. Wickham.—Have you ever formed an opinion that Colonel Burr was guilty of treason? Answer. I have in my own mind. He was set aside.

Richard E. Parker said that he had, like every other person, formed an opinion on that case, on newspaper statements, but he had heard very little of the evidence that may be adduced on this occasion. He had declared that if these newspaper statements were true, Colonel Burr had been guilty of some design contrary to the interest and laws of the United States. As to the doctrine of treason, he had not formed a conclusive opinion.

Mr. Burr.—I have no objection to Mr. Parker. He is therefore elected.

A desultory argument here ensued about the propriety of swearing one juryman at a time. The counsel for the prosecution opposed, the counsel for the prisoner advocated, the doctrine. The court decided that it would adhere to the practice of Virginia, and swear four jurymen at a time.

John W. Ellis said that he had no doubt the prisoner had been guilty of having treasonable designs. Whether he had proceeded to acts, he had doubt. He was suspended.

Thomas Starke, without any expectations of being summoned as a juryman, had stated his opinion to his neighbors, who had asked him questions on the subject, that Colonel Burr had been guilty of high treason. He was set aside.

William White stated that he had been in the western country in May last, and from Colonel Burr's character, and from the representations he had received of his conduct, he had been induced to say that he was guilty of treason, and that he ought to be hanged, or that hanging was too good for him. He was set aside.

William B. Chamberlaine stated that he stood in a very peculiar situation, if, as Mr. Wickham declared, any man were unfit to be a juryman who had asserted Colonel Burr to have been worthy of death. He was ready to confess that he himself came under this restriction. He had said uniformly that he had treasonable designs; but he did not now believe that Colonel Burr had committed an overt act of treason, though he believed him to be guilty of the intention. He, however, believed that he could do him justice, and that he could conscientiously pass between him and his country. He was rejected.

David Lambert wished to be excused on account of his indisposition, but the court rejected his plea. On being interrogated, he declared that he did not recollect to have formed an opinion for or against Colonel Burr. He was elected.

William Hoomes had no hesitation in saying that he had often declared his opinion that Colonel Burr was guilty of treasonable intentions, and, perhaps he might say, of treason itself. He had imbibed his impressions from

everything he had seen, heard, or read. He had understood that Colonel Burr's counsel had made preparations to prove that he had disqualified himself by his own declarations. He should thank them to develop their objections.

Mr. Burr.—I assure you, sir, no such preparation has been made. He was set aside.

24. Overton Anderson said that he had often expressed an opinion that Colonel Burr's views were inimical to the United States. These opinions he had principally formed upon newspaper statements. He did not recollect that he had ever asserted him to be guilty of treason; but he had sometimes given credit to the representations which he had heard, without particularly defining the degree of guilt in which they might involve the prisoner, and thought him guilty of the charge against him, though he would not say it was treason. He was rejected.

Hugh Mercer, upon being called, said that it was his duty to state that an opinion which he had for some time past entertained of the character of Colonel Burr was unfriendly to a strictly impartial inquiry into his case; that he was entirely uninformed as to the testimony which would be introduced, and that he did not recollect to have ever expressed a positive opinion either as to his guilt or innocence. He was elected.

Jerman Baker had entertained opinions unfavorable to Aaron Burr, which he had repeatedly expressed. He had spoken them with warmth, for it was his nature to be warm. He had no doubt that the prisoner had formed very unfriendly designs against the United States, but, from his ignorance of the evidence, he could not venture to say that they had ripened into an overt act.

Mr. Burr.—What opinion have you formed of me? Answer. A very bad one, which I have expressed often when called upon, and often when not. He was set aside.

Edward Carrington, next called, said that he had formed an unfavorable opinion of the views of Colonel Burr, but these opinions were not definitive. Some had said that Colonel Burr's object was to invade the Spanish territories; others, that it was to dismember the Union. His own opinion had not been definitely fixed. There was another subject connected with this trial on which he had also expressed his opinions, and that related to the measures taken at New Orleans. His own opinion had been that it was impossible for any one at this remote scene to determine upon the state of affairs in that city; but if General Wilkinson did seriously believe what he said had been represented to him as the views of Colonel Burr, that he ought to consider it as an extreme case, and take extreme measures, and act somewhat in the manner that General Wilkinson had done. This has been the state of his mind for twelve months.

Mr. Burr.—Have you, Colonel, any prejudice of a more settled kind and ancient date

against me? Colonel Carrington.—None at all.

Mr. Burr.—He is elected.

Mr. Parker said that perhaps he had been misunderstood by the court and Colonel Burr. Perhaps he was disqualified, and he wished to be distinctly understood. He said that he had expressed no deliberate opinion on the subject, yet he had believed that Colonel Burr had some designs contrary to the interests of the United States; that he had formed no opinion of the truth of those depositions, but if they were true his designs were treasonable. Mr. Parker was retained as a juror.

The four jurymen that had been elected were then called to the Book and sworn, viz.: Messrs. Parker, Lambert, Mercer, and Carrington.

Robert Haskins had expressed an opinion that Colonel Burr was guilty, but does not recollect to what extent he went. He went so far as to say he was guilty of an intention of treason, but not of an overt act. He might have said that he deserved to be hung. He was set aside.

William R. Fleming had formed and frequently expressed an opinion that Colonel Burr was guilty of treasonable intentions, and might have made a general declaration, not only as to intentions but to acts. He was set aside.

George W. Smith suggested a right to the same exemption which had been granted to Mr. P. Randolph. The court said that this privilege would be incontestible unless the prisoner should urge his conflicting privilege. Mr. Burr then requested Mr. Smith to attend to-morrow. Mr. Smith wished to be excused, as he had some important business in another court to attend to. He should, however, attend on the trial to-morrow; but it might now be proper to state the general impressions which he had received from these transactions. He had generally been solicitous to avoid an expression of his opinions; and as in such cases, where the government commences a prosecution against an individual, there is always a preponderance of prejudice against him, he himself had not only been solicitous not to declare, but even not to form an opinion. No one can, however, avoid reading representations of these things in the public papers, and he had formed and declared his impressions that Colonel Burr had entertained designs offensive to the peace and laws of the United States. What was the species of guilt he had not pretended to define, but he had concluded from the newspaper reports and the testimony which he had heard in the other end of the capital that his designs were of a military nature, and that they might amount at least to a misdemeanor. He was suspended for further consideration.

31. Armistead T. Mason had formed no deliberate opinion in regard to the actual commission of treason. But it was his delib-erate opinion that Colonel Burr had designed, if not to subvert the government, at least to divide the country. He was suspended for further consideration.

32. Dabney Minor had often said that Colonel Burr's intentions were unfriendly to the United States; he had said that if he were guilty of what was charged against him he ought to be hanged, but had heard no positive testimony. Some conversation here ensued between Mr. Minor and Mr. Botts, when Mr. Minor was suspended until to-morrow.

Thus, then, of the whole venire that appeared, four only were elected and sworn, and nine were suspended till arguments should be heard on the subject, in order to aid the court to form an opinion whether they were competent jurymen or not.

Here a discussion of considerable length took place on the propriety of confining or not confining, in the custody of the marshal, the jurors already sworn, till the other eight should be sworn.

THE COURT then decided that there was no necessity for delivering the jurymen who had been or should be sworn, into the custody of the marshal, until the whole number had been impaneled and sworn.

Adjourned till Tuesday, eleven o'clock.

Tuesday, August 11, 1807.

*The court met according to adjournment.*

Present: MARSHALL, Chief Justice, and GRIFFIN, District Judge.

The CHIEF JUSTICE informed the counsel engaged in the cause that the court was ready to hear any observations on the question before them yesterday, which they might think proper to make.

Mr. Martin.—We are ready to say something relative to the situation that a juryman ought to be in to enable him properly to pass upon the case of a prisoner.

Mr. George W. Smith was the first of the jurors suspended yesterday for subsequent examination who was called. He said that he supposed himself entitled to exemption, from his profession as a practicing lawyer in this court; that by the law of the land, as long as he behaved with respect to the court and diligence to his client, he ought not to be obstructed in the pursuit of his professional duties; that though there was no express statute exempting him, yet he was exempted by the reason of the law.

Mr. Burr observed that as some real or fictitious difficulty had occurred in the selection of jurymen, he should be extremely sorry if such as were impartial should object to themselves. If Mr. Smith, however, raised such objections, he himself should submit to the decision of the court, as he wished to be perfectly passive.

Mr. Smith did not know whether he deserved such an encomium on his impartiality; but as the arrangement of his professional business, in other courts, (though not

in this court at this particular time,) would not permit him to attend the trial with any convenience, he should claim the privilege of exemption, to which, in his opinion, he was entitled by law.

The CHIEF JUSTICE said that this privilege would certainly exempt Mr. Smith, unless his attendance was claimed by the prisoner; and as Colonel Burr waived his right, Mr. Smith was excused from attending.

James Henderson, of Wood county, who was absent yesterday, was next called; he was challenged for cause. On being examined by Mr. Botts, he admitted that he was not a freeholder, and was consequently set aside.

Mr. Hamilton Morrison was the next of the suspended jurymen who was called. He declared that it was with pain he should serve on the jury; that he did not wish to serve on it; that it was still more disagreeable to him, as the defendant seemed to have such imaginary thoughts against him; that he had not meddled with the prisoner's transactions, though perhaps he might have done so, had it been profitable to him. James Henderson and Mr. Neale were both examined as to what they might have heard him say on this subject, and both declared that they had heard him say nothing material.

Mr. Burr.—Have not these rumors excited a prejudice in your mind against me? Answer. I have no prejudice for or against you.

Mr. Botts.—Are you a freeholder? Answer. I have two patents for land. Question. Are you worth three hundred dollars? Answer. Yes; I have a horse here that is worth the half of it. Question. Have you another at home to make up the other half? Answer. Yes; four of them. (Here the court said that sufficient cause had not been shown against his being a proper juror.) I am surprised why they should be in so much terror of me. Perhaps my name may be a terror, for my first name is Hamilton.

Colonel Burr then observed that that remark was a sufficient cause for objecting to him, and challenged him. Mr. Morrison was therefore set aside. This was the first peremptory challenge which the prisoner made, of the thirty-five to which the law entitles him.

Thomas Creel, another of the suspended jurymen from Wood county, was next set aside by the court, because he said that he had both formed and expressed sentiments unfavorable to the prisoner.

John H. Upshaw was next called up. He stated, before he was interrogated, that he had received strong impressions against Colonel Burr, but that he believed he could find a verdict according to testimony.

The CHIEF JUSTICE wished to know whether those impressions related to the general charge of treason against the prisoner, or to what happened before, or to what circumstances?

Mr. Upshaw answered that they related to the transactions in the Western country, and added: "My opinions have changed as the lights of evidence seemed successively to appear. It was my first impression that he had nothing more in view than the settlement of the lands on the Waschita. I next supposed that he intended to attack Mexico, but that as a means of effecting that object he intended to attack New Orleans; and last of all, that his plans were of a more complicated nature, but that he never thought, till after his leaving the mouth of Cumberland, that Burr had treasonable designs, but that he could not recollect particularly the times when he formed or changed these opinions."

Mr. Wickham asked him whether, as the result of all these impressions, he did not consider Colonel Burr a dangerous man? He answered that that was his impression.

Mr. MacRae.—Have you formed or delivered an opinion that he has committed an overt act of reason, as charged in the indictment? Answer. I have not.

Mr. Martin said that he should state whether there was any bias on his mind, although he did not believe that an overt act had been committed, for if he had such bias, he was unfit for a juryman.

Mr. Baker.—Have you not, in your own county, argued in conversation, to show that Colonel Burr was guilty, and that there was strong presumptive evidence against him? Answer. I have done so, and not only supported such opinions, but have gone on to vindicate the propriety of the measures taken by the government.

Mr. Burr said that enough had appeared to show that Mr. Upshaw had taken up strong prejudices against him.

Mr. Hay asked whether such testimony as that could disqualify him as a juryman.

Mr. Upshaw said that he had been in the habit of impressing on others his prejudices, or opinions that Burr was a dangerous man to the community.

Mr. MacRae.—I beg leave to ask whether personally you have any prejudices against him? Have you any other prejudices against him, except that he has entertained treasonable designs? He answered explicitly that he had not.

Mr. Burr.—Had you not, anterior to those transactions rumored in the Western country, formed an unfavorable opinion of me?

Mr. Upshaw answered that he had before (with other persons) formed rather an unfavorable opinion against him during the presidential election, (of 1801,) though he had no positive evidence on that subject.

Here Mr. Upshaw was suspended till the general question on the doctrine of challenges should be argued.

Mr. Martin rose to proceed with his argument. He stated that it was one of the soundest principles of law that every man had a right to be tried by an impartial jury;

that this right extended to all cases, civil and criminal, but that in criminal cases it was secured by the constitution in a positive and sacred manner, so that all altercation as to the meaning of the terms was rendered unnecessary.

Mr. MacRae apologized for interrupting Mr. Martin, but suggested that it would be a saving of time, first, to know the objections to all the jurors, and then to have one general argument as to all, instead of having an argument on each particular case as it might occur; that he wished to economize time, and that the experience of yesterday showed the propriety of saving time as much as possible. Evidence is now heard as to this case, and if it be argued, the court must hear arguments in the case of every other juryman. He did not see the necessity of holding twelve arguments instead of one, where the cases were precisely similar. He did not wish to prescribe to gentlemen the course of proceeding, but he really supposed that one argument would suffice for all the cases. To this the CHIEF JUSTICE assented.

Mr. Martin.—I have been repeatedly interrupted by the gentlemen, and they have found out in their infinite wisdom that we are to hold twelve arguments on this point. They talk, sir, of economy of time. They have shown a happy instance of this economy of time, when I was here on a former occasion. I know what kind of economy they wish. They wish us to be silent. They would, if they could, deprive Colonel Burr's counsel of an opportunity of defending him, that they may hang him up as soon as possible, to gratify themselves and the government.

Mr. MacRae.—That is a most unprincipled and most unfounded assertion.

Mr. Burr said that he thought the gentlemen for the prosecution were not altogether so wrong. Generally the question was, whether those gentlemen who said that they were convinced that he had treasonable intentions were impartial and proper jurymen. They had avowed their convictions as to these intentions in court, that one argument would apply to all, and if the principle were once fixed it would not be necessary to renew it in the case of each gentleman; that they had entered into the argument because they wished the principle to be settled, and then it could be applied to the particular cases.

Mr. Hay.—We wish the argument to proceed without hearing ourselves grossly insulted; without making accusations against us that are malicious and groundless. We said nothing that could give offence to the feelings of any gentleman. The gentlemen cannot say with truth that we wish to deprive them of the right of defending their client. The charge is unjust. I wish him to have a fair trial, and justice to be done, with all my heart; but I feel myself hurt, and grossly insulted, when the gentleman on the other side charges me with feelings that are disgraceful to humanity. I trust, therefore, that the arguments will no longer be conducted with such indecorum.

The CHIEF JUSTICE had hoped that no such allusions would have been made, that the government ought to be treated with respect, and that there was a delicacy to be observed on that subject from which he hoped there would be no departure hereafter.

Mr. Burr.—I rose to stop the progress of such language when up before. I had made sufficient apologies, if any were necessary, for any expressions which had been used, and I had hoped that no allusions would have been made to the subject. It will be recollected that I have constantly manifested my displeasure at such expressions. I have carefully avoided such myself, and imposed similar restraints on my counsel, and urged that the government should be treated with the utmost delicacy, though there was great provocation from the gentlemen on the part of the prosecution, which would have justified harsh terms. I hope these things will cease. On the part of my counsel I am sure they will cease.

Mr. Martin.—I have no wish to hurt the feelings of a single individual, but they have no right to hurt our feelings, and when I am so often interrupted and charged with wasting the public time, and the gentlemen still persist in their observations, I cannot repress mine.

[Mr. Martin then addressed the court at length on the qualifications of jurors. His argument, and that of the other counsel, and the opinion of the court will be found reported as Case No. 14,692g.]

The suspended jurymen were then called. John H. Upshaw was asked by the court whether he conceived that the prisoner had pursued his treasonable designs to the time charged in the indictment. Mr. Upshaw answered in the affirmative and the CHIEF JUSTICE observed that he was not qualified to serve as a juryman.

J. Bowe, Miles Selden, Lewis Truehart, William Yancey, Thomas Prosser, Nathaniel Selden, John W. Ellis, Armistead T. Mason, and Dabney Minor were successively set aside, after having been further interrogated, because, having formed an opinion as to the criminal intentions of the accused, they came within the principle of exclusion just established by the court.

Mr. Hay moved the court to award a new venire, to consist of a sufficient number to secure a certainty of supplying the deficient jurymen. He thought the "tales" might exceed the number of the original panel, and referred to Hawkins in support of that opinion. He proposed one hundred and fifty. After some remarks by various counsel and

the CHIEF JUSTICE, the court awarded a panel of forty-eight, and adjourned till Thursday.

Thursday, August 13. 1807.

As soon as the court met, Mr. Burr observed that just before coming into court he had received a copy of the panel last awarded; that it was defective, in not having the places of residence annexed to the names of the jurors; that he should, perhaps, require till the day after to-morrow to examine it, which was a less time than the law allowed him for that purpose.

Some conversation ensued respecting the subpœna "duces tecum," when Mr. Hay stated that he had found General Eaton's letter among certain papers transmitted by Mr. Rodney, and had filed it with the clerk; that he had not found among them General Wilkinson's letter of the 21st October, but would seek for it.

Three of the jury summoned on the second venire, were discharged by the court, viz: General Pegram, because he was then necessarily engaged in military business, in giving the necessary orders to the officers of his brigade to get in readiness its due proportion of this state's quota of troops required by the president's proclamation, pursuant to the act of congress: Mr. Lewis, because he owned no freehold in the state of Virginia, and Mr. Moncure, on account of his indisposition. It was understood that the marshal should summon three substitutes, and that the prisoner should accept them. So that the venire was still to consist of forty-eight.

The court then adjourned till Saturday, eleven o'clock.

Saturday, August 15, 1807.

The court met pursuant to adjournment. The jurymen summoned by the marshal were called, and all except seven answered to their names. One juror answering was excused on account of ill health.

Mr. Burr then addressed the court, and observed that the panel was now reduced to forty; and as it would be exceedingly disagreeable for him to exercise the privilege of making peremptory challenges, to which he was entitled, he would lay a proposition before the opposite counsel which would prevent this necessity, and would save one or two hours that might be otherwise unpleasantly spent. He would select eight out of the whole venire, and they might be immediately sworn, and impaneled on the jury.

The CHIEF JUSTICE said that if no objection was made it might be done, and that they might be placed at the head of the panel.

Mr. Hay observed that there could be no utility in objecting to it, as the prisoner could challenge peremptorily, and that he had no objection to this arrangement, as it would be easy for him to examine the qualifications of the eight who were selected, when they were once known.

William S. Smith then requested to be excused on account of his indisposition.

Mr. Burr observed that Mr. Smith was one of those whom he had selected, but he would be sorry to impose such a burden upon any invalid. Mr. Smith was discharged.

When Christopher Anthony was called, he observed to the court that he had uttered some expressions since he came to town which he had been told would certainly disqualify him from serving, according to the rules said to have been laid down by the court. On being interrogated as to what words he had spoken,

Mr. Burr said, perhaps the words were used through levity. . Do you think they would be sufficient to warp your judgment? Answer. No.

Mr. Burr.—Then, sir, you are not disqualified.

Mr. MacRae.—State the tenor of those expressions.

Mr. Anthony.—When I first arrived here I met with an intimate friend, to whom I observed that I had come to town with a hope of being placed on this jury, and if I were, I would hang Colonel Burr at once without further inquiry.

Mr. MacRae.—Did you say so, knowing that such expressions would disqualify you? Answer. I did not; for I never expected to be put on this panel. Question. Were you serious? Answer. Far from it. I spoke in the utmost spirit of levity. Question. Have you been in the habit of reading the newspapers? Answer. I have.

Mr. MacRae proceeded to make further inquiry of him. He asked him whether he had read the depositions of Generals Wilkinson and Eaton. He answered in the affirmative. He then asked him whether those depositions had made no impression upon his mind. Hereupon, both Colonel Burr and Mr. Martin objected to this inquiry as improper.

Mr. MacRae contended that this examination was in vindication of the rights of the United States, and perfectly proper and correct, and was no more than had been done repeatedly by the prisoner.

Mr. Martin.—You have no right to disqualify any juryman for us.

The CHIEF JUSTICE.—Certainly the counsel for the United States may challenge for cause.

Mr. Hay was willing to take the persons selected, for he entertained no doubt of the integrity of the gentlemen who were summoned. He was willing to take them, provided they should be asked by the bench whether they were conscious of any cause which should disqualify them from serving. If they themselves were satisfied, he should be also satisfied. No man on this panel who had definitely made up his mind would conscientiously think to lay his hand on the book, and solemnly avow himself an impartial and qualified juryman.

The CHIEF JUSTICE understoood, then,

that these selected eight were to pass without challenge, unless they challenged themselves. If the court were required to say, as seemed to be the wish of the prosecution, that any impressions, however slight, were sufficient cause for challenge, he would ask where they could obtain a jury? The United States had precisely the same rights as the prisoner had, and were entitled to make the same challenges for good cause. He then addressed those eight jurymen who were placed at the head of the panel, thus: "Gentlemen, if you have made up and expressed any opinion either for or against the accused you ought to express it."

Mr. Burr.—The law presumes every man to be innocent until he have been proved to be guilty. According to the rules of law, it is therefore the duty of every citizen who serves on this jury to hold himself completely unbiased. It is no disqualification, then, for a man to come forward and declare that he believes me to be innocent.

CHIEF JUSTICE.—The law certainly presumes every man to be innocent till the contrary be proved; but if a juryman give an opinion in favor of the prisoner he must be rejected.

When Christopher Anthony was called to the book, he stated that he was in court the other day when the first venire was investigated; that it would be extremely unpleasant to serve on the jury; and that his general opinions had been precisely the same that had disqualified (as he understood) several other gentlemen. Mr. Anthony's objections were overruled.

John M. Sheppard.—I, too, feel myself disqualified for passing impartially between the United States and Aaron Burr. From the documents that I have seen, particularly the depositions of Generals Wilkinson and Eaton, I have believed, and do still believe, that his intentions were hostile to the peace and safety of the United States; in short, that he had intended to subvert the government of the United States. It would be inflicting a wound on my own bosom to be compelled to serve under my present impressions. Mr. Sheppard observed that considerations of a private nature had also borne upon his mind, for he had a child at home extremely sick.

Mr. Burr.—Notwithstanding Mr. Sheppard's impressions, I could rely upon his integrity and impartiality As to his private considerations, I do not wish wantonly to wound his feelings. I must request him, therefore, to sit down for a moment, until we shall ascertain whether we can make a jury without him.

Mr. Hay.—Has the court understood the extent of Mr. Sheppard's declarations?

The CHIEF JUSTICE.—If the prisoner's counsel waive the right of challenge, there is an end of it.

James Sheppard was then called, who made no further declarations.

Reuben Blakeley.—I have made up no opinions either way, positively, on this subject.

Doctor John Fitzgerald.—It is incumbent on me to state to the court that I have formed and delivered an opinion unfavorable to Colonel Burr. My opinion has been founded upon the depositions of Generals Eaton and Wilkinson, and other newspaper publications, and it is that Colonel Burr's intentions were hostile and treasonable against the United States. On which account I am very unwilling to serve, lest I should possess that bias upon my mind which is unbecoming a juryman. Mr. Fitzgerald was requested to sit down for a few moments.

Miles Bott.—From the affidavits of Generals Wilkinson and Eaton, my opinion has been completely made up for several months past.

Mr. Martin.—I suppose you have only taken up a prejudice on the supposition that the facts stated were true.

Mr. Bott.—I have gone as far as to declare that Colonel Burr ought to be hanged.

Mr. Burr.—Do you think that such declarations would now influence your judgment? Would not the evidence alter your opinion? Answer. Human nature is very frail. I know that the evidence ought, but it might or might not influence me. I have expressed myself in this manner perhaps within a fortnight, and I do not consider myself a proper juryman.

Mr. Burr.—It will be seen either that I am under the necessity of taking men in some degree prejudiced against me, or of having another venire. I am unwilling to submit to the further delay of other "tales," and I must therefore encounter the consequences. I will take Mr. Bott under the belief that he will do me justice.

Four jurymen then having been selected, three were sworn. Mr. C. Anthony affirmed.

When Henry E. Coleman was called, he stated that he had conceived and expressed an opinion that the designs of Colonel Burr were always enveloped in mystery, and inimical to the United States; and when informed by the public prints that he was descending the river with an armed force, he had felt as every friend of his country ought to feel.

Mr. Burr.—If, sir, you have completely prejudiced my case—

Mr. Coleman.—I have not. I have not seen the evidence.

Mr. Burr.—That is enough, sir. You are elected.

Mr. Hay then suggested to the court the propriety of not swearing all the jury this day, as it would subject them to the inconvenience of an unnecessary confinement in their own room to-morrow (Sunday). Would it not be better for Mr. Marshall (the clerk) to swear three only out of the remaining four? The court might then impanel the whole on Monday, and proceed immediately to business.

Mr. Burr had no objections to this measure, but hoped that the court would enjoin them not to hold any conversations on the subject of the trial.

John Curd, upon being called, stated that he had no prejudices for or against the prisoner, but that he was bound in candor to inform the court that he was afflicted by a disorder (a palpitation of the heart) which was irregular in its attacks, but was sometimes very sudden and violent, and rendered him entirely incapable of business, and if he were sworn on the jury, it might interrupt and delay the progress of the cause. He was excused.

Isham Godwin had formed and declared a uniform opinion of Colonel Burr's guilt. If he were impaneled he should be under a strong impression that Colonel Burr was guilty of treason. Suspended.

Samuel Allen had for several months made up an opinion unfavorable to the prisoner. Suspended.

Benjamin Graves had not formed an opinion, and gave a long history of his domestic and family engagements to excuse himself from serving. He was asked whether he could not make some arrangements of this business between this time and Monday, calculated to remove all the inconvenience of his serving. Mr. Graves could not positively say.

Mr. Burr then observed that the two jurors who had been selected might be sworn, The other two might be selected on Monday. And Messrs. Coleman and Graves were accordingly sworn.

Mr. Burr hoped that the marshal would direct all the necessary preparations to be made for the accommodation of the jury, who would be confined to their own chamber after Monday.

Colonel Thomas Branch was then excused from serving because he was engaged in military business.

The CHIEF JUSTICE requested the jury and the remaining members of the venire to attend on Monday, at twelve o'clock, and enjoined them to hold, in the mean time, no communication on this subject with any person.

Mr. Hay stated that he was satisfied, from some expressions which he had heard from Mr. Munford, of Powhatan, at the moment of his summons, that the prisoner would himself object to him.

Mr. Burr was satisfied with the attorney's word, and Mr. Munford was accordingly discharged.

Mr. Burr was sorry to be importunate, but he was under the necessity of mentioning once more the letter of the 21st October. He wished to know whether the attorney had yet found it amongst his papers, or whether he could point to any other means of obtaining it.

Mr. Hay had examined two bundles of papers transmitted to him by Mr. Rodney, but he had not found it. There were other papers which he had yet to examine. He had, however, a copy of the original letter.

Mr. Burr.—Where is this copy from? From Washington or from General Wilkinson?

Mr. Hay.—It is from General Wilkinson. He has, however, written it from the original.

Mr. Burr.—I shall not accept of his copy; but I will state this proposition to the attorney: If he do not find this letter by Monday, will he consent that I obtain a subpœna duces tecum?

Mr. Hay.—I have no objection.

The CHIEF JUSTICE.—I suppose an order may be made to issue a subpœna duces tecum addressed to the attorney general of the United States, in case the letter be not found.

Mr. Hay.—I have no objection.

The court then adjourned till Monday, twelve o'clock.

Monday, August 17, 1807.

The court met according to adjournment.

Charles Lee, appeared as counsel for the prisoner.

The names of the selected jurors and of the venire were then called over. After which, John M. Sheppard, and Richard Curd were selected to complete the panel, and sworn. The following is, therefore, a complete list of the petit jury: Edward Carrington, David Lambert, Richard E. Parker, Hugh Mercer, Christopher Anthony, James Sheppard, Reuben Blakey, Benjamin Graves, Miles Bott, Henry E. Coleman, John M. Sheppard, Richard Curd.

Proclamation then having been made in due form, the prisoner standing up, the clerk addressed the jury in the usual form, and read the indictment in the words following:

"Virginia District. In the Circuit Court of the United States of America in and for the Fifth Circuit and Virginia District. The grand inquest of the United States of America, for the Virginia district, upon their oath, do present, that Aaron Burr, late of the city of New York, and state of New York, attorney at law, being an inhabitant of, and residing within the United States, and under the protection of the laws of the United States, and owing allegiance and fidelity to the same United States, not having the fear of God before his eyes, nor weighing the duty of his said allegiance, but being moved and seduced by the instigation of the devil, wickedly devising and intending the peace and tranquility of the same United States to disturb and to stir, move, and excite insurrection, rebellion and war against the said United States, on the tenth day of December, in the year of Christ, one thousand eight hundred and six, at a certain place called and known by the name of 'Blannerhassett's Island,' in the county of Wood, and district of Virginia aforesaid, and within the jurisdiction of this court, with force and arms, unlawfully, falsely, maliciously and traitorously did compass, imagine and intend to raise and levy war, insurrection and rebel-

lion against the said United States, and in order to fulfil and bring to effect the said traitorous compassings, imaginations and intentions of him the said Aaron Burr, he, the said Aaron Burr, afterwards, to wit, on the said tenth day of December, in the year one thousand eight hundred and six, aforesaid, at the said island called 'Blennerhassett's Island' as aforesaid, in the county of Wood aforesaid, in the district of Virginia aforesaid, and within the jurisdiction of this court, with a great multitude of persons whose names at present are unknown to the grand inquest aforesaid, to a great number, to wit: to the number of thirty persons and upwards, armed and arrayed in a warlike manner, that is to say, with guns, swords and dirks, and other warlike weapons, as well offensive as defensive, being then and there unlawfully, maliciously and traitorously assembled and gathered together, did falsely and traitorously assemble and join themselves together against the said United States, and then and there with force and arms did falsely and traitorously, and in a warlike and hostile manner, array and dispose themselves against the said United States, and then and there, that is to say, on the day and in the year aforesaid, at the island aforesaid, commonly called 'Blannerhassett's Island,' in the county aforesaid of Wood, within the Virginia district and the jurisdiction of this court, in pursuance of such their traitorous intentions and purposes aforesaid, he, the said Aaron Burr, with the said persons so as aforesaid, traitorously assembled and armed and arrayed in manner aforesaid, most wickedly, maliciously and traitorously did ordain, prepare and levy war against the said United States, contrary to the duty of their said allegiance and fidelity, against the constitution, peace and dignity of the said United States, and against the form of the act of the congress of the said United States in such case made and provided. And the grand inquest of the United States of America, for the Virginia district, upon their oaths aforesaid, do further present that the said Aaron Burr, late of the city of New York, and state of New York, attorney at law, being an inhabitant of, and residing within the United States, and under the protection of the laws of the United States, and owing allegiance and fidelity to the same United States, not having the fear of God before his eyes, nor weighing the duty of his said allegiance, but being moved and seduced by the instigation of the devil, wickedly devising and intending the peace and tranquility of the said United States to disturb, and to stir, move and excite insurrection, rebellion and war against the said United States, on the eleventh day of December, in the year of our Lord one thousand eight hundred and six, at a certain place called and known by the name of 'Blannerhassett's Island,' in the county of Wood and district of Virginia aforesaid, and within the jurisdiction of this court, with

force and arms unlawfully, falsely, maliciously and traitorously did compass, imagine and intend to raise and levy war, insurrection and rebellion against the said United States; and in order to fulfil and bring to effect the said traitorous compassings, imaginations and intentions of him, the said Aaron Burr, he, the said Aaron Burr, afterwards, to wit: on the said last mentioned day of December, in the year one thousand eight hundred and six aforesaid, at a certain place commonly called and known by the name of 'Blannerhassett's Island,' in the said county of Wood, in the district of Virginia aforesaid, and within the jurisdiction of this court, with one other great multitude of persons whose names at present are unknown to the grand inquest aforesaid, to a great number, to wit: to the number of thirty persons and upwards, armed and arrayed in a warlike manner, that is to say, with guns, swords and dirks, and other warlike weapons, as well offensive as defensive, being then and there unlawfully, maliciously and traitorously assembled and gathered together, did falsely and traitorously assemble and join themselves together against the said United States, and then and there with force and arms did falsely and traitorously, and in a warlike and hostile manner, array and dispose themselves against the said United States, and then and there, that is to say, on the day and in the year last mentioned, at the island aforesaid, in the county of Wood aforesaid, in the Virginia district, and within the jurisdiction of this court, in pursuance of such their traitorous intentions and purposes aforesaid, he, the said Aaron Burr, with the said persons so as aforesaid traitorously assembled, and armed and arrayed in manner aforesaid, most wickedly, maliciously and traitorously did ordain, prepare and levy war against the said United States, and further to fulfil and carry into effect the said traitorous compassings, imaginations and intentions of him the said Aaron Burr, against the said United States, and to carry on the war thus levied as aforesaid against the said United States, the said Aaron Burr, with the multitude last mentioned, at the island aforesaid, in the said county of Wood, within the Virginia district aforesaid, and within the jurisdiction of this court, did array themselves in a warlike manner, with guns and other weapons, offensive and defensive, and did proceed from the said island down the river Ohio in the county aforesaid, within the Virginia district and within the jurisdiction of this court, on the said eleventh day of December, in the year one thousand eight hundred and six aforesaid, with the wicked and traitorous intention to descend the said river and the river Mississippi, and by force and arms traitorously to take possession of a city commonly called New Orleans, in the territory of Orleans, belonging to the United States, contrary to the duty of their said allegiance and fidelity, against

the constitution, peace and dignity of the said United States, and against the form of the act of the congress of the United States in such case made and provided.

"Hay, Attorney of the United States,
for the Virginia District.

"Indorsed: A true bill. John Randolph.

"A copy. Teste, William Marshall, Clerk."

After the indictment was read, Mr. Hay requested that the jury should be furnished with implements necessary to enable them to take notes on the evidence, and also on the arguments if they should think proper; that as the cause was important, and would require all their attention, it would be proper to afford them this assistance. This was accordingly done.

Mr. Hay then opened the case to the jury.

After some introductory remarks exculpating himself and his associates from charges which he said had been thrown out, that they had indulged in an intemperate zeal against the prisoner, and some general observations on the obligations and duties of jurors, he proceeded to give at length his views of the law of treason, as applicable to this case. He said that in Great Britain there are no less than ten different species of treason, but in this country, where the principle is established by the constitution, there are only two descriptions of treason, and the number never can be increased by the legislature. The constitution declares that, "Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." With respect to the latter description, there was no occasion to say anything, as the offence charged in the indictment was "levying war against the United States." The constitution also provided that, "no person shall be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on confession in open court." The only question, therefore, which would present itself to their view at this stage of the proceeding, was, what shall constitute an overt act of levying war against the United States? What is in law an overt act of levying war? It is obvious that the interval between the first movement towards a conspiracy and actual hostilities is immense. There may be a conspiracy to "levy war;" but this is not treason. Individuals may meet together and traitorously determine to make dispositions to bring forces into the field, and levy war against their country; this is a conspiracy, but not treason. The conspirators may go a step further; they may not only project a plan for "levying war," but they may enlist troops for the purpose of prosecuting their traitorous designs; but this is not an overt act. It has been decided by the supreme court of the United States that the persons concerned in this conspiracy may yet take one step further, and be on the safe side of the line which separates conspiracy from treason. It has been adjudged that the individuals engaged in the treason may pro-

ceed to a place of rendezvous. But common sense and principles founded on considerations of national safety certainly require that the crime of treason should be completed before the actual commission of hostilities against the government. Actual force is not necessary to constitute the crime of treason. An assemblage of men convened for the purpose of effecting by force a treasonable design, which force is intended to be employed before their dispersion, is treasonable, and the persons engaged in it are traitors. He claimed that this was the principle settled by the supreme court in the Cases of Bollman and Swartwout [4 Cranch (8 U. S.) 75], in which the following words occur: "It is not the intention of the court to say that no individual can be guilty of this crime who has not appeared in arms against his country. On the contrary, if war be actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of action, are to be considered as traitors; but there must be an actual assembling of men to constitute a levying of war."

He further insisted, that it was not only not necessary that the persons so assembled should proceed to hostilities, but it was not necessary that they should be armed, or appear in military array. Permit me, said he, to examine the question on principles of common sense; for in legal discussions we do not always carry common sense along with us, from the beginning to the end. Suppose a number of men were assembled on Blennerhassett's Island—suppose (which I believe was not the fact) that they had no arms, but that they meet there for the purpose of descending the Ohio and the Mississippi for the purpose of seizing upon New Orleans. They calculate upon meeting their leader at the mouth of the Cumberland river; and they are told that either there or at Baton Rouge they are to get arms. They have no arms on the Island, or on the river; but would it not be an absurdity, and a violation of the principles of common sense, to say that they are not traitors because of this simple circumstance? The supreme court, he said, in giving a definition of treason, had not said a single word about the necessity of arms; but if he had read the decision right, had said that arms were not necessary. He referred to English authorities to show that in Great Britain, under the statute of 25 Edw. III. in which treason by levying war is defined in the very same words used in our constitution, the crime may be committed without arms. Fost. Crown Law, 208; 1 East, Crown Law, 67. He then discussed at length the proposition, that no actual hostility, no force or violence whatever, was necessary to the consummation of an overt act of levying war. The act was complete, he contended, the moment that a number of persons assembled together with a traitorous design to attain an object, the attain-

ment of which would be treason. He admitted that there were some expressions used by Judge Chase in the trial of Fries from which it might be inferred force was necessary to make the treason. But he thought the subject was not distinctly before the court, and therefore his opinion was extra-judicial. At all events, he was only a single judge, and his opinion could not prevail against that of the supreme court in session; and he contended that the doctrine that force or military array was necessary was not warranted by the decision of that court. He claimed that his position on this point was consistent with the English adjudications, and cited Fost. Crown Law, 211–218; 1 East, Crown Law, 67; 1 Hale, P. C. 146. He argued that there was no "constructive treason" involved in this doctrine. He then reviewed the facts as he expected them to be disclosed by the evidence, and claimed that they would show, first, that there was a treasonable design in the transactions about to be examined: secondly, that there was an assemblage of men for the purpose of effecting that object. He concluded by invoking the jury to enter upon the examination with calmness and impartiality, to do justice, and decide the case according to the evidence which would be brought before them.

On the conclusion of Mr. Hay's speech the question how long the court ought to be occupied each day was introduced, when Mr. Burr expressed a wish that the court should meet at as early and adjourn at as late an hour as possible. He referred to trials in England, in which the court sat twelve and sixteen hours every day, and proposed that the court should sit ten or twelve hours each day. This was opposed as too long, fatiguing and oppressive, in such warm weather.

The CHIEF JUSTICE said the court had no wish on the subject, but was willing to consult the convenience of the gentlemen of the bar, and the accommodation of the jury.

It was finally determined that the court should meet at nine o'clock in the morning, and sit till four in the afternoon.

Mr. Hay proceeded to the examination of the evidence on the part of the United States. General William Eaton was sworn, when Mr. Burr objected to this order of examining the witnesses.

[The argument on the question consumed the balance of the day. The chief justice rendered an opinion on the following day (Tuesday August 18, 1807), which will be found reported as Case No. 14,692h.]

General William Eaton was then called to give his evidence. He inquired whether he might be permitted to have a recurrence to his notes.

The CHIEF JUSTICE.—Were they written by yourself?

Mr. Eaton. They were taken and copied by me from others, which are at my lodgings.

Mr. Burr's counsel objected, unless he had the original notes.

Mr. Wickham.—At what time were they taken?

Mr. Eaton. At different times.

Mr. Burr.—What is the nature of them? Answer. They are nothing but memoranda, taken from notes which I made of the conversations between you and myself at the times when they passed.

THE COURT decided that they were not admissible.

Mr. Eaton. May I ask one further indulgence from the court? I have been long before the public. Much stricture and some severity have passed upon me. May I, in stating my evidence, be permitted to make some explanation about the motives of my own conduct?

The CHIEF JUSTICE.—Perhaps it would be more correct for the court to decide upon the propriety of the explanation when the particular case occurs. Some cases may require it; and if any objection be made to your explanation, then the court will decide upon it.

Mr. Eaton. Concerning an overt act which goes to prove Aaron Burr guilty of treason, I know nothing.

Mr. Hay.—I wish you to state to the court and jury the different conversations you have had with the prisoner.

Mr. Eaton. Concerning certain transactions which are said to have happened at Blennerhassett's Island, or any agency which Aaron Burr may be supposed to have had in them, I know nothing. But concerning Colonel Burr's expressions of treasonable intentions I know much, and it is to these that my evidence relates.

Mr. Martin.—I know not how far the court's opinion extends.

The CHIEF JUSTICE.—It is this: that any proof of intention formed before the act itself, if relevant to the act, may be admitted. One witness may prove the intention at one time, and another may prove it at another, so as to prove the continuance of the intention throughout the whole transaction, and therefore the proof of very remote intentions may be relevant to this particular act.

Mr. Martin.—I trust that when he speaks of a treasonable intention not applicable to this act the court will stop him.

Mr. Wickham.—If I understand the opinion of the court correctly, it relates to treason charged to be committed in Virginia, and evidence of acts out of it is inadmissible.

The CHIEF JUSTICE.—The intention to commit this crime, to erect an empire in the West, and seize New Orleans, may be shown by subsequent events to have been continued; and facts out of the district may be proved, after the overt act, as corroborative testimony.

Mr. Eaton. During the winter of 1805–6, (I cannot be positive as to the distinct point of time, yet during that winter,) at the city of Washington, Aaron Burr signified to me that he was organizing a military expedition to be moved against the Spanish provinces on the southwestern frontiers of the United States; I understood under the authority of the general

government. From our existing controversies with Spain, and from the tenor of the president's communications to both houses of congress, a conclusion was naturally drawn that war with that power was inevitable. I had just then returned from the coast of Africa, and having been for many years employed on your frontier, or a coast more barbarous and obscure, I was ignorant of the estimation in which Colonel Burr was held by his country. The distinguished rank he held in society, and the strong marks of confidence which he had received from his fellow citizens, did not permit me to doubt of his patriotism. As a military character, I had been made acquainted with none within the United States under whose direction a soldier might with greater security confide his honor than Colonel Burr. In case of my country's being involved in a war, I should have thought it my duty to obey so honorable a call as was proposed to me. Under impressions like these I did engage to embark myself in the enterprise, and pledged myself to Colonel Burr's confidence. At several interviews it appeared to be his intention to convince me, by maps and other documents, of the feasibility of penetrating to Mexico. At length, from certain indistinct expressions and innuendoes, I admitted a suspicion that Colonel Burr had other projects. He used strong expressions of reproach against the administration of the government; accused them of want of character, want of energy, and want of gratitude. He seemed desirous of irritating my resentment by dilating on certain injurious strictures I had received on the floor of congress on account of certain transactions on the coast of Tripoli, and also on the delays in adjusting my accounts for advances of money on account of the United States, and talked of pointing out to me modes of honorable indemnity. I will not conceal here that Colonel Burr had good reasons for supposing me disaffected towards the government; I had indeed suffered much from delays in adjusting my accounts for cash advanced to the government whilst I was consul at Tunis, and for the expense of supporting the war with Tripoli. I had but a short time before been compelled ingloriously to strike the flag of my country on the ramparts of a defeated enemy, where it had flown for forty-five days. I had been compelled to abandon my comrades in war on the fields, where they had fought our battles. I had seen cash offered to the half-vanquished chief of Tripoli, (as he had himself acknowledged,) as the consideration of pacification.

Mr. Wickham.—By whom?

Answer. By our negotiator, when as yet no exertion had been made by our naval squadron to coerce that enemy. I had seen the conduct of the author of these blemishes on our then proud national character, if not commended—not censured; whilst my own inadequate efforts to support that character were attempted to be thrown into shade. To feelings naturally arising out of circumstances like these, I did give strong expression. Here

I beg leave to observe, in justice to myself, that however strong those expressions, however harsh the language I employed. they would not justify the inference that I was preparing to dip my sabre in the blood of my countrymen, much less of their children, which I believe would have been the case had this conspiracy been carried into effect.

Mr. Martin objected to this language.

I listened to Colonel Burr's mode of indemnity; and as I had by this time begun to suspect that the military expedition he had on foot was unlawful, I permitted him to believe myself resigned to his influence that I might understand the extent and motive of his arrangements. Colonel Burr now laid open his project of revolutionizing the territory west of the Allegany, establishing an independent empire there; New Orleans to be the capital, and he himself to be the chief; organizing a military force on the waters of the Mississippi, and carrying conquest to Mexico. After much conversation which I do not particularly recollect respecting the feasibility of the project, as was natural, I stated impediments to his operations; such as the republican habits of the citizens of that country, their attachment to the present administration of the government, the want of funds, the opposition he would experience from the regular army of the United States stationed on that frontier, and the resistance to be expected from Miranda, in case he should succeed in republicanizing the Mexicans. Colonel Burr appeared to have no difficulty in removing these obstacles. He stated to me that he had in person, (I think the preceding season,) made a tour through that country, that he had secured to his interests and attached to his person, (I do not recollect the exact expression, but the meaning, and I believe the words were,) the most distinguished citizens of Tennessee, Kentucky, and the territory of Orleans; that he had inexhaustible resources and funds; that the army of the United States would act with him; that it would be reinforced by ten or twelve thousand men from the above mentioned states and territory; that he had powerful agents in the Spanish territory, and "as for Miranda," said Mr. Burr, facetiously, "we must hang Miranda." In the course of several conversations on this subject, he proposed to give me a distinguished command in his army; I understood him to say the second command. I asked him who would command in chief. He said, General Wilkinson. I observed that it was singular he should count upon General Wilkinson; the distinguished command and high trust he held under government, as the commander-in-chief of our army, and as governor of a province, he would not be apt to put at hazard for any prospect of precarious aggrandizement. Colonel Burr stated that General Wilkinson balanced in the confidence of his country; that it was doubtful whether he would much longer retain the distinction and confidence he now enjoyed; and that he

was prepared to secure to himself a permanency. I asked Colonel Burr if he knew General Wilkinson. He said, yes; and echoed the question. I told him that twelve years ago I was at the same time a captain in the wing of the legion of the United States which General Wilkinson commanded, his acting brigade-major, and aide-de-camp, and that I thought I knew him well. He asked me what I knew of General Wilkinson? I said I knew General Wilkinson would act as lieutenant to no man in existence. "You are in an error," said Mr. Burr, "Wilkinson will act as lieutenant to me." From the tenor of much conversation on this subject, I was prevailed on to believe that the plan of revolution meditated by Colonel Burr, and communicated to me, had been concerted with General Wilkinson, and would have his co-operation; for Colonel Burr repeatedly and very confidently expressed his belief that the influence of General Wilkinson with his army, the promise of double pay and rations, the ambition of his officers, and the prospect of plunder and military achievements, would bring the army generally into the measure. I pass over here a conversation which took place between Colonel Burr and myself respecting a central revolution, as it is decided to be irrelevant by the opinion of the bench.

Mr. Hay.—You allude to a revolution for overthrowing the government at Washington, and of revolutionizing the Eastern states.

I was passing over that, to come down to the period when I supposed he had relinquished that design, and adhered to the project of revolutionizing the West. .

Mr. Wickham.—What project do you mean?

Answer. A central general revolution. I was thoroughly convinced myself that such a project was already so far organized as to be dangerous, and that it would require an effort to suppress it. For in addition to positive assurances that Colonel Burr had of assistance and co-operation, he said that the vast extent of territory of the United States west of the Allegany Mountains, which offered to adventurers, with a view on the mines of Mexico, would bring volunteers to his standard from all quarters of the Union. The situation which these communications, and the impressions they made upon me, placed me in, was peculiarly delicate. I had no overt act to produce against Colonel Burr. He had given me nothing upon paper; nor did I know of any person in the vicinity who had received similar communications, and whose testimony might support mine. He had mentioned to me no person as principally and decidedly engaged with him but General Wilkinson; a Mr. Alston, who, I afterwards learned, was his son-in-law; and a Mr. Ephraim Kibby, who, I learnt, was late a captain of rangers in Wayne's army. Of General Wilkinson, Burr said much, as I have stated; of Mr. Alston, very little, but enough to satisfy me that he was engaged in the project; and of Kibby, he said that he was brigade-major in the vicinity of Cincinnati, (whether Cincinnati in Ohio or in Kentucky I know not,) who had much influence with the militia, and had already engaged the majority of the brigade to which he belonged, who were ready to march at Mr. Burr's signal. Mr. Burr talked of this revolution as a matter of right, inherent in the people, and constitutional; a revolution which would rather be advantageous than detrimental to the Atlantic states; a revolution which must eventually take place, and for the operation of which the present crisis was peculiarly favorable. He said there was no energy to be dreaded in the general government, and his conversations denoted a confidence that his arrangements were so well made that he should meet with no opposition at New Orleans, for the army and chief citizens of that place were now ready to receive him. On the solitary ground upon which I stood, I was at a loss how to conduct myself, though at no loss as respected my duty. I durst not place my lonely testimony in the balance against the weight of Colonel Burr's character, for by turning the tables upon me, which I thought any man, capable of such a project, was very capable of doing, I should sink under the weight. I resolved therefore with myself to obtain the removal of Mr. Burr from this country, in a way honorable to him; and on this I did consult him, without his knowing my motive. Accordingly I waited on the president of the United States, and after a desultory conversation in which I aimed to draw his view to the westward, I took the liberty of suggesting to the president that I thought Colonel Burr ought to be removed from the country because I considered him dangerous in it. The president asked where we should send him? Other places might have been mentioned, but I believe that Paris, London and Madrid were the places which were particularly named. The president, without positive expression, (in such a matter of delicacy,) signified that the trust was too important, and expressed something like a doubt about the integrity of Mr. Burr. I frankly told the president that perhaps no person had stronger grounds to suspect that integrity than I had; but that I believed his pride of ambition had so predominated over his other passions, that when placed on an eminence, and put on his honor, a respect to himself would secure his fidelity. I perceived that the subject was disagreeable to the president, and to bring him to my point in the shortest mode, and at the same time point to the danger, I said to him that I expected that we should in eighteen months have an insurrection, if not a revolution, on the waters of he Mississippi. The president said he had too much confidence in the information, the integrity, and attachment to the Union of the citizens of that country, to admit any apprehensions of that kind. The circumstance of no interrogatories being made to me I thought imposed silence upon me at

that time and place. Here, sir, I beg indulgence to declare my motive for recommending that gentleman to a foreign mission at that time; and in the solemnity with which I stand here, I declare that Colonel Burr was neutral in my feelings; that it was through no attachment to him that I made that suggestion, but to avert a great national calamity which I saw approaching; to arrest a tempest which seemed lowering in the West, and to divert into a channel of usefulness those consummate talents which were to mount "the whirlwind and direct the storm." These, and these only, were my reasons for making that recommendation. About the time of my having waited on the president, or a little before, (I cannot, however, be positive whether before or after,) I determined at all events to have some evidence of the integrity of my intentions, and to fortify myself by the advice of two gentlemen, members of the house of representatives, whose friendship and confidence I had the honor long to retain, and in whose wisdom and integrity I had the utmost faith and reliance. I am at liberty to give their names if required. I do not distinctly recollect, but I believe that I had a conversation with a senator on the subject. I developed to them all Mr. Burr's plans. They did not seem much alarmed.

Mr. Martin objected to the witness stating any of the observations of other persons to himself.

After some desultory conversation between the counsel on both sides, the CHIEF JUSTICE said that though more time was wasted by stopping the witness than by letting him tell his story in his own way, yet if it were required he must be stopped when he gave improper testimony. He then told the witness, "You are at liberty to vindicate yourself, but declarations of other gentlemen are not to be mentioned, because that certainly would be improper."

Mr. Eaton.—I did ask indulgence of the court to make such explanations, because perversions of my conduct were before the public. But I waive this indulgence, contented with meeting these perversions at some other time and place.

The CHIEF JUSTICE.—You have used that indulgence.

Mr. Eaton.—Little more passed between Colonel Burr and myself relevant to this inquiry while I remained at Washington. Though I could perceive symptoms of distrust in him towards me, he was solicitous to engage me in his western plans. I returned to Massachusetts, to my own concerns, and thought no more of Colonel Burr, or his projects, or revolutions, until in October last a letter was put into my hands at Brumfield, from Mr. Belknap, of Marietta, to T. E. Danielson, of Brumfield, stating that Mr. Burr had contracted for boats, which were building on the Ohio.

Mr. Burr.—Have you that letter?

Mr. Eaton.—No.

Mr. Burr.—It is improper, then, to state it.

Mr. Hay.—It is immaterial. Mr. Belknap is here.

Mr. Eaton.—As to letters, I have had no correspondence with Colonel Burr. I was about to state that I had made a communication, through Mr. Granger, to the president of the United States, stating the views of Colonel Burr, and a copy of the letter from Belknap was transmitted to the department of state.

Questions by the Prosecution:

Mr. Wirt.—Was there any conversation between you and the prisoner in which you spoke of the odium attached to the name of usurper? Mr. Eaton.—That conversation was excluded by the opinion of the court, as relating to the central project.

Mr. Hay.—Did you mean to state that the honorable indemnity proposed to you by the prisoner was to be included in this plan? Mr. Eaton.—I understood it to be included in the perpetual rank and emolument to be assigned me. In his conversations he declared that he should erect a permanent government, of which he was to be the chief, and he repeated it so often that I could not have misunderstood him.

Cross-questioned:

Mr. Martin.—Do you recollect when you arrived in Washington? Mr. Eaton.—I said that I did not recollect particularly. But the principal part of these conversations must have been between the middle of February and the latter end of March, 1806. I arrived here in the latter end of November, 1805, at Philadelphia, and in December went to New England, and afterwards returned. These conversations happened after my return. Question. Did you go any remote distance till you came back? Were you as far as Baltimore? (To these questions no answers were made, or, if made, were not heard.) Question. Do you recollect any particular conduct of yours calculated to put an end to Colonel Burr's importunities? Answer. Yes. At some of our last interviews I laid on his table a paper containing the toast which I had given to the public, with an intention that he should see it, but I do not know that he did see it, but I believe it. "The United States: Palsy to the brain that should plot to dismember, and leprosy to the hand that will not draw to defend our Union." Question. Where was that toast drunk? Answer. I cannot say. This question was made to me from authority. It was sent, with other toasts I had corrected, to a paper at Springfield. I laid this paper on Colonel Burr's table. Question. Was it drunk at any distant place? At Philadelphia? Answer. I do not recollect. I thought at first it was at Philadelphia, but on reflection it could not have been there. But I had received many hospitalities throughout the Union; many of my toasts were published; and in the hurry of passing and repassing I have completely forgotten.

Mr. Burr.—Do you recollect when you left Washington? Answer. About the 5th or 6th

of April. Question. Can you not be certain where this toast was drunk? At Washington or Philadelphia? Answer. I am not certain when or where it was drunk, but I am certain it was not at Washington, because I gave another there when called upon. Question. Did you say that all these conversations happened between the middle of February and the last of March? Answer. No, I did not say so. I said the principal part of these conversations passed in that interval.

Mr. Burr.—Did you say the paper containing that toast was laid on my table in March? Answer. I cannot tell. It cannot be material. From that time our intercourse became less frequent. You expressed some solicitude to keep me at your house. Question. You say that this toast was printed at Springfield? Answer. I did. Question. Have you in your possession a paper containing that toast? Answer. I have not here.

Mr. Martin.—Did you transmit the toast for publication, and to what printer? Answer. I do not recollect distinctly. Question. You mentioned something about a communication which you made to the president, through the postmaster general. Look at that paper. Is that your signature? Answer. It is; and I must give a short account of that paper. I went to Springfield, about twenty-five miles distant from my place of residence. Mr. Granger was there. I went to see him. On my arrival there, in the evening, I understood that he had gone out of town to his seat in the country, but that he had taken notes concerning those transactions. Next morning I went to his house. He put into my hands notes which he had got from Mr. Ely. Question. Whom were the notes written by? Answer. By Mr. Granger. They were subscribed by him, if I have a correct recollection. Mr. Eaton then mentioned that the notes on the two first pages were drawn up by Mr. Granger, from conversations which had passed between Mr. Granger and Mr. Ely, on certain communications made to Mr. Ely by Mr. Eaton, respecting Colonel Burr's plans; that he had seen Mr. Ely at Northampton, at the session of the court of common pleas, at the time when they had first heard of the building of boats on the Ohio. The notes on the last page, in Mr. Granger's writing, and subscribed by himself, were from subsequent conversations between him and Mr. Granger. Question. How many days' travelling is it by the stage from Springfield to Washington? Answer. Not more than five.

Mr. Burr.—You spoke of accounts with the government. Did you or the government demand money? Answer. They had no demand on me. I demanded money of them. Question. Did they state in account a balance against you? Answer. I expended money for the service of the United States when employed as consul at Tunis, an account of which being presented to the accounting officers of the treasury, they, I was told, had no legal discretion to settle it. As there was no law to authorize this adjustment, I did refer to the congress of 1803–4. A committee had reported on my claims, favorably, as I supposed. Then my accounts were left. When I went, however, to the coast of Barbary, and when I returned, after eighteen months, I renewed my claim to the congress. I found that new difficulties had occurred to prevent an adjustment. Leaving out the sums I had advanced, the government had a considerable balance against me. Some comments were made by a member from New York which I thought derogatory to my character, but the balance was in my favor. The last session of congress left them to the accounting officers to settle according to equity. It has been since settled and paid.

Mr. Martin.—Did not Colonel Burr confine his plans to attack the Spanish provinces, for the most considerable part of the time, to the event of a war with Spain? Answer. Not for the most considerable part of the time, but for some time.

Mr. Martin asked him some questions relative to his having seen him, accompanied by his step-daughter and another lady and a gentleman, at Georgetown and Alexandria, about the time he had spoken of, and whether he had given the toast then, when together in the same room. He admitted that he had seen him when so accompanied, but was not positive when or where the toast was given.

Mr. Martin.—What balance did you receive? Answer. That is my concern, sir.

Mr. Burr.—What was the balance against you?

Mr. Eaton (to the court).—Is that a proper question?

Mr. Burr.—My object is manifest; I wish to show the bias which has existed on the mind of the witness.

The CHIEF JUSTICE saw no objections to the question.

Mr. Eaton. I cannot say to a cent or a dollar, but I have received about 10,000 dollars.

Mr. Burr.—When was the money received? Answer. About March last. Question. You mentioned Miranda. Where did you understand he was gone to? Answer. On the benevolent project of revolutionizing the Spanish provinces. Question. What part of them? Answer. Caraccas. I had some reason, too, to know something of that project, because I too was invited to join in that. He, too, was to have been an emperor; he might have been troublesome to us; and of course when I asked you what was to be done with him, you observed, "hang him." Question. Did you understand that I was to do all at once, to execute the central project too as well as that in the West? Answer. I have no objection to answering that, but it will be nothing in your favor. When Colonel Burr was speaking of a central revolution, not much was said about his revolution in the West. Had the other been effected I doubt much whether you would have been willing to have separated that part. Question. You spoke of

a command? Answer. You stated what I have already mentioned, that you were assured, from the arrangements which you had made, that an army would be ready to appear when you went to the waters of the western country. I recollect particularly the name of Ephraim Kibby, who had been a ranger in General Wayne's army. You asked me about his spirit. You gave me to understand that his brigade was ready to join you, and that the people also in that country were ready to engage with you in the enterprise. You spoke of your riflemen, your infantry, your cavalry. It was with the same view you mentioned to me that that man (pointing to General Wilkinson, just behind him) was to have been the first to aid you, and from the same views you have perhaps mentioned me.

Mr. Martin objected to the witness interposing his own opinions in this manner.

Mr. Hay.—Some allowance is to be made for the feelings of a man of honor.

Mr. Eaton, bowing, apologized to the court for the warmth of his manner.

Mr. Burr.—You spoke of my revolutionizing the western states. How did you understand that the Union was to be separated? Answer. Your principal line was to be drawn by the Alleghany mountains. You were persuaded that you had secured to you the most considerable citizens of Kentucky and Tennessee, but expressed some doubts about Ohio; I well recollect that on account of the reason which you gave: that they were too much of a plodding, industrious people to engage in your enterprise. Question. How was the business to be effected? Answer. I understood that your agents were in the western country; that the army and the commander-in-chief were ready to act at your signal; and that these, with the adventurers that would join you, would compel the states to agree to a separation. Indeed, you seemed to consider New Orleans as already yours, and that from this point you would send expeditions into the other provinces, make conquests, and consolidate your empire. Question. Was it after all this that you recommended me to the president for an embassy? Answer. Yes; to remove you, as you were a dangerous man, because I thought it the only way to avert a civil war. Question. Did you communicate this to me, and what did I say? Answer. Yes; you seemed to assent to the proposition. Question. What had become of your command? Answer. That I had disposed of myself. Question. Did you understand that you had given me a definite answer? Answer. No; after you had developed yourself, I determined to use you until I got everything out of you; and on the principle that, "when innocence is in danger, to break faith with a bad man is not fraud, but virtue." Question. Did you think that your proposition, as to a foreign embassy, which was so incompatible with my own plans, would be received by me

with indifference had I abandoned the project? Answer. You seemed to me to want some distinguished place; as to the mode, you were indifferent; and you seemed to acquiesce in the plan of a foreign embassy.

Mr. Hay.—You said that you received about $10.000 from the government in consequence of a law passed for the purpose. The act of congress did not give you a definitive sum? Answer. The act of congress gave the accounting officers the power of settling with me on equitable principles under the inspection of the secretary of state; under whose department I had served, and the settlement was accordingly made.

Commodore Truxton was then sworn.

Mr. Hay.—Were you present when the court delivered its opinion? Answer. I was. I know nothing of overt acts, treasonable designs or conversations on the part of Colonel Burr.

Here Mr. Hay, the attorney for the United States, seemed to doubt whether the evidence of the commodore applied to this charge, and to be indisposed to examine him.

Mr. Wickham then observed that he would put two questions to him. 1st, Whether he had not frequent and considerable conversations with Colonel Burr concerning the Mexican expedition. 2d, Whether in any of those conversations he ever heard him say anything of a treasonable design.

Mr. Hay objected to his examination at this time, and Mr. Wickham insisted on it.

Mr. Wirt contended that the attorney had the right to examine the witness or not at this time, as he thought proper; that the court would recollect that there were two indictments against the prisoner: the one for high treason, now in discussion before the court, and the other for a misdemeanor (under the act of congress) for preparing an expedition against the Spanish provinces; that the witnesses were summoned promiscuously to support both charges; that the attorney could not ascertain what witnesses supported each indictment without inquiring of themselves; and what he now asked the witness, ought to be considered merely as an inquiry to which of the two indictments his evidence related; and that his evidence was deemed very material on the second indictment, though not on the first.

Mr. Hay said that on reflection he had no doubt the testimony of Commodore Truxton would have a direct bearing on the subject now before the court, when connected with the other evidence in the cause; that it would appear that there was an intimate connection between the two projects, the seizure of New Orleans and the attack on Mexico; he would therefore examine him now and propound this question. Have you not had several conversations with the accused concerning the Mexican expedition?

The commodore proceeded thus: About the beginning of the winter 1805–6, Colonel Burr returned from the western country to Phila-

delphia. He frequently, in conversation with me, mentioned the subject of speculations in western lands, opening a canal and building a bridge. Those things were not interesting to me in the least, and I did not pay much attention to them. Colonel Burr mentioned to me that the government was weak, and he wished me to get the navy of the United States out of my head; that it would dwindle to nothing; and that he had something to propose to me that was both honorable and profitable. but I considered this as nothing more than an interest in his land speculations. His conversations were repeated frequently. Some time in July, 1806, he told me that he wished to see me unwedded from the navy of the United States, and not to think more of those men at Washington; that he wished to see or make me (I do not recollect which of those two terms he used) an admiral; that he contemplated an expedition to Mexico, in the event of a war with Spain, which he thought inevitable. He asked me if the Havana could be easily taken in the event of a war? I told him that it would require the co-operation of a naval force. Mr. Burr observed to me that that might be obtained. He asked me if I had any personal knowledge of Carthagena and La Vera Cruz, and what would be the best mode of attacking them by sea and land. I gave him my opinion very freely. Mr. Burr then asked me if I would take the command of a naval expedition. I asked him if the executive of the United States was privy to or concerned in the project. He answered emphatically that he was not. I asked that question, because the executive had been charged with a knowledge of Miranda's expedition; I told Mr. Burr that I would have nothing to do with it; that Miranda's project had been intimated to me, but I declined to have anything to do with such affairs. He observed to me that in the event of a war he intended to establish an independent government in Mexico; that Wilkinson, the army, and many officers of the navy would join. I told Mr. Burr that I could not see how any officer of the United States could join. He said that General Wilkinson had projected the expedition, and he had matured it; that many greater men than Wilkinson would join, and that thousands to the westward would join.

Question by Mr. Hay.—Do you recollect having asked him whether General Wilkinson had previously engaged in it? Answer. He said yes, and many greater men than Wilkinson.

Question by Mr. Hay.—I will ask you whether at that time you were in the service of the United States? Answer. I am declared not to be.

Mr. Hay.—I do not wish to hurt your feelings, but merely to show to the jury the state you were in.

Commodore Truxton then proceeded: Colonel Burr again wished me to take a part, and asked me to write a letter to General Wilkinson; that he was about to dispatch two couriers to him. I told him that I had no subject to write about, and declined writing. Mr. Burr said that several officers would be pleased at being put under my command. He spoke highly of Lieutenant Jones, and asked me if he had sailed with me. I told him that he had not, and that I could give him no account of Mr. Jones, having never seen him to my knowledge. He observed that the expedition could not fail; that the Mexicans were ripe for revolt; that he was incapable of anything chimerical, or that would lead his friends into a dilemma. He showed me the draught of a periauger or kind of boat that plies between Paulus-Hook and New York, and asked my opinion of those boats, and whether they were calculated for the river Mississippi and the waters thereof; and I gave him my opinion that they were. He asked me whether I could get a naval constructor to make several copies of the draught. I told him I would. I spoke to a naval constructor and delivered it to him, but as he could not finish them as soon as Colonel Burr wished, the draught was returned to him. Mr. Burr told me that he intended those boats for the conveyance of agricultural products to market at New Orleans, and, in the event of a war, for transports. I knew and informed him that they were not calculated for transports by sea, nor for the carrying of guns; but having determined to have nothing to do with the Mexican expedition, I said very little more to him about those boats; but I very well recollect what I said to him in our last conversation towards the end of July. I told him that there would be no war. He was sanguine there would be war. He said, however, that if he was disappointed as to the event of war, he was about to complete a contract for a large quantity of land on the Washita; that he intended to invite his friends to settle it; that in one year he would have a thousand families of respectable and fashionable people, and some of them of considerable property; that it was a fine country, and that they would have a charming society, and in two years he would have double the number of settlers; and being on the frontier, he would be ready to move whenever a war took place. I have thus endeavored to relate the substance of the conversation which passed between us, as well as I can recollect; though it is very possible that I have not stated them after such a lapse of time verbatim.

Question by Mr. MacRae.—Was it in your first conversation that he told you that you should think no more of those men at Washington? Answer. It was in several.

Question by the same counsel.—Was it not in July that he told you that he wished to see you unwedded from the navy of the United States, and to make you an admiral? Answer. That conversation happened in July.

He wished to see or make me an admiral; I cannot recollect which.

Question by Mr. Hay.—Did those conversations take place after it was declared that you were no longer in the service of the United States? Answer. They did.

In answer to a question by Colonel Carrington, one of the jury, he again stated that the latter conversation was in July.

Question by Mr. Martin.—Was it not to the event of a war with Spain that these conversations related? Answer. All his conversations respecting military and naval subjects, and the Mexican expedition, were in the event of a war with Spain. I told him my opinion was there would be no war, and he seemed to be confident that there would be war.

Mr. MacRae.—Did he mention General Eaton in any of those conversations? Answer. He mentioned no person but General Wilkinson and Lieutenant Jones.

Mr. Hay.—Had you not expressed your dissatisfaction at the declaration of your not being in the service of the United States? Answer. I had. The misunderstanding between the secretary of the navy of the United States and myself took place in March, 1802.

On cross-examination, the commodore further stated that he had had several (he did not know how many) conversations with Mr. Burr; and that as well as he could recollect, it was about the latter end of July that he informed him that he was about concluding a bargain for the Washita lands, and wished also to see him unwedded from the navy of the United States. He added, Colonel Burr said that after the Mexican expedition he intended to provide a formidable navy, at the head of which he intended to place me; that he intended to establish an independent government, and give liberty to an enslaved world. I declined his propositions to me at first, because the president was not privy to the project. He asked me the best mode of attacking the Havana, Carthagena, and La Vera Cruz, but spoke of no particular force.

Question by Colonel Burr.—Do you not recollect my telling you the propriety of private expeditions, undertaken by individuals in the case of war; and that there had been such in the late war, and that there is no legal restraint on such expeditions?

Mr. Hay objected to this question as improper.

Colonel Burr insisted on its propriety, and that the gentleman for the prosecution had set an example far beyond it.

Commodore Truxton answered: You said that Wilkinson, the army, and many officers of the navy would join, and you spoke highly of Lieutenant Jones.

Colonel Burr.—Had I not frequently told you, and for years, that the government had no serious intention of employing you, and that you were duped by the Smiths? and do you not think that I was perfectly correct in that opinion? Answer. Yes; I know very well I was.

Colonel Burr.—Were we not on terms of intimacy? Was there any reserve on my part in our frequent conversations; and did you ever hear me express any intention or sentiment respecting a division of the Union? Answer. We were very intimate. There seemed to be no reserve on your part. I never heard you speak of a division of the Union.

Colonel Burr.—Did I not state to you that the Mexican expedition would be very beneficial to this country? Answer. You did.

Colonel Burr.—Had you any serious doubt as to my intentions to settle those lands? Answer. So far from that, I was astonished at the intelligence of your having different views, contained in newspapers received from the western country after you went thither. Question. Would you not have joined in the expedition if sanctioned by the government? Answer. I would most readily get out of my bed at twelve o'clock at night to go in defence of my country at her call, against England, France, Spain, or any other country.

Mr. Hay.—Did the prisoner speak of commercial speculations? Answer. He said they might be carried on to advantage. Question. Did he in his conversations speak of commercial establishments, in which he or his friends were to have an interest? Answer. He spoke of settling that country, and sending produce therefrom to different parts of the world, New Orleans particularly.

Mr. Wirt.—Did he speak of an independent empire in Mexico, having an advantageous connection with this country? Answer. I understood him so.

Mr. MacRae.—Did he wish to fill your mind with resentment against the government? Answer. I was pretty full of it myself, and he joined me in opinion.

Mr. Wirt.—On what subject did Burr wish you to write to General Wilkinson? Answer. General Wilkinson and myself were on good terms, and he wished me to correspond with him; but I had no subject for a letter to him, and therefore did not write to him.

Mr. Hay.—Suppose we were to have a war with Spain, would not New Orleans be a proper place from whence to send an expedition against the Spanish provinces? Is it not more proper for that purpose than any other place in the western parts of the country? Answer. Certainly it is; but large ships cannot come up to New Orleans; small craft or vessels must take the expedition down the river.

Question by Mr. Parker, one of the jury. Did you understand for what purpose the couriers spoken of were to be sent by Mr. Burr to General Wilkinson? Answer. I understood from him that there was an understanding between himself and General Wilkinson about the Mexican expedition.

Mr. Parker.—Was this expedition only to be

In the event of a war with Spain? Answer. Yes; in all his conversations with me, he said that this expedition was to take place only in the event of a war with Spain.

Mr. Parker.—Was there no proposition made to you for such an expedition, whether there was war or not? Answer. There was not.

Colonel Burr said that enterprises by individuals are lawful and customary in cases of war, and asked whether there were not preparations making in Philadelphia now for that purpose. Answer. Preparations are making at New York as to gunboats and fortifications. The merchants of Liverpool, in expectation of war, build ships for privateers, and if there be no war they convert them into Guineamen.

Question by Mr. MacRae.—Are not the preparations going on openly at New York? Has any commander been appointed independent of the government? Answer. No.

Question by Colonel Burr.—Did I not say that I had never seen Lieutenant Jones? Answer. I do not recollect that, but you spoke highly of him.

Question by Mr. Hay.—When he proposed to make you an admiral, did not the thought strike you how he was to accomplish this?

Mr. Botts denied that Commodore Truxton had said that Mr. Burr had promised to make him an admiral.

Commodore Truxton.—Mr. Burr told me he wished to make or see me one; I do not particularly recollect which was his expression.

Question by Mr. Hay.—From what quarter of the world was the expedition by sea to go? Answer. I do not know. I did not ask him where it was to go from.

Question by the same.—Did you not understand that you were to command the expedition by sea? Answer. I declined the offer, and asked no questions particularly on the subject.

Mr. Botts.—Can ships be built secretly in a corner? Answer. No.

Peter Taylor was next sworn.

Mr. Hay asked him to state everything he knew concerning the assemblage on Blennerhassett's Island.

Mr. Botts objected to this mode of examination; and though he was willing to accommodate Mr. Hay so far as to let the witness tell his story in his own way, yet he would not consent to his introducing completely illegal testimony. He had no objection to the witness stating what Colonel Burr had said, or the facts which happened on the island, though both were, strictly speaking, improper evidence; but he would not agree to his speaking of the declarations of Mr. and Mrs. Blennerhassett.

Colonel Burr said he waived the objection at present.

Mr. Hay.—This witness will directly prove the connection of Burr with Blennerhassett, and with the assemblage on the island.

Peter Taylor.—The first information I had upon this subject was from Mrs. Blennerhassett, when Mr. Blennerhassett and Mr. Alston were gone down the river. The people got much alarmed concerning this business, and Mrs. Blennerhassett sent me to Lexington after Mr. Blennerhassett, with a letter to prevent Colonel Burr from coming back with him to the island. I went to Chillicothe, but I did not find Mr. Blennerhassett there, and I then went on to Cincinnati. I was directed to call at Cincinnati, at Mr. John Smith's, where I would find Mr. Blennerhassett. I called at Mr. Smith's store, where I saw his son. I asked if Mr. Smith was at home. He said yes. I said I wanted to speak to him. His son went and told him a man wanted to see him. When Mr. Smith came out I inquired for Colonel Burr and Blennerhassett, to see whether he could give any account of them. He allowed he knew nothing of either of them. He allowed I was much mistaken in the place. I said no, this was the right place, "Mr. John Smith, Storekeeper, Cincinnati." Says I, "Don't you recollect a young man who came here some time ago for Colonel Burr's topcoat? (great coat.)" I said, "Sir, I have lived with Mr. Blennerhassett for three years." When Mr. Smith heard me talk so, he knew me, and took me up stairs to talk with me. He wanted to know the news up our way. I told him the people had got alarmed. I told him that everything was in agitation; that they talked about new settlements of lands, as they told me. He seemed surprised. He asked what was said about General Wilkinson? I said I knew nothing about it. He asked me if I would carry a letter from him to Blennerhassett. I told him I would carry anything, so as it was not too burthensome; so he sat down and wrote a letter. He asked whether I wished to drink, for he charged me not to go to any tavern, lest they should be asking me questions. He gave me liquor, and I drank; and then he showed me a stable, and told me to go and get my horse fed by the ostler, but not to go into the tavern. I asked him where I should find Colonel Burr and Blennerhassett. He said he expected they were at Lexington. I told him I supposed at Mr. Jourdan's. He said that was the very house. When I got to Lexington it was Saturday, about 1 o'clock. Mr. Jourdan happened to be in the street, and knew me. He said, "Peter, your old master, as you call him, is not in town." But he said, before I asked him, he expected him either that night or to-morrow early. He asked me, what news in our parts, and I told him. I asked him what I was to do with my horse. He said that he was to be put at the livery stable. He then went up stairs, and he opened a door and made a motion with his hand. I suppose to Colonel Burr. I went in, and there was Colonel Burr. Colonel Burr wanted to know the news in our parts. I began to tell him that my business was to prevent Colonel Burr from going back to the island. Question. Did you know Colonel Burr at that time? Answer. I did not. He had been on the island three

times, but I did not see him. When I told Colonel Burr that, says he, "I am the very man involved in this piece of business, and you ought to tell me all you know." I said, "If you come up our way the people will shoot you." I told him it was my sincere opinion that it was not safe for him to come up our way. I told him that I had heard several declare that they had rather shoot him than let it alone, if they had a good chance. He seemed surprised that they should have such a thing in their heads. I told him I could not tell why, and then I told him about the land settlement, but the people said all that was a fib, and that he had something else in view. Then Colonel Burr asked me what letters I had. I said two; one was from Mrs. Blennerhassett and the other from John Smith, of Cincinnati. He asked me if he might open the letter from John Smith to Blennerhassett, for he expected it was for him. I told him I supposed it made no difference between him and Blennerhassett, and he might. He broke the seal open, and showed me there was a letter inclosed for himself. He asked me about my wife. I asked him whether I might not go about the town. He said I might, and then I went down stairs and left the opened letter with him. I then went to Mr. Jourdan and asked him whether I was to stay at his house or go to a tavern? He said I was to go to a tavern, and he would pay for me. Mr. Jourdan wished me to go next day to Millersburg, after the saddle-bags left there by Mr. Blennerhassett. I told him I would, and I did go. I left Mrs. Blennerhassett's letter with Mr. Jourdan, expecting Blennerhassett to get there before me. I got back on Monday, by 1 o'clock, and then Mr. Blennerhassett was come and preparing to go home. We started, and came ten miles that night. We stopped at a tavern. I went to see after the horses, and he went into the house. There were people in the house who wanted to know his name. He told them his name was Tom Jones. He came out and told me the people in the house had asked, and he had told them his name was Tom Jones, and I must mind and not make no mistake, but call him Tom Jones too. So he passed by that name till we got to the Mudlicks. He then told me he was known there, and I must call him by his own name. Question. When did these things happen? Answer. All this was in October, 1806, I believe. He then began to inquire for young men that had rifles—good, orderly men, that would be conformable to order and discipline. He allowed that Colonel Burr and he and a few of his friends had bought eight hundred thousand acres of land, and they wanted young men to settle it. He said he would give any young man who would go down the river one hundred acres of land, plenty of grog and victuals while going down the river, and three months' provisions after they had got to the end. Every young man must have his rifle and blanket. I agreed to go myself, if I could carry my wife and family, but he said he must have further consultation upon that. When I got home I began to think, and asked him what kind of seeds we should carry with us. He said we did not want any; the people had seeds where we were going.

Mr. Wirt.—Of what occupation were you on the island? Answer. A gardener.

Mr. Wirt.—I put this question that the jury might understand his last observation.

I urged that subject to him several times. At last he made a sudden pause, and said, "I will tell you what, Peter, we are going to take Mexico, one of the finest and richest places in the whole world." He said that Colonel Burr would be the king of Mexico, and Mrs. Alston, daughter of Colonel Burr, was to be the queen of Mexico whenever Colonel Burr died. He said that Colonel Burr had made fortunes for many in his time, but none for himself; but now he was going to make something for himself. He said that he had a great many friends in the Spanish territory. No less than two thousand Roman Catholic priests were engaged, and that all their friends, too, would join, if once he could get to them; that the Spaniards, like the French, had got dissatisfied with their government, and wanted to swap it. He told me that the British, also, were friends in this piece of business, and that he should go to England on this piece of business, for Colonel Burr. He asked me if I would not like to go to England. I said I should certainly like to see my friends there, but would wish to go for nothing else. I then asked him what was to become of the men who were going to settle the lands he talked about. Were they to stop at the Red river, or to go on? He said, "Oh, by God, I tell you, Peter, every man that will not conform to order and discipline I will stab; you'll see how I'll fix them;" that when he got them far enough down the river, if they did not conform to order and discipline, he swore by God he'd stab them. I was astonished. I told him I was no soldier, and could not fight. He said it made no odds; he did not want me to fight; he wanted me to go and live with Mrs. Blennerhassett and the children, either at Natchez or some other place, while he went on the expedition. I talked to him again, and told him the people had got it into their heads that he wanted to divide the Union. He said Colonel Burr and he could not do it themselves; all they could do was to tell the people the consequence of it. He said the people there paid the government upwards of four hundred thousand dollars a year, and never received any benefit from it. He allowed it would be a very fine thing if they could keep that money among themselves on this side of the mountains, and make locks, and build bridges, and cut roads. About two weeks after I got home he sent me to Doctor Bennett's, of Mason county, with a letter. He wanted to know if Doctor Bennett wouldn't sell him the arms belonging to the United States which were in his charge.

If he could sell them and keep himself out of danger, he'd give him a draft upon his friend in Kentucky for payment. If he could not sell them without bringing himself into a hobble, he must send him word where they were kept, and he would come and steal them away in the night. I delivered the letter. He gave me directions to get it back and burn it, for it contained high treason. I was not to give the letter to Doctor Bennett until the doctor promised to deliver it back, for me to burn it, for that it contained high treason. I did burn it. The doctor was present. The doctor read the letter, and said he was unacquainted with the plot, and couldn't join in it.

Mr. Hay.—Were you not on the island when the people were there? Answer. Yes. Question. When did the boats leave the island? Answer. It was contemplated to sail on the 6th of December, but the boats were not ready; they did not come till the 10th (Sunday). Mr. Knox and several other men were with him, and they sailed on the Wednesday night following. Question. How many boats were there? Answer. Four. Question. How many men from the boats came ashore? Answer. About thirty. Question. What did the men do who did not belong to the boats? Answer. Some were packing meat, and some were packing other things.

Mr. MacRae.—Who went off on Wednesday night? Answer. Mr. Blennerhassett and Mr. Tyler, and the whole of the party. Question. At what time in the night? Answer. About one o'clock. Question. Did all that came down to the island go away? Answer. All but one, who was sick.

Mr. Hay.—Had they any guns? Answer. Some of them had; some of the people went a shooting. But I do not know how many there were.

Mr. J. M. Sheppard (a juryman).—What kind of guns, rifles or muskets? Answer. I can't tell whether rifles or muskets. I saw no pistols but what belonged to Blennerhassett himself. Question. Was there any powder or lead? Answer. They had powder, and they had lead both; I saw some powder in a long small barrel like a churn, but I was so employed I could not notice particularly. Some of the men were engaged in running bullets, but I do not know how many.

Mr. MacRae.—What induced them to leave the island at that hour of the night? Answer. Because they were informed that the Kenawah militia were coming down there. Question. Did you carry some boxes to the boats? Answer. I carried half a bushel of candles and some brandy; several boxes were carried, but I knew not what they contained, and a great many things besides, of which I knew nothing.

Mr. Hay.—Were you on the island when they went off? Answer. Yes. They held a council at the foot of the pier, to determine which was the best way to go. Mr. Blennerhassett said that they had better go together;

if he went in a canoe he would be an easy prey. I said to them, "best stick together;" and so they determined to stick together. They went off in great haste. Question. Why did they go in a body? Answer. I suppose for security.

Mr. Wickham.—You saw General Tupper and Mr. Woodbridge that night? Answer. Yes. Question. Was Colonel Burr there? Answer. No. I did not see him. Question. Did you understand whether he was in that part of the country at that time? Answer. I understood not; never saw him on the island.

The court then adjourned till to-morrow.

Wednesday, August 19, 1807.

The court met, according to adjournment, at the usual hour.

General John Morgan was then sworn, and gave the following testimony:

Some time in August last, about this time twelvemonth, my father put a letter into my hands, signed Aaron Burr, in which he said that himself and Colonel Dupiester would dine with him the following day. My father requested me and my brother to go and meet Colonel Burr, which we did about seven miles distant. After a few words of general conversation, Colonel Burr observed to me that the union of the states could not possibly last; and that a separation of the states must ensue as a natural consequence in four or five years. Colonel Burr made many inquiries of me relative to the county of Washington; particularly the state of its militia, its strength, arms, accoutrements, and the character of its officers. These conversations continued some time, besides other things, which I cannot recollect because I did not expect to be called upon in this way. After traveling some miles we met one of my workmen, a well-looking young man. Colonel Burr said he wished he had ten thousand such fellows. At my father's table, during dinner, Colonel Burr again observed that the separation of the Union must take place inevitably in less than five years. Shall I give the answers that were made?

Mr. Wirt.—Perhaps it may serve to connect your narrative better.

I recollect that it was my father who answered him, God forbid! Colonel Burr, in the course of conversation at the dinner table, observed that with two hundred men he could drive the president and congress into the Potomac, and with four or five hundred he could take possession of the city of New York. After dinner he walked with me to my brother's, about one mile distant, and in the course of the walk spoke of military men, and asked me if either of my brothers had a military turn? He said he should like to see my brother George at the head of a corps of grenadiers; he was a fine, stout-looking fellow. These circumstances induced me to speak to my father; I warned him to beware of Colonel Burr, and told him that in the course of

that night Colonel Burr would attempt to have an interview with him, and would make a requisition of my brother Tom to go with him, and that I suspected something was going on, but what I did not know. The next morning I rode with Colonel Burr to the town of Washington, about nine or ten miles. We had a good deal of conversation; principally on military affairs, on the state of the militia, the necessity of attending to military discipline. He told me the effect it had in New York; that in New York the militia were in good order, which was brought about by the influence and exertions of a single individual (Colonel Swartwout). Colonel Burr asked me if I thought I could raise a regiment in Washington county, or whether I could raise one with more facility in New Jersey.

Mr. Wirt.—You have lived in New Jersey? Answer. Yes. At Washington we took a walk, Colonel Burr, Colonel Dupiester and myself, down the town; and I pointed out to him the house where Mr. Bradford lived, who had been at the head of the western insurrection. He inquired about Mr. Bradford. (He was at Baton Rouge.) I told him his son was in town, and Colonel Burr expressed a wish to see him. Colonel Burr mentioned to me that he had met with several who had been concerned in the western insurrection, and particularly a major in the Northwestern Territory, (whose name I do not recollect,) who had told him that if he was ever engaged in another business of the kind, he pledged himself it should not end without bloodshed. He said that he was a fine fellow. It was on these circumstances that I advised my father to apprise the president of the United States that something was going on.

Mr. Hay.—Which way did he go? Answer. I saw him leave Washington for Wheeling.

Mr. Wirt.—Were the separation of the Union and military affairs the predominant subject of his conversations? Answer. Our conversation was very general and mixed, never very long; but these seemed to be the leading subjects.

Mr. Hay.—Do you recollect anything he said about Bradford's qualifications for conducting such an enterprise? Answer. I recollect it well. He said that Bradford was very incompetent to such an undertaking; and that in such a case there ought to be the utmost confidence in the leader.

Mr. Wirt.—At what time in the month of August was this visit? Answer. Somewhere between the 20th and 25th.

Mr. Hay.—Perhaps the date of this letter (from the prisoner to your father) may show. This letter is dated on the 21st.

Mr. Parker (one of the jury.) Did he approve or condemn that sentiment of the major's which you have just quoted? Answer. I do not recollect. Question. Did he make any further remarks respecting him? Answer. He only said that he was a fine fellow,

or words to that effect; that he was very fit for business of that kind.

Mr. Burr.—You spoke of a letter from me to your father. Do you know whether he wrote me, some time before, a letter of invitation to his house? Answer. Yes; he had written about a year before to you to Pittsburg. That letter is yet unsealed, in my brother Tom's bureau.

Question by the same. Do you remember that it was communicated to me and that that was the cause of my coming to visit him? Answer. Not by myself or my brother, in my hearing.

Question by the same. Do you remember the manner in which I introduced the subject you allude to? Was it in the course of a lively conversation? Was there anything very serious in it? Answer. You only mentioned it in a lively or careless manner. Question. Did your father communicate to you, next morning, our night's conversation? Answer. Yes. Question. Before we rode? Answer. No. Question. Do you recollect of my having made several inquiries, also, about the seminaries of learning, and of one that was projected in your neighborhood, and of my suggesting the necessity of encouraging it? Answer. You spoke much, too, on that subject. Question. Did I seem to know anything of Bradford before you told me? Answer. You seemed to know a good deal about the insurrection. Question. Did you not tell me that Bradford was a noisy fellow? Answer. I did not. I have no objections to give my opinion of Mr. Bradford. I mentioned him to you as a mere lawyer. Question. Did I seem to know that Bradford lived at Washington before you mentioned it and pointed out his house? Answer. You did not seem to know it. Question. Who were at dinner at your father's? Answer. My father, mother, wife, sister, Colonel Dupiester, Mr. T. Ewell, and my brother Tom.

Colonel George Morgan was then sworn, and was proceeding, when

Mr. Burr remonstrated against this kind of evidence, consisting of conversations and previous declarations. He did not mean to interrupt the inquiry, but to prevent the time of the court from being wasted. Some desultory conversation ensued upon this point, when

The CHIEF JUSTICE said that he understood the same objections would hereafter apply as well to the consideration as to the introduction of testimony; that these objections might be hereafter urged; and that it was impossible for the court to know the nature of the evidence before it was introduced.

Mr. Hay.—If the gentlemen will only have a little patience they will find that other circumstances will come out to prove the materiality of this testimony, and will also prove the most perfect connection between the different parts of the conspiracy. This

witness will prove what was the state of the prisoner's mind in August last.

Mr. Lee.—I hope, then, the jury will distinctly understand that they are not to infer from the court's declining to interfere on the present occasion that everything which drops from the witness is to pass without objection, which may be made at any time.

Colonel Morgan (the father of the last witness).—There has been a long acquaintance between Colonel Burr and myself. He had introduced to my notice two of his nephews by the name of Pollock, and a third by the name of Edwards, Pierrepont Edward's son. I had received many civilities from Colonel Burr, and many civil letters from him, from New York, in consequence of my civilities to those gentlemen. After these things had passed I had formed such an attachment to him that I never should have forgotten it had not this late business taken place. About three years ago Colonel Burr was under considerable, and, as I thought, unjust persecution. I had then a younger son (who is now here) studying law at Pittsburg. I wished to make him known to Colonel Burr, and in consequence of my friendship for him, and of the great rage of persecution against him, I invited him in that letter to come and see me at Morganza. In all probability I should have done the same thing from the attachment which I had conceived for him. Colonel Burr, however, had left Pittsburg before my letter reached it, and it remains now in my son's bureau at Pittsburg. On the 24th of last August I received a letter from Colonel Burr dated at Pittsburg, informing me that he should dine with me next day.

Here Mr. Hay handed the letter to Colonel Morgan, who said that the letter was dated on the 21st, and that he had not for some time seen it, as he had enclosed it to the president of the United States as introductory to his communication to him. This letter was handed to me by a man who called himself Count Willie, one of his attendants. I believe my son did not call on me that evening, but next morning I informed him that from my great affection for Colonel Burr, if I was able, I should certainly go and meet Colonel Burr; and I requested him and his brother to do it, with a letter of introduction, explanatory of their names and their intention. What conversation took place between him and my son I know not. Colonel Burr mentioned to me in conversation Colonel Dupiester as one of the first military characters of the age. I shall pass over the conversation and incidents during dinner. After dinner I spoke of our fine country. I observed that when I first went there, there was not a single family between the Allegany mountains and the Ohio; and that by and by we should have congress sitting in this neighborhood or at Pittsburg. We were allowed to sport these things over a glass of

wine: "No, never," said Colonel Burr, "for in less than five years you will be totally divided from the Atlantic states." The colonel entered into some arguments to prove why it should and must be so. The first reason was, the produce of the sale of the western lands being carried to the Atlantic states, and that the people to the west should not be tributary to them. He said that our taxes were very heavy, and demanded why we should pay them to the Atlantic parts of the country? By this time I took an opportunity to observe, God forbid! I hoped that no such things would ever happen, at least in my time. This observation terminated the conversation as to that particular point. It then turned upon the weakness and imbecility of the federal government.

Mr. Wirt.—Who started that subject?

Answer. Colonel Burr started it. I don't recollect saying anything on the subject, but began to think that all was not right. He said that with two hundred men he could drive congress, with the president at its head, into the river Potomac, or that it might be done; and he said with five hundred men he could take possession of New York. He appealed to Colonel Dupiester if it could not be done; he nodded assent. There was a reply made to this by one of my sons, that he would be damned if they could take our little town of Cannonsburg with that force. Some short time after this Colonel Burr went out from the dining-room to the passage, and beckoned to my son Thomas. What their conversation was I cannot say. Soon after a walk was proposed to my son's mill, and the company went. When they returned, one (or both of my sons) came to caution me, and said, "You may depend upon it Colonel Burr will this night open himself to you. He wants Tom to go with him." After the usual conversation Colonel Burr went up stairs, and, as I thought, to go to bed. Mrs. Morgan was reading to me, (as is usual when the family have retired,) when about eleven o'clock, and after I had supposed he had been an hour in bed, she told me that Colonel Burr was coming down, and as she had heard my son's conversation, she added, "You'll have it now." Colonel Burr came down with a candle in his hand. Mrs. Morgan immediately retired. The colonel took his seat by me. He drew from his pocket a book. I suppose it was a memorandum book. After looking at it he asked me if I knew a Mr. Vigo, of Fort Vincent, a Spaniard. I replied, yes, I knew him; I had reasons to know him. One was, that I had reasons to believe that he was deeply involved in the British conspiracy in 1788, as I supposed, the object of which was to separate the states, and which General Neville and myself had suppressed. I called it a nefarious thing to aim at the division of the states. I was careful to put great emphasis on the word "nefarious." Colonel Burr,

finding what kind of men he had to deal with, suddenly stopped, thrust into his pocket the book, which I saw had blank leaves in it, and retired to bed. I believe I was pretty well understood. The next morning Colonel Burr and Colonel Dupiester went off before breakfast, without my expecting it, in company with my son, and from that time to this I have not seen him but in this place. I well remember some explanatory circumstances. My son agreed with me that I should apprise the president of our impressions, and point out a mode by which Colonel Burr might be followed, step by step.

Mr. MacRae.—After your son's observation about the town of Cannonsburg and the subsequent conversation, did the prisoner draw any comparison between the people of the eastern and western country? Answer. He said, "keep yourself on this side of the mountain, and you'll never be disturbed;" by which I understood that there was an attempt to be made to effect a disunion. There is one more circumstance which I must state to the court. The Sunday after, the judge of our circuit court dined with me. I requested him to mention the circumstances to General Neville, and invited him to come the following Sunday to dinner with Judges Tilghman and Roberts, for I had business of the first importance to communicate. The court being longer engaged than was expected, they did not dine with me on that day; but they did on the following Sunday. These gentlemen wrote a joint letter to the president, informing him of my communications to them.

Mr. Burr.—What sort of a book was the one I had in my hand? Answer. It was a small book like this. (A pocket-book.) Question. Was it bound? Answer. It was not so large as this; I do not recollect whether it was bound, as it would not be very polite in me to take particular notice of such things when gentlemen are at my own house. Question. When you spoke of a nefarious plan, to what transaction did you allude? Answer. To Vigo's plan, which I conceived was intended to dissever the Union. Question. Who were present when Judge Tilghman saw you? Answer. General Neville, and Judge Roberts and my son. Question. Was there any other from Pittsburg? Answer. None. Question. Your conversation at dinner, then, was jocular about the moving of congress to Pittsburg. Was not part of the conversation jocular? Answer. My manner might have been jocular, but not my meaning. Question. Did you not once live on the Mississippi, or go to that country with a design to settle there? Answer. I did, with the approbation of my country, in order to take up and distribute lands to all my countrymen to the west of the Mississippi. Question. Did you acquire any lands there? Answer. I am told I have a right to some lands there. Question. Where was it that you lived on the Mississippi? Answer. At New Madrid. Question. On which side of the Mississippi? Answer. The west. Question. In the Spanish territories? Answer. With the approbation of the Spanish government. Question. How long did you live there? Answer. About forty days. I went from that place to New Orleans, where I detected a British spy. Question. In what year? Answer. In 1788.

General Morgan was then called in at the request of the prisoner.

Mr. Burr.—In what state of mind was your father when General Neville and Judge Tilghman were there? Answer. He had lately had a fall, which had done him considerable injury. Question. I mean as to his capacity. Did you not make some apology to Judge Tilghman for the state of his mind? Answer. I did tell Judge Tilghman that my father was old and infirm, and like other old men, told long stories, and was apt to forget his repetitions.

Mr. MacRae.—What was your reply to the prisoner's remark about two hundred men to attack congress, and five hundred men to take New York? Answer. When Colonel Burr said that with two hundred men he could drive the president and congress into the Potomac, I must confess that I felt myself hurt, and replied with some warmth, "I'll be damned, sir, if you could take the little town of Cannonsburg with that force." Colonel Burr replied, "Confine yourself to this side of the mountain, and it is another thing." Question. Do you recollect whether anything was said concerning the people on the eastern and western sides of the Allegany? Answer. He answered, "Confine yourselves on this side of the mountain, and it is another thing."

Mr. Baker objected to this examination by Mr. MacRae, as improper.

Question by Mr. Burr.—Do you recollect that the probability of a Spanish war was mentioned? Answer. It was a general subject of conversation between Colonel Burr and myself.

Thomas Morgan was next sworn. His evidence was as follows: On the evening of the 21st of August, my father received a letter from Pittsburg by the hands of some person, the signature of which was Aaron Burr. In that letter the writer communicated his intention of dining with my father on the following day; he also mentioned that he should take the liberty of introducing a friend. My father requested my brother and myself to meet him, which we accordingly did. Nothing of importance occurred during our ride in my presence. Colonel Burr rode generally with my brother; Colonel Dupiester was often with myself, and sometimes we were promiscuously together. Whilst we were at and after dinner Colonel Burr emphatically, as I thought confidently, and with great earnestness, said that we (meaning the people of the West) would be separated in five years from the Atlantic states, the Allegany

mountains to be the line of division. He said that great numbers were not necessary to execute great military deeds; all that. was wanting was a leader in whom they could place confidence, and who they believed could carry them through. This conversation occurred during dinner. He said that with five hundred men New York could be taken, and that with two hundred congress could be driven into the Potomac river. To the last observation, my brother, I think, indignantly replied, "By God! sir, with that force you cannot take our little town of Cannonsburg." Colonel Burr's reply to this observation was, "Confine yourself to this side of the mountain, and I'll not contradict you," or words to that effect. Colonel Burr withdrew from the room where we dined, and on reaching the door leading into the entry invited me, by a nod, to go with him. When we had arrived at the back door of the entry, out of hearing of any other person, Colonel Burr inquired what my pursuits were. I informed him that I was studying the law. He then said he was sure I could not find employment for either body or mind, but he did not further explain himself. He said that there were, or asked if there were not, a number of young men in Pittsburg similarly situated. He said that under our government there was no encouragement for talents; that John Randolph had declared on the floor of congress that men of talents were dangerous to the government. He asked me how or whether I would like a military expedition or enterprise. (I cannot recollect which, but it was some such expression.) My answer was, "It would entirely depend upon the object or cause for which I was to fight." I think previously, or certainly soon after, he said, "I wish you were on your way with me." After asking Colonel Burr concerning a young man (Mr. Duer) living at New Orleans, with whom I had a slight acquaintance, he said he was doing well; and he then spoke of Duer's brother, of whom I knew nothing, who was also doing well as a lawyer, but he had much rather be at the head of a military corps. Mr. Morgan then proposed to state the steps which his father had taken to defeat A. Burr's projects. when he was stopped by the court.

Mr. Burr.—Had you ever spoken to me before? Answer. Never. Question. Did you not mention, with some complaints, the neglect which your education had received? Answer. No. Question. Did you not complain about wasting your time? Answer. I recollect nothing on that subject, but your remark that I could not surely find employment for either body or mind.

Mr. Wirt.—Do you recollect your answer to Colonel Burr's observation that he would like to see you on your way with him? Answer: I do not recollect except what I have stated already. Here our conversation ended.

Mr. Hay.—Do you recollect, when you said that your liking a military life would depend on the object or cause in which you were engaged, whether anything more was said by Colonel Burr? Answer. No.

Examination of Jacob Allbright:

Mr. Hay.—Our object is to prove by his testimony the actual assemblage of men on Blennerhassett's Island, and it goes, of course, to prove directly the overt act.

Jacob Allbright. The first I knew of this business was, I was hired on the island to help to build a kiln for drying corn; and after working some time, Mrs. Blennerhassett told me that Mr. Blennerhassett and Colonel Burr were going to lay in provisions for an army for a year. I went to the mill where I carried the corn to be ground after it had been dried. I worked four weeks on that business on the island. Last fall, (or in September,) after Blennerhassett had come home, (he had been promising me cash for some time,) I stepped up to him. He had no money at the time, but would pay me next day, or soon. Says he, "Mr. Allbright, you are a Dutchman." But he asked me first and foremost, whether I would not join with him and go down the river. I told him I did not know what they were upon; and he said, "Mr. Allbright, we are going to settle a new country." And I gave him an answer that I would not like to leave my family. He said he did not want any families to go along with him. Then he said to me, "You are a Dutchman, and a common man; and as the Dutch are apt to be scared by high men, if you'll go to New Lancaster, where the Dutch live, and get me twenty or thirty to go with us, I will give you as many dollars." New Lancaster was some distance off. I went home then, and gave him no answer upon that. In a few days after the boats came and landed at the island. The snow was about two or three inches deep, and I went out a hunting. I was on the Ohio side; I met two men; I knew they belonged to the boats, but I wanted to find out; and they asked me whether I had not given my consent to go along with Blennerhassett down the river. As we got into a conversation together they named themselves Colonel Burr's men, belonging to the boats landed at the island. When they asked me whether I had not consented to go down with Blennerhassett, I put a question to them. I told them I did not know what they were about; and one of the gentlemen told me they were going to take a silver mine from the Spanish. I asked the gentlemen whether they would not allow that this would raise war with America. They replied, no. These were only a few men, and if they went with a good army they would give up the country and nothing more said about it. I had all this conversation with the two men. These men showed me what fine rifles they had, going down the river with them. Then I went to the island and Blennerhassett paid me off in Kentucky notes. People, however, did not

like these notes very well, and I went over to the bank at Kanawha to change them. I got two of the notes changed, and one, a ten dollar note, was returned to my hand, for which I wished to get silver from Blennerhassett. I went to the island the day the proclamation came out. But before I went to Blennerhassett's house I heard he was not at home, but at Marietta. I went on the Virginia side, where I met three other men belonging to the boats, with three complete rifles. They made a call upon me to take them to the island in my canoe, and I accepted (excepted or refused) to it, but afterwards I carried the third man, who stood close by my canoe, over to the island. After being some time on the island, I went down to the four boats. Blennerhassett was not at home yet, and I met some of the boat people shooting at a mark. They had a fire between the bank and boats. I saw this in the daytime.

Mr. Hay.—How many boats were there? Answer. Four.

I waited at the house till Blennerhassett came home. He appeared very much scared. One of the boatmen came up to him for something, and he told him, "Don't trouble me, I have trouble enough already." He went up to his chamber and I saw no more of him. I asked an old gentlemen who was there, and with whom I was well acquainted, to go up to his chamber and change my note for silver. He did go, and brought me silver. By and by I heard that they were going to start that night. Thinks I, "I'll see the end of it." This was the night of the very day that Blennerhassett got back from Marietta. He got back before night. When night came on I was among the men, and also in the kitchen, and saw the boatmen running bullets. One of them spoke out to the others, "Boys, let's mould as many bullets as we can fire twelve rounds." After that I saw no more till after twelve o'clock at night. Then Blennerhassett came down from the chamber and called up some of his servants; he had four or five trunks. They were not trusty hands enough to carry them to the boats, and some person called after my name, and asked me to help them, and I carried one of the trunks and moved along with them. When we got down, some person, I don't particularly know who, but think it was Blennerhassett himself, asked me to stand by the trunks till they were put in the boats. When the last of them went off I saw men standing in a circle on the shore. I went up to them; perhaps they were five or six rods from me. The first thing that I noticed was their laying plans, and consulting how Blennerhassett and Comfort Tyler should get safe by Gallipolis. One Nahum Bent was called forward, and when he came Blennerhassett asked him whether he had not two smart horses. Nahum Bent answered, no; he had but one. Then Blennerhassett told him to go to Captain Dana and get his sorrel horse; and Na-

hum Bent told him that the sorrel horse had no shoes on; and Blennerhassett said the roads were soft and would not hurt the horse. Blennerhassett told Nahum Bent to meet him and Comfort Tyler with the horses somewhere about Gallipolis. Bent inquired how he was to find him out; should he inquire for him? "No." "Have you no friends there?" "No." Mrs. Blennerhassett then came forward, and she told Blennerhassett and Comfort Tyler that they must take a canoe and get into it before they got to Gallipolis, and sail down the stream of the Ohio, for nobody would mind a couple of men going down the stream. She said "she'd" pay for the canoe. Blennerhassett told Nahum Bent to take the two horses and pass around Gallipolis before day, and then they might surround [go around] Gallipolis. After that a man by the name of Tupper laid his hands upon Blennerhassett, and said, "Your body is in my hands in the name of the commonwealth." Some such words as that he mentioned. When Tupper made that motion there were seven or eight muskets levelled at him. Tupper looked about him and said, "Gentlemen, I hope you will not do the like." One of the gentlemen who was nearest, about two yards off, said, "I'd as lieve as not." Tupper then changed his speech, and said he wished him to escape safe down the river, and wished him luck. Tupper before told Blennerhassett he should stay and stand his trial. But Blennerhassett said no; that the people in the neighborhood were coming down next day to take him, and he would go. Next day after I saw the Wood county militia going down. The people went off in boats that night about one. Question. All? Answer. All but one, who was a doctor. All belonging to the boats had some kind of arms. Some of the boats were on the shore and some not.

Mr. Hay.—How many men were there in all? Answer. About twenty or thirty; I did not, however, count them. Every man belonging to the boats that I took notice of had arms.

Mr. Coleman (one of the jury.) What day, month, or year, was this? Answer. In the fall of the year. I don't recollect the month or particular time, but there was snow on the ground.

Mr. Hay.—Do you recollect whether it snows in September? Answer. I do not know.

Mr. Sheppard (one of the jury.) Was Tupper a magistrate or officer? Answer. I know not. Question. Where had Blennerhassett been? Answer. In Kentucky.

Mr. Wirt.—Had you seen Colonel Burr on the island? Answer. Yes. Question. Was he there before Blennerhassett went to Kentucky? Answer. He was. Question. Did you speak of the boats under the command of Tyler? Answer. I did. Question. Did the boats quit the island at the time of hearing about the proclamation? Answer. Yes. Ques-

tion. Did the Wood county militia go there next day? Answer. Yes.

Question by Mr. Parker (one of the jury.) Did you hear Peter Taylor give advice? Answer. I did not.

Question by Mr. Parker. Did you see Peter Taylor converse with Blennerhassett that night? Answer. I do not recollect; I was busy about the boats.

Question by the same. How long did Aaron Burr remain on the island? Answer. I do not recollect.

Question by the same. How long had he been there before the departure of the boats? To this question he first answered that he did not know, and that Mr. Burr never returned back to the island; but after some reflection he said that he had been there about six weeks before the departure of the boats.

Mr. Sheppard (one of the jury.) How long was Blennerhassett absent? Answer. I don't know. I did not live on the island.

Mr. Burr.—Was that Mr. Tupper called General Tupper? Answer. He was. Question. Did you know General Tupper? Answer. Yes. Question. Is that the gentleman? (pointing to General Tupper, who was present in court.) Answer. Yes. Question. When the muskets were levelled at him, did they seem to have a mind to hurt him? Answer. Yes. A gentleman near me said, "I'd as lieve shoot as not."

Mr. Burr.—You said differently on a former occasion. Don't you recollect making a statement in which nothing was said about levelling guns at him, and that it looked like exercising? Answer. I do not.

A desultory conversation here ensued between the opposite counsel.

Mr. Burr professed that it was his intention to degrade the witness by invalidating his credibility.

Mr. Hay said that it was very probable if this man had at different times stated what seemed to be contradictory, he did it through ignorance; and Mr. Burr insisted that an error through ignorance might be as injurious to him as an error through immorality; he cared not which; that the consequences to him were in both cases the same.

Mr. Burr.—Have you not been examined before? Answer. Yes. Question. By whom? Answer. By Mr. Jackson. Question. Had he not printed questions in his hand? Answer. He had a paper in his hand. Question. Did he set down your answers? Answer. Yes. Question. How long after the guns were pointed at General Tupper before the men went to their boats? Answer. I do not recollect. Anything I am not certain of I cannot speak to. Question. Was Mrs. Blennerhassett there when the guns were pointed? Answer. Yes. Question. Was Tupper inside of the circle? Answer. Yes. Question. Was she too? Answer. I don't recollect. Question. Did you see Mr. Woodbridge there? Answer. I don't know him. He lived in the state of Ohio. Question. How long did you work with Blen-

nerhassett? Answer. Six weeks. Question. At what time was it you saw me there? Answer. I do not recollect.

Mr. Burr.—The counsel for the United States know, I presume, this circumstance, and have testimony to ascertain it.

Mr. Hay.—We have not, as far as I am informed.

Mr. Burr.—If they have no objection, I will state when I was on the island.

Mr. Hay said he had not.

Mr. Burr then said that it was on the last day of August and the first of September that he was on the island.

Question. Were the boats in the stream, or close to the land, when General Tupper wished them good luck? Answer. In shore.

Mr. Anthony (one of the jury:) Did you see any powder? Answer. No.

Mr. Hay.—Were you in the boats? Answer. I was not.

Mr. Burr.—Where does General Tupper live? Answer. In Marietta. Question. Does he not belong to the state of Ohio? Answer. Yes. Question. When did you first know him? Answer. Last fall.

Question by Mr. Parker. Where did you live before you went to work on the island? Answer. About a mile from the island.

Mr. Burr then asked the clerk for the statement which he had taken of Allbright's testimony, when it was submitted to the court on a former occasion, on the motion for binding himself in a higher bail. The clerk handed him the copy, and the prisoner proceeded with the examination.

Question. You said before that the men who raised their muskets against General Tupper were not in earnest? Answer. That was a piece of my opinion. I did not know whether they were in earnest, as there was no quarrel among them, and no firing afterwards.

Mr. Carrington, (one of the jury,) reminded him of an expression of one of the party, "I had as lieve as not shoot," which showed that they were in earnest.

Mr. Burr.—I beg the court to call on the prosecution for the deposition of this witness, taken before John G. Jackson.

Mr. Hay said that he would not let gentlemen have access to his portfolio when they pleased; that he must be satisfied by reasons assigned or required by the order of the court, before he produced it.

The CHIEF JUSTICE was not satisfied that the court had a right to call for the affidavit.

Mr. Hay observed that Mr. Jackson might not have taken down the testimony of the witness in his language, but couched it in his own; hence there might be an apparent variation between the present evidence and the affidavit, but that there was no real variance; that the object of Mr. Jackson's taking his affidavit was merely to ascertain whether he ought to be summoned as a witness or not; that this was the object in taking all the testimony which had been collected; that his affidavit was therefore general; but that the

man, after finding that he was to be summoned as a witness, had revolved the subject in his own mind, and recollected many circumstances which had not before occurred to him.

Mr. Burr.—We have a right to coerce this paper. If gentlemen will not surrender it, I may at all events avail myself of their refusal. My object is to prove such a diversity between the statements of the witness at different times as may destroy all faith in his recollection.

Mr. Hay.—Then, sir, although I might retain this paper, the gentlemen are welcome to make all the use of it they can. Take it.

Mr. Burr then proceeded. When you said that all had guns, did you mean to say that all in the circle, or all of them together without exception had arms? Answer. There were seven or eight who had guns, and there were other arms; but there might be more men than guns. Question. How many were in the circle? Answer. I did not count them. Qustion. What kind of guns had they? Answer. Rifles and shot guns. Question. Did you see any guns with bayonets? Answer. I saw none.

Mr. MacRae.—When did you see most arms? in the day, or in the night? Answer. I saw more arms in the day; but it was in the night that I saw most armed men.

Mr. Parker (one of the jury.) Why did you think that all of them had arms? Answer. Because I was with them almost all night. In the day I saw some of them shooting at marks, and I saw other arms at that time lying upon the beach.

Mr. Wickham.—Did you see them all with arms at once? Answer. No.

Question by the same. How many arms did you see in the whole, or at any one time and place together? Answer. I cannot tell.

Question by the same. Did you know the men who had arms? Answer. I did not.

Question by the same. Did you know the names of the other men? Answer. No.

Question by the same. Would you know any of them if you saw them? Answer. I would not. They are all strangers to me.

Question by the same. How could you distinguish the arms seen in the daytime from those seen late in the evening, or at night? Answer. I cannot answer.

Question. How, then, are you certain that you did not see the same arms at different times, in the hands of different persons? To this question he made no answer.

Peter Taylor was then called, and Mr. Hay asked him whether he had not seen Mr. Burr on the island. He answered he had not.

Mr. Burr.—If the gentlemen have done with the overt act, or when they have done, I will thank them to inform me, for then we shall have some considerations to offer to the court.

Mr. Hay.—We have other additional testimony to offer on this very point: the assemblage of men on the island.

Maurice P. Belknap was called, but did not answer.

William Love was then sworn.

Mr. Hay.—Were you on Blennerhassett's Island? Answer. Yes; but I was not there at the time when Colonel Tyler's boats arrived there. I was then at Marietta; and it was on Sunday that I went down in a skiff with two barrels of salt. Question. How many boats were at the island? Answer. Four. Question. How many men? Answer. I cannot tell you, but I suppose about betwixt twenty and twenty-five belonging to Colonel Tyler's boats. When I arrived on the island, Blennerhassett met me. Question. Did you see any arms? Answer. I saw the men and rifles. I know that Mr. Blennerhassett took away with him one brace of horse pistols, a brace of pocket pistols, and a dirk. Some fusees were put in the boat, but not more than three or four, all belonging to him. Question. And what arms had Tyler's men? Answer. Pistols, dirks and rifles, they brought there, but all were not armed with rifles. I know not whether they were armed with different things. Some of the men had guns, some had dirks. Being, as how, Mr. Blennerhassett's servant, that is, his groom, I went down the river with him. Question. Did you see Taylor and Allbright there? Answer. I knew Peter Taylor very well. I saw him there the morning of the day I went away, and I saw Allbright also. I saw Mr. Woodbridge, too. Question. What time did you set sail? Answer. We were the last to embark, and we started between twelve and one, as well as I can recollect. We parted with General Tupper in the greatest friendship, so I understood from others. I do not know that I saw him. I was the last man who went into the boat. Question. Did you see the prisoner on the island? Answer. I never saw Colonel Burr on the island. I first saw him at Natchez about two and a half years ago. Question. What took place after you left the island? Answer. That night was very cold. The next morning we stopped and made fires. Mr. Blennerhassett and Colonel Tyler went ashore and called the company together; and the best I could make out was, I understood that the governor of Ohio had uttered state warrants against Mr. Blennerhassett and Tyler, and that they wanted to make their escape as fast as possible. I went down with the party to Bayou Pierre, where——

Mr. Burr expressed a wish that the attention of the witness should be at present confined to the transactions on the island. He said that gentlemen ought to confine themselves to evidence of the overt act; that they would submit the question to the court; that it would be too late to discuss the question whether the evidence ought to be submitted to the jury, after it should have been all heard.

Mr. Martin.—Gentlemen had better confine themselves to facts within the district of Virginia. When they travel beyond the district,

we shall have some important questions to bring forward. We shall object to the production of such evidence.

Mr. Hay acquiesced for the present in this arrangement.

Mr. Burr.—Were not some of Mr. Blennerhassett's clothes put up in the boats? · Answer. Yes. Question. Did you not insist in putting those things in the boats? Answer. Yes. Question. Were not his books put in boxes and trunks? Answer. None that I ever saw. Question. How long had you lived with Blennerhassett? Answer. Ten or twelve days before we started. Question. How many guns had the party? Answer. I do not know; many of the young men that came down with Tyler were out a gunning. Question. Did you see anything like military appearance? Answer. The men were in a state of preparation to defend themselves, because they expected people from the mouth of Kenahwa, to attack Blennerhassett and the island. And to the best of my opinion, they did not mean to be killed without some return of the shot. It was said at Marietta that the people of Kentucky were to attack them, and I suppose they would have done their best to defend themselves. I should be sorry if a man slapped me on my face without returning the blow. Question. Was there no disturbance among the party on the island? ·Answer. None; I did not part with my friends in England more comfortably than in parting with the people on the island. Question. Were they in fear of being attacked when they first met together? Answer. Not till Tyler's boats came down. I do not recollect to have seen General Tupper there.

Mr. Parker (one of the jury.) Did you ever see all the men with arms? Answer. I cannot say. When I got to the mouth of Cumberland river, I saw a chest of arms opened.

Mr. MacRae.—Were any chests of arms put into the boats when you left the island? Answer. Not that I know. They might or might not have been put on board without my seeing them. Many things were put into the boats before I got in.

Mr. Parker (one of the jury.) Had you no conversation with Blennerhassett about the expedition? Answer. Only that if I did not choose to go with him, he would recommend me to some travelling gentleman as a servant, or if I went to the Washita, he would make me a present of a piece of land.

Mr. Burr.—Did you see any arms but those belonging to Blennerhassett? Answer. I did not.

Question by the same. Did you see any guns presented? Answer. I did not. Question. Were they mostly young gentlemen who came in the boats? Answer. They looked like young gentlemen in that country.

Mr. Wirt.—Why did they go away in the night? Answer. They were afraid of being taken by warrants issued by the governor of Ohio.

Mr. MacRae.—Was the chest which you saw opened at the mouth of Cumberland the same as those that you saw go from the island? Answer. No. Question. What did you think of this business? Answer. I understood the object of the expedition was to settle Washita lands.

Mr. Hay.—What kind of looking men were they? Answer. They looked like gentlemen, such as live upon their own property. Question. Did they look like men used to work? Answer. They did not. Question. When did you see Mr. Blennerhassett that night down at the beach? Answer. Late that night; it was a very cold night, raining and freezing; it was generally expected that the people would come and destroy Blennerhassett's house.

Mr. Parker (one of the jurymen.) Did you see any bullets run? Answer. Yes; but I do not know how many. I was a servant in the house, but could not ı   my own business and other people's too.

Dudley Woodbridge was next sworn.

Mr. Hay.—Were you on the island when the boats left it? Answer. I slept there that night.

Mr. Wirt.—What party do you mean? Answer. I allude to the four boats with Comfort Tyler, Mr. Smith, and others. Question. Were you at the boats? Answer. I passed them about dusk. Question. Did you see any of the men? Answer. I came to the island about dusk. I saw five or six standing about the boats. I went directly up from the landing to the house, and saw fifteen or twenty men in one of the rooms of Mr. Blennerhassett's house. Question. Had they any arms in their hands when you saw them? Answer. I recollect to have seen no arms but two pairs of pistols on the bureau of the room where I slept, which were gone in the morning.

Mr. Hay.—Had you no communication with Mr. Burr or Mr. Blennerhassett about this expedition? Will you inform us what you know on this subject? Answer. About the beginning of September or last of August, Mr. Blennerhassett, (with whom I had been connected in commercial business for six or eight years past, under the firm of Dudley Woodbridge and Company,) called with Colonel Burr at our counting-house at Marietta. Mr. Blennerhassett observed that Colonel Burr wished us to purchase a quantity of provisions. I am not positive that Mr. Burr was present when he first mentioned the subject, but I think he was. Colonel Burr then went into an inquiry about the prices of different kinds of provisions, and the expense of boats best calculated to carry provisions up and down the river. After his making a number of inquiries and receiving such information as I could give him, he left a memorandum of such provisions as he wanted, and of the boats which he wished to have built. They were to be on the Schenectady model, such as are used on the Mohawk river. The number ordered was fifteen; only eleven were com-

pleted. Question. What were their dimensions? Answer. Principally ten feet wide and forty feet long; five were to be ten feet longer. Question. What provisions were ordered? Answer. Pork, flour, whisky, bacon, and kiln-dried meal; but no article was purchased but pork, the prices in our market being much higher than those limited in the memorandum. I immediately made a contract with Colonel Barker to build the boats, and proceeded to make arrangements for purchasing provisions. The boats were built up the Muskingum, about seven miles above Marietta, and were to be delivered on the 9th of December. On that morning, when they were to be brought down, (the 9th of December,) I saw six or eight armed men of the militia going to take possession of the boats. I set off for Blennerhassett's Island, but met Mr. Blennerhassett, Comfort Tyler, Mr. Smith, and some young men from Belpre, going up to take down the boats. I informed them of the proceedings at Marietta, and advised Mr. Blennerhassett not to go up. After some consultation, he determined not to go up, and returned to the island. I went back to Marietta to get some money and papers, and returned that evening to the island, after getting the papers.

Mr. Hay.—On what terms was the contract for the boats made? Answer. I made the contract for the boats with Colonel Burr, and agreed to take a draft on New York. When Mr. Blennerhassett handed me the draft, I expressed my dissatisfaction at the long sight at which it was drawn, (being ninety days,) observing that it would not become due until after the time in which the boats and provisions were to be delivered, and that I wished to run no hazard. Mr. Blennerhassett, with some warmth, asked me if I doubted Colonel Burr's honor. When I repeated that I wished to run no risk, he said that he would guarantee the draft, and be answerable himself, and that in the event of its not being paid I might charge it to him. The draft was drawn by Mr. Burr on Mr. Ogden, of New York. These were the boats which Smith, Tyler, Blennerhassett, and the young men, were going up to receive.

Mr. Hay.—Do you recollect where the boats were to be delivered by the contract? Answer. Colonel Barker undertook to bring them, but there was no contract to deliver them at any particular place.

Mr. Parker. Did you say that it was the 9th day of December that the boats were to go away? Answer. The boats were to be delivered on the 9th, but those that were at the island went away on the 10th. When Colonel Barker was bringing them to Marietta they were taken by General Buel, as I understood, by order of the governor of Ohio.

Mr. MacRae.—State what occurrences took place on the island. Answer. I arrived about dusk, and immediately inquired about Mr. Blennerhassett. I stated to him that I was ready to adjust our partnership concerns, and that I had brought down the money and papers for that purpose. We went up stairs. We were two hours engaged in the business, after settling which I set off to go across the river home, and met Mr. Belknap at the shore. He asked me to go back with him—that he had business to do. I returned with him. We went both to bed at nine o'clock at night, where I remained, and did not, as the witness Peter Taylor states, go to the shore with the party when they went off. His saying that I was there then is a mistake, as this gentleman (Mr. Belknap) can prove.

Mr. Hay.—State to the court and jury for whom the boats were built. Was the contract made for the company? Answer. Yes; it may be so considered, but it was not particularly specified. Mr. Blennerhassett first introduced the subject, and Mr. Burr then spoke. As to the use for which these boats were intended, Mr. Blennerhassett made some communications to me respecting it. Shall I now state to the court these communications? (He was requested to proceed.) Late in August, or early in September, Mr. Blennerhassett mentioned to me that he had embarked in an enterprise with Colonel Burr; that General Eaton and some others were engaged in it, and that the prospects were flattering. Our first conversation lasted but a few minutes. The next week I was at the island, when he went into further particulars. From what he stated, the inference I drew was that his object was Mexico. He did not positively say so, but I inferred it from several circumstances, particularly from a map of that country which he showed me. He spoke highly of the country—stated its advantages, wealth, fertility, and healthiness. He asked me if I had a disposition to join. I evaded his question, but could not forbear telling him that I preferred my situation to an uncertainty, (which was the same as declining it.) On the way up to Marietta, he observed that he did not wish me to say anything about his conversation on this subject. This is the substance of my testimony.

Mr. Hay.—Do you recollect any further detail of the plan or object of the expedition? Answer. I do not.

Mr. Hay.—What became of the boats and the pork you purchased? Answer. The pork was taken and sold by order of the president or government; it was sold, as I understood, by General Buel. The boats, or a part of them, were afterwards fitted out by the government for transports, to convey troops from Marietta to St. Louis.

Colonel Burr.—Do you recollect that I told you that I wanted the description of boats used in the Mohawk river; and were they not made for shoal water, and to go up the stream? Answer. You did. The boats were to be calculated for shallow water.

Colonel Burr.—You know Mr. Blennerhassett well. Was it not ridiculous for him to be engaged in a military enterprise? How far can he distinguish a man from a horse?

Ten steps? Answer. He is very near-sighted. He cannot know you from any of us, at the distance we are now from one another. He knows nothing of military affairs. I never understood that he was a military man.

Question by the same. What became of his library? Answer. Part of it was carried down by Mrs. Blennerhassett; the residue was left behind and has been since sold.

Question by the same. Do you recollect when I was at Marietta? Was it not about the last of August or first of September? Answer. I left Philadelphia about the middle of August, and on my return I saw you about the time you mention. I have never heard that you have been there since. Question. What became of the draft on Mr. Ogden for two thousand dollars? Answer. It was paid. Question. What quantity of pork did you purchase for me? Answer. About one hundred barrels. Question. At what price? Answer. It cost about twelve, and was charged at thirteen dollars per barrel. Question. What became of it? Answer. I stored it in Mr. Green's cellar, adjoining our store. It was taken and sold by General Buel, by order of the government, as already mentioned; that is, as I understood. Question. Did you demand it of Mr. Green? (The answer to this question was not heard.) Question. To whom did you consider the pork as belonging when seized? Whose loss was it, yours or mine? Answer. It may hereafter become a dispute. Question. What were the boats estimated to be worth? Answer. Colonel Barker's bill for the eleven boats amounted to twelve or thirteen hundred dollars.

Mr. Martin.—Were you at any time that evening on the water's side with Mr. or Mrs. Blennerhassett? Answer. I was not.

Mr. Wirt.—You were asked, sir, about Mr. Blennerhassett's military talents. Permit me to ask you what were his pecuniary resources? What was the state of his money matters? Answer. I believe they are not as great as was generally imagined. I gave him six thousand dollars for one-half of his profits of our business. He had about three thousand dollars in stock in our company's concern. His fortune is much less than is generally understood. He had not over five or six thousand dollars in the hands of his agent at Philadelphia. His island and improvements cost about forty or fifty thousand dollars. It would not, however, sell for near that sum, except to a person of the same cast with Mr. Blennerhassett. After building his house, his property, exclusive of the island and five negroes, amounted probably to seventeen thousand dollars.

Question by Mr. Coleman, (the juror.) Explain again, if you please. In what did that property consist, and how much money could he command? Answer. He had nine thousand dollars in my hands in stock and profits already stated, and about one thousand dollars on another account, and the money in his agent's hands, besides his island and negroes. Question. Had he no foreign funds? Answer. I think he had none. They were vested in American stock some years before. Question. What was the amount of property he had in these funds? Answer. I believe the property left him by his father amounted to twenty thousand pounds sterling, which he vested in British three per cent. stock.

Mr. Wirt.—Is he esteemed a man of vigorous talents? Answer. He is; and a man of literature. But it was mentioned among the people in the country that he had every kind of sense but common sense; at least he had the reputation of having more of other than of common sense. Question. What are his favorite pursuits? Answer. Chemistry and music.

Mr. Hay.—Was Colonel Burr to have returned to the island? Answer. I believe so; I expected him to have returned in about two months—the time for the delivery of the boats.

Mr. Hay.—Had you received any money from Burr before the presentation of the draft by Blennerhassett? Answer. The draft was at so long a sight that I objected to letting the property out of my hands till I was secured by the responsibility of Mr. Blennerhassett. The balance over the two thousand dollars (the amount of the draft on Ogden) was to be paid by Mr. Burr on his return. He was to return in two months, and to complete the payment when the property was delivered.

Mr. Hay.—Did Mr. Blennerhassett bring you the draft? Answer. He did; but Burr made the contract with me.

Mr. Hay.—Do I understand you correctly in supposing that Mr. Burr contracted to pay two thousand dollars in one draft, and the balance on his return? Answer. You do.

Mr. Lee.—How many acres of land are in the island? Answer. Mr. Blennerhassett owned about one hundred and eighty acres, which was about half of the island, and cost him about five thousand dollars; but with the house and all, cost him forty or fifty thousand dollars, as already observed.

Mr. Hay.—Was not one of the boats fitted up for Mrs. Blennerhassett and family? Answer. One of the large boats was. Mr. Blennerhassett had taken a keel boat belonging to the firm up to Colonel Barker's to be fitted up for his family; but, by Colonel Barker's advice, he concluded to have one of the large boats prepared for that purpose, on account of its superior accommodation. This was accordingly done.

Mr. Hay.—Had not the delivery of the boats been interrupted by the armed men, would they not have been delivered to Blennerhassett? Answer. I suppose they would have been delivered at Marietta, where he would have received them.

Mr. Martin.—Was not the contract made by

Colonel Burr with your firm? Answer. It was.

Question by the same. Do you understand that Colonel Burr has received any consideration for this sum of two thousand dollars thus paid? Answer. I do not know.

Mr. Wirt.—If the delivery of these boats had not been prevented, would they not have been delivered to Blennerhassett or Burr? Answer. They would have been delivered to either. The company contracted for them.

Mr. Hay.—If delivered to Mr. Blennerhassett, would you not have considered yourself as delivering them to one of Burr's associates? Answer. I cannot say what I should have thought.

Colonel Burr.—How came you to suppose yourself authorized to deliver the boats to Blennerhassett, since I gave the draft? Answer. I should in any event have considered myself justified in delivering the boats to him, as he guaranteed the payment for them, and he had property to a larger amount in my hands; and besides these considerations, early in September Blennerhassett had mentioned to me his having joined Colonel Burr.

Mr. Baker.—Did you make any stay upon the beach, on the night of their departure? Answer. I did not, for I returned immediately to the house with Mr. Belknap.

Mr. Botts.—Were the people peaceable on that night? Answer. Yes.

Question by the same. Did you hear any noise like that of war, the roaring of cannon, or the rattling of small-arms? Answer. None.

Mr. Wirt.—Did you hear any alarm in the evening about the militia from the Ohio side? Answer. There was some alarm in the evening.

Mr. Parker. Did Mr. Burr leave the island before Mr. Blennerhassett communicated to you his being joined with him? Answer. I do not precisely recollect the time of the communication; but I knew that Blennerhassett had connected himself with him in the same enterprise, and I would therefore have delivered the boats to him.

Mr. Coleman. Was Mr. Blennerhassett's determination to go away the effect of your having told him of the armed men going to take the boats? Answer. That information might have operated with other circumstances.

Mr. Parker. Did you see the president's proclamation on that day? Answer. No; that was Wednesday, and it came next Friday by the mail. It was handed to me by the postmaster. I did not hear of its being sent otherwise. I might have heard of it before, but I am not absolutely certain.

Mr. MacRae.—Did you hear anything of it before? Answer. I do not recollect distinctly. I believe that the printer at Marietta, who had been to Pittsburg, had brought some information about a proclamation; I have some idea that he might have mentioned that he had seen it.

Mr. Hay.—Did you hear anything of a state warrant? Answer. No. I did hear that the legislature of the state of Ohio were sitting with closed doors, in consequence of something communicated by Mr. Graham, and that it was probable that the boats would be stopped, and that they would suppress the enterprise.

Mr. Wickham.—Did you understand that Blennerhassett's boats, or the people on the island, would be taken? Answer. I did not suppose that they would go to Virginia, but that they would only stop the boats that were built pursuant to his contract up the Muskingum.

Mr. Hay.—What was the cause of his precipitate flight? Did you hear any particular observations from any of the party on the island? Answer. Mr. Blennerhassett told me that he would go off in three or four hours; and I heard Comfort Tyler say that he would not resist the constituted authorities, but that he would not be stopped by a mob.

Mr. Wirt.—At the time he said so was the legislature of Ohio understood to be in session with closed doors? Answer. It was; and I saw the militia of Wood county assembled the next day or the day after.

Mr. Burr.—Was there not some danger of being stopped by the ice if they had not gone off as soon they did? Answer. I thought so; and that it was also hazardous for Mrs. Blennerhassett to go. Tyler was detained two days by Blennerhassett.

Mr. MacRae.—Did Blennerhassett that night communicate his apprehensions to you? Answer. He did not.

Mr. Burr.—Were Tyler's party disorderly? Answer. They were not. Question. Did they do any mischeif? Were they guilty of any misconduct? Answer. None.

The court then adjourned till the next day at the usual hour.

### Thursday, August 20, 1807.

The court met at the usual hour, when a desultory discussion took place, in which

Colonel Burr and his counsel insisted that the counsel for the prosecution should produce all the evidence which they had relative to the overt act, before they attempted to offer any collateral testimony; and again reminded them that as soon as all their testimony on that point was introduced they had certain propositions to submit to the court.

The counsel for the prosecution said that they had some more evidence to introduce on this point, and Simeon Poole was then sworn.

Mr. Hay.—Be so obliging as to say what you know with respect to the men on Blennerhassett's Island.

Simeon Poole. I never was on the island at that time, but was opposite to it. I saw boats and men there, if I mistake not, on the 10th of December. I arrived opposite the island about dusk, at the distance of about

one hundred and fifty or two hundred yards from it. I do not know how many boats there were. I saw people walking about in the evening, and in the course of the night they kindled a fire, and I saw some persons by the light that appeared to be armed, as if they were sentinels.

Mr. Hay.—Why did you think they were so? Answer. I don't know that they were, but they appeared so to my view. I don't know positively what they were, but they appeared to have guns, and looked like sentinels. I did not go over that night, nor did I offer to go. Boats were passing and repassing during the night, from the island to the main land. Question. To whom did these boats belong? Answer. I do not know, but I presume to the island. There were large boats at the landing, but these were small boats. I did not speak to them. I stood as much undiscovered as possible, as I was authorized by the governor of Ohio to apprehend Blennerhassett. I went for that purpose.

Mr. Hay.—Do you recollect any indications of arrangements about a watch-word? Answer. Yes. In the course of the evening I found that some boats crossed, and when a particular word was given I observed there were some that did not cross. I heard others that were hailed across and a word given. They would hail for a boat. The people on the island would ask, "What boat?" If the answer was "I's boat," the boat immediately put off.

Mr. Parker. On what occasion was the watch-word used? Answer. When the people on the Ohio side wanted to go across, they would hail or call for a boat. The people on the island would ask, "What boat?" and if the answer were, "I's boat," the boat would immediately put off.

Mr. Burr.—Till what hour did you stay out that night? Answer. I imagine it was as late as 10 o'clock. Question. Was it not cold enough to render a fire pleasant? Answer. It was. Question. Is it not usual for boats to build fires on the bank when it is so cold? Answer. It is. There seemed to be a considerable number of men on the island that evening, going up and down, to and from the house. The witness further observed that lanterns were passing during the night between the house and boats, as if there were business between them; that he could not say whether the persons whom he had called sentinels were not merely loitering around the fire; that he thought it likely that if he, too, had used the watch-word the boats would have put off for him; that he lived on the Ohio side; that he could not distinguish well, but he apprehended that some of them had guns, but most of the people were without guns.

Mr. Burr.—Do you not commonly hail boats when you wish to cross the river? Answer. It is not common to give a word. There were several boats hailed by people who did not use that word, and these people were not sent for; but there was no instance where the boat was not sent for the party hailing where that watch-word was used.

Maurice P. Belknap was then sworn.

Mr. Hay.—Will you tell us, sir, what you saw on the island? Mr. Belknap. On the evening of the 10th of December, I was at the island of Mr. Blennerhassett. I arrived there between 8 and 9 o'clock in the evening. I hailed a boat, and they asked my name. Having given it, a skiff was immediately sent over with two of Blennerhassett's servants. Having crossed, I met with Mr. Woodbridge, who returned to the house with me. When I went into the house, I observed in the room, when I first entered, a number of men, who, from the promiscuous view I had of them, might have been about twenty.

Mr. Hay.—What were they doing? Answer. The two or three I noticed near the door had rifles, and appeared to be cleaning them. These were all the arms I saw, for I merely passed through the room where they were. Near the place where I landed there appeared to be two or three boats, and people about them. It was a dark evening, and the lights in the boats was the only circumstance which made me notice them.

Mr. Burr.—Did you give a watch-word when they brought you over? Answer. I gave no watch-word; I only gave my name; but they brought me over.

Edmund P. Dana was next sworn.

Mr. Dana. I never saw Colonel Burr on the island.

Mr. Hay.—Will you state what you know about their number and arms? Answer. On the evening of the 10th of December I understood that the boats were to start with Comfort Tyler and his men down the river. Two other young men and myself were determined to cross over from Belpré, where I live, to the island. We went down to the landing opposite the island about dusk, took a skiff, and landed at the upper part of the landing. We then went up to the house. Tyler's boats lay below our own about seven or eight rods. I heard some person talking on board, but it was dark, and I could not distinguish any one. We went into the hall, a large room, where there were a number of men. I remained but a short time, and did not count them. I cannot say how many there were, but I should judge there were about fifteen or sixteen. One of them was running some bullets, and there was nothing but hubbub and confusion about the large fire. I was then introduced into a chamber, where there were Colonel Tyler, Blennerhassett, Mr. Smith, of New York, as they said, and three or four other gentlemen. I was introduced to Mr. Smith and Dr. McCassley, (or McCastle,) who had his lady, if I mistake not, there. I had been introduced to Colonel Tyler the day before.

Mr. Randolph.—Were you a perfect stranger to the people in the hall? Answer. I was.

Question by the same. Was there any alarm on your going in? Answer. They did not appear to be alarmed.

Mr. Coleman (one of the jury) addressed the court. Is it proper to ask any questions about the conversations which took place with those gentlemen?

The CHIEF JUSTICE.—It is left to the consent of the accused.

Mr. Burr.—If any of the jury think proper, I have no objection. The inquiry was not pressed.

Before the examination of Mr. Belknap and Mr. Dana, an interesting and animated discussion took place.

Mr. Burr said: Before the gentleman proceeds with his evidence, I will suggest that it has appeared to me that there would be great advantage and propriety in establishing a certain principle founded upon the facts which have been presented to the court. He said the facts which had been presented were to be taken for granted; and yet they utterly failed to prove that any overt act of war had been committed; and it was admitted that he was more than one hundred miles distant from the place where the overt act is charged to have been committed. He denied that any evidence was admissible to connect him with other persons, in acts done by them in his absence, and even done without his knowledge; or that facts brought from distant places could be connected with those done at Blennerhassett's Island, to give to the acts done there the name of treason, when no overt act of war was committed at that place. He commented upon the opinion of the supreme court in the Case of Bollman and Swartwout, and said that it had been totally misunderstood by the counsel for the prosecution. The defence had the right here to call upon the attorney for the United States to say whether an assemblage of men merely can be called, or in any way tortured into an act of "levying war." This point must be inevitably determined at some stage of the examination, and therefore they had the right to require of the prosecutor to show that every witness will give testimony tending to prove an overt act of war, or his testimony would be irrelevant and immaterial. Another point was, whether a person not present, remote, in another district, can be considered, in any possible legal construction, to be present, and concerned in the transaction, so as to make him a principal in the guilt of it. If not, then the necessity of examining the remainder of these 135 witnesses is done away, because their testimony can have no bearing on the case. If, said he, the gentlemen mean or expect to prove an overt act; if they mean to prove that I am the source of the whole transaction, and that there was anything like an act of violence on Blennerhassett's Island, and that there was actual war waged, actual exertion of force used, a collision of arms, or the like, then to be sure the case will have a right to go on to that point; but even then

there would be an absurdity, because of my being absent at that time, at a distance where I could not take a part in it. The gentlemen who are engaged with me as my counsel will enlarge on these points, and, if I am not mistaken, they will prove that this is the moment when the argument and decision will be most applicable, because upon the result will rest the future fate of the case.

Now, if my ideas are right, the gentlemen mean to argue that a bare assemblage of men, coupled with previous treasonable declarations, is treason. I understand that they mean to contend further, that a person not being present, but absent from the place where the treason is laid, he having counseled and advised the operations, should be denominated a principal in the treason. But this, I shall contend, is a species of constructive treason. Again: I shall ask what an accessory means, and prove that if it means what they think it does, resort must be had to the exploded common law of England. These questions, sir, will demand some attention from the court, and will be extremely interesting to the country at large, because every man might be affected by them. Gentlemen ought to come forward and say that they mean to charge me upon the common law: that though there was no force used in reality, yet by construction there was force used; that though I was not personally present, yet that by construction I was present; that though there really was no military array, yet by construction there was military array. Now, sir, we totally deny all these things, upon the soundest principles, and it is full time that it should be known what is, and what is not, the law on the subject.

Mr. Hay said he had no objection to any fair inquiry into these principles; but the motion was premature. He believed testimony would be introduced, and that presently, which would give a very different aspect to the transactions on Blennerhassett's Island to what had appeared. Although there was not on that island what Mr. Lee had called "open war," no "collision of arms," or "hard knocks," they would prove that there was "military array"; that the men were collected for military purposes, and that a military object was in view. It was impossible then to tell in what precise light the transactions on Blennerhassett's Island would ultimately appear, because new light was every moment coming in. He asked if the court after all that had been exposed, and with the uncertainty as to what might be brought to view, would undertake to say that an overt act of treason had not been proved. That was a fact to be ascertained by the jury. It was their province, and theirs only, to say whether the act has or has not been committed. The object of the motion was not to save time, but it was to prevent the public from seeing what they ought to see. He denied that there was any privilege or authority in this court, or in

the courts of Great Britain, to arrest inquiry and tell the jury that the act had not been proved, and therefore there was an end to the case. When the whole of the testimony should be laid before the court, it would then be in the power of the accused to address to the court a motion to instruct the jury on any point of law which the circumstances of the case might require. It would then become the duty of the court to take up the subject and say what is the law upon the case; and the jury would take the facts under their views, and regulate their verdict agreeably to the law and the facts that may appear.

. He did not understand what the common law had to do with any inquiry before our courts, except it was any part of it adopted by statute. He was willing to steer clear of the common law, and go entirely upon the principles of statutory law and common sense. The case was a charge for an overt act of treason in levying war. Would common sense say, or would our statutes or constitution require that the person who had produced all this commotion should be present when the battle was fought, or even when the troops were collected for the enterprise? He conceived the question to be, whether the accused was principally concerned with it—whether he did project and carry it on with a design to complete it? And how could this be ascertained, unless the prosecution were permitted to go on with the evidence?

. Mr. Wickham, in answer to the allegation that it was not a proper time to bring forward such a motion, denied that, during the whole three days that had been occupied in the examination of witnesses, there had been a single word, by any one witness, that could tend in the least to support the indictment. It is proved, (said he,) and the attorney for the United States declares, that Colonel Burr was not present at the time and place charged. Now we declare that it is absolutely necessary to prove the fact of presence at once: we say the indictment must inevitably fail without it. The counsel for the accused propose now to go into this question, and I trust the court will hear them. He would give an intimation to the counsel for the prosecution, that they should take a wide and extensive range on the subject, and by which they were convinced there would be a stop put to the case at once.

Mr. Burr added: The gentlemen were about to proceed to connect me with the act. I deny, sir, that they can do so. They admit that I was not there, and therefore let the nature of the transaction be what it may, it cannot affect me. Again: I deny that there was war, at all, and no testimony can be brought to prove that there was war; and surely the article war is of imperious necessity in the charge of treason. Now, if this be true, will the court go on week after week, discovering nothing that can affect me? I was desirous that the court, the jury, and the country should know what was charged against me; this has been done, and it has been found that I cannot be connected with the facts. I demand the opinion of the court on these points.

Mr. Martin spoke of the great length of time that the trial would probably last, if the prosecutor was permitted to go on in his own way. It was a very sickly season, and the probability of sickness among some of the jury or the court was very great, which would prevent the case going on. If one of the jurors should die, however far the case may have progressed, the trial must begin anew.

The CHIEF JUSTICE said that there was no doubt that the court must hear the objections to the admissibility of the evidence; it was a right, and gentlemen might insist on it. But as some of the transactions on Blennerhassett's Island remained yet to be gone into, he suggested whether it would not be as well to postpone the motion till that evidence was gone through.

Mr. Burr.—I have no objection to that, if they do confine themselves to Blennerhassett's Island, and strictly to transactions on that island; if so, we will hear it.

Mr. Hay said that the connection was meant to be proved; that the prisoner was not only connected, but principal in it, although absent.

(Belknap and Dana were then introduced, and testified as hereinbefore stated.)

Mr. Botts moved the court to direct the marshal to make payment daily of their allowance to about twenty witnesses, summoned for the accused, most of whom were so poor that they could not subsist without it. He had hoped the marshal would have paid them without this application. Colonel Burr thought them material, and summoned them from the best information he could obtain; and when the United States even imprisoned witnesses to compel their attendance, those of the accused ought at least to be supplied with the means of subsistence.

The marshal said that as the number of witnesses was so great, and many of them were said to know nothing of the subject in controversy, he was cautioned by the attorney for the United States not to pay them till their materiality was ascertained, or till the court ordered him.

Mr. Hay said that the expenses were so enormous, that they would be felt by the national treasury, though it was full. This justified the caution alluded to; and the laws contemplated to pay the witnesses as soon as they gave their evidence.

Colonel Burr said that when the attorney cautioned the marshal, it was supposed that he had summoned between two and three hundred witnesses, whereas the truth was that they did not exceed twenty; that they were material; that some of them were summoned to repel what might be said by the witnesses for the United States; that the United States had many advantages in com-

manding the attendance of their witnesses, which he had not; that he would not acquiesce in the establishment of a principle that might prove injurious to others; that the witnesses ought to be paid, and he hoped that there would be no more difficulty made on the subject.

After some more desultory observations, as the witnesses were stated and considered to be material, the court directed the payment to be made by the marshal.

Mr. Wickham then renewed the subject of objecting to the evidence. and again urged the gentlemen. who prosecuted to adduce, if they could, any more testimony in support of what they deemed the overt acts.

Mr. Hay objected to their course of proceeding, but added that he had only one or two more witnesses on that point, who were then absent, and if gentlemen were determined to make their motion, they might proceed.

(Subsequently, on Friday, the 21st of August, after Mr. Wickham had concluded the opening argument on the motion to arrest the evidence, the prosecution introduced the following additional testimony, which they admitted to be all they had relating to the transactions on Blennerhassett's Island:)

Israel Miller was then sworn.

Question by Mr. Hay.—Were you on the island, Mr. Miller. with Blennerhassett and his party. at the time charged in the indictment, the 10th of December last? Answer. I arrived on the island between the 7th and 10th of December last, in company with Colonel Tyler. who had four boats.

Question by the same. How many men had he with him? Answer. About thirty-two men.

Question by the same. What proportion of arms had they? Answer. Five rifles and about three or four pairs of pistols are all that I know of. I joined them at Beaver, and went down with them to Blennerhassett's Island, and there I saw one blunderbuss, two pairs of pistols, and one fusee. I do not know that there were any more.

Question by Colonel Burr.—How many bullets did you see run? Answer. I only saw one man run bullets.

Pearley Howe was then sworn.

Mr. Hay.—Will you be pleased to say what you know of the party on the island, their arms and conduct? Answer. I was not on the island during their stay on it. I was applied to by Mr. Blennerhassett to make about forty boat poles. On the evening of the 10th day of December I went to the landing (on the Ohio side) to deliver them, being called upon to do so, and Blennerhassett sent his flat to receive them. In this flat were two sentinels, being two young men, each of them armed with a rifle.

Mr. Hay.—State what you know of their arms on the island.

Mr. Howe. I flung the poles down the bank and offered them assistance, but they said they had men enough. One of my neighbors, Mr. Allan Wood, wished to go over in the flat, but they refused to take him. saying they had orders not to let any person go with them from the Ohio side.

Question by Mr. Hay.—Did you see any arms but the two rifles? Answer. None but those in the hands of these two young men. One of them laid down his rifle in the bow of the flat, and stowed away the poles as they were handed in. while the other sat on the bow and held his rifle across his thighs. I saw men on the island for three or four days, who were said to be Tyler's or Blennerhassett's men.

Question by Mr. MacRae.—Did you see those two men who were guards leave the boats? Answer. I did not; they stayed there constantly.

Question by Mr. MacRae.—Did you know these men? Were they not all strangers to you except Peter Taylor? Answer. They were.

Question by Mr. Burr to Mr. Miller.—Did you see General Tupper there? Answer. I did not see him, but I understood that he was there.

Question by the same. Did you see any disturbance there? Answer. No.

Question by the same. Were you with the boats all the time? Answer. I was.

Mr. Wirt.—Did you join this party there, or come with them? Answer. I came from Beaver with them.

The argument of this important motion, which finally put an end to the case, was commenced on Thursday, the 20th, and concluded on Saturday, the 29th of August, having occupied the attention of the court for eight days, during a session of seven hours each day. It was conducted on both sides with great ability, and elicited from Chief Justice MARSHALL, when he came to deliver his masterly opinion, the following high compliment: "A degree of eloquence seldom displayed on any occasion has embellished a solidity of argument and a depth of research, by which the court has been greatly aided in forming the opinion it is about to deliver."

The order in which the arguments were delivered was as follows: Mr. Wickham commenced the opening argument in support of the motion on Thursday, the 20th, and concluded on Friday the 21st; on which day Mr. Randolph followed on the same side. The court then, at the request of the counsel for the prosecution, adjourned till Monday, the 24th, to enable them to make preparation for answering the arguments which had been adduced. On Monday, Mr. MacRae made the opening argument on behalf of the prosecution. On Tuesday, the 25th, Mr. Wirt delivered his celebrated speech; after which Mr. Botts commenced an argument which he concluded on Wednesday, the 26th. On the same day Mr. Hay commenced an address, which he concluded on Thursday, the 27th. Mr. Lee followed in a comparatively brief but very lucid argument. Mr. Martin occupied the

whole of Friday, the 28th, and the greater portion of Saturday, the 29th, in delivering the learned and searching, but ill-arranged and ungraceful argument, which, next to Mr. Wirt's, has probably obtained more celebrity than any other delivered in the case. Mr. Randolph then closed the discussion by a short address.

In giving abstracts and extracts of some of these arguments in the following pages, and omitting others altogether, no invidious distinction is intended to be made between them. But where so many counsel addressed the court at great length on the same question, as a matter of course the same ground was repeatedly travelled over; and to give abstracts of all would neither be consistent with the prescribed limits of this work, nor entertaining to the majority of readers.

Mr. Wickham, in opening the argument in support of the motion, laid down and elaborately discussed four propositions, in substance as follows:

1. That under the constitution of the United States no person can be guilty of treason, by levying war, unless he was personally present when and where an overt act of war was committed, and participated therein.

2. Even admitting this construction of the constitution to be wrong, and that a person who was not present at the committing of the overt act may be guilty of the crime of treason by relation, still the facts must be specially charged in the indictment, and proved as laid. And inasmuch as the indictment charges Mr. Burr with personally levying war with others on Blennerhassett's Island, no evidence to charge him with the act by relation, he being absent at the time it was committed, is relevant to the indictment. He should not only be charged specially with the assessorial acts imputed to him, but charged and tried in the district where said acts were committed.

3. That if aiders, abettors, and procurers in treason be considered as principals, yet their guilt is derivative, and can only be established by legal proof that the persons whose acts they are answerable for have committed treason; which legal proof can consist of nothing less than a record of their conviction.

4. That the evidence wholly failed to prove that an overt act of levying war had been committed on Blennerhassett's Island; and hence no evidence could be received to charge Col. Burr, by relation, with an act which had not been proved to have been committed.

In support of the first proposition, Mr. W. contended that the clauses of the constitution which declare that "treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort," and that "no person shall be convicted, unless on the testimony of two witnesses to the same overt act," must be construed according to the plain, natural import of the words. The constitution is a new and orginal compact between the people of the United States, and is to be construed, not by the rules of art belonging to a particular science or profession, but like a treaty or national compact, in which words are to be taken according to their natural import, unless such a construction would lead to a plain absurdity. It being new and original, and having no reference to any former act or instrument, forbids a resort to any other rules of construction than such as are furnished by the constitution itself, or the nature of the subject. Hence, artificial rules of construction, drawn from the common law and the usages of courts in construing statutes, cannot be resorted to, to prove that these words of the constitution are to be construed, not according to their natural import, but that an artificial meaning, drawn from the statute and common law of England, is to be affixed to them, entirely different.

But even if these words of the constitution are to have an artificial meaning, such as it is contended has been given them in the courts of England, he denied that even in that country the rule had practically obtained that all persons aiding and abetting others in the act of levying war against the government are guilty of treason, though not personally present, notwithstanding some dicta of the law writers to that effect.

He admitted that Lord Coke, and after him some other writers who are deservedly revered, had laid down the general proposition that there are no accessories in treason, either before or after the fact, but that all are principals. But no adjudications in the case of an accomplice in the nature of an accessory before the fact bear them out in it, except that of Sir Nicholas Throgmorton, reported in 1 State Tr. pp. 63–76; and the conduct of the court on that occasion was so obviously contrary, not only to the rules of law and justice, but even to those of decency, that he persuaded himself the counsel on the other side would not rely on it as an authority. He read an account of this trial, from 4 Tuck. Bl. Comm. note B, p. 44.

He found in Tremaine's Pleas of the Crown (page 3) an indictment against Mary Speke for treason, in aiding the duke of Monmouth and others in levying war, with provisions; neither before nor after, but at the time when the treason was committed by the principals. She was not an accessory in fact, but an "aider" in the commission of the treason, and the case comes within the definition of "an aider or procurer," and belongs to the class of accessories before the fact. But neither history nor any report of the decision of the court (as far as he had been able to discover) informs us how the case was decided. It was in the fourth year of the reign of James II., when the spirit of persecution was very high, and was probably one of the cases decided by the execrable Jeffries, on the occasion of Monmouth's rebellion. Whether he carried this doctrine to the utmost length or

not, he could not say, but presumed the counsel for the United States would not rely on it as a precedent, even if it applied.

He had been unable to find any other decisions that go to this point with respect to accomplices, in the nature of accessories before the fact, to treason in "levying war." As to the other great class of treasons in England, that of compassing the death of the king, the crime does not admit of an accessory before the fact, as distinguished from a principal; because the crime consists in the intention, and every person concerned is a party to the agreement, and therefore, from the nature of things, a principal.

In the lesser treasons, such as counterfeiting the coin, he had not met with any instance of a conviction of an accomplice before the fact.

He admitted that there were to be found in England a number of convictions of receivers of traitors and other aiders in the nature of accessories after the fact; and he admitted the correctness of the inference, that if these decisions were proper to be considered as precedents, the principle would apply to aiders and abettors before the fact. But before they ought to be regarded as precedents worthy of imitation, we should inquire in what times and under what circumstances these cases were decided. He had not found any of them since the revolution of 1688, when the principles of liberty and enlightened jurisprudence began to be better understood than before; and most of those previous to that event were decided by Jeffries; such as the case of Lady Lisle, 4 Whart. St. Tr. 106; John Fernley's Case, Id. 131; and Elizabeth Gaunt's Case, Id. 142. He read from Hume an account of the "atrocious legal murder" committed in the trial and conviction of Lady Lisle; also in the case of Mrs. Gaunt. He admitted that these cases and Throgmorton's were precedents, if the counsel for the prosecution chose to rely on them. They could find no other.

Since the revolution of 1688, though the doctrine has been admitted by the writers, yet all the decisions of the courts that bear upon the subject lead to a directly different conclusion. The greatest number of prosecutions for treason in levying war since that time grew out of the rebellion of 1745. We all know the history of those times, and what cruelties the late duke of Cumberland committed after the victory of Culloden. Yet there was not a single instance of a conviction for assisting or harboring traitors. History mentions the wonderful escape of the Pretender, and his concealment and protection by the unexampled courage and fidelity of Miss McDonald. Yet no attempt was made to convict her of treason, or others who aided him, or even to prosecute them.

He went into a review of the cases to show that in every instance the overt act was laid in the particular county where the accused had been present, participating in the rebellion, and that proof of his presence at the place where the overt act was charged was held to be necessary to sustain the indictment. Deacon's Case, Fost. Crown Law, 9, 10; Sir John Wedderburn's Case, Id. 22; and Lord Balmarino's Case, 9 Tr. 605,—were referred to and relied upon as sustaining this position. He read from Judge Tucker's treatise on the subject, to show how the erroneous doctrine laid down by the elementary writers, that "in treason all are principals," originated. 4 Tuck. Bl. Comm. Append. 40–47. But, (said Mr. W.,) admitting that both the theory and practice in the English courts concur in establishing the doctrine which the gentlemen contend for, and that any man connected in any manner with traitors is himself a traitor, yet I contend that it cannot be law in this country, where the constitution of the United States has pointed out and established a different rule. The statute in England, on which all the indictments are founded, is well known to be that of 25 Edw. III. It does not create any new treasons of which the punishments are pointed out, or enlarge the doctrine of treason; but on the contrary was intended to narrow the legal definition of this crime, which was punishable at common law.

In construing the statute, therefore, the judges considered it as made in affirmance of the common law, except, where the restraining clauses were permitted to operate; it was construed according to the course of the common law, and the doctrine that all are principals in treason, if it rests on any foundation, can have no other than the common law. 1 Hale, P. C., pp. 76–87, proves that this statute, 25 Edw. III., was made to confine and limit the crime of treason, "which was, before that statute, arbitrary and uncertain." In page 85 he calls it "the great boundary of treason," and shows that its object was to prevent constructive treasons. This salutary statute is also spoken of by Hume as a very popular act passed to narrow, define, and limit treasons known at common law.

Under the federal constitution, I presume, it will hardly be contended by the counsel for the prosecution that we have any common law belonging to the United States at large. I always did believe, and still believe, that we have no common law for the United States, especially in criminal cases. The only ground on which the common law becomes a rule of decision in the federal courts, is under that clause in the judiciary law (1 Stat. c. 20, § 34, p. 92), which makes the laws of the several states a rule of decision, as far as they respectively apply. The common law is part of the law of Virginia, and the act of congress has adopted the laws of Virginia as the rule of decision in cases where they apply.

With respect to crimes and offences against the United States, which must be punished in a uniform manner throughout the Union, it seems clear, for the reason already given,

that none such can exist at common law, as the United States have in that character no common law, and that they must be created by statute. Unquestionably the gentlemen will not deny this uniformity; they will not contend that what is treason in Maryland is not treason in Virginia, or vice versa. If it exist at all, it must be uniform, embracing the whole of the United States. That the United States have no common law, and that offences against them must be created and prohibited by statute, is the opinion of the learned Judge Chase; and I believe that this opinion received the unqualified approbation of those who thought most unfavorably of his opinions and judicial conduct on other occasions.

Now, as there is no general common law of the United States, the act of congress must be construed without any reference to any common law, and treason is to be considered as a newly created offence, against a newly created government. In England treason and felony are classes or descriptions of offences at common law; they are generic terms; aiders and abettors are punished in the former, if you will, as principals, in the latter as accessories. It is a rule of law there that, when a statute is made in affirmance of the common law or to supply the defects of the common law, it should be expounded according to the common law. See McDaniel's Case, 10 How. State Tr. 436; Hob. 98.

It has therefore been held, that if an act, criminal at common law, be declared by a statute to be felony or treason, it being made to supply the defects of the common law, its prototype, the same consequences follow as if it were felony or treason by common law. It becomes therefore unnecessary to mention accessories, or even to define the punishment; and accordingly there are acts of parliament which go no further than to declare that the offences mentioned in them shall be felony, without even mentioning the punishment. This rule may be questioned on this ground, that penal statutes should be construed strictly; but it is generally considered as law in England, that when a felony is created by statute, accessories to it, though not named in the statute, are punishable; and that all legal consequences of felony are attached to it by the common law, except in cases where the special nature of the act leads to a different conclusion. This rule is illustrated by the decisions on the 28 Hen. VIII. c. 15, which makes piracy, an offence not punishable by common law, felony. It has been solemnly adjudged, that as this was not a common law offence, it worked no corruption of blood; that accessories to it were not punishable; in short, that the statute not being made in imitation or supply of the common law, shall not be construed according to the course of the common law.

If, therefore, I be right in my postulatum, that there is no common law of the United States, as such, it follows as a necessary consequence, that no persons can be punished for treason, or any other offence under an act of congress creating such offence, unless they come within the description of the act; that no person can be said to have levied war against the United States, where it had not been levied by himself, but by others; and that no overt act of others can, under the statute, be made his overt act. That such was the opinion of the framers of the act of congress (Laws U. S. 1 Stat. p. 100), for the punishment of treason and other offences is manifest. In sections 10 and 11 of the act. the punishment of accessories before and after the fact is defined; that of the former is death, as in the case of a principal; that of the latter, fine and imprisonment. If the English rule concerning accessories to felonies, were thought to obtain, to what purpose was the 10th section enacted? By the 10th section, the person who advises the piracy is declared to be an accessory and made punishable. If it were implied why was this provided? In section 16th, persons stealing military stores, their counsellors, aiders, and abettors are mentioned; why were they expressly mentioned if they would have been necessarily implied? In the 10th section some offences are enumerated, the accessories to which, before the fact, are expressly made punishable with death; and in the 11th section the accessories to the same crimes, after the fact, are in express terms made punishable with imprisonment not exceedings three years, and with fine not exceeding five hundred dollars; but even in this enumeration, treason is not included. In both sections the offences of murder, robbery, or other piracy, are mentioned, and in the latter felony is added. The obvious conclusion resulting from this provision in these sections is, that without it, accessories to those offences, neither before nor after, would have been punishable; and that as treason is omitted, accessories to that offence, whether before or after its commission, are not subject to be punished. The 23d section affords an argument still more directly applicable to the present question. It provides that "whoever shall by force set at liberty or rescue any person who shall be found guilty of 'treason, murder, or any other capital crime, or rescue any person convicted of any of the said crimes, going to execution, or during execution, every person so offending, and being thereof convicted, shall suffer death." "And if any person shall by force set at liberty or rescue any person who before conviction shall stand committed for any of the capital offences aforesaid, or if any person or persons shall by force set at liberty or rescue any person committed for or convicted of any other offence against the United States, every person so offending shall, on conviction, be fined not exceeding five hundred dollars, and imprisoned not exceeding one year." This provision punishes those who rescue persons guilty of these crimes after conviction with

death, but after commitment and before conviction, with fine and imprisonment only.

Now, according to the gentlemen's arguments, all are principals, as well the mere receivers after as the procurers, or the actual perpetrator of the offence. There is no distinction in the books. The English writers consider persons who rescue or set at liberty traitors as accessories after the fact; and they are said to be indictable as traitors. Why, then, was this clause inserted? A receiver of a traitor is as much a principal, according to the doctrine laid down in the English books, as a person aiding before the fact. Will the counsel for the United States contend that such a receiver is punishable as a traitor, while the person who forces open the doors of the prison, and rescues the principal out of the hands of the marshal, shall be punishable only by a fine of five hundred dollars, and by one year's imprisonment? If so, a man might rescue a traitor before conviction, and conduct him to another, who receives him. The receiver who, like Lady Lisle, only entertains him but for one night, would be punishable with death, while the rescuer and conductor, whose crime has the additional ingredient of force, and that force directly employed in opposing the administration of justice, would be only fined and imprisoned! It is so absurd and contrary to the rules of equal justice, that it is impossible that the legislature could have intended it. It proves that congress were of opinion that aiders and abettors were not, according to the constitutional definition of treason, traitors and principals. If this were an English statute, made with reference to the common law, I might with propriety contend that it was the intention of the legislature that when counsellors, aiders, and abettors of some offences are named and not those of others, those not mentioned should be considered as not within the meaning of the act according to the maxims of law. If this were not their intention, why did they mention these terms in one and not in the other?

But it will be said that in high treason it is unnecessary to mention counsellors, aiders, &c., because in treason there are no accessories; all are principals. Now this argument is founded on a total misapplication of terms. If they can be punished at all, it is as principals; but in point of fact, there may as well be aiders and abettors in treason as in other offences. Indeed, there are many instances to be found in the statute-books of these very words "aiders, counsellors, and abettors" being used and applied to treason. The statutory treasons between 25 Edw. III. and 1 Mary are collected by Lord Hale in the 24th chapter of his Pleas of the Crown, p. 258, and among others I would refer the court to 20 Hen. VI. c. 3, mentioned by him in page 270; 26 Hen. VIII. c. 13, and 27 Hen. VIII. c. 2, in page 275; 35 Hen. VIII. c. 1, in page 280; all of which, and I doubt not many more, expressly mention counsellors, aiders, and abettors. If it be not necessary to mention aiders and abettors to make them punishable, why are they inserted in these statutes? In page 275 "maliciously to wish, will, or desire, by word or writing, or by craft, to imagine, invent, practice, or attempt, any bodily harm to the king, queen, heir apparent, &c., to detain his castles," &c., is "enacted to be treason in the offenders, their aiders, counsellors, consenters, and abettors." "Counterfeiting the privy seal, privy signet, or sign manual, is made treason, and the offenders, their counsellors, aiders, and abettors, to suffer as in case of treason," &c. The statutes which are made with a reference to this law, mention aiders, counsellors, and abettors in some clauses, and not in others. Is not the inference fair that where they are not mentioned they are not intended to be subjected to punishment? And when congress took up the doctrine of treason with reference to the constitution, and did mention the aiders and abettors in some cases, but not in others, is not the conclusion equally fair that they did not intend that they should be involved in the guilt or punishment of treason, except where they are expressly mentioned? But a still better reason may be given why congress did not mean to include aiders, counsellors, &c., in the guilt or punishment of treason. It was prohibited by the constitution of the United States to enlarge the doctrine of the commission of treason, and they knew that such a provision would be void. This brings me to the consideration of the constitution itself. I have before endeavored to demonstrate that this instrument is not to be explained by the same narrow, technical rules that apply to a statute made for altering some provision of the common law; but that such a construction should be given as is consistent not only with the letter but the spirit in which the great palladium of our liberties was formed.

The object of the American constitution was to perpetuate the liberties of the people of this country. The framers of the instrument well knew the dreadful punishments inflicted, and the grievous oppressions produced, by constructive treasons in other countries, as well where the primary object was the security of the throne as where the public good was the pretext. Those gentlemen well knew from history, ancient as well as modern, that, in every age and climate, where the people enjoyed even the semblance of liberty, and where factions or parties existed, an accusation of treason, or a design to overturn the government, had been occasionally resorted to by those in power as the most convenient means of destroying those individuals whom they had marked out for victims; and that the best mode of insuring a man's conviction was to hunt him down as dangerous to the state. They knew that mankind are always the same, and that

the same passions and vices must exist, though sometimes under different modifications, until the human race itself be extinct. That a repetition of the same scenes which have deluged other countries with their best blood might take place here they well knew, and endeavored as far as possible to guard against the evil by a constitutional sanction. They knew that when a state is divided into parties, what horrible cruelties may be committed even in the name and under the assumed authority of a majority of the people, and therefore endeavored to prevent them. The events which have since occurred in another country, and the sufferings under Robespierre, show how well human nature was understood by those who framed our constitution.

The language which they have used for this purpose is plain, simple, and perspicuous. There is no occasion to resort to the rules of construction to fix its meaning. It explains itself. Treason is to consist in levying war against the United States, and it must be public or open war; two witnesses must prove that there has been an overt act. The spirit and object of this constitutional provision are equally clear. The framers of the constitution, with the great volume of human nature before them, knew that perjury could easily be enlisted on the side of oppression; that any man might become the victim of private accusation; that declarations might be proved which were never made; and therefore they meant, as they have said, that no man should be the victim of such secret crimination; but that the punishment of this offence should only be incurred by those whose crimes are plain and apparent, against whom an open deed is proved.

Now let me ask the opposite counsel what security is afforded by the constitution, to the best or meanest man in this country, if the construction on which they insist be correct? and whether, instead of a safeguard to the citizen, they do not reduce it to an unmeaning phrase? According to the construction on which they must insist or abandon the prosecution, all that is wanted to fix the guilt of treason on any individual is, that an insurrection shall have existed somewhere in the United States, no matter where. Observe, sir, that I am arguing on abstract principles, and not with a particular application. But suppose the government wished to destroy any man; they find him in Georgia; an insurrection happens in New Hampshire. This will suffice for the purpose, and if this cause go on they will be obliged to contend that less will suffice; that an insurrection is not necessary; but that even a peaceable assemblage going down the Ohio is sufficient for the purpose. They merely undertake to prove the existence of an insurrection; that a number of people have committed an act of insurrection; the man who is selected to be a victim is dragged from one end of the continent to the other, before a judge who is the creature of the government, appointed at the pleasure of the government, liable to be thrown out of office if he offend the government; the cause comes on to trial; they prove an insurrection; and when once this insurrection or assemblage can be proved by two witnesses, nothing remains but to connect with it the individual thus marked for destruction; and as this may be done by evidence of his secret acts or even his declarations, he may be seized and hurried by force from New Hampshire to Georgia, or to any part of the United States which his accusers may choose as best fitted for their purpose; it is in vain that he may prove he was not present when the offence of which he is accused was committed; that he never at any period of his life had been there; that the actors and the scene were alike unknown to him; wretches who, from views of interest or revenge, are ready to further the views of his oppressors, will present themselves, and he may be convicted of treason in levying open war against the government, with people whom he never saw, and at a place where he never was. Gentlemen may say that this only shows that the citizen may be equally the victim of false accusations of other offences; that it proves nothing but that the innocent may be condemned on the testimony of perjured witnesses. In no other crime can a man be punished except in the county or district where he committed the act. Let gentlemen mention for what other offence an individual may be tried in a different district from the one in which he did the act which constitutes the essence of the crime; and admitting their principle in its full force, what becomes of the constitutional provision on this subject? where is the constitutional tribunal to try him, "an impartial jury of the state wherein the offence has been committed?" It is reduced to a mere nullity. The constitution meant something; but according to this construction it means nothing, and deceives instead of affording any security. It may be objected that treasonable conspiracies might thus go unpunished. To this it is a sufficient answer that they may be prosecuted and charged according to the truth of the case.

In support of the second proposition, Mr. Wickham said that the position of the counsel for the prosecution was, that in treason all are principals, and therefore, in construction of law, the accessory was present aiding and abetting at the time and place where the act was committed, and might be so charged, although in fact hundreds of miles away. But this was evidently a misapplication of the rule, as aiders and abettors after the fact are as much, in construction of law, principals, as those before the fact. And all the precedents show that they must be tried, not in the county where the war was levied, but where they did the accesso-

rial acts which made them principal traitors by relation; and that they must be charged specially, in accordance with the facts. This rule of law was not founded on arbitrary principles, but on maxims of immutable justice and reason. The indictment should specially state the offence which is intended to be proved against the accused. He cannot otherwise be prepared to defend himself. An offence different from that which is charged against him, and which alone he can be expected to meet with his defence, is never allowed to be given in evidence. Does this indictment inform us that it is meant to be proven that Colonel Burr was not present when the overt act was committed, but that he was guilty of treason by being connected with those who perpetrated the overt act? On the contrary, the plain import of the indictment was that Colonel Burr himself committed and levied war against the United States in person. It charges that he committed the act on Blennerhassett's Island, with divers persons unknown. And it was attempted to prove this charge by holding him responsible for the acts of other persons, done in his absence, without even informing him who those other persons were who had committed the acts. He referred to the constitutional provision, that "in all criminal prosecutions, the party accused shall have a speedy and public trial by an impartial jury of the state or district where the crime was committed;" and said this was meant to be a substantial provision, securing a trial by the vicinage; and yet according to the construction contended for it is merely illusory, and a native of Virginia, who was never out of the limits of the state,[6] may be hurried off to New Hampshire, and tried there for an offence which he never did commit, and which it is impossible he should have committed.

It must be admitted that an aider and abettor after the fact must be tried in the county and district where he committed the offence; and what sufficient reason can be assigned for a different rule in the case of an aider and abettor before the fact? The only precedent that could be found of the trial of an aider or abettor before the fact showed that the rule was the same. Sir Nicholas Throgmorton was indicted for levying war against the queen, and the evidence was a connection with Sir Thomas Wiatt, who raised an insurrection in Kent, and marched towards London, but did not enter the jurisdiction of the city, which begins at Temple Bar. Yet Throgmorton was tried within the jurisdiction of the city, and the lord mayor presided at the trial, and he was acquitted. In the indictment against Mary Speke (in Tremaine's P.

C.) for aiding the Duke of Monmouth and others in the act of levying war against the king, the charge is special, that she, "knowing the said James Scott (the Duke of Monmouth) to be a false traitor, and that he, with many other false traitors, to the number of four thousand, had assembled and collected, and had traitorously prepared and levied and raised war, insurrection, and rebellion against the king, &c., did cause to be conveyed and carried to the said James Scott, &c., cart loads of bread and cheese," &c. In a case of felony such an accomplice would be an accessory before the fact. There are in law but two species of accessories: one before and the other after. In the Case of Somervile, And. C. P. 106, it appears to have been settled, on great consideration, "that aiders and other procurers of the treason should be indicted specially for the procurement."

Mr. W. argued that if it is proper to charge an aider and abettor who was not present at the committing of the overt act, generally, as if he were present, in one case, it must be proper in all cases. The rule must be general, applying alike to all kinds of treason. To show the absurdity of such a rule, he referred to a statute of 28 Hen. VIII. c. 18, by which "marrying any of the king's children, or reputed children, or his sisters, or aunts of the father's part, or children of the king's brethren or sisters, without the king's license under his great seal, or deflowering any of them," is enacted to be treason. Now, said he, we may suppose a very probable case, that of a female accomplice in one of these treasons; for instance, one of the maids of honor, should be prosecuted for aiding and abetting the principal traitor; would she be indicted by her name, as a female, with the addition of spinster, for marrying the king's aunt, or deflowering his daughter? or would she be charged specially with aiding or abetting the male person who did the act? By another act of parliament of the same reign it is made treason in any woman the king shall intend to marry, thinking her to be a true maid, to marry him if she be not so. Now it is a very possible case that the paramour of such a woman (I will suppose her to be one of the maids of honor and him a lord of the bed-chamber) should aid her in imposing upon the king. She is tried, found guilty, and executed. How is he to be charged? Would he be indicted by the name of A B. gentleman, or by his title of lord, for marrying the king, not being an unspotted virgin, or to use the language of the act, a "pure and clean maid?" Mr. W. cited and commented upon other authorities in support of the position that the indictment must charge the facts specially, and that they must be proved as laid.

In support of the third proposition, Mr. W. contended that even admitting the doctrine to be true in this country, that all are principals in treason, and whatever would make a man an accessory in felony will make him a

---

[6] The trial and conviction of a man in a state which he never was in until after the commission of the crime is no anomaly. See People v. Adams, 3 Denio, 190, 1 Const. [1 N. Y.] 173. See, also, note A at the end of Chief Justice Marshall's opinion in this case.

principal in treason, it is nevertheless true that the crime of a person who advises or procures an overt act of treason to be committed by others, must be accessorial in its character; and the rule that those who actually committed the deed must first be convicted, still holds good. The reason of the rule, that a man is not to be charged, by relation, with the criminal acts of others until said acts are proved in the only legal way, that is to say, by a record of the conviction of those who committed them, applied with equal force to treason as to any other crime, whether the aider, adviser, or procurer was held to be a principal or an accessory. If Blennerhassett and Tyler were not guilty of treason, then it was impossible that Colonel Burr could be guilty of treason in aiding, advising, or procuring them to commit the crime. But if this indictment can be sustained, then the guilt of Blennerhassett and Tyler may be established in a trial to which they are not parties. But, he said, it was unnecessary to rely on general reasoning, however conclusive, as express authorities may be adduced. He then cited 1 Hale, P. C. p. 613, where it is said that "as to the course of proceeding, it hath been, and indeed ought to be the course, that those who did actually commit the very fact of treason should be first tried, before those that are principals in the second degree, because otherwise this inconvenience might follow, viz.: That the principals in the second degree might be convicted, and yet the principals in the first degree might be acquitted, which would be absurd." He also cited other authorities to the same effect, viz: 2 Hale. P. C. 223; Somervile's Case, And. C. P. 106, 26 Eliz.; Fost. Crown Law, 341–347, and East. Crown Law, c. 2, § 29, p. 100. He admitted that a different rule was laid down by Sergeant Hawkins, in Hawk. P. C. (Leach's Ed.) bk. 2, c. 27, § 2, pp. 439, 440. But he gives only a general expression of the rule, goes into no detail, and does not pretend to argue the question. And Mr. Leach, his able and accurate commentator, has a note on this very passage, in which he corrects the generality of the expression, and confines it to treason in compassing the death of the king.

Mr. W. said it was possible that an objection might be made, that "the accomplice may waive the benefit of the law, and submit to a trial," and that as the accused has done so in the present instance, the objection now comes too late. A reference to the authorities and a moment's consideration will satisfy the court that there can be no force in this objection. The indictment gives us no information of the nature of the charge; it is against Col. Burr himself, who had no reason to doubt that it was meant to be proved, that he in person committed the overt act of treason in levying war as principal in the first degree. The charge that the act was committed by him, in conjunction with persons unknown, excludes the idea of a derivative trea-

son or a responsibility for the act of any particular individual or set of men. But if it were specially charged, and the person whose acts the accused was to answer for were named in the indictment with every necessary description of time, place, and circumstances, the party going to trial according to the course of the court without a special prayer to be tried before the principal, and an express waiver of his right entered on record, could not be concluded from making this exception. The words "waive the benefit of the law," mean an express renunciation of a right, and none such certainly has been made in the present instance.

In support of the fourth proposition, Mr. W. went into an examination of the question, "What properly constitutes the crime of levying war?" He contended that force and military array were essential ingredients; neither of which had been proved at Blennerhassett's Island. He did not claim that actual force was absolutely necessary when there was a sufficient display of men and means to effect the object by intimidation. If a body of men, sufficient in number and means to take the capital, and all the property in it, should march into the city, and find no opposition, they would accomplish their object by terror of numbers and warlike appearance. This is denominated potential force; the object is accomplished without the actual exertion of force, though force sufficient to accomplish it is employed. He referred to the trial of Fries [Case No. 5,126], to show that even Mr. Rawle and Mr. Sitgreaves, the counsel for the prosecution, admitted that force of this character, at least, was necessary. He also referred to many English authorities to prove that force and military array are necessary ingredients, under the statute of 25 Edw. III, of the crime of levying war. He insisted that in so far as any expressions were to be found in the opinion of the supreme court in the Case of Bollman and Swartwout [supra], which might seem to imply that force was not necessary, they were obiter and extra-judicial. He cited other authorities which are here omitted, and insisted that the evidence wholly failed to show that there had been anything like force, or violence, or military array displayed on Blennerhassett's Island.

Mr. Wirt, after some introductory remarks, said:

This motion is a bold and original stroke in the noble science of defence. It marks the genius and hand of a master. For it gives to the prisoner every possible advantage, while it gives him the full benefit of his legal defence: the sole defence which he would be able to make to the jury, if the evidence were all introduced before them. It cuts off from the prosecution all that evidence which goes to connect the prisoner with the assemblage on the island, to explain the destination and objects of the assemblage, and to stamp beyond controversy the character of treason

upon it. Connect this motion with that which was made the other day to compel us to begin with the proof of the overt act. in which from their zeal gentlemen were equally sanguine, and observe what would have been the effect of success in both motions. We should have been reduced to the single fact, the individual fact, of the assemblage on the island, without any of the evidence which explains the intention and object of that assemblage. Thus gentlemen would have cut off all the evidence which carries up the plot almost to its conception, which at all events describes the first motion which quickened it into life and follows its progress until it attained such strength and maturity as to throw the whole western country into consternation. Thus of the world of evidence which we have, we should have been reduced to the speck, the atom which relates to Blennerhassett's Island. General Eaton's deposition, (hitherto so much and so justly revered as to its subject,) standing by itself. would have been without the powerful fortification derived from the corroborative evidence of Commodore Truxton, and the still stronger and most extraordinary coincidence of the Morgans. Standing alone, gentlemen would have still proceeded to speak of that affidavit as they have heretofore done; not declaring that what General Eaton had sworn was not the truth, but that it was a most marvelous story! a most wonderful tale! and thus would they have continued to seek in the bold and wild extravagance of the project itself an argument against its existence, and a refuge from public indignation. But that refuge is taken away. General Eaton's narration stands confirmed beyond the possibility of rational doubt. But I ask what inference is to be drawn from these repeated attempts to stifle the prosecution and smother the evidence? If the views of the prisoner were, as they have been so often represented by one of his counsel, highly honorable to himself and glorious to his country, why not permit the evidence to disclose these views? Accused as he is of high treason, he would certainly stand acquitted, not only in reason and justice, but by the maxims of the most squeamish modesty, in showing us by evidence all this honor and this glory which his scheme contained. No, sir, it is not squeamish modesty; it is no fastidious delicacy that prompts these repeated efforts to keep back the evidence; it is apprehension; it is alarm; it is fear; or rather it is the certainty that the evidence, whenever it shall come forward, will fix the charge; and if such shall appear to the court to be the motive of this motion, your honors. I well know, will not be disposed to sacrifice public justice committed to your charge, by aiding this stratagem to elude the sentence of the law; you will yield to the motion no further than the rigor of legal rules shall imperiously constrain you.

I shall proceed now to examine the merits of the motion itself, and to answer the argument of the gentleman (Mr. Wickham) who opened it. I will treat that gentleman with candor. If I misrepresent him it will not be intentionally. I will not follow the example which he has set me on a very recent occasion. I will not complain of flowers and graces where none exist. I will not, like him, in reply to an argument as naked as a sleeping Venus, but certainly not half so beautiful. complain of the painful necessity I am under. in the weakness and decrepitude of logical vigor, of lifting first this flounce and then that furbelow before I can reach the wished-for point of attack.[7] I keep no flounces or furbelows ready manufactured or hung up for use in the millinery of my fancy, and if I did I think I should not be so indiscreetly impatient to get rid of my wares as to put them off on improper occasions. I cannot promise to interest you by any classical and elegant allusions to the pure pages of Tristram Shandy. I cannot give you a squib or a rocket in every period. For my own part, I have always thought these flashes of wit, (if they deserve that name,) I have always thought these meteors of the brain which spring up with such exuberant abundance in the speeches of that gentleman, which play on each side of the path of reason, or, sporting across it with fantastic motion, decoy the mind from the true point in debate, no better evidence of the soundness of the argument with which they are connected, nor, give me leave to add, the vigor of the brain from which they spring, than those vapors which start from our marshes and blaze with a momentary combustion, and which, floating on the undulations of the atmosphere, beguile the traveller into bogs and brambles, are evidences of the firmness and solidity of the earth from which they proceed. I will endeavor to meet the gentleman's propositions in their full force, and to answer them fairly. I will not, as I am advancing towards them with my mind's eye, measure the heighth, breadth. and power of the proposition; if I find it beyond my strength, halve it; if still beyond my strength, quarter it; if still necessary, subdivide it into eighths; and when, by this process, I have reduced it to the proper standard, take one of these sections and toss it with an air of elephantine strength and superiority. If I find myself capable of conducting, by a fair course of reasoning, any one

---

[7] This was in allusion to the following passage in a speech delivered by Mr. Wickham in an earlier stage of the trial, which is omitted in this work: "I heard the gentleman with pleasure, and felt extremely obliged to him for scattering over the barrenness of law such a variety of flowers. His profuse embellishments reminded me of a Roman epigram on a lady who was so completely enveloped in decorations that she was really the smallest part of herself. It was precisely so with the gentleman's argument. It was so ornamented and covered up with figures and graces that it constituted the least part of itself, and it was only by lifting a flounce here and a furbelow there that you could get a glimpse of the argument."

of his propositions to an absurd conclusion, I will not begin by stating that absurd conclusion as the proposition itself which I am going to encounter.

Mr. Wirt then proceeded to discuss, seriatim, the four propositions laid down by Mr. Wickham, and to reply to his arguments in support of them. In many of that gentleman's general propositions he concurred: that the constitution was intended to guard against arbitrary and constructive treasons; that the principles of sound reason and liberty require their exclusion; and that the constitution is to be interpreted by the rules of reason and moral right. He found it difficult to reconcile some of the positions of Mr. Randolph with the rules of Mr. Wickham, for while one tells us to interpret the constitution by sound reason, the other exclaims, "Save us from the deductions of common sense!" Mr. Wickham having read the constitutional definition of treason, and given the rule by which it was to be interpreted, it was natural to expect that he would have proceeded directly to apply. that rule to the definition, and give us the result. But while we were expecting this, even while we have our eyes on the gentleman, he vanishes like a spirit from American ground, and we see him no more until we see him in England, resurging, by a kind of intellectual magic, in the middle of the sixteenth century, complaining most dolefully of my Lord Coke's bowels. Before we follow him in this excursion, it may be well to inquire what it was that induced him to leave the regular track of his argument. I will tell you what it was. It was, sir, the decision of the supreme court in the Case of Bollman and Swartwout. It was the judicial exposition of the constitution by the highest court in the nation, upon the very point which the gentleman was considering, which made him take this flight to England, because it stared him in the face and contradicted his position. Sir, if the gentleman had believed this decision to be favorable to him, we should have heard of it in the beginning of his argument, for the path of inquiry in which he was led him directly to it. Interpreting the American constitution, he would have preferred no authority to that of the supreme court of the country. Yes, sir, he would have immediately seized this decision with avidity. He would have set it before you in every possible light. He would have illustrated it. He would have adorned it. You would have seen it, under the action of his genius, appear with all the varying grandeur of our mountains in the morning sun. He would not have relinquished it for the common law, nor have deserted a rock so broad and solid to walk upon the waves of the Atlantic. But he knew that this decision closed against him completely the very point for which he was laboring. Hence it was that the decision was kept so sedulously out of view, until, from the exploded materials of the common law, he thought he had reared a Gothic edifice so huge and so dark as quite to overshadow and eclipse it. Let us bring it from this obscurity into the face of day. We who are seeking truth and not victory, whether right or wrong, have no reason to turn our eyes from any source of light which presents itself, and least of all from a source so high and so respectable as the decision of the supreme court of the United States. The inquiry is whether the presence at the overt act be necessary to make a man a traitor. The gentlemen say that it is necessary—that he cannot be a principal in the treason without actual presence. What says the supreme court in the Case of Bollman and Swartwout? "It is not the intention of the court to say that no individual can be guilty of this crime who has not appeared in arms against his country. On the contrary, if war be actually levied, that is, if a body of men be assembled for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." He insisted that this decision of the supreme court had settled the principle that actual presence was not necessary, and that the passage upon which he relied was not a mere obiter dictum, and not extra judicial; that in the Case of Bollman and Swartwout the question whether actual presence at the place where the overt act was committed was necessary to constitute the crime of treason was a material question to be considered by the court.

That a law should be so construed as to advance the remedy and repress the mischief is not more a rule of common law than a principle of reason; it applies to penal as well as to remedial laws. So also the maxim of the common law, that a law as well as a covenant should be so construed that its object may rather prevail than perish, is one of the plainest dictates of common sense. Apply these principles to the constitution. Gentlemen have said that its object was to prevent the people from being harassed by arbitrary and constructive treason. But its object, I presume, was not to declare that there was no such crime. It certainly did not mean to encourage treason. It meant to recognize the existence of the crime and provide for its punishment. The liberties of the people, which require that the offence should be defined, circumscribed, and limited, required also that it should be certainly and adequately punished. The framers of the constitution, informed by the examples of Greece and Rome, and foreseeing that the liberties of this republic might one day or other be seized by the daring ambition of some domestic usurper, have given peculiar importance and solemnity to the crime, by ingrafting it upon the constitution. But they have done this in vain if the construction contended for on

the other side is to prevail. If it require actual presence at the scene of the assemblage to involve a man in the guilt of treason, how easy will it be for the principal traitor to avoid this guilt and escape punishment forever? He may go into distant states, from one state to another. He may secretly wander like a demon of darkness from one end of the continent to the other. He may enter into the confidence of the simple and unsuspecting. He may pour his poison into the minds of those who were before innocent. He may seduce them into a love of his person, offer them advantages, pretend that his measures are honorable and beneficial, connect them in his plot and attach them to his glory. He may prepare the whole mechanism of the stupendous and destructive engine and put it in motion. Let the rest be done by his agents. He may then go a hundred miles from the scene of action. Let him keep himself only from the scene of the assemblage and the immediate spot of battle, and he is innocent in law, while those whom he has deluded are to suffer the death of traitors! Who is the most guilty of this treason, the poor, weak, deluded instruments, or the artful and ambitious man who corrupted and misled them? There is no comparison between his guilt and theirs, and yet you secure impunity to him, while they are to suffer death! Is this according to the rules of reason? Is this moral right? Is this a means of preventing treason? Or rather, is it not in truth a direct invitation to it? Sir, it is obvious that neither reason nor moral right requires actual presence at the overt act to constitute the crime of treason. Put this case to any common man, whether the absence of a corruptor should exempt him from punishment for the crime which he has excited his deluded agents to commit, and he will instantly tell you that he deserves infinitely more severe punishment than his misguided instruments. There is a moral sense much more unerring in questions of this sort than the frigid deductions of jurists or philosophers; and no man of a sound mind and heart can doubt for a moment between the comparative guilt of Aaron Burr (the prime mover of the whole mischief) and of the poor men on Blennerhassett's Island who called themselves Burr's men. In the case of murder, who is the most guilty, the ignorant, deluded perpetrator or the abominable instigator? The decision of the supreme court, sir, is so far from being impracticable on the ground of reason and moral right, that it is supported by their most obvious and palpable dictates. Give to the constitution the construction contended for on the other side, and you might as well expunge the crime from the criminal code; nay, you had better do it, for by this construction you hold out the lure of impunity to the most dangerous men in the community, men of ambition and talents, while you loose the vengeance of the law on the comparatively

innocent. If treason ought to be repressed. I ask you who is the most dangerous and the most likely to commit it? The mere instrument who applies the force, or the daring, aspiring, elevated genius who devises the whole plot, but acts behind the scenes?

Mr. Wirt then argued that the decision of the supreme court was supported by the law of England. He cited Lord Coke, 3 Inst. p. 9, where, commenting on the words in the statute of Edward III. which make our constitutional definition of treason, he says: "If many conspire to levy war, and some do levy the same according to the conspiracy, this is treason in all, for in treason all are principals, and war is levied." He also referred to similar passages in pages 16 and 21, Id. He also cited Hale, P. C. 214, where the same doctrine is laid down in terms equally distinct and emphatic: "But if many conspire to counterfeit, or counsel or abet it. and one of them doth the fact upon that counselling or conspiracy, it is treason in all, and they may be all indicted for counterfeiting generally, for in such case in treason all are principals." The same doctrine is in effect laid down in pages 323, 328, 339. Hawkins and Foster support the same doctrine. "Also, there can be no doubt but that he who by command or persuasion induces another to commit treason, is himself a traitor, (for without question, by such means he would be accessory to a felony,) and it is an uncontroverted rule that whatever will make a man an accessory in felony will make him a principal in treason." 1 Hawk. P. C. c. 17, § 39. Foster (page 341) says: "It is well known that, in the language of the law. there are no accessories in treason. All are principals." "Every instance of incitement, aid, or protection, which in the case of felony will render a man an accessory before or after the fact, in the case of high treason, whether it be treason at common law or by statute, will make him a principal in the treason, unless the case be otherwise provided for by the statute creating the same." &c. Mr. Wirt referred to Judge Tucker's argument to prove that the doctrine that in treason all are principals is not the established law of England, and after passing a high encomium upon the learning, ability. and virtue of the author, said: "However sincerely I revere him, yet, certainly, when the question is, 'What is the law of England?' it cannot be considered as disrespectful to our learned and virtuous countryman to prefer the authority of such men as Coke, Hale, Hawkins, and Foster, to his." Mr. Wirt then adverted to the assertion of Mr. Wickham, that but two cases can be found in the books of accessories before the fact having been adjudged guilty as principals. But he admits (said Mr. Wirt) that there are several cases of accessories after the fact being so adjudged. The gentleman had inverted the order of the guilt. He apprehended no case could be found which will show that acces-

sories after the fact are as criminal as those before the fact. It was for a long time doubted in England whether accessories after the fact were principals; but it was never doubted that accessories before the fact were principals. 2 Hawk. P. C. c. 29, § 3. The gentleman had read the case of Sir Nicholas Throgmorton's sufferings, as they are presented as a Gorgon's head by Judge Tucker —not as an illustration of the law, but by way of exciting our horror against a corrupt judge. The prosecution did not rely upon the authority of that case. What could be the gentleman's motives in reading this case with a countenance and cadence of such peculiar pathos? Was it to excite our sympathies, under the hope that our apprehensions and feelings, when once set afloat, might, for the want of some other living object, be graciously transferred to his client? It was with the same view, he presumed, that the gentleman gave us the pathetic and affecting story of Lady Lisle, as it is touched by the elegant, chaste, and delicate pencil of Hume. It was with the same views, also, that he recited from the same author the deep, perfidious, and bloody horrors of a Kirk and a Jeffries. Sensible that there was nothing in the virtues of his client or in this case to interest us, he borrowed the sufferings and the virtues of a Throgmorton and a Lady Lisle to enlist our affections and set our hearts a bleeding, hoping that our pity, thus excited, might be transferred and attached to his client. He hoped that the counsel for the prosecution felt as much horror at the infernal depravity of Judge Bromley, and the sanguinary and execrable tyranny of Judge Jeffries, as they or any other gentleman can feel. But these cases do not apply to merciful and immaculate judges. He did not think it very respectful to this court to adduce such cases. They seem to be held up in terrorem, from an apprehension that their authority would be admitted here, but we apprehend no such consequence.

In answer to Mr. Wickham's argument that since the revolution of 1688 the British decisions have leaned the other way, and go to show that accessorial acts do not make a principal in treason, Mr. Wirt said that the conclusion was based on no adjudged case, nor even upon any obiter dictum of any judge. It has no other foundation than the impunity of those who aided the Pretender—who fought his battles or aided him in his fight. This was the mere policy of the house of Hanover. The pretensions of the Stuarts had divided the British nation. Their adherents were many and zealous. Their pretensions were crushed in battle. Two courses were open to the reigning monarch—either by clemency and forbearance to assuage the animosity of his enemies and brace his throne with the affections of his people, or to pursue his enemies with vengeance and wanton cruelty, and unsettle and float his throne in the blood of his subjects. He chose the former course; and because, either from magnanimity or policy, or both, he spared them, the gentleman supposes the law of treason was changed, and that they could not be punished.

Mr. Wirt adverted to the doctrine advanced by Mr. Wickham, that "a statute made in aid or affirmance of the common law carries with it all common law consequences," but "if a new felony be created by statute no common law consequences follow;" and contended that the authorities cited by Mr. Wickham in support of this position do not sustain it. He claimed that from the authorities cited these two positions were fairly deducible: First: That when a statute creates a new felony, unknown to the common law, although the statute says nothing about accessories to that felony, yet they exist and are punishable under the act; unless the peculiar wording of the statute precludes it, as in the statute of 28 Hen. VIII. c. 15. Secondly: That accessories are not the mere creatures of the common law; they may derive their existence from a statute solely, and that by mere implication under that statute. Since, then, accessories are not the creatures merely and solely of the common law, it makes no difference whether the common law exist here or not; accessories may nevertheless exist. Since a statute creating an offence impliedly embraces accessories, not by the operation of common law, but by the reason and nature of things, an American statute may impliedly embrace accessories, since whatever we may think of the existence of the common law in this country, no American, I hope, will doubt that reason and its deductions exist here. The only fair inference from Mr. Wickham's positions and authorities is, that if a statute of the United States were to adopt a common law phrase, in the creation of an offence, no common law consequences would follow, because we have no common law. But this is a moot point, because while the constitution and act of congress adopt the word "treason," they define in what it shall consist. I see no benefit that the gentleman could derive from these positions if they were admitted. If he meant to say that accessories are the mere creatures of the common law, and therefore cannot exist in this country, where there is no common law; I answer, First: That if the position were true, it would not affect this case, because within the reason of the doctrine touching principal and accessories, the part which the prisoner bore in this transaction would constitute him a principal. Secondly: If his conduct were of such a nature as to make him an accessory, I hold that we have a right to look to the common law to ascertain whether he be not a principal in this case.

First, I contend that the part which the prisoner bore in this transaction would constitute him a principal. Gentlemen say that

all are accessories who are not present at the commission of the offence. We, on the contrary, contend that even in inferior felonies, a man may be a principal without actual presence. Let us examine this question. The law recognizes a legal as well as an actual presence. Before I refer to the books to explain this distinction, I beg leave to make one remark, that in order to determine the degree of proximity which should be between the principal and accessory, it is necessary to look into their acts and consider the nature of the crime and the extent of the theatre which it requires for its perpetration. A man may be legally present, although actually absent; even in felony legal presence makes a man as much a principal as actual presence. I beg leave to introduce a series of cases which go to unfold and establish this distinction, most of which my friend Mr. MacRae has already mentioned. You will find in the progress of these cases, the sphere of legal presence perpetually extending itself in proportion to the nature of the crime and the extent of theatre necessary for its commission. You will observe that as the theatre widens the scale of proximity is extended. The first case is in Hale, P. C. 439, "If divers persons come to make an affray, and are of the same party, also come into the same house, and one be killed in one of the rooms, those that are of that party, and that came for that purpose, though in other rooms of the same house, shall be said to be present." Here the house is the theatre, and it is required that those who are to be implicated as principals shall be in the other rooms of the same house. The next is the case of the Lord Dacre. Here, as the park was the theatre of the meditated crime, the scale of proximity is enlarged, and it was enough that the Lord Dacre and his associates were in the same park to implicate them in the guilt. The next is Pudsey's Case, which is thus stated in 1 Hale, P. C. 534: "Pudsey and two others, viz., A. and B. assault C. to rob him, in the highway, but C escapes by flight, and as they were assaulting him, A rides from Pudsey and B and assaults D, out of the view of Pudsey and B, and takes from him a dagger by robbery, and came back to Pudsey and B, and for this Pudsey was indicted and convicted of robbery—though he assented not to the robbery of D, neither was it done in his view—because they were all three assembled to commit a robbery, and this taking of the dagger was in the mean time." Here, as the highway and the whole forest was the scene of action, a still less degree of proximity was required than in either of the preceding cases; and, indeed, no limit of proximity is stated at all. But this case of Pudsey is irresistibly strong in another point of view, and contains a principle which covers the case at bar completely. He and his colleagues were leagued for the general purpose of robbing; they went out upon this purpose, and although Pudsey was not only absent at the particular act of robbing D, but gave no assent to that particular act, yet he was involved in the guilt of it, and suffered accordingly. The same author (page 537) contains a case which is, if possible, still stronger to the same purpose. It is the case of two men who go out for the purpose of robbing on the highway or committing a burglary. Although one only commits the offence, and the other, so far from being present, is actually engaged in the perpetration of a different offence, at a different place, yet this other is equally involved in the offence committed by the first. Hence, it is not actual presence which makes a principal in felony. It is merely their going forth leagued in the same general design, and their readiness to co-operate for effecting the common purpose. Suppose two men in the county of Bedford or Campbell should concert the murder of a man who had removed from thence to this place, and should set off together to effect this purpose, but that not knowing whether he had fixed his residence in Richmond or Manchester, they should on their arrival separate—one should enter Richmond and the other Manchester. They both agree and determine that he who had the first chance should kill him, and they also agree to return together and to assist and protect each other. He who enters Richmond commits the murder. Would not the other who went into Manchester be a principal in the murder? They were both engaged in the same unlawful design of murdering the same individual. They set off together and intend to return together. There was a concert between them, and each was ready to co-operate with the other in carrying this murderous design into effect. Here, then, is a case of a legal presence, though the person is actually absent, involving him in the guilt of actual presence. Foster, 349, 350, thus treats the subject: "When the law requires the presence of the accomplice at the perpetration of the fact, in order to render him a principal, it doth not require a strict, actual, immediate presence." &c. The reason of the law is the soul of the law. What is the reason, then, which, according to Foster, constitutes this legal presence? It is that the cause is a common cause; that each man operates in his station towards the same common end; that the part each man takes tends to give countenance, encouragement, and protection to the whole gang, and to insure the success of their whole enterprise. Whoever, in any crime, performs a part within this description, is legally present, and a principal in that crime. Foster (in pages 353, 354), after stating that general resolutions against all opposers, whether explicitly entered into or to be collected from their numbers, arms, or behavior at the scene of action, had always been considered as strong ingredients in cases of constructive presence, concludes

thus: "In cases of homicide, committed in consequence of them, every person present in the sense of the law when the homicide hath been committed, hath been involved in the guilt of him that gave the mortal blow. The offences that Lord Dacre and Pudsey stood charged with, as principals, were committed far out of their sight and hearing; and yet both were holden to be present. It was sufficient that at the instant the facts were committed they were of the same party, and upon the same pursuit, and under the same engagement and expectation of mutual defence and support, with those who did the facts."

Let us apply the reasoning and principles of those cases to the case of Aaron Burr. In order to do this with propriety, we must consider the nature of the crime charged upon the prisoner, the theatre required for its perpetration, and the various parts to be performed in promotion of the general purpose. We must consider the difference between treason and felony; that treason occupies a much wider space; that if there have been an act of treason in this case it may be said to have covered the United States; and, therefore, you will not require the same degree of proximity between the accessory and principal as you would in a common felony. I proceed, then, to make this application. The charge in the indictment is treason, in levying war against the United States. The objects imputed to the prisoner are the seizure of Orleans and the separation of the states. Was not Aaron Burr of the same party, with the same design, and upon the same pursuit? Did he not first create the party? Did he not enlist the men and engage them in his project? And did they not all call themselves his men? Were they not all under the same agreement and expectation of mutual defence and support? Was it not a common cause with them? Did he not place each man to operate at his station, at one and the same instant, towards the same common end? Did not the part which each man took tend to give countenance, encouragement and protection to the whole gang, and to insure the success of their common enterprise? Was not the prisoner within every reason and principle assigned for the constitution of legal presence, and therefore a principal in the treason? If it be urged that the prisoner gave no express assent to the particular meeting on the island, it may be answered that neither did Pudsey, in the case cited, assent to the particular robbery of D by A; but Pudsey and A had the same common purpose, which involved them in the same common guilt. So the purpose of the prisoner and the men upon the island was a common purpose; and therefore their guilt was the same. But an error seems to have arisen in considering the overt act as the treason; the overt act is only the evidence of it. The moral guilt is in their intention. The overt act or assemblage on the island was not the object, the end, the consummation of the treason; it was a mere transient effect of it, an incidental evolution of the design. We must not, therefore, apply the doctrines just investigated to the act on Blennerhassett's Island. We must consider the prisoner's local position, not in reference to the assemblage, but to the general and grand object of the treason; not in reference to the island, but to the great theatre which the treason required, and on which it was acting, from New York to Orleans. For the object was not Blennerhassett's Island, but the empire of the West, formed in the North; the splendid purpose of seizing Orleans and rending the whole Union forcibly asunder. The whole country from Beaver to New Orleans was the scope of action. Burr, therefore, was not only legally but actually present on this theatre of action. In those cases of felony, the proximity between the accessories and principal actors was measured according to what was intended to be done. Here, the object was not an island but a kingdom; the theatre of action was much more extensive, and the proximity between the parties engaged in it must be proportionably enlarged. The part which the prisoner took in this transaction is such as in the case of felony would make him a principal and not an accessory, as the gentlemen contend; and consequently, according not only to the reasoning of all those cases, but to their own arguments, the prisoner must be considered as a principal in the treason.

Secondly: Let me inquire whether we have not a right to look at the common law, to show that the prisoner is a principal. Let us admit, for the sake of argument, (what is certainly disproved,) that accessories are the mere creatures of the common law; let us also admit that our constitution and act of congress do not embrace accessories; is it clear that we have no right to resort to the common law to implicate accessorial traitors? I do not know myself that this inquiry is necessary; nor do I pretend to say what may be the result of your reflections on the subject; it may appear to you necessary, and I would leave no subject untouched which the court may consider as involved in the debate. It would not be very bold in me, sir, to argue for the existence of the common law en masse, in this country. But let it not for a moment be understood that I mean to contend for this. I only say that it would not be very bold in me to do this, and I say so, because a majority of the federal judges, so far as their opinions have been made known, have held that opinion. In Worrel's Case, cited from Dallas, the court was divided; Judge Chase thought the common law not in force; Judge Peters thought otherwise. In a subsequent case, and that a criminal one, I mean the Case of Williams, Judge Ellsworth held the whole of the common law to be in force; and Judge Tucker informs us that Judge

Washington was also of opinion that the common law of England is in force here. These are all the opinions of which I have heard.[8] Having thus the majority of the federal judges, as far as their opinions are known, in favor of the opinion that the common law of England is in force here, I repeat that it would not be very bold in me, standing before a federal court, to insist on the full operation of the common law, with all its consequences and imputed offspring, accessories among the rest; but I will not avail myself of this "vantage ground." My own opinion is a different one. I take the principle with much greater restriction, and on this head submit these reflections to the consideration of the court. When a technical term is borrowed from any art or science, we look to that art or science to ascertain its import and signification. If a statute adopt phrases of the common law, we must look to the common law to ascertain their true signification. This is a rule of reason. It is the foundation of the principle cited by Sergeant Pengelly from Hobart, that when a statute adopts a common law term, you take that term in its common law meaning. It is the foundation, also, of a paragraph in one of the most luminous, elegant, and masterly state-papers that ever the world saw—I mean the celebrated report of the Virginia committee in 1799, 1800, from which I beg leave to read a short extract relative to our present inquiry: "Deeply impressed with these opinions, the general assembly of Virginia instruct the senators and request the representatives from this state in congress to use their best efforts to oppose the passing

---

8 It has since been decided by the supreme court, that the federal courts have no common law jurisdiction in criminal cases. U. S. v. Hudson. 7 Cranch [11 U. S.] 32. But in U. S. v. Coolidge [Case No. 14,857], Mr. Justice Story says that recourse must be had to the principles of the common law to fix the definitions of crimes, as well as of other common law terms used in the constitution or statutes. "For instance," (he says) "congress has provided for the punishment of murder, manslaughter, and perjury, under certain circumstances, but has nowhere defined those crimes. Yet the common law must be resorted to for their definition," &c. This case has been relied upon to support the position that the common law rule, that whatever will make a man an accessory in felony will make him a principal in treason, is in full force in this country. 14 Boston Law Rep. 1851. It should be observed, however, that the constitution has defined the crime of treason; and this definition, as far as it goes, must be exclusive of all others. But in this definition itself certain common law terms are used, the meaning of which can only be ascertained by resorting to common law authorities. For instance, our courts have held that we must look to common law adjudications to ascertain the precise legal meaning of the term, "levying war." And the question seems to be reduced to this: Is it a common law principle, that those who successfully advise or incite others to levy war do actually levy war themselves, so as to come within the true definition of that term, or does the rule which makes them principals in the crime rest upon a mere arbitrary basis? Upon this question much more might be said than the limits of this note will allow.

of any law founded on or recognizing the principle lately advanced, that the common law of England is in force under the government of the United States, excepting from such opposition, such particular parts of the common law as may have a sanction from the constitution, so far as they are necessarily comprehended in the technical phrases which express the powers delegated to the government; and excepting, also, such other parts thereof as may be adopted by congress as necessary and proper for carrying into execution the powers expressly delegated." Here we find the recognition of the principle which takes common law phrases in the common law sense. Upon the same ground, Judge Iredell, in the Case of Fries [supra], states, in effect, that the constitutional terms of our definition of treason, being borrowed from the British statute, the framers of our constitution intended to adopt the meaning of those terms, as expounded in the parent country. Suppose an act of congress was passed, which said that a particular act should be felony, and said no more on the subject: where would you look for its true meaning? Would you not, by the adoption of that word, find it necessary to look at the source from which it was derived—that is, the common law—in order to ascertain its import? There is no other to which you can look for that purpose. Let us examine how these considerations bear on the point that we have a right to look at the common law to ascertain whether accessorial traitors be implicated. In applying these principles, we must inquire particularly into the nature of treason in levying war. Whence do we derive this particular treason? Sir Edward Coke, in his 3 Inst. 9, referring to the statute of Edward III., gives us a commentary on it, divides it into members, and expounds each of them as he goes along. He says that it has done nothing new, that it created no new offence which was not an offence at common law, but excluded some treasons and abolished and mitigated some of the punishments and penalties which existed at common law. When he comes to the words of the statute, "Si un home leve guerre encounter notre seigneur le roy,"—"if a man levy war against our lord the king,"—he says that "this was high treason by the common law." Although, then, the words of our definition are derived immediately from the statute of Edward, and though it received the sanction of parliament, this species of treason, levying war, was an offence at common law, and has been transplanted from the common law into our constitution. Have we not, then, a right to go to the fountain head, and ascertain there how much ground it covered, what was the nature of the treason, what its extent and limits? I do not speak of common law treasons at large, but this particular treason of levying war. Gentlemen will understand me. I do not mean to sanction any of the absurdities of the common law. I speak only of this single branch of treason, selected by the constitution. If, then, we have a right

to go to the common law for this purpose, we shall discover that it comprehended all who were leagued in the general conspiracy, whether they themselves actually levied the war or caused it to be levied by others. I submit this idea to the court, not as one which I have had time to weigh and digest, but one which it may perhaps find not unworthy of consideration. But without resorting to the aid of the common law, we show by the constitution, interpreted by the rules of reason and moral right, as expounded by judicial decision, as well as by the English law, to which we were invited, that presence at the scene of the overt act is not necessary to make a man a traitor.

Mr. Wirt remarked that whenever the acts of congress mention accessories to any crime, it is for the purpose of distinguishing between the guilt, and consequently the punishment, of accessories before and after the fact. Accessories before the fact in piracy are punished with death; those after, by fine and imprisonment. The same principles are observed with respect to accessories before and after in other cases. An inference very different from that drawn by Mr. Wickham ought to be deduced from the statute. According to his argument, even if the common law were in force here, accessories would not be liable. Congress knew that in treason all are principals, and that therefore it was unnecessary to implicate them in detail by a special act; but knowing that those who were the most innocent, who were the least concerned in that crime, were before then equally punishable with the most atrocious offenders, they intended to mitigate the fate of the least culpable as receivers and comforters after the fact, and rescuers of those who were not convicted. They felt that they were treading on ground that was previously occupied. They did not legislate on the subject as if they were creating an offence. They speak of it as an offence already existing. They distinguish between the degrees of guilt, and proportion the punishments accordingly. But according to Mr. Wickham's argument, accessories before the fact in treason, who are in general the greatest offenders, because the procurers and contrivers of the crimes, would escape altogether, whilst the least guilty are severely punished. Before you think that Mr. Wickham's idea is correct, you must believe that congress meant to punish the lesser, and leave entirely unpunished the greater offence. Was it possible that they should have intended that the dark, designing, flagitious offender, who intrigues and contrives, who plots and procures a deep conspiracy to subvert the government and destroy the liberties of his country, shall escape wholly unpunished, while the poor ignorant man, who is deluded by his artifices or those of his associates, shall be severely punished for rescuing from imprisonment another of the deluded victims of his ambition? Yet this result, as monstrous as it is absurd, may take place if Mr. Wickham's construction shall be adopted.

Mr. Wirt took up the second proposition of Mr. Wickham, that the indictment should charge the facts specially. He said the indictment was drawn from an authentic copy of the indictment in the Case of Fries, and was an exact transcript of that indictment, mutatis mutandis. He referred to a number of English precedents to show that to charge the prisoner generally with levying war had always been held sufficient.

Mr. Wickham here begged leave to interrupt Mr. Wirt in order to explain, as he said Mr. Wirt had misunderstood him. His argument, he said, was not that a special indictment was necessary in every case, but that whenever an absentee was charged and was to be made liable by relation for the acts of another, the manner of his being connected with that other should be stated in the indictment. For instance, I put the case of Blennerhassett. I never said that such an indictment as is now before the court would not be good against him, who was present at the time and place where the overt act is charged to have been committed.

Mr. Wirt, resuming, said he did not misunderstand the gentleman. His answer was, that if the accused have borne a part which constitutes treason, he is sufficiently and properly charged in the indictment. I have shown that in every case where a prisoner has acted a part which amounted to treason, whether he be absent or present, he may be indicted generally, because he is a principal in the treason; and whenever a person accused is a principal in a treason of levying war, it is sufficient to charge that he did levy war.

The CHIEF JUSTICE.—Do you mean to say that it is not necessary to state in the indictment in what manner the accused, who it is admitted was absent, became connected with the acts on Blennerhassett's Island?

Mr. Wirt.—I mean to say that the count is general in modern cases; that we are endeavoring to make the accused a traitor by connection, by stating the act which was done, and which act, from his conduct in the transaction, he made his own; that it is sufficient to make this charge generally, not only because it is authorized by the constitutional definition, but because it is conformable to modern cases, in which the indictments are pruned of all needless luxuriance.

Mr. Wirt referred to several cases, from which he drew inferences in favor of his position. He then took up the third proposition of Mr. Wickham. By this, he said, I understand the gentleman to advance, in other terms, the common law doctrine, that when a man is rendered a principal in treason by acts which would make him an accessory in felony, he cannot be tried before the principal in the first degree. I understand this to be the doctrine of the common law, as established by all the authorities; but when I concede this point, I insist that it can have

no effect in favor of the accused for two reasons: 1st. Because it is the mere creature of the common law. 2d. Because if the common law of England be our law, this position assumes what is denied, that the conduct of the prisoner in this case is of an accessorial nature, or such as would make him an accessory in felony. If this position be the mere creature of the common law, no consequences can be deduced from it. It is sufficient to take Mr. Wickham's own declaration, that the common law does not exist in this country. If we examine the constitution and act of congress, we shall find that this idea of a distinction between principals in the first and second degree depends entirely on the common law. All who levy war against the United States, whether present or absent—all who are leagued in the conspiracy, whether on the spot of the assemblage or performing some minute and inconsiderable part in it a thousand miles from the scene of action—incur equally the sentence of the law. They are all equally traitors.

But to try this position to its utmost extent, let us not only put aside the constitution and act of congress and decision of the supreme court, but let us admit that the common law does not exist here. Still, before the principle could apply, it would remain to be proven that the conduct of the prisoner in this case has been accessorial; or in other words, that his acts in relation to this treason are of such a nature as would make him an accessory in felony. But is this the case? It is a mere petitio principii. It is denied that his acts are such as would make him an accessory in felony. I have already in another branch of this subject endeavored to show, on the grounds of authority and reason, that a man might be involved in the guilt of treason as a principal by being legally though not actually present; that treason occupied a much wider space than felony; that the scale of proximity between the accessory and principal must be extended in proportion to the extent of the theatre of the treason; and that as the prisoner must be considered as legally present, he could not be an accessory, but a principal. If I have succeeded in this, I have in fact proved that his conduct cannot be deemed accessorial. But an error has taken place from considering the scene of the overt act as the theatre of the treason, from mistaking the overt act for the treason itself, and consequently from referring the conduct of the prisoner to the acts on the island. The conduct of Aaron Burr has been considered in relation to the overt act on Blennerhassett's Island only; whereas it ought to be considered in connection with the grand design, the deep plot of seizing Orleans, separating the Union, and establishing an independent empire in the West, of which the prisoner was to be the chief. It ought to be recollected that these were his objects, and that the whole western country from Beaver to Orleans was the theatre of his treasonable operations. It is by this first reasoning that you are to consider whether he be a principal or an accessory, and not by limiting your inquiries to the circumscribed and narrow spot in the island where the acts charged happened to be performed. Having shown, I think, on the ground of law, that the prisoner cannot be considered as an accessory, let me press the inquiry whether on the ground of reason he be a principal or an accessory; and remember that his project was to seize New Orleans, separate the Union, and erect an independent empire in the West, of which he was to be the chief. This was the destination of the plot and the conclusion of the drama. Will any man say that Blennerhassett was the principal, and Burr but an accessory? Who will believe that Burr, the author and projector of the plot, who raised the forces, who enlisted the men, and who procured the funds for carrying it into execution, was made a cat's paw of? Will any man believe that Burr, who is a soldier, bold, ardent, restless and aspiring, the great actor whose brain conceived and whose hand brought the plot into operation, that he should sink down into an accessory, and that Blennerhassett should be elevated into a principal? He would startle at once at the thought. Aaron Burr, the contriver of the whole conspiracy, to everybody concerned in it was as the sun to the planets which surround him. Did he not bind them in their respective orbits, and give them their light, their heat and their motion? Yet he is to be considered an accessory, and Blennerhassett is to be the principal!

Let us put the case between Burr and Blennerhassett. Let us compare the two men, and settle this question of precedence between them. It may save a good deal of troublesome ceremony hereafter. Who Aaron Burr is we have seen in part already. I will add, that beginning his operations in New York, he associates with him men whose wealth is to supply the necessary funds. Possessed of the main-spring, his personal labor contrives all the machinery. Pervading the continent from New York to New Orleans, he draws into his plan, by every allurement which he can contrive, men of all ranks and descriptions. To youthful ardor he presents danger and glory; to ambition, rank and titles and honors; to avarice, the mines of Mexico. To each person whom he addresses he presents the object adapted to his taste. His recruiting officers are appointed. Men are engaged throughout the continent. Civil life is indeed quiet upon its surface, but in its bosom this man has contrived to deposit the materials which, with the slightest touch of his match, produce an explosion to shake the continent. All this his restless ambition has contrived; and in the autumn of 1806, he goes forth for the last time to apply this match. On this occasion he meets with Blen-

nerhassett. Who is Blennerhassett? A native of Ireland, a man of letters, who fled from the storms of his own country to find quiet in ours. His history shows that war is not the natural element of his mind. If it had been, he never would have exchanged Ireland for America. So far is an army from furnishing the society natural and proper to Mr. Blennerhassett's character, that on his arrival in America, he retired even from the population of the Atlantic states, and sought quiet and solitude in the bosom of our western forests. But he carried with him taste and science and wealth; and lo! the desert smiled. Possessing himself of a beautiful island in the Ohio, he rears upon it a palace, and decorates it with every romantic embellishment of fancy. A shrubbery, that Shenstone might have envied, blooms around him. Music that might have charmed Calypso and her nymphs, is his. An extensive library spreads its treasures before him. A philosophical apparatus offers to him all the secrets and mysteries of nature. Peace, tranquility, and innocence shed their mingled delights around him. And to crown the enchantment of the scene, a wife who is said to be lovely even beyond her sex and graced with every accomplishment that can render it irresistible, had blessed him with her love, and made him the father of several children. The evidence would convince you that this is but a faint picture of the real life. In the midst of all this peace, this innocent simplicity and this tranquility, this feast of the mind, this pure banquet of the heart, the destroyer comes; he comes to change this paradise into a hell. Yet the flowers do not wither at his approach. No monitory shuddering through the bosom of their unfortunate possessor warns him of the ruin that is coming upon him. A stranger presents himself. Introduced to their civilities by the high rank which he had lately held in his country, he soon finds his way to their hearts, by the dignity and elegance of his demeanor, the light and beauty of his conversation, and the seductive and fascinating power of his address. The conquest was not difficult. Innocence is ever simple and credulous. Conscious of no design itself, it suspects none in others. It wears no guard before its breast. Every door and portal and avenue of the heart is thrown open, and all who choose it enter. Such was the state of Eden when the serpent entered its bowers. The prisoner, in a more engaging form, winding himself into the open and unpracticed heart of the unfortunate Blennerhassett, found but little difficulty in changing the native character of that heart and the objects of its affection. By degrees he infuses into it the poison of his own ambition. He breathes into it the fire of his own courage; a daring and desperate thirst for glory; an ardor panting for great enterprises, for all the storm and bustle and hurricane of life. In

a short time the whole man is changed; and every object of his former delight is relinquished. No more he enjoys the tranquil scene; it has become flat and insipid to his taste. His books are abandoned. His retort and crucible are thrown aside. His shrubbery blooms and breathes its fragrance upon the air in vain; he likes it not. His ear no longer drinks the rich melody of music; it longs for the trumpet's clangor and the cannon's roar. Even the prattle of his babes, once so sweet, no longer affects him; and the angel smile of his wife, which hitherto touched his bosom with ecstasy so unspeakable, is now unseen and unfelt. Greater objects have taken possession of his soul. His imagination has been dazzled by visions of diadems, of stars and garters and titles of nobility. He has been taught to burn with restless emulation at the names of great heroes and conquerors. His enchanted island is destined soon to relapse into a wilderness; and in a few months we find the beautiful and tender partner of his bosom, whom he lately "permitted not the winds of" summer "to visit too roughly," we find her shivering at midnight, on the winter banks of the Ohio, and mingling her tears with the torrents, that froze as they fell. Yet this unfortunate man, thus deluded from his interest and his happiness, thus seduced from the paths of innocence and peace, thus confounded in the toils that were deliberately spread for him and overwhelmed by the mastering spirit and genius of another—this man, thus ruined and undone and made to play a subordinate part in this grand drama of guilt and treason, this man is to be called the principal offender, while he by whom he was thus plunged in misery is comparatively innocent, a mere accessory! Is this reason? Is it law? Is it humanity? Sir, neither the human heart nor the human understanding will bear a perversion so monstrous and absurd! so shocking to the soul! so revolting to reason! Let Aaron Burr, then, not shrink from the high destination which he has courted, and having already ruined Blennerhassett in fortune, character and happiness forever, let him not attempt to finish the tragedy by thrusting that ill-fated man between himself and punishment.

Upon the whole, sir, reason declares Aaron Burr the principal in this crime, and confirms herein the sentence of the law; and the gentleman, in saying that his offence is of a derivative and accessorial nature, begs the question, and draws his conclusions from what, instead of being conceded, is denied. It is clear from what has been said that Burr did not derive his guilt from the men on the island, but imparted his own guilt to them; that he is not an accessory but a principal; and, therefore, that there is nothing in the objection which demands a record of their conviction before we shall go on with our proof against him.

Upon the fourth and last proposition laid

down by Mr. Wickham, viz: That no evidence could be received to connect Col. Burr with the transactions on Blennerhassett's Island, because the evidence failed to prove that any overt act of levying war had been committed there, Mr. Wirt said:

The question which the court is here called on to decide is, whether the assemblage on Blennerhassett's Island were an overt act of levying war. As the overt act is compounded of fact and intention, they must yield to us the intention. because we are ready to prove their intention is to be traitorous. Were they not to admit it we could not be debarred from proving it. They must admit that the individuals who composed the assemblage on Blennerhassett's Island, were enlisted by Aaron Burr or his subaltern officers; that they had marched by individuals to the mouth of Beaver, a place of partial rendezvous; that when collected there, they proceeded to Blennerhassett's Island, another place of rendezvous, where they were to receive an accession of boats, men, provisions, arms and ammunition under the command of Blennerhassett himself; that from the island they proceeded by the mouth of Cumberland to Baton Rouge, a place of general rendezvous for the expected forces from the West and from the states of Virginia, Kentucky, Ohio, and Tennessee; and that at this place he headed them with a considerable addition of men and arms. They must admit that he attempted the seduction of the officers and men at the several forts and garrisons of the United States as they passed; which forts and garrisons were too weak to have resisted with effect. They must admit that their destination was New Orleans, where they expected the co-operation of the United States troops and the commander-in-chief. They must admit that New Orleans was to be taken, together with its bank, shipping and military stores, &c., that the standard of treason was to be planted in that city, which was to be made the seat of his empire. All the country west of the Allegany was to be annexed to his empire. All this they must admit; for this and more we are prepared to prove; and they must insist that the assemblage on the island, connected with all these facts, does not amount to treason.

The question, then, is whether, all these things admitted, the assemblage on the island were an overt act of levying war. Here, sir, are we forced most reluctantly to argue to the court, on only a part of the evidence, in presence of the jury, before they have heard the rest of the evidence, which might go a great way to explain or alter its effect. But unpleasant as the question is in this way, we must meet it. What is an open act of levying war? To which we are obliged to answer that it must be decided by the constitution and act of congress. Gentlemen on the other side, speaking on this subject, have asked us for battles, bloody battles, hard knocks, the noise of cannon. "Show us your open acts of war," they exclaim. Hard knocks, says one, are

things we can all feel and understand. Where was the open deed of war, this bloody battle, this bloody war? cries another. Nowhere gentlemen. There was no bloody battle. There was no bloody war. The energy of a despised and traduced government prevented that tragical consequence. In reply to all this blustering and clamor for blood and havoc, let me ask calmly and temperately, does our constitution and act of congress require them? Can treason be committed by nothing short of actual battle? Mr. Wickham, shrinking from a position so bold and indefensible, has said that if there be not actual force, there must be, at least, potential force, such as terror and intimidation struck by the treasonable assemblage. We will examine this idea presently. Let us at this moment recur to the constitutional definition of treason, or to so much thereof as relates to this case. "Treason against the United States shall consist only in levying war against them," not in making war, but in levying it. The whole question then turns on the meaning of that word, "levying." This word, however, the gentlemen on the other side have artfully dropped; as if conscious of its operation against them, they have entirely omitted to use it. We know that ours is a motley language, variegated and enriched by the plunder of many foreign stores. When we derive a word from the Greek, the Latin, or any other foreign language, living or dead, philologists have always thought it most safe and correct to go to the original language for the purpose of ascertaining the precise meaning of such word. "Levy," we are told by all our lexicographers, is a word of French origin. It is proper, therefore, that we should turn to the dictionary of that language to ascertain its true and real meaning; and I believe we shall not find that, when applied to war, it ever means to fight, as the gentlemen on the other side would have us to believe. Boyer's Dictionary is before me, sir, and I am the more encouraged to appeal to him, because in the Case of Bollman and Swartwout, your honor, in estimating the import of this very word, thought it not improper to refer to the authority of Doctor Johnson. "Lever," the verb active, signifies, according to Boyer, "to lift, heave, hold, or raise up." Under the verb he has no phrase applicable to our purpose; but under the substantive "levee," he has several. I will give you them all. "Levee d' un siege," the raising of a siege. "Levee des fruits," gathering of fruits, crop, harvest. "La levee du parlement Britannique," the rising or recess of the British parliament. "Levee, (collecte de deniers,)" a levy-raising or gathering. "Levee de gens de guerre," levying, levy, or raising of soldiers. "Faire de levees de soldats," to levy or raise soldiers. So that when applied to fruits or taxes, it means gathering as well as raising. When applied to soldiers it means raising only, not gathering, assembling, or even bringing them together, but merely raising. Johnson takes both these meanings, as you mentioned in the

Case of Bollman and Swartwout; but in the original language, we see that levying, when applied to soldiers, means simply the raising them, without anything further. In military matters, "levying" and "raising," if Boyer may be trusted, are synonymous. But to ascertain still more satisfactorily the meaning of this word "levy," let us look to the source from which we have borrowed the whole definition of treason, the statute of 25 Edw. III. The statute is in Norman French, and in describing the treason of levying war, uses these words: "Si home leve de guerre, contre nostre seigneur le roy en son royalme." In a subsequent reign, I mean the factious and turbulent reign of Richard II., when the statute of Edward, although unrepealed, was forgotten, lost and buried under the billows of party rage and vengeance, it became at length necessary for parliament to interfere and break in pieces the engine of destructive treason; and in the 21st year of Richard II., a statute was passed which may be considered as a parliamentary construction of that of Edward III. In that statute, the treason of levying war is thus explained, "Celuy gue levy le people, and chevache en counter le roy à fair guerre deins son realme." Here the French verb, "leve," is the same as that used in the statute of Edward, with an unimportant orthographic variation; and here it is clearly contradistinguished from the actual war. The levy is of men and horses, for the purpose of making war; and the levy would have been complete, although the purpose had never been executed. I consider, therefore, the statute of Richard, as not only adding another authority to Boyer, to prove that the extent of the French verb "leve" when applied to soldiers goes no farther than the raising them; but I consider that statute, also, as a parliamentary exposition or glossary of the phrase "levy de guerre," in the statute of Edward. In this latter opinion I am supported by 1 Hale, P. C. 85, who, speaking of the statute of Richard, says: "These four points of treason" (settled by the parliament of Richard) "seem to be included within the St. 25 Edw. III. as to the matter of them, with these differences, viz: The forfeiture is extended further than it was formerly, namely to the forfeiture of estates tail and uses. 2. Whereas the ancient way of proceeding against commoners was by indictment and trial thereupon by the country, the trial and judgment is here appointed to be in parliament. 3. But that wherein the principal inconvenience of this act lay was this: that whereas the statute of Edward the Third required an overt act to be laid in the indictment and proved in evidence, this act hath no such provision." These are all the differences that he makes between them. Hence it is clearly the opinion of Hale that the treason of levying war is materially the same in both statutes. For if the statute of Edward required actual war, hard knocks, bloody battle, to constitute treason, while that of Richard made the mere

preparation for those purposes treason, would it have escaped such a mind as Hale's, more particularly when he was especially employed in discriminating between the two statutes; and marking the points of difference to the disadvantage of the statute of Richard? If nothing short of actual war will satisfy the statute of Edward, while that of Richard covers so much more ground as to comprehend the first act of recruiting, and to make it the treason, how can the former be said to include the latter? It might, with as much propriety, be said that a field of battle includes the country or kingdom within which it lies, or that the less includes the greater. Yet of this absurdity Hale hath been guilty, unless it be conceded that the statutes of Richard and of Edward are materially the same. If, in conformity of the opinion of Hale, this point be conceded, then it is indisputably clear and certain that the statute of Richard makes levying of war to consist in the preparations for that war, in the raising of men, horses, &c., for the purpose of making war; so, also, under the statute of Edward, levying war means the preparations for that war. And if this construction of the statute of Edward be admitted, we have but to remember that our definition of treason is borrowed from this statute, and to ask whether the same words, "levying war," in the English and American statutes mean the same thing.

Confiding in the candor of this investigation and the truth of the conclusion to which it has led me, I should myself have thought the mere enlistment of soldiers of itself an overt act of levying war. I should think such enlistment, too, sufficient to satisfy the reason of the statute of Edward, and consequently of our constitution and act of congress, in requiring an overt act to be proven.

Gentlemen may say that the statute of Richard II., by this construction, proves too much for my purpose; that it must be evident that the parliament were dissatisfied with the generality of the statute of Edward, and intended by that of Richard to restrain that generality and narrow the ground of constructive treason, but that this construction would extend it, and instead of producing the intended salutary effects, would augment the dangers which it was intended to avert. But the language of the act, which is plain and most explicit, affords a satisfactory answer to this argument. It is exclusive of all possible doubts, by making the act of war consist in visible external preparation. The term "levy" in some lexicons means simply "to raise;" and if this plain sense and most natural meaning were to be adopted, there could, then, be no doubt, the prevention of which is certainly one of the benefits intended by the act. But it appears to me that it is, also, a reasonable construction; that it is all that reason can require. What is the reason avowed by all the books for requiring proof of an overt act to constitute treason? Every man knows that the moral turpitude consists

in the mind and intention. Why, then, do we require proof of an act? It is because we cannot otherwise discover the intention. It is because the secret intentions of the mind lie beyond the ken of mortal sight. They can be known only to the man himself and to that Being whose eye can pierce the gloom of midnight and the still deeper gloom that shrouds the traitor's heart. To his fellow men. those intentions can be manifested only by some external or overt act. I consider the phrase "overt act" as intended to be in contrast with "secret intention;" but whenever this secret intention ripens and breaks out into an act of which the human senses can take cognizance, I consider the reason of the law as being satisfied. We are, then. relieved from the necessity of prying into and guessing at the secrets of the heart. It is not pretended that any case ever occurred to contradict this idea, until the case which is reported by Ventris, which hath been said by some modern English writer, and pronounced by your honor, to settle the principle that the mere enlistment of soldiers is not sufficient to constitute the levying of war. Permit me, with the utmost deference and respect for your honor, to examine that case, and see whether it justify a conclusion so broad. That case, it is to be observed, is adjudged under the statute of 25 Edw. III. Now it requires but to adopt for a moment the idea which I have shown to be sanctioned by Lord Hale. that the statute of Richard explains by a periphrasis the more condensed definition of that of Edward, to perceive the reasoning and whole scope of the case in Ventris. "If a man." says the statute of Edward, "shall levy war against our lord the king in his realm;" "or he," says the statute of Richard. "who levies men and horses against the king, to make war in his realm." The levy, then. is a totally different thing from the war. The levy is the preparation; the war is the purpose; but it is "to make war in his realm." Wheresoever, then, the levy is made. the purpose must be to make war in the realm. Hence it is very clear that though the levying should be within the realm, the statute would not be satisfied. unless the purpose. also. were to make war within the realm. It is upon this latter point alone, upon the destination, that the case in Ventris turns. and not upon the scene of enlistment, nor upon the insufficiency of the fact of enlistment. The case in Ventris is that of Patrick Harding (volume 2, pp. 315, 316). The charge in the indictment is conspiring the death of the king and queen. William and Mary; and the overt act laid is "levying war by raising divers soldiers and men, armed and to be armed. (armatos et armaturos,) et milites sic ut præfertur levatos extra hoc regnum Angliæ misit, et iter secum suscipere procuravit ad sese jungendos aliis hostibus," &c. The special verdict finds that the prisoner did list. hire, raise and procure sixteen men, subjects of this kingdom, at the time, &c., and those sixteen men so listed, hired, raised and procured, did send out of this kingdom into the kingdom of France to assist and aid the French king, &c. Upon this special verdict found, the lord chief justice, Justice Gregory, and Justice Ventris, who were then present at the sessions, conceived some doubt; for they were of opinion that it did not come within the clause of Edw. III. of levying war; for that clause is, if a man levy war against our sovereign lord the king in his realm. and by the matter found in the special verdict it appears that these men were listed and sent beyond sea to aid the French king. In the original report, the words "in his realm" are printed in italics, as marking the particular part of the statute on which the opinion rested. But suppose the purposed war had been within the realm; is not the implication from the reasoning of the court irresistible, that the enlistment would have been a sufficient overt act of levying? Is it not clear that the court in this case considered the statute of Edward as explained by that of Richard II.? that it distinguished between the levy and the war, and required, according to the express letter of the second statute, that not only the preparation but the proposed war should be within the realm? But it has been said that if the enlistment had been a sufficient overt act of levying war, then war had been levied within the realm. But this is confounding the levy with the war, the means with the end, the preparation with the purpose. It is losing sight of the requisition of the statute, that not the levying merely, but the intended war shall be within the realm. Besides, when the court avows the reason of its opinion; when it declares it to consist, not in the insufficiency of the fact of preparation, but in the fact that the proposed war was to be out of the realm with what propriety can it be argued that its opinion rested not on the reason which it does itself avow, but on one which it does not avow, and which it disapproves as far as it can do it by implication? If it were immaterial where the war was to be. if the enlistment of men were in itself insufficient as an overt act of levying war; why did not the court take this ground at once, and say that the mere enlistment of men was not an overt act of levying war? The answer is obvious; it was because it considered the statute as requiring that the proposed war should be within the realm; whereas the war, as found by the jury, was intended to be out of the realm; and to my judgment the inference is equally obvious, that if the war had been found to be intended within the realm, the court would have had no doubt that the war had been levied by the enlistment. The case in Ventris, therefore, is so far from warranting the conclusion that the mere enlistment is not a sufficient overt act of levying war, that in my conception it warrants the conclusion that it is a sufficient act. And if the case in Ventris do not jus-

tify the doctrine that enlistment is insufficient as an overt act, I defy the gentlemen to produce a case not dependent on that which does warrant it.

Mr. Wirt then went into a critical examination of the authorities cited on the other side to prove that force and military array are necessary to constitute the act of levying war, and insisted that they did not sustain the position assumed by counsel for the defence. He dwelt upon the decision of the supreme court in the Case of Bollman and Swartwout, and maintained that the evidence proved such a treasonable assemblage on Blennerhassett's Island, as, according to that opinion, clearly amounted to levying war. He also insisted on the position, that whether an overt act had been proved was a question of fact which must be submitted to the jury, and decided by them under the instructions of the court.

Mr. Hay. A large portion of Mr. Hay's argument was devoted to the question, whether the motion to arrest the evidence was one which, on principle and precedent, could be entertained by the court. He contended that no precedent could be found to justify such practice, either English or American. He insisted that the motion called upon the court to usurp powers belonging exclusively to the jury, by deciding upon the facts of the case. To wrest from the jury the decision of facts in a criminal prosecution, he said, was a most dangerous proposition, replete with incalculable mischief. He felt infinitely more solicitude about the preservation of this principle in all its purity, than for the correct construction of constitutional treason, as contradistinguished from constructive or oppressive treason.

In answer to arguments on the other side, Mr. Hay said the counsel all call aloud for an open deed of war. But neither the constitution nor the law speak of an overt act of war. They speak of levying war. There was a real, essential difference between an open deed of war and an overt act of levying war. An open deed of levying war is an assemblage of troops. If you go beyond that line, if these troops employ force or fight a battle, it is folly to call it an overt act of levying war; it is an open act of war previously levied. Is not this distinction, he asked, plain to the mind of every man of common sense? and is it not according to the obvious meaning of the constitution? Why, then, should counsel call so loudly and vehemently for open deeds of war, when they must have known that the overt act of treason consisted in levying war against the United States, and not in making it?

In reference to the position that before the accused could be held answerable for acts of an accessorial nature, the guilt of the principals must be proved by a record of their conviction, Mr. Hay said there was no law to warrant the application of the rule to this case. The real doctrine was, that if a man

be indicted as an accessory, he is at liberty to state before his trial, when the indictment is called, that he does not choose to be tried till the principal be convicted. The judge knows that his objection is valid, and he suspends the prosecution till the principal be convicted; either confining him in prison or bailing him till his trial, according to the circumstances of the case. The accused may choose to be tried, and waive the right of suspending the trial. It never was in the power of the accessory, after he had been arraigned and plead not guilty to the indictment without objection, when he found that the testimony bore heavily upon him, then to call for the record of his principal's conviction as a preliminary point. He cited 1 Hale, P. C. 623. He contended that this right to call for the record of the conviction of the principal only existed in case of an accessory indicted as an accessory; and could not exist in this case, because the accused was not charged as an accessory, but as a principal.

In reply to the position that inasmuch as Col. Burr was not present when and where the pretended overt act was charged to have been committed, he could be guilty, if at all, only in an accessorial capacity, Mr. Hay said: Mr. Wickham says that his proposition, that Burr is an accessory and not a principal, is deduced from the constitution of the United States, their laws, and the laws of England. His first position was, that there is no treason in the United States but that which is defined by the constitution. Agreed. This is sound doctrine.

His next position was, that no man can be punished but he who does the act thus defined. This is conceded also. But when he says that this act of levying war against the United States cannot be performed but by a person present on the spot where the offence is alleged to be committed, I deny the correctness of the position, and aver that it is not founded in sound sense, or in the law of this country or of Great Britain. A man may levy war without being present with the troops where the offence is alleged to be committed, or even without making actual war at all. It is unnecessary to press the distinction between levying war and war itself. The common sense of mankind has decided this question. The man who levies war is he who projects the plan, provides the means, causes soldiers to be enlisted, and arms and other necessaries to be prepared, and directs and superintends the whole operation. He may sometimes be also master of means sufficient for the subversion of the liberty and happiness of a whole people. What would be the course of conduct which a man, at the head of a conspiracy to subvert the government of his country, and to raise himself on its ruins, would pursue, you may easily judge. Supposing him to be a man whose understanding was equal to his ambition, he would proportion the means to the end. He would use activity

and enterprise. He would be confined to no particular scene of operations. He would be here and there and at every place, where and when it would be necessary to prepare for the accomplishment of his great object. He might give directions to different bodies of troops to meet him at given times and places, while in the intermediate time he might make arrangements at different places to prevent disappointment, and to secure final and ample success. Is it necessary, according to common sense, that a leader should be present at the very moment when an assemblage of part of his soldiers is to meet at a particular place in consequence of his previous orders? There may be twenty different assemblages. If he be a man of talents, intelligence, and activity, he may have formed his designs so wisely and concerted his measures so skilfully, as to have fifty, or five hundred, or even a thousand different assemblages and subordinate plans conducing to one common end, all going on at the same time without his actual presence. He is not present at any one place, but he directs and commands everywhere, and vigilantly waits for a favorable moment till he can strike a final and decisive blow. On principles of common sense it is not essential, therefore, that the commander should be present at any preconcerted assemblage of his troops. I repeat, that the common understanding of mankind has decided this question. We find (and every expression used here may be soon verified) that George III. levies war against the United States three thousand miles from us. It is he who declares the war, by whose directions the troops are raised and employed. It is he who levies the war, and not his subjects, who fight the battles; his generals, and soldiers, who come hither for slaughter and murder, they make the war upon us, but they do not levy it. If the subjects of the king of Great Britain were to levy war upon this country, they would not be entitled to be considered as public enemies, but robbers, pirates, and murderers, according to the acts which they would commit; and, therefore, instead of being treated as public enemies, they would be regarded as individual offenders who had perpetrated those crimes, and proceeded against as such. But as he levies the war, they become public enemies in consequence thereof. A man may, on principles of common sense, not only levy war, but make war without being present at the place where a battle is fought. Bonaparte was not actually on the field at the battle of Austerlitz. I do not know that he was in view of the line of battle. He was in the rear with the body of reserve; yet the victory gained on that memorable day was gained by him, because he stationed the troops, directed their movements, and stood ready to give assistance; and the glory of that victory, so decisive of the destiny of Europe, was his. He not only levied but

made war, without being personally present. Such is the case here: admit it to be true that Burr was not on the island, yet the men who went, met there by his procurement and direction; they leave it by his direction; and he afterwards joins them, and takes the command. So that in coming to, remaining on, and quitting the island, they act in exact obedience to his command. If the assemblage on Blennerhassett's Island were an overt act of levying war, the person who procured that assemblage, by whom its movements to and from the island were directed, is emphatically guilty of levying war against the United States. Let us pursue this argument a little further; suppose that Burr had never been at the spot at all, but he knows that his troops are there. He apprehends that an attack is to be made on them; and to repel it, he dispatches more men, arms, ammunition, provisions, and everything necessary for their defence, with orders to resist, and instructions how to conduct the battle which is actually fought. The attack is made and repelled. Thousands fall in the battle. Would he not, then, levy war? Would it be contended by gentlemen that by the constitution of the United States, Aaron Burr, not having been personally present when this overt act of his procurement was committed, was not a principal but an accessory? that his soldiers are principals in the treason, but that he is not guilty? that the constitution requires the actual presence of the commander-in-chief whenever a battle is fought by any part of his army, or wherever an attack is made or repelled? If he would be guilty of levying war, what becomes of the doctrine which requires his presence? The constitution requires his presence nowhere.

To prove, however, the fallacy of this doctrine, let us examine the result. He is innocent and safe. They are guilty and punished. Is it possible that the human mind can be so perplexed by learning and so misled by ingenuity, so totally bereaved of all its powers, as to adopt a conclusion like this? to pronounce that the great projector, the prime mover of the whole conspiracy and plot, is constitutionally safe, while his deluded followers are to be hanged? Yet this is the language and this the doctrine of Mr. Wickham. He would make as little ceremony with Blennerhassett as Burr said he would use to Miranda. As to Miranda, said he, "We will hang Miranda." It appears to me, sir, that that construction of the constitution which leads to such a conclusion, which shall exculpate Burr and hang Blennerhassett, which leaves the principal to destroy the agent, is not only repugnant to common sense but to every dictate of feeling and humanity. There is sufficient reason to deplore the misconduct and crime of Blennerhassett. He has certainly done wrong and offended against the laws of his country grievously; but I hope to be excused for

declaring that there is no more comparison between Blennerhassett and Burr, as to criminality, than there is between the breeze which gently shakes the leaves and the storm which desolates the earth. If this construction be not founded in reason, let us call for the law which sanctions the doctrine for which he contends. If we look at home we shall find that this question has been decided already by our own judges. The supreme court of the United States has solemnly decided it, in direct opposition to what gentlemen have insisted to be the law. But they say that it ought not to be regarded, because it was an extra-judicial decision. Mr. Wickham. finding it inconvenient to prove it: pretends to anticipate our admission of it, and with his usual dexterity takes it for granted that he has nothing to do but to follow up that supposed concession. Let us examine the subject and see whether it be extra-judicial or not. Bollman and Swartwout, who were never at Blennerhassett's Island or with the troops, were before the court on suspicion of high treason. A motion was made to commit them on this charge. Having been brought before the court on a writ of habeas corpus, a motion was made by their counsel to discharge them. Those cases came first before the circuit court for the county of Washington, and the records of that court, containing the orders by which they were committed on the charge of treason in levying war against the United States, and the testimony on which the commitment was made, were brought before the supreme court. I do not know by whom they were defended in that court or in the circuit court. But I take it for granted when I turn my eyes to that part of the world that they were defended with ability and zeal. They were not present on Blennerhassett's Island, nor with any part of the forces of Colonel Burr; and though not present they were charged with treason. I certainly am at liberty to suppose, whoever may have been their counsel, that they were defended with great zeal and ability, and that they were defended on this ground. From the extreme zeal displayed in the course of this defence, we may infer what defence was made for those persons; and if so, the decision of the supreme court was on the very point, and must be conclusive authority in this case. But let us suppose that this was not the point immediately in discussion nor before the court, and that consequently the decision may, strictly speaking, be considered as extra-judicial. Still I am at liberty to say that this opinion of the supreme court is entitled to the highest degree of consideration and respect, and ought not to be departed from but for reasons very different in principle and effect from those used on the part of the counsel for the prisoner.

The law as expounded by the judges of this country not suiting Mr. Wickham, he goes to Great Britain for his law, and brings with him the common law of that country, to show that the accused is only an accessory, and therefore not guilty. Let us see what benefit he derives from this voyage and importation of the common law. The very instant he opens the law-book he finds that the common law declares, "in treason all are principals." The very system to which he resorts presents this doctrine at once to him: that in treason all persons in any manner concerned, whether present or absent, are principals. How is this dilemma removed? The gentleman will not rely on this doctrine, and he turns to us with an exulting countenance and exclaims, "the common law is not in force in this country under the government of the United States; you must be governed by the constitution only. The gentleman will not contradict me." He well knew that I would not controvert the position as to the non-existence of the common law. He knew that this was a point agreed. The common law is not in force in the United States. There is no treason in the United States but that defined by the constitution; and he who was not leagued in the conspiracy and performed a part in it. whatever else he may have done, cannot be punished. In what manner does he avail himself of this concession that we do not claim the aid of the common law? That very instant he takes it up for his own use. Because we have disclaimed and thrown it by, he takes it up for his own exclusive benefit. "After what you have said, you cannot resort to the common law which says that all are principals; but I will resort to some other parts of the common law. and avail myself of them." How does he avail himself of them? After having stated that it was not in force, he resorts to it and relies on the common law distinction of principals and accessories; a principal being the actor or person present aiding and abetting the offence; an accessory an absent person who procures and counsels or receives and comforts an offender. Is there not in this reasoning, which disclaims and uses the same authority at once, a temerity which defies reflection and amounts to desperation? Is it not a desperate construction of the case? Would a man of Mr. Wickham's talents contend in one breath that the common law is not in force in this country, and yet in the next make it the principal basis of his argument, unless it were a desperate case? Desperate cases require desperate efforts. He avails himself of the common law to borrow from it distinctions which he endeavors to fix without reason or propriety on the constitution, which he says we wish to render merely a dead letter. It is a distinction borrowed from the common law, which says that a principal is he who is the actor or is present at the perpetration of the act, aiding and abetting, and declares an accessory to be a person who is absent, but procures or com-

mands or counsels the act to be done. This is the distinction in Great Britain between principals and accessories founded on the common law. He insists that the prisoner, not having been present at the commission of the act, is merely an accessory; that an accessory is not punishable under the constitution of the United States; and therefore that the prisoner is not punishable at all.

If the common law be not in force, the gentleman has no more right to resort to it, or borrow any distinctions from it, than he has to borrow a distinction from the civil law, the Gentoo law, the Chinese law, or any other law in the world. I conceive that Mr. Wickham has himself furnished us with a conclusive reason why we should not resort to the common law for these definitions. Before I mention that reason, permit me to remark that there is something extraordinary and humiliating in this argument respecting the correct construction of the constitution. Those who framed it have used plain words, such as a man of the most ordinary capacity, as well as a man of the most enlightened mind can understand; and yet we are not to depend on plain construction, such as is obvious to every man of common understanding, but to go to England to resort to a system declared not to be in force, to find out the true meaning! It appears to me, sir, to be as degrading as it is absurd, to resort to a foreign system not in force in order to introduce a distinction which does not belong to it.

I have said that Mr. Wickham had himself furnished the reason why we should not resort to the common law. The constitution, he says, must be our guide; and its construction must be governed by rules of moral right, and not by artificial rules. The only reason he gives for this is, that the constitution is a compact and not a law. It does not fully justify his inference. It is both a compact and a law. It may be considered as a rule prescribed by a superior, or as founded in compact between parties. The fair construction is, that so far as it operates on states, it is a compact between those states, equally obligatory on them all; but as far as it applies to individuals it is a law prescribed by the supreme power in the state (the people in convention) which every citizen is bound to obey; and it is declared by the instrument itself to be the supreme law of the land. It is not very material in what light it is to be considered; whether as a compact or law, or both; but this shows the construction most consonant to common sense, and that when the question is put in that way there is no difficulty. But let us avail ourselves of Mr. Wickham's golden key for unlocking the door of the constitution. By rules of moral right, I suppose he means that exposition which will give us the intention, if the words used by its framers will bear it. Knowing the character, mental acuteness, talents, and intellectual powers of those who framed that constitution, it must be presumed not only that they intended to suppress the mischief and advance the remedy in every instance, but that they expressed their meaning in such a manner that if the constitution be fairly expounded that object will certainly be attained. I will ask whether it is to be supposed that their intention was that a traitor must be on the spot while his troops slaughtered their fellow-citizens, or else that he could not be punished. That the accessory should pass with impunity while the humble instruments of his ambition should be punished. Suppose the question put to the enlightened men who framed that constitution. Suppose they were asked at that time "whether it be your intention to exclude from punishment the prime mover and projector of a treasonable plot, who shall by himself or his agents enlist and assemble troops and procure everything conducive to the overt act, if he be not present when the overt act is performed. Do you intend that such a contriver and leader shall not be a principal traitor, or punished at all, but that the humble and deluded instruments of his ambition shall be punished?" They would all have unanimously answered. "This construction never will be adopted by any intelligent court. It will be the duty of the court to adopt the principle which will prevent the mischief; and if it be urged that such a projector and leader being absent does not levy war, is only an accessory, and not being expressly mentioned, as such is not punishable, the court will not be at all embarrassed by such an argument, only calculated to mislead." They could not have answered otherwise. Whence could they derive a contrary idea? as they must have intended the suppression of the mischief. I very cordially agree with Mr. Wickham, that in the exposition of the constitution artificial rules ought not to be admitted. If we are to be governed by the rules of moral right and to exclude artificial rules, then we must be governed by the general principles of reason and justice, and not by rules borrowed from the most complicated of all artificial systems on the face of the earth. the common law, where the parts are artfully constructed to suit each other, and which have no sort of reference to this country. The force of this remark is illustrated very completely in this very case. In Great Britain the principal is the perpetrator or aider who is present. The accessory is he who, not being present, procures, counsels, &c. It is manifest that in Great Britain it is immaterial where you draw the line between the principal and the accessory before the fact. because no mischief can ensue, for all the ground not covered by the principal is occupied by the accessory; and what is not covered by the accessory is occupied by the principal. All persons concerned in the perpetration of the offence and in the acts which led to that perpetration are amenable

to the laws and justice of their country. The definition, therefore, of a principal is manifestly connected with that of an accessory: both together taking in the guilt of the transaction and the guilt that led to it.

But how does the introduction of the distinction operate in this country? The gentleman tells us that those only are principals who are present at the perpetration of an offence; that all others concerned are accessories; and that accessories are not punishable by the constitution; so that he circumscribes the guilt of a principal, and which only is punishable within very narrow limits. The result of his exposition is that the constitution does not operate on the very persons whom it was intended to affect, and the most atrocious and dangerous offenders escape unpunished. Can this be correct? In England the definition of principal depends on that of accessory, and that of an accessory on that of a principal. But Mr. Wickham wishes us to borrow the definition from Great Britain, in order to cut off one-half of the offenders. He who counsels, commands, or procures treason to be committed is to escape with impunity. It is very clear that if Mr. Wickham's doctrine be adopted here, to have its full operation, no man can be indicted as an accessory in this country. He cannot be charged as an accessory to levying war. He must levy it. If you take every person who is an accessory, that is, who is guilty of what is termed an accessorial treason in Great Britain, to be an accessory here, you trample on the constitution and exempt from punishment all except those who are present at the scene of action. These, though infinitely less guilty, the humble and deluded followers, are to be punished, while their absent leaders escape; and the gentleman is the very man by whose doctrines it is to be prostrated to the earth.

The doctrine for which I contend appears to me to be infinitely more reasonable. It will not produce the punishment of all who are guilty either as principals or accessories, using those words in the English acceptation. It will extend to those only who are leagued in the general conspiracy and take a part in it. It does not extend to him who only conspires, but takes no part; who avails himself of the locus pœnitentiæ and turns from the iniquity of those men with whom he was leagued, and is a mere traitor in design, because he has performed no act. Nor will it extend to him who does what is termed in Great Britain an accessorial act after the fact. So that doing an act only without being leagued in or a party to the design, or designing without an act, or giving food or lodgings to the conspirators, knowing their design, but being no party to it, would not be embraced by it. He who seeing this party going down to New Orleans, but had known nothing of them before, gave them half a dozen barrels of whisky, would not be a traitor; because though he did perform a minute act, he was not leagued in the general conspiracy, nor was the act done with a traitorous design. I place it precisely on the ground taken by the supreme court. Is not this reasonable? Is there any distinction between the guilt of the persons embraced by this construction of the constitution? Was not Aaron Burr as guilty as his associates on the island assembled by his direction? Is there any difference in England between the guilt of the principal and the accessory before the fact? They are equally punishable with death. The accessory in Great Britain is regarded as equally guilty with the principal.

By making the question presented by the constitution and the act of congress the only question to be submitted to the jury, (that is, did the accused levy war?) we get clear of all the subtilties and refinements of the common law, which require an understanding infinitely more acute than mine to state or even to comprehend them. I do not wish to be bewildered in this labyrinth of law. I have seen gentlemen, in merely attempting to argue, perfectly bewildered in a chaos which they themselves had created. I think it will be fortunate for this country if we expound the constitution by the rules of common sense, without the distinctions of the common law. There is too much subtilty, too much refinement, too much complexity in it for a practical system. A man may devote twenty or thirty years to its study, and not be able to comprehend it completely. I will venture to say that he will misinterpret some parts of it, however learned he may be. Even the gentleman's argument was so abstruse from the subtilties and niceties derived from that system, that not more than half a dozen among us were able to understand the direct scope of it. Let us, then, have a system of our own, adapted to the situation, habits and feelings of the country, without the absurdities, the trash and rubbish of the common law.

I said that the common law was not in force. This may require some explanation. I should not deem it necessary to make it, if the gentlemen on the other side had rightly understood the extent of my admission on the subject. But I think it necessary to remove any doubts and prevent misconceptions. The court will observe that in civil cases congress has made a provision for this defect by the act of 1789. But this does not extend to criminal cases by its very terms. How far certain parts may have been adopted by the use of certain technical expressions is an important question requiring no decision now. Certain parts of it have been taken into use, by the use of certain technical phrases in the constitution and some acts of congress. It is the opinion of some very able men, who have combated the doctrine that the common law is in force, that some particular parts of it have a sanction from the constitution as far as they are necessarily comprehended in the technical phrases which express the powers delegated to the government, and that certain other

parts thereof are and may be adopted by congress as necessary and proper for carrying into execution the powers expressly delegated. This idea is founded on the report of the committee of the Virginia assembly, in the session of 1799–1800, written by Mr. Madison, aided by some other able men. Beyond this limitation the common law has not been adopted under the government of the United States. I have said that certain parts of it have been adopted by the use of certain technical phrases in the constitution. For instance, it provides "that the trial of all crimes (except in cases of impeachment) shall be by jury." Every person indicted must be tried by a jury. The trial by jury is a technical phrase of the common law. By its insertion in the constitution, that part of the common law which prescribes the number, the unanimity of the jury and the right of challenge is adopted. The constitution does not say of what number a jury shall consist; whether of twelve, thirteen, or twenty-three, or any other number. But according to the practical construction of the constitution, we take it to mean twelve men; and that the jury must be unanimous in the opinion which they pronounce. And whence do we get this order but from the word "trial"? Whence does the accused get the right to a peremptory challenge or a challenge for cause? They spring from the word "jury" in the constitution. The act of congress does not give him the right of peremptorily challenging thirty-five. It says that if any person indicted of treason shall challenge peremptorily above the number of thirty-five of the jury, the court shall proceed to the trial of the person so challenging as if he had pleaded not guilty, and render judgment accordingly, from which the right of challenging thirty-five or a certain number is implied; and this act is itself founded on the words of the constitution, "trial by jury." There is in that law not one word on the subject of a challenge for cause; and yet it is deduced from the practical construction of the common law that he has a right to challenge for cause. The whole of this doctrine and all these rights are deduced from those words in the constitution.

I said that the question whether a man were principal or not was a question of law and fact which the jury must decide; and the question whether the accused be guilty in the first or second degree is a question of law and fact which the jury must also decide. The question, "who is a principal in the second degree?" is a question of law on which the court may instruct the jury. The court may decide that question with reference to any particular case coming before it; but the question, whether the person charged as a principal be so, is a question compounded of law and fact. The question here is, not who is a principal, but whether the accused, who stands charged as such, be so in his conduct. It is compounded of fact and law, and to be decided by the jury, subject to be informed by the court as to the law.

In the illustration of this doctrine the court may say that he is a principal in the first degree, or actor or principal in the second degree, present, aiding and abetting; but this presence need not be within sight or hearing: for if a party be engaged in the same enterprise with the actors, and stationed where he can give them aid or protection, he is a principal. Of all these circumstances the jury must judge according to the evidence, and apply the law as they find the facts proved. The whole evidence must, therefore, go before them; and they may decide on the law as well as the fact. Therefore, whether he contend that he is merely an accessory, and not punishable, or only a principal in the second degree, and therefore not punishable until after the conviction of the principal in the first degree, yet as we charge him with levying war, we have a right to introduce all our evidence, and to call on the jury to decide all the questions resulting from that evidence.

In reply to the argument that the indictment should charge the facts specially, as they were intended to be proved, Mr. Hay said: Let us ask in what situation we should be, if we had done what Mr. Wickham says we ought to have done? If we had stated in the indictment that he had levied war, but that he was absent at the time when he levied it? It would, indeed, be a strange and unprecedented indictment which should state that he levied war on Blennerhassett's Island, (which implies presence,) but that he was not present when he did the act on it. It would have been as much as to say that he was present, and yet not present, which would be an absurdity in terms. How could the fact have been stated? I believe it would puzzle the gentleman to draw such an indictment. I believe there never was an indictment, from the beginning of the world to this day, which stated that the accused was not present at the time of committing the act. We say that he was legally, or in the estimation of the law, present and concerned in the act of treason. If we had stated that he was absent, it would have excluded his legal as well as actual presence. How could we have got over this difficulty? If we had stated the fact as it appears, that though not actually, he was constructively present, we must have given a detail of the evidence, the most minute and difficult that could be conceived; which is utterly proscribed by practice and propriety, as several authorities which I have already referred to prove; and if we had so stated it, gentlemen would most probably have loudly complained of it as irregular and extraordinary. An indictment cannot be framed by the mind of mortal man charging the actor to be absent without involving the absurdities or inconveniences which I have stated. Such a detail of the evidence is extremely difficult to obtain and inconvenient to state, and has nev-

er been required. No more is requisite than what we have stated: that the accused and a number of men met together for the purpose of levying war against the United States, and did levy it on Blennerhassett's Island. These are the principles on which I contend that his third objection could not be sustained even in England. The idea that the indictment should state him to have been absent was not law. An accessory before the fact, who was never on the spot, may be convicted under an indictment charging him as the actual perpetrator of the offence. He cited 1 Hale, P. C. 214, where it is said that "if many conspire to counterfeit, or counsel, or abet it, and one of them doth the fact, upon that counselling or conspiracy, it is treason in all; and they may be indicted for counterfeiting generally within this statute, for, in such case, in treason all are principals." Also, page 238: "Though the receiver of a traitor, knowing it, be a principal traitor, and shall not be said an accessory, yet this much he partakes of an accessory, that his indictment must be special of the receipt, and not generally that he did the thing, which may be otherwise in case of one that is a procurer, counsellor, or consenter." He also cited 1 East, P. C. 126, 127, where the same doctrine is laid down in nearly the same words.

Mr. Hay closed with the following remarks: It was said by Mr. Wickham that if the doctrine for which we contend could be sanctioned by the court, a precedent would be established which would be fatal to the liberty and happiness of the people of this country; that it would be more dangerous than any ever introduced in any country. He seems to be alarmed at our temerity, and endeavors to persuade us to desist from pursuing the object we have in view. He admonishes us that the principles and doctrine which we advocate to maintain the prosecution are totally subversive of public liberty. The pathetic and animated description which the gentleman gave us of anticipated calamities, and the fervor of his zeal in their deprecation, had a considerable effect on my mind, and induced me to examine minutely whether they would lead to those fatal consequences which he so eloquently depicted. He trembles for his country, for himself and his posterity, lest we should succeed. I have looked into the subject according to my best ability and judgment, and endeavored to discover whether any great evil or mischief would ensue from the principles which we have advocated, or the measures we have recommended. I, too, am a citizen of this country and the father of children, for whose happiness and welfare I feel a solicitude as lively and affectionate as any parent can feel. To the true happiness of my country, I hope, I know, that I am sincerely and ardently attached. But I see no danger. I apprehend none for myself or my posterity. I am perfectly willing to risk my own life, liberty, and happiness, and those of my posterity, on the propriety of the principles which we recommend. Let them avoid entering into traitorous conspiracies and designs fatal to the liberty and happiness of their fellow-citizens; let them avoid traitorous assemblies, overt acts of levying war, and they will be safe. They cannot be hurt. No individual need apprehend any danger from accusations of treason, either to himself or his posterity, if he and they be innocent. Before any man's life can be in jeopardy, he must not only be concerned in the unnatural and ungrateful scheme of subverting the government of his country, but he must take one active step to carry it into effect. It is unnecessary to mention the fate which any man deserves who attempts to destroy such a government as ours, or to destroy the tranquility and happiness of the people. Let every man pursue the path of integrity and patriotism; let him avoid schemes of unprincipled ambition; and he will not even be suspected. I hope and believe there is no danger on this score. The gentleman made another remark, to which I beg leave to call the attention of the court. I appeal to them whether the principles on which we have gone warranted his injurious anticipations. Without waiting to hear one word in support of the doctrines which we professed to maintain, he said that we must contend, before we could succeed in the prosecution, that the constitution was a dead letter. Have we done so? Have we not advocated the constitution in all its extent? Have we not maintained it in the most perfect purity? Have we not uniformly contended for its inviolability in every respect? Sir, we have contended for that construction which can alone save it from violation, and give it stability and permanence. Yet the gentleman said that we could not oppose his argument without contending that the constitution was a dead letter! The gentleman knows that he was incorrect. I would agree to die ten thousand times over before I would dare to advance so horrible a proposition. It was the language of zeal, mistaken zeal, uttered in the warmth of debate. It was a spark of momentary irritation which is common to that gentleman with most other men, but inconsistent with his usual sentiments of politeness and friendship, which, I hope, now have resumed their place in his breast. I do not wish to hurt his feelings; but I must add that he went still further. He stated that if we opposed him, we must adopt the doctrine established by the cruel Jeffries, and apply it against the accused, not the doctrine of the execrable Coke, but of the bloodthirsty Jeffries. Have we quoted his opinions, resorted to his authority, or advocated his principles? Sir, I never did, I never will, I never can advocate opinions and principles which I abhor; and I firmly and cordially

unite in handing down the name of Jeffries with my execration to all posterity. Let that name be consigned to merited and eternal infamy. No man holds it in greater detestation and abhorrence than I do. Jeffries, the disgrace of the English bench, whose name is not mentioned even in that country but to be despised, will never be spoken of in this country but in terms of the deepest reproach.

Sir, we have never gone one step out of the right path, as far as we could trace it. We have confined ourselves within the fair exposition of the constitution of our country, according to our several capacities. I may be mistaken; but I have heard nothing yet to induce me to think that my exposition of the constitution and laws is incorrect. I have not stated a single fact which I did not believe to be true, nor urged a single argument which has not operated conviction on my own mind. Nor have the great and persevering exertions of the counsel of the accused, with all the splendor of their talents and the depth of their researches, enabled them to advance a single principle of defence which, in my estimation, hath not been amply refuted.

With this view of the subject, and believing the liberty, prosperity, and happiness of the people to be strongly connected with the decision of this case, I cannot conclude without expressing my hope that the motion will be rejected; that according to the opinion of this court on a late occasion, they will not stop the prosecution, but permit us to introduce the rest of our witnesses, in order to enable the jury to decide upon the fact coupled with the intention.

The following is a brief extract from Mr. Lee's compact and vigorous address:

Charles Lee. The second position is, that the presence of the party accused at the scene of action is, by the constitution of the United States, indispensably necessary to make him guilty of the fact of levying war. In this case we lay down the broad doctrine: that in this country there is no treason but under the constitution; that consequently there is no common law treason. When there is no other than the constitutional treason, I should suppose that this could hardly be a question, because we read in the constitution the word "only," which excludes everything from being treason but what the constitution says is treason: "Treason against the United States shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." To advise levying war is in its essence and nature different from levying war. The constitution says it shall consist only in levying it; the other branch, of adhering to their enemies, &c., not being at all in question. To advise or procure levying of war is clearly distinct from levying it. Every person who can read has only to open the book containing the constitution, and he reads that levying war shall be treason only. Of course, by the adoption of this strong negative word, "only," it says, that advising to levy war shall not be treason. But gentlemen tell us that at common law advising to levy war is treason, and that there are no accessories in treason. We answer, that our constitution is in derogation and abridgement of the common law, not in affirmance of it; that it excludes entirely all common law treasons; all treasons whatsoever except the two instances specified. The common law of England is not in force on any subject under the constitution of the United States. If advising to levy war be a common law treason, (that is, a treason created by the common law,) and the common law have no force in this country, how can the common law be said to have created this treason in any court of the United States? Gentlemen admit that the common law as a general system has no force here. According to the opinion of Judge Chase, there can be no crime of which any courts of the United States can take cognizance unless it be created by an act of congress, and expressly authorized by the constitution, and the constitution has never adopted that common law doctrine which says that accessories in treason shall be considered as traitors. If it can be shown, let it be shown that the constitution has adopted this doctrine of accessories. It is said that it is impliedly adopted. This doctrine of implication I trust will not be countenanced by this court. I hope to be excused for repeating, that the constitution, touching the crime of treason, is in abridgement, not in affirmance of the common law. It takes its ground independently of the common law. The statute of 25 Edw. III., from which the words of the constitution are taken, is different from it. There are many other treasons at common law which remain in force there, and which that statute recognizes; whereas there are adopted into our constitution only these two specific treasons, with negative words excluding the possibility of any other. An accessorial treason is a common law treason in its own nature. It exists in England because the common law exists there; but it does not exist here, because treason consists only in levying war. If by the common law doctrine accessories be traitors, the same consequence does not follow in this country that does in England. This crime, which is to consist only of levying war and adhering to the enemies of the country, is punishable by law according to the discretion of congress, who may punish it in whatever way they may think proper; but the powers of congress have not yet been exercised over it. Whether it be through inadvertence or otherwise, they have hitherto omitted to punish accessories, except in an inconsiderable degree, as to those after the fact, who are rescuers of persons convicted of or committed for treason. This court has nothing to do

with it. It would seem very strange to the ear of an American to hear that a man might be guilty at an after day; that after the cessation of a rebellion a man may be guilty of an act of war in that rebellion; that after the war has ceased there may be an act of levying war. Yet this part of the English law the constitution has completely excluded. By the common law this crime may be committed after the war has completely ceased, by receiving or giving comfort to a party who had been engaged in it. Treason might be committed on this day, in this place, in relation to some persons who had committed treason in person in the insurrection of 1793 or 1798. This common law doctrine I consider as being cut up by the constitution. If one common law treason be cut up, all are cut up; there is no common law treason. It is only by construction and deduction that any common law treason can be admitted. If one constructive treason be admitted, all may enter. If it be admitted that an accessory before the fact, an adviser or abettor, be constructively a traitor under the constitution, by the same common law rule of construction, an accessory after the fact, a mere receiver or comforter of a person deemed to have been a traitor, may be punished as a traitor long after the termination of a war, or the suppression of an insurrection. I know no difference between a procurer or aider before, and a receiver and comforter after the fact in treason. The same rules of decision apply to both. Either both exist or are cut up by the roots. Then, sir, if according to the English law accessorial treason be the creature of the common law, it has its existence only with the common law. The person who procures treason to be committed, who plots some project to subvert the government, who advises, who hires, who counsels, who commands, or who abets a project to subvert the government, is a traitor according to that common law. If all these be created by the common law of England, they exist only there. But if the common law have no existence here, the doctrine of accessorial treason has no force here. Gentlemen say that the common law has no force here as a general system; but they say that certain parts of it have been adopted. They will look into authorities to see the meaning of particular expressions. They refer to the common law for the meaning of words. They say that crimes have been created by using such and such words in the constitution. What is levying war? It is said it consists of such and such facts, because it is so according to the English authorities, which are founded upon the common law. They still forget the distinction: that our constitution is in abridgment of the common law, and that it was intended to stand on its own feet independently of common law reasons. Let them only recollect this principle and it will prevent them from a repetition of errors. There are no words in the constitution which warrant their arguments. Was it intended by it that constructive treason should exist in this country in any case? Was it intended that a person absent at a great distance (perhaps out of the country, in another and very remote part of the world) should be construed to be present here? that such a person should, under the constitution, be considered as guilty of treason here by acts done by others? Can there be a more unnatural and tortured construction than to suppose a person present, committing acts of treason and violence in one state, when he was peaceably and innocently occupied in another? Sir, constructive treason is abrogated by the constitution. It exists in no case in this country. We are not to consider men present when they are absent. Such a construction is as unjust and oppressive as it is unnatural and unessential to the purposes of justice.

Mr. Luther Martin commenced his speech by the following introductory remarks:

May it please your honors: I shall now endeavor to close the important debate before the court, and to show that our motion ought to be granted. It involves certain great principles, on the correct settlement of which greatly depend the welfare and happiness of the people of this country. I shall therefore make no apology for any length of time I may occupy in the discussion of the question. When we are defending the life of a human being, and discussing principles of such vast importance to the interests of the community and posterity, time ought not to be regarded. A sufficient period ought to be devoted to the complete investigation of the subject, and entire development of truth. We contend that there is nothing to support the indictment before the jury, even admitting all those things to be true (and considering them as proved) which gentlemen say their testimony could establish. We call on the court to decide on the relevancy of the evidence which they offer. It is the duty of the court to prevent the introduction of any evidence in any case before it which is irrelevant to the issue. For this objection to illegal testimony, which it was our indispensable duty to make, we have been denounced throughout the United States as attempting to suppress the truth, and encroaching upon the exclusive rights of the jury. This subject shall be particularly discussed in the course of the argument. The exercise of this indisputable right has been held up to the public and to this jury as a conclusive proof of our guilt. It is alleged that we interrupt the due course of the testimony; that if we knew ourselves to be innocent, we would not have done so; and that it is sufficient to convince the jury of our criminality. We have been told that we are profoundly skilled in the science of defence, and are making the utmost efforts to save our client from merited punishment. Let us see what an immensity of time has been spent, and

what means have been used in the course of this prosecution against our client, what patience and forbearance he hath manifested, and then let it be determined whether we ought to forego any legal advantages or surrender any of our rights.

The grand jury were sworn on the 22d of May; and we waited patiently from that day to the 13th day of June, before the primum mobile General Wilkinson thought proper to appear in obedience to the process of the court, by which means our client has suffered much inconvenience; and a great number of witnesses have suffered still more inconvenience. From the time that the indictment was found to be a true bill, our client has been closely confined. The first panel did not contain a sufficient number of unexceptionable jurors. Only four of them could be admitted; and these were not sworn till the 10th of August. Another panel was to be summoned, out of which the rest of the jury were not selected and sworn till the 17th of August; although Colonel Burr did everything that he possibly could to expedite the trial, waiving considerable privileges, as the history of the proceedings thereon will show. It may be said that he objected to a jury being sworn from the first panel, and therefore retarded the proceedings; but surely, sir, no person will consider it as a crime that he did not consent to be sacrificed; or, what is the same thing, that gentlemen who had signed his doom in their own minds before hand should decide on his reputation and his life. When this motion was made, though so much time had elapsed, only twelve witnesses had been sworn out of about one hundred and forty on their side; and there are thirty or more to be examined on our side; it is not, therefore, unreasonable to suppose that to examine all the witnesses, and hear the whole testimony, irrelevant as well as relevant, would require a month, perhaps two months. And further, when the circumstance of this season of the year is considered, the admission of illegal testimony, and waste of time in its examination, became more improper. Jurymen cannot be certain of retaining their health. Is it not probable that before the trial would be brought to a close, some of the jury, from the confinement which they must endure, might be taken sick? What would be the result? Our situation, already unpleasant and distressing, would become much more so. The jury must be discharged, and the whole must be done anew; or if by consent a juror were to be substituted in the place of a juror taken sick, the whole testimony must be re-examined, and the same length of time consumed; and if so, the same cause might again produce the same effect; so that from the infirmity of witnesses produced on the present occasion, there is scarcely a probability of the cause being determined in any reasonable period. During all this time Col. Burr must remain in confinement; and yet this time would be totally useless to him.

While it oppressed him, it would afford him no benefit.

These considerations must satisfy every person who is in court, that our conduct is justifiable in resisting all attempts to introduce illegal testimony, and preventing the time of the court from being wasted in improper and irrelevant discussion; and that we do not wish to evade justice. I was myself disposed to waive these obvious and undeniable rights, and to submit to the inconveniences of hearing all the evidence, however irrelevant, because I was convinced that it would remove all the prejudices which have been excited against Colonel Burr without having the least foundation, and demonstrate his innocence to be as pure as that of the unsullied snow. But on consultation with the able gentlemen associated with me, this course has been deemed more eligible on principles of law as well as convenience. That the artifices and persecution of his enemies should have so far succeeded as to place Colonel Burr in his present situation, is a matter of deep regret; but I shall ever feel the sincerest gratitude to Heaven that my life has been preserved to this time, and that I am enabled to appear before this court in his defence; and if the efforts of those highly respectable and eminent gentlemen with whom I have the honor to be associated, may, united with my feeble aid, be successful in rescuing a gentleman for whom I, with pleasure, avow my friendship and esteem, from the fangs of his persecutors—if our joint efforts shall be successful in wiping away the tears of filial piety, in healing the deep wounds inflicted on the breast of the child by the envenomed shafts of hatred and malice hurled at the heart of the father—if our efforts shall succeed in preserving youth, innocence, elegance and merit from a life of unutterable misery, from despair, from distraction—it will be to me the greatest pleasure. What dear delight will my heart enjoy! How ineffable, how supreme will be my bliss!

Nor is private friendship for the accused and his connections my only inducement to use my utmost efforts in his vidication. I am urged by a different but very powerful motive. I am thankful to Heaven that when a great question, so awfully important as that which respects the principles of treason, is to be decided—a question on the correct construction of which the happiness or misery of the present and future ages depends—it gives me infinite pleasure to have an opportunity of exerting to the utmost my feeble talents, in opposing principles which I consider so destructive as those which are advanced on the present occasion; and if we shall demonstrate contrary principles to be correct and proper, if we shall be able to satisfy the court that principles the reverse of those contended for on the part of the prosecution ought to be established, I shall think that I have not lived in vain.

In proceeding to the argument, Mr. Martin

laid down, in substance, the same four general propositions discussed by Mr. Wickham, and said there were no other points in the case, unless the counsel for the prosecution had some further testimony to prove that Colonel Burr was on Blennerhassett's Island when the pretended overt act was committed. He said he would observe by way of preliminary remark that there was no sort of question but what the principal and accessory may be brought to trial together, (or at the same time,) if both be before the court and the accessory waive all objections to a trial; but if he do not waive it, the antecedent conviction of the principal must be produced; and if he waive it, the court will direct the jury to acquit him if the guilt of the principal be not proved. Here, sir, I would beg to be understood that neither Colonel Burr nor his counsel admit or suggest that Blennerhassett or any other person was guilty of treason on Blennerhassett's Island. It is only a suspicion. We have not the most distant idea that he was guilty. Where, then, was the propriety of saying that we are willing to sacrifice Blennerhassett? and that he might be hanged without pity or remorse on our part? We deny it. We disavow and execrate such sentiments. We hold up to the public our sacred belief that Blennerhassett is as innocent as I am, or as the gentlemen on the other side; that no man on the island was guilty of treason; and that the party who were there were engaged in honest and honorable pursuits, without any other motive whatever. If even the intention to make war had been proved, yet throughout the whole Union the violence of actual war has never been known to take place. If such a war have taken place, it was a mighty strange kind of war, which neither man nor woman nor child has ever seen or heard. Though there was a great war in the United States from New Hampshire to New Orleans, and a great number of persons engaged in it, yet in this great war not a single act of violence can be proved by any human being to have happened.

Mr. Martin then proceeded to examine the question, who are accessories in murder and felony before and after the fact, and to apply the result to the doctrine of treason, in which the law of England declares persons to be principals who in those cases are accessorial agents. In order to understand the doctrine correctly, it was necessary to have a clear and distinct idea in what instances persons concerned in murder and felony can be considered as principals, and in what cases accessories. It seemed to be agreed that those who by hire, counsel, or conspiracy—and generally holden that those who by showing an express liking, approbation, or assent to another's felonious design of committing a felony, abet and encourage him to commit it, (but are so far absent when he commits it that he could not be encouraged by the hopes of any immediate help or assistance from them,) are accessories before the fact, both as to the felony intended and all other felonies which shall happen, in and by the execution of it, if they do not expressly retract and countermand their encouragement before it is actually committed. 2 Hawk. P. C. p. 445. c. 29. § 16. Whenever a person can be considered by law as constructively present, though not heard or seen, accessorial agency does not apply to him, but he must be considered as an immediate actor, and so indicted. He then went into an elaborate examination of the authorities to show how far the doctrine of constructive presence had been carried by the courts. He read and commented upon the authorities cited by Mr. Wirt on this point, Lord Dacre's Case, Pudsey's Case, and others, and claimed that they clearly settled the doctrine that no person can be considered constructively present, so as to make him a principal, who is not engaged in the general conspiracy, and so near that the person who does the fact is emboldened in it, from the hopes of present and immediate assistance of the abettor, whether he be in view of the fact or not. He then said:

On the present occasion the counsel have endeavored to distinguish between cases of constructive presence in treason and other crimes. They insist that to determine the degree of proximity between the immediate actor and his aiders or abettors, who are legally construed to be present, you must consider the theatre of action, and extend the degree of proximity according to the extent of that theatre; that the legal presence, which would not exist in murder or felony, may well exist in treason; that in treason all the whole United States are the theatre of action; the scale of proximity essential to legal presence should be in proportion, so that persons in Tennessee or Kentucky are to be considered as legally present on Blennerhassett's Island when the acts in question were committed. It is evident that the principles of legal constructive presence cannot be extended to this case, for the actors could have no hopes of immediate assistance from the others, who were hundreds of miles distant. But they insist that treason consists in the treasonable intention. It has been echoed and re-echoed that treason consists in the treasonable intention. We admit that there is in Great Britain one species of treason which consists in the intention, without any act consummating the guilt of treason. I mean the compassing the death of the king, where the crime is merely imagined; and nothing more is necessary than to write a letter to a man advising him to kill the king, and that fact being proved, he is guilty and liable to be punished for treason, though the king was not killed, and though the party advised took no steps to pursue it. Though this be correct when confined to the death of the king, queen, or eldest son of the king, and the treasonable intention constitutes the treason, yet the overt act is evidence of the intention only and not of the

actual commission of the crime, because writing a letter is not treason, but proof of the intention to commit it. But why is the intention to commit it treason in Great Britain? Because a special law is made for the safeguard of the life of the king, making it treason to conspire, compass, or imagine his death, when evidenced by some overt act such as I have just stated; a conspiracy against the life of the king, whether carried into execution or not, is made treason by special act of parliament. But in America we have no species of treason except two: levying war against the United States, and adhering to their enemies, giving them aid and comfort. What is the treason charged on us? Levying war. This overt act of levying war, which is said to have been committed, must be proved by two witnesses. According to the constitution, no person can be convicted unless on the testimony of two witnesses to the same overt act. If there be twenty overt acts and each of them proved by one witness, nay, if there be fifty overt acts committed at different places, and each proved only by one witness, it will not suffice; two witnesses must concur in proving the same act at some particular place or the accused cannot be convicted. The overt act of levying war is not the crime of levying war, which consists of intention and act together. But gentlemen must admit that the intention alone is not punishable. There must be an actual levying of war, and the overt act is proof of it. On an indictment for levying war they can give no evidence but of what is charged. They can adduce proof only of the overt act which they have laid. Proof of the intention alone would be inadmissible; just as in the case of murder, the prosecutor cannot prove the murder without proving that the party has been killed; and so in a prosecution for stealing a horse, the taking of the horse must be proved; the malicious intention to kill in the one case, and the felonious intended appropriation in the other, must be established; but the intention in either case will not do without the act.

Mr. Martin said it had been repeatedly declared in our courts that the decisions in Great Britain, however entitled to respect, are not binding authority in this country; and he thanked God that such was the case. The principles laid down in Great Britain respecting treason, as appears from the history of their jurisprudence, have been such that their judges have in the most arbitrary manner carried into execution the most wicked wishes of the persons who held the crown. Even after the revolution of 1688 this has been the case, though not so much as formerly; they have extended the rules of evidence with respect to treason so as to shock humane judges. The influence of the crown was such, that whatever endangered the life of their sovereign lord and master, from whom the judges derived their authority, was construed to be treason in imagining or compassing his death. As they were under this bias, their decisions

ought not to be considered as binding precedents, but received with great caution. It is necessary for the clear investigation of this matter that mere general expressions relating to the crime of treason in Great Britain ought not to be construed as extending to treason in levying war, but to the other branch, the doctrines of which were adopted to guard the life of the sovereign. The reason why there are not so many cases in Great Britain of indictments against accessories before the fact as against those after, was, that most of the prosecutions for treason there are for compassing the death of the king; and in indictments for compassing his death, he who advises it by writing or otherwise is as much a principal traitor as he who aids or assists in actually killing him. A party who converses on the subject is deemed a traitor; and the overt act is laid against him for compassing and consulting about the death of the king. Every act which evinces an intent formed in the mind of the accused against the safety of the king, as meeting to consult, writing a letter, enlisting men, preparing other means, &c., is admissible evidence to support an indictment for compassing or imagining the death of the king. An overt act must be set forth in every indictment for treason, and proved in every instance. In the case of compassing the death of the king, the object of requiring it is to prove the intention. If the intention could be otherwise proved, whether any act were done or not, though the person of the king were never injured, yet the party would suffer death for it; because in that case the crime consists in the design formed in the mind. Levying war, itself, may be laid as an overt act of compassing the king's death; and when it is so laid, the accused need not be charged with anything more. When the indictment is for levying war as a specific treason, it must specify the overt act which is to support it. So says the act of parliament; so say all the authorities. This doctrine is fully confirmed in Vaughan's Case [2 Salk. 634], 5 State Tr. 17. Captain Vaughan went on board a vessel called the Loyal Clencartie, in the service of the French king, to cruise against the subjects of England. In that case there were two counts in the indictment: one for levying war and the other for adhering to the king's enemies. It was decided on argument that his cruising in this vessel, though he fought no battle, and committed no actual hostility, was an act of aiding, and supported the count for adhering to the king's enemies; but it was decided and admitted that it was not sufficient proof to support the other count for levying war; and "that there must be an actual war proved upon a person indicted for levying war." In Harding's Case, 2 Vent. 316, who was indicted of treason in the time of William and Mary for enlisting sixteen men and sending them to France to aid the king of that country against the English, it was decided that he was guilty of treason, but not of treason in levying war. The specific treason whereof he was guilty

was not that of levying war, but adhering to the king's enemies. The indictment charged that he compassed the death of the king and queen, and levied war against them, in enlisting those men and sending them out of the country to aid their enemies. It was determined that he was guilty of high treason within the clause of the statute for compassing the death of the king, it being found by special verdict that the prisoner did enlist those men with an intent to depose the king and queen, &c. It appears to have been an almost universal practice in former times, in prosecutions carried on by the attorney general, to state in every indictment a charge for compassing the death of the king—and for the plainest reason in the world: that this kind of indictment comprehended every kind of treason, and facilitated the conviction of those marked out for destruction. It was a comprehensive mode of prosecution which was more easy to be conducted and more successful in accomplishing the end proposed. If a person were to be indicted for aiding and assisting the king's enemies, or levying war against him, they would state in the indictment a charge for compassing the death of the king, because, according to the system adopted, this charge could be more · easily supported by proof. Those who wished to destroy innocence preferred this mode of prosecution, because it would put the person accused more at their mercy. For in cases of compassing the king's death, the most wicked and arbitrary prosecutions were countenanced by the courts of justice. When the safety of the person of their king was in question, principles the most incompatible with justice were sanctioned. For this purpose, in every prosecution, when specific facts were proved, they would go into a history of the conspiracy against the king, because every conspiracy against the prince or his government was construed to be a plot intended against his life. And in the examination of these conspiracies, in order to establish their existence, they went into every kind of evidence—letters and verbal declarations, and words uttered by others, though not in the presence or hearing of the person accused; letters, written not to him but to any other person, and papers found in his possession. All these were jumbled together to establish the conspiracy, and the connection of the persons accused with it. To establish those conspiracies, and the connection of those who were accused of being concerned in them, every species of illegal and improper evidence was admitted by the most corrupt judges that ever sat in a court of justice. Not acts alone, but mere loose words, a hasty declaration, an assent inferred from an unguarded expression, nay, the declarations of other people and papers found in the possession of the party, by whomsoever written, were all admitted against the accused as proofs of a conspiracy and of compassing the death of the king. Transactions in themselves innocent were deemed sufficient to condemn to the scaffold.

A mere declaration was sufficient to prove any act required to be established, because the death of the king was the cause of prosecution. An open, notorious act was not deemed necessary to establish guilt, but a story, a mere verbal assertion, without any positive proof of any real fact. This kind of evidence was admitted because it was the best calculated to destroy the victim of the government or of private revenge. They have on the present occasion proceeded on the principle that they could prove a conspiracy; but is there a particle of criminality proved? If some sort of connection between the person accused and those joined in the supposed conspiracy be proved, this is by no means sufficient on this indictment for levying war; but they must prove war actually levied—an act done. No person can be guilty of treason, though a thousand conspiracies to levy war were proved, without the existence of actual war. There must be an actual war proved. That is the proof which is introduced in all other cases except compassing the death of the king. In prosecutions for levying war, there must be acts of violence alleged and proved; an actual war must be proved to exist; or, at least, sufficient must be stated to show that the party were in a posture of war. When specific acts or particular circumstances, not amounting to the actual levying of war, or an adherence to the king's enemies, constitute treason, they can only support an indictment for compassing the death of the king. This may be safely laid down as a general rule, from which there is no exception whatever.

Let us see whether the principle that requires a specification of the offence of receiving a traitor after the fact do not equally apply to the case of advising and procuring treason before the fact. The cases already mentioned sufficiently prove that there is no difference between them in this respect. Why is a receiver after the fact considered as a traitor? Because the law says that he is a principal in the treason. But it is as necessary to distinguish or specify the crime of advising treason, or that a person said a thing before the fact, as it is to distinguish the doing a thing, as receiving a person guilty of treason after the fact. Is there any distinction between them? Is not notice as necessary in one case as the other? Each is considered as a principal in the treason. It is surely as necessary to lay the receiver in the indictment as having done the principal act himself, as he has done that which the law says makes him a principal, as it is to charge the adviser with having performed the act of war himself, because he has committed what makes him in law a principal. If he have done an act which the law says makes him a principal in treason, and it is sufficient in any case, however special the facts, to charge the accused generally according to the legal effect, then he may be charged generally in every case, and there will be no necessity of a specification in any case. I ask, if a man who

counsels the levying of war can be charged with levying war. because he is a principal in treason, cannot the receiver be generally charged, also, with levying war, since he has done what makes him guilty of treason? The reason is in both cases the same. If, notwithstanding his having done what makes him a principal in treason, a receiver of a traitor must be specially charged, there is no reason in the world why a person who advises the commission of treason should not be charged specially. But there is a direct reason. stated in Foster. Hale, and Hawkins, why the adviser of treason should be specially charged: that in all other cases, except compassing the king's death, those who are to be considered as accessories (as far as relates to the mode of prosecution) cannot be put on their trial. except the principal have been convicted; but they may be brought to trial together. Do not these authorities prove that the indictment must specially show who is charged as an accessorial agent, and who did the act? that if they be not tried together the indictment must show that the principal has been convicted, since till then he cannot be tried against his will? How is he to know, when indicted in this general mode. that they do not mean to charge him by their proof directly with levying war in person? How can he suppose from this indictment that they mean to make it appear that other persons levied the war, and that he was more than one hundred miles off? If the indictment charged. what is true. that he was not with the actors. that he was at a great distance, but he advised or persuaded them to act. then he would not be obliged to be tried till the principal should have been convicted. Does not this furnish a decisive argument to prove that the indictment must specially show that the accused is charged as an accessory. when the evidence is intended to prove it? Before the conviction of the principal, the accessory cannot be put on his trial, except together with the principal; in which case the jury are expressly to be directed that if they do not find the principal (the person charged with levying the war) guilty, they are not to inquire into the conduct of the person who advised the levying of the war, but to acquit him, of course, since his guilt. being only derivative in its nature, cannot exist, if the principal on whose guilt it would be founded be innocent. How else could he object to a trial? It would be impossible for the accessorial agent to make any objection, unless it were specially stated in the indictment that he was charged as an accessory. This is full and explicit to show why, in treason, an overt act is laid in the indictment; that the party charged may know what he is charged with.

I ask, how could Colonel Burr. charged with treason on Blennerhassett's Island, know the specific act meant to be proved against him? that he was meant to be charged with some act done there when he was two hundred miles off? that he was considered as having advised that act? and that this was the offence he was to answer for? But gentlemen say that a specification is unnecessary, because we know what the charge is against Colonel Burr. The law presumes that every person is innocent till the contrary appear; that the party charged has no knowledge at all of what is not specified; and, consequently, that any man who means to disprove that innocence should make a clear and distinct charge against him. Gentlemen say that he must know the charge, because he has summoned thirty or forty men to give testimony in his favor. We saw that we were charged with treason on Blennerhassett's Island; and we have summoned these witnesses to prove that we were not there, and to contradict the evidence of certain witnesses summoned against us—I might say to prove the character of that all-important witness who endeavored to excite an insurrection of the negroes. Of this, however, the proof is rendered unnecessary by his precipitate flight. As they have charged that we were on the island, and laid there what they deem an overt act of levying war. we could not but conclude that they meant to prove it. We could not conjecture that they meant to prove, not that we were on the island. but that others were there. and to connect us with them. Hawkins. Hale. and Foster all declare the reason why an overt act must be stated: that the accused may know how to defend himself against it. The constitution and laws have provided that persons accused of crimes shall be tried in the state and district where they were committed; and that a copy of the indictment should be given to the accused a certain number of days before his trial, in order that he might be prepared to make his defence. If, when the party accused comes to be tried, evidence proving a different charge from that which is stated in the indictment of which he had a copy were to be admitted against him, would it not be a mockery of the constitution and a denial of justice? It would, because though the form were complied with by delivering him a copy, it would give him no notice of what was to be proved against him. But gentlemen say that the indictment does not charge Colonel Burr with being on the island, and therefore it need not be proved. If the indictment say that he levied war on the island. does it not necessarily allege that he was there? When it charges that he committed an overt act there, is it not the legal and fair inference that he was at the place when he committed it? When a party is said to have done any act at any place, is it not naturally understood that he was at the place where he is thus said to have committed the act?

But the gentleman says that he has authority to show that he may be charged as present, though not there; and he cites in support of the assertion 1 Hale, P. C. pp. 214, 238, and 1 East. P. C. p. 127. Let us see whether any-

thing in Hale justify it. In page 214, his words are: "But if many conspire to counterfeit, or counsel, or abet it, and one of them doth the fact upon that counselling or conspiracy, it is treason in all, and they may be all indicted for counterfeiting generally within this statute, for, in such case, in treason all are principals." We must consider only as much of the precedents as from the reason of the case applies to the subject now in discussion. Now Hale has not said that those persons who, having conspired to counterfeit, become traitors by one of them having done the fact, upon that conspiracy, were not present. He says nothing of their being present or absent, but that if several conspire and only some of them act in pursuance of that conspiracy they are all equally guilty; that if two conspire to counterfeit the coin, and one do it according to the intention of that conspiracy, they are both equally guilty of treason. It is the nature of a conspiracy that what two conspire to do may be done by one, whether the other be absent or present. Hale says nothing as to their being together, or whether an absentee, or a person who only advises, can be charged as present and an actor. He leaves these questions just where they were, unexamined and undecided. If two persons conspire together for any unlawful purpose, as to write a letter to cheat a third person, and one of them write the letter, the other, being present, is considered as a conspirator, and as criminal as the writer of the letter, and they are indicted as joint conspirators. So in coining money: if two have joined in a conspiracy to counterfeit, and a part of the conspiracy be that one shall act upon that conspiracy, and he doth counterfeit or coin false money accordingly, they are equally guilty, and the act of one is thus the act of the other, under the law against coining false money in England. But he does not say that the party were absent. He refers to no authority. It is a mere inference, and can have no influence on this case. It can have no influence on accessorial agency. Here, though it does not strictly apply to this branch of my argument, I may draw a conclusion from the authority adduced by themselves, which operates against them. In this very page he had just said before that "there must be an actual counterfeiting; for a compassing, conspiracy, or attempt to counterfeit is not treason within this statute, without an actual counterfeiting." On the same principle, if the doctrine be applied to levying war, there must be an actual levying of war; and a conspiracy or attempt to levy war is not treason within the words and meaning of the constitution. So much for page 214.

Let us now turn to page 238, and see whether it can furnish any justification of the gentleman's argument: "Though the receiver of a traitor, knowing it, be a principal traitor, and shall not be said an accessory, yet thus much he partakes of an accessory, that his indictment must be special of the receipt, and

not generally that he did the thing, (which authority we have repeatedly urged against them,) which may be otherwise in case of one that is a procurer, counsellor, or consenter. Thus it was done in Conier's Case, Dyer, 296a." This authority he relies on to show that a procurer or an accessory before the fact need not be specially charged; that he may be indicted generally that he levied the war. The words, "which may be otherwise in the case of one that is a procurer," &c., are depended on. So it may be otherwise in that species of treason compassing the king's death. I have no doubt that in that species of treason any degree of accessorial agency before the fact, as counselling another person, writing a letter, &c., would be construed an overt act of compassing the death; and, therefore, the accessory before the fact might be indicted generally for having compassed the death of the king. But it would not be so in the case of levying war, or any other treason. If he mean anything else, there is not a shadow of authority for it. He cites a case in Dyer which does not justify the construction for which the gentleman contends. That case only shows that a receiver of a false coiner was indicted specially for the receipt, and it was deemed a misdemeanor. That was an indictment for receiving a coiner, knowing him to have counterfeited or coined false money; and it specified the receiving him particularly; but judgment was not rendered against him, because it was judged to be only a misdemeanor. It states nothing as to the manner in which an accessory before the fact ought to be indicted; but it may fairly be inferred from it that he ought to be charged specially, as the indictment in that case was special. 1 East. P. C. p. 127, merely refers to those passages of Hale which have been just commented on, but does not explain them: but he fully explains himself in pages 100, 101, of the same volume, which, though already referred to, I beg leave again to read: "In regard to all acts of approbation, incitement, advice, or procuring, to that species of treason, compassing the king's death, &c., there is no doubt that the party may be tried before the person who acted upon such indictment, because the bare advising or encouraging to such actions is in itself a complete overt act of compassing, and it is totally immaterial whether the attempt were ever made or not. The Case of Sommerville proves no more than this, (though the rule is there laid down in general terms,) that a person aiding or procuring a treason may be tried before the actor. But with regard to all other treasons within the 25 Edw. III., if one advise or encourage another to commit them, or furnish him means for that purpose, in consequence whereof the fact is committed, the adviser will indeed be a principal, for such advice or assistance would have made him an accessory before the fact in felony; but if the other forebore to commit the act thus advised, the adviser could not be a traitor, merely on ac-

count of his ineffectual advice and encouragement, though his conduct would be highly criminal; for it cannot be said that a person procured an offence which in truth never was committed. In these cases, therefore, the treason is of a derivative nature, and depends entirely upon the question whether the agent have or have not been guilty of such treason, the proof of which can only be legally established by his conviction, if he continue amenable to justice, or his attainder by outlawry if he abscond, unless the accessory choose to waive the benefit of the law and submit to a trial." Here East explains himself where he means that a man may be indicted generally, and shows that where a party is to be considered in an accessorial point of view, he cannot be brought to trial, except by his own choice, until the principal be convicted or outlawed. Here those persons who advised or procured a treason before, are placed on the same footing with those who receive a traitor after the fact. But any act of an accessorial nature may be a complete overt act of that species of treason which comes within that clause of the statute which is against compassing the death of the king, queen, &c. This is the most comprehensive treason, the most easily prosecuted, and the most liable to be abused for the purpose of tyranny and oppression. As Aaron's rod swallowed all other rods, so this treason for compassing the king's death swallows all other treasons. 2 Hale, P. C. p. 223 (which see before), shows that though in high treason all are to be considered as principals, yet accessories before and after the fact (who are both put on the same footing) are to be proceeded against only as accessorial agents; that the accessory shall not be put to answer of the receipt or procurement, till the principal be outlawed, (or attained, &c.)

But the gentleman has said that agreeably to our constitution they could not charge the accused otherwise than as they have done; that they must have charged him with levying war. I cannot see any difficulty in charging him according to the truth of the case. But however criminal or injurious his conduct may be, and however much he may deserve punishment, he ought not to be deprived of the benefit of law, or to be considered as guilty of treason, without legal proof of his having committed an overt act of levying war, or to be condemned unheard to subserve unworthy party purposes. If advising a man to levy war be treason and punishable under the constitution in the same manner as actually levying war, I ask why should not the indictment be so drawn as to correspond with the evidence, and give full notice to the accused of the charge intended to be proved against him? I ask why was not the indictment in this case so drawn as to embrace the real facts? Why did it not state that A, B, and C, (meaning those on the island,) did levy war against the United States, and that Colonel Burr did advise, incite, encourage and counsel them to levy it?

Gentlemen say that we have insisted that the accessory ought not to be brought to trial till the principal were convicted; but that there is a case where it is not necessary to produce this record. We did not mean to deny one exception from this general rule: that they may be tried together. We admit that the position was laid down in terms rather too broad; because if the principal and accessory were indicted in the same indictment together, the accessorial agent could not be found guilty till the guilt of the principal were found. In that case the record of the conviction would not be necessary, because it could not exist. The indictment in such case would specify distinct charges against both according to the real facts; which would enable each of them to be prepared for trial. But the court would direct the jury: "Gentlemen, you are first to decide whether the principal charged with having done the acts be guilty or not. If you do not find him guilty, you are to make no inquiry as to the accessorial agent, (whose guilt is connected with and founded alone on that of the principal,) but to find him not guilty and discharge him of course; but if you find the principal guilty, you are then to inquire into the conduct of the accessory." But gentlemen, unable to controvert this correct doctrine, endeavor to avoid it, and say that Colonel Burr might have declined a trial till some of the actors who were on the island had been convicted. They ask us, why did not Colonel Burr refuse to come to trial? and urge that by submitting to a trial, he has waived the benefit of every objection which he might have been entitled to make. That they should have mentioned Blennerhassett in terms of compassion and regret may be accounted for; they may have policy for doing so. For some think that the public indignation ought only to be excited against Colonel Burr, in order to press him down as much as possible. This indirect seems to be a favorite mode of attacking the accused. But Colonel Burr could not resist a trial. The prosecutor has thought proper to charge him as having levied war in person, as a principal actor; and being thus indicted, he could not avoid it. He could make no specific objection. He could only meet the accusation by the general defence of not guilty.

Having proved that under this indictment no evidence yet adduced is competent to convict the accused, I shall now make a few observations on one of the questions before your honors. There is one proposition laid down by us which is of the greatest importance, and requires the utmost deliberation. It is this: Admit that the acts on the island were done with an intention to subvert the government of the United States, (which I hold must be the motive to render them treasonable; for no person will controvert this position, that the acts of levying war, in order to be treasonable, must have been done with this design,) yet there was no act of

war, no violence done; there was no overt act of levying war, no treason committed. It involves a most important question: whether the most peaceable acts, acts innocent in their nature, though done with a design of subverting the government of the United States, can be considered as acts of levying war against the United States. The question is, whether violence be not necessary; whether some act of force must not be used to constitute a levying of war? We insist that no evidence can support an indictment for levying war without some act of violence. What is a levying of war? Why, gentlemen say that levying war is levying war—"lever la guerre"—levying soldiers—that it consists in preparing the means of war. I should rather suppose that the framers of our constitution, who proceeded with so much caution, and endeavored in every part of that instrument to secure the rights and liberties of their fellow-citizens, and especially a speedy trial by an impartial jury of the district, did not intend, by the terms "levying war," an unnatural and dangerous construction, unknown in common parlance, and unusual in history or judicial proceedings. They could not have contemplated an extension of the doctrine of constructive treason, which has been always held so peculiarly hostile to civil liberty. They never could have intended that acts peaceable or innocent in themselves should constitute treason. If by "levying war" they meant enlisting of troops or raising an army, they would have said so in plain terms. They would have said that "treason against the United States shall consist in enlisting or levying troops, or raising an army, with intention to make war against them." If levying troops, embodying men, or enlisting soldiers, with intention to subvert the government of the United States, were intended as sufficient to constitute treason, why did not the framers of the constitution say so? Why did they not say that levying of troops or raising an army had the same idea or meant the same thing as levying of war?

In a constitution devised by men distinguished as much for their devotion to the public good as eminent by their talents, nothing unfavorable to liberty would have been intended. Precision of language must also have been attended to. Nothing, therefore, can justify the construction which gentlemen advocate but unavoidable necessity. But it is as unnecessary as it is dangerous. If they had intended that merely to enlist men, to raise and embody troops, to raise an army, without anything more, should constitute treason, they would have expressed it in such plain terms as to defy misconstruction. Levying of war implies force of some kind. The idea of violence of some kind is inseparable from that of war. But, sir, raising an army or levying troops is only a preparatory step towards levying war. You levy troops in preparation, in intention to levy war. But no act preparatory to levying war can be an actual levying of war. What is the technical meaning of "levying?" Whether derived from the French word "lever," or the Latin word "levare," to raise, (or, as applied to war, to make,) to levy war is to make it, according to its popular acceptation, as well as its meaning as used by some of the best writers. The meaning or true construction of both expressions, "to levy war," and "to make war," is precisely the same. Whatever is making war is levying it.

But, says the gentleman, "levying war and making war are different things; an overt act of levying war and an overt act of war are not the same; the king of England can levy war, but his troops make the war; that he levies, but his officers and soldiers fight the battles and make it." I did not know before, that in the United States, levying or raising troops was the same thing as levying war. Troops are often raised. One hundred thousand men have been authorized to be called out; but I did not know that we were levying war, however desirous some individuals may be that it were so. But gentlemen say that it is a common expression that the king levies war, and his officers and soldiers actually make it. Why is it said that the king levies war? It is a very uncouth expression; but he is said to levy war because he represents the nation. It is the nation in its national character that really makes war; and he is the person who is at the head of the nation, of which nation the officers and soldiers are only the constituent parts. He is said to levy war, because he is the representative of the nation in its national capacity. The United States also make war in their national capacity. They are composed of individuals, of whom the officers and soldiers, like the people of other countries, actually fight battles. It may as well be said that if I, Luther Martin, knock a man down with my hand, I do not knock him down, but my hand does; because my hand is a constituent part of my body. But there is no such distinction as gentlemen contend for between the king and his officers and soldiers. There is no such distinction as that the king levies, and his officers and soldiers make war. One king, as the representative of one nation, makes war on another as the representative of another nation; and thus the one nation makes war on the other. But there is no possible correctness in the distinction contended for. There is none in reason, in the decisions of courts, or in the practice of nations, which confines the making of war to those who actually fight battles; and until there shall be some decision establishing such a distinction, and thereby placing our country in a worse situation than the laws of Great Britain have placed that country, I cannot believe it to exist. I shall hold the true definition of levying war to be making war, and for the purpose of subverting the government of the United States. Sir, "making war," ex-

vi termini, implies the use of force, violence, soldiers. I appeal to the authorities both in Great Britain and America, as far as prosecutions for levying war have taken place in this country, whether an act of violence has not always been deemed essential to levying war; and whether the indictments do not specify some act of force or violence.

Even in the constructive treasons of destroying meetinghouses, and pulling down bawdy houses, force or violence must be employed to constitute treason. In all cases of that kind, houses have been violently torn down and destroyed, and many persons greatly injured. In the cases of Messenger, Green, and others, those of Damaree and Purchase, and all other cases of the like kind in England, and that of Fries and other cases in this country, force and violence have been used, and invariably stated; and what is still more decisive as to the necessity of employing actual force or using violence on such occasions, it was determined by all the judges of England on the former cases, that as to Green and Bedel, the special verdicts were not full enough to judge it treason, because the verdicts only found that these two persons were present, but neither found any particular act of force committed by them, nor that they were aiding and assisting to the rest who did use violence. Force or violence has always been deemed essential to the existence of treasonable war in England; and I call on the gentlemen to show one instance to the contrary.

Mr. Martin argued that men assembling and marching in military array, without actual violence being committed, could not constitute an overt act of leving war. He went into a critical examination of Lord Balmarino's Case, (relied on by the other side,) and contended that although he was seen marching at the head of a large body of armed troops, yet the plain inference from the report of the case was, that the court never considered such marching in military array as a sufficient overt act; that it was his taking possession of and holding the city of Carlisle that constituted the overt act which, in the opinion of the court, justified his conviction; and without this, or some other act of violence, the mere marching in military array, as aforesaid, would not, in the opinion of the court, have been sufficient. He also commented upon Vaughan's Case, in which it had been contended by the prosecution that the mere cruising on the high seas, without any acts of violence, had been held to constitute an overt act of levying war. He said as that was an indictment for aiding the king's enemies, which was proved by his cruising against the English, it could not be considered an authority for the purpose of proving that force is unnecessary to constitute treason in levying war. On this point he cited and commented upon many other authorities. He then said:

I beg leave to make a few observations on that part of our inquiries which relates to the great constitutional question: whether a person who, in Great Britain, would only be guilty of accessorial agency, can be guilty of treason in the United States. Is an act of accessorial agency before or after the fact in treason, in the United States, treason or not? Here I beg leave to observe that we ought not to be misled by the argument of the gentlemen; that the most guilty might pass unpunished by the negative of this question. The question is not whether a person can, by procuring treason to be committed, or by receiving and comforting a traitor, be guilty of a crime. No person will doubt but the person who is guilty of advising treason is guilty of a great crime, and liable to punishment; but the question which I propose to examine into, is, whether that crime be treason or not. He who advises, procures, or persuades another to commit treason is highly criminal, and merits very severe punishment. The receiver of a traitor, knowing him to be such, is highly censurable and punishable. But we aver that neither of them is guilty of treason within the true interpretation of the constitution of the United States. Every preparation made for the purpose of making or levying of war is not an act of treason; because nothing but making war for the purpose of changing or subverting the government of the United States is treason. Every act of those who make those preparations to levy war is criminal; and the government has an undoubted right to use the force of the country and all the means which the laws allow for their suppression. The government has an unquestionable right to punish those persons, and prevent their acts from being ripened into acts of treason.[9] It is not the question whether the government be to look on passively, and see those preparations matured without opposition, which are intended for its destruction. No person doubts the right of the government to punish those persons, and prevent the maturity and success of their plans. So clearly was the congress of

[9] Here the question very naturally occurs, of what practical force is the constitutional limitation of the crime of treason, if congress has been left free to impose such penalties as it may see fit upon those treasons at common law which are excluded by the constitutional definition, by merely giving them another name? If congress has the power to prescribe any punishment at all for those offences in the nature of treason which do not come within the constitutional definition of that crime, we shall look in vain for any express limitation of that power in the constitution. There is, however, a very clearly implied limitation; and it is not to be presumed that congress would enact a law prescribing capital punishment for any offence in the nature of treason which cannot be punished as treason under the constitution. Such an act would certainly be a palpable violation of the spirit of the constitution, though not of its express letter. The late act of July 17, 1862, c. 195, § 2 [12 Stat. 589], provides for the punishment of many acts in the nature of treason, which would not, perhaps, amount to treason under the constitution; but the punishment it prescribes is fine and imprisonment only, with forfeiture of property in slaves, if the offender own any.

the United States of opinion that preparation to levy war was not treason, that, if I mistake not, there was an act passed last session expressly punishing such preparatory acts. It passed one branch of the legislature, and was sent forward to the other for its concurrence. I am not certain, but I believe it passed.

The CHIEF JUSTICE.—I believe it did not pass.[10]

Mr. Martin. It is immaterial whether it passed or not. It was in contemplation, and deemed necessary, whether the law passed or not. The only question is, whether a person who advised or procured treason to be committed be guilty of high treason or not. No person doubts that he is guilty of a great crime or a high misdemeanor; but is the offence of which he is guilty treason? But gentlemen ask what a deplorable situation the country is in if such an offence be not treason. As if the people and government were bound hand and foot, and could take no step to prevent the levying of war; as if, because he who only prepares to levy war cannot be punished as if he had actually levied it, he must escape entirely with impunity! as if, because preparation is not the same as consummation, there was no possibility of punishing it! This is begging the question entirely. There is no doubt that for so doing he would be guilty of treason in Great Britain; because it would be evidence to support an indictment for compassing the death of the king. But can a person who only advises war to be levied be said to have actually levied it? Gentlemen say that he had all the moral and intentional and therefore ought to be considered as having the actual guilt of it. Let it be so, that he has all the guilt of giving the advice, but not of the act of levying the war, because he never committed it. The court is to decide according to the constitution and laws. What prevented the framers of our constitution from providing that persons who should counsel, commend, or procure levying of war against the United States should be guilty of treason? As they made no such provision they did not intend it. There is another reason which prevents a mere counsellor or adviser of treason from being guilty of the treason of levying war. It is this: that levying war is of itself an open, public act. It is of such notoriety that everybody may see it going on. It is carried on publicly in the face of the world when the parties are levying it. It cannot, from its nature, be concealed from the public view. The word "public," we say, is material, though omitted in this indictment. It ought to be laid, because it ought to be proved. The authorities show that it ought to be so charged; and that levying of

war must be an act of such notoriety that every one sees it. When troops are levied, and when they march through the country, &c., the people behold them, and the knowledge of the fact is universal.

We have had two insurrections in Pennsylvania: the one named the "Whisky Insurrection," and the other the "Hot Water Insurrection." If I were to name this I would call it the "Will-o'-the-Wisp Treason." For though it is said to be here and there and everywhere, yet it is nowhere. It exists only in the newspapers and in the mouths of the enemies of the gentleman for whom I appear, who get it put into the newspapers. But as acts of war must be open and public, if war exist at all it may be easily proved. If false, it may be easily proved to be so. If a man were to come forward and say that war was made, that armies marched and took towns and places, laid waste the country and took contributions from the inhabitants, if it were true it could be proved by everybody; if false, it could be disproved by everybody. Open and notorious facts are susceptible of easy proof or contradiction. But an advice previously given to commit treason is not in its nature susceptible of clear, explicit proof. It may be given in private and may be pretended to have been given when it was not. Innocent persons may be implicated. Communications or declarations may be feigned to have been secretly made which never were made. Persons having enmity against others and intent on their destruction may be brought forward in a court of justice as witnesses against them, and gratify their resentment by the disclosure of conspiracies which never existed but in their own malice, because they are secret crimes incapable in their nature of being directly refuted or disproved. If open deeds, notorious facts are not to be the only evidence, confessions must be received. The framers of the constitution wisely determined that no man should be guilty of treason in such a case. They would not expose the life of any man to the hazard of being destroyed by perjury, incapable from its nature of being disproved. They have secured a probability (if not a certainty) that the accused cannot be convicted unless he be guilty. They have not secured him from the resentment or hatred of private individuals, (for that is impossible,) but they have taken care that he is not to be charged with private acts incapable of disproof; with confessions and acknowledgments unsupported by probability; so that while there is a probability of the guilty being punished, the innocent is secured from being sacrificed to the malignant resentment of his enemies. These principles are such as ought to have directed and influenced (and no doubt did) the conduct of those who framed the constitution—men selected for their wisdom and patriotism to devise a system of government to secure and perpetuate the liberty and happiness of their country. No gentleman who

---

[10] The chief justice was right. No act was ever passed by congress to punish aiders, abettors, or procurers of rebellion or treason until July 17, 1862, c. 195, § 2 [12 Stat. 589], as to which see notes to the final opinion of the court by Chief Justice Marshall.

had read and considered ancient history and knew the various systems of oppression which had existed in different countries, and the necessity of protecting innocence as well as punishing guilt, would have subjected his country to such misery as that any man could be convicted on evidence impossible to be disproved; and of this nature are all acts of accessorial agency before the fact in treason, as advising, counselling, commanding, &c., as well as many acts of accessorial agency after the fact. I have made these observations to show the principles on which the convention might correctly have determined to exclude this doctrine of accessorial treason. Let me now make some observations on the constitution itself, abstractedly from the consideration of those principles which must have most probably actuated the convention.

The gentleman who so ably opened the debate (Mr. Wickham) correctly said that the constitution, which was made to perpetuate the liberties of the people of this country, is to be construed differently from a statute law; that it is a sacred compact made between the United States in their corporate capacity, and every individual belonging to the United States. The United States in their corporate aggregate capacity have pledged themselves to the people of America that this constitution shall be the safeguard of their liberties and a barrier against encroachments on their rights, and that it shall continue unaltered unless amended by a constitutional majority. As to all statutes to be enacted by any succeeding legislatures, it is a compact that they shall not impair the great principles of, or transcend the limits prescribed by the constitution. In this view it is a compact between the United States and individuals; but when any question arising under any part of it comes before a court of justice, when any part of it is to be considered judicially, it is to be considered as the supreme law of the land. It is to be construed by the very terms of the compact itself: "This constitution, and the laws of the United States which shall be made in pursuance thereof,"—"shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." The judges are thereby rendered incapable of making any decision in support of any law contravening its provisions or principles; and if any law passed by the legislature be contrary to any of the provisions of this constitution, the judges who are to pronounce judgment on the rights of individuals affected by such unconstitutional law, shall consider it as void and null as far as it contravenes or violates the constitution.

The gentlemen also said that the framers of the constitution intended to guard against constructive treason. This principle is so self-evident that it cannot be controverted.

It neither has been nor can be denied. They certainly intended to make the question, what shall be said to be treason, as clear as possible, so that there should be no doubt. I ask what constructive treason is but that treason which the constitution does not mention in plain and express terms, but is inferred from circumstances by implication and construction. The terms employed by its framers are admirably calculated to exclude all construction and implication. He who reads with an intention to understand cannot possibly mistake their meaning. They tell him in plain terms that treason against the United States shall consist but in two acts: "that it shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort." He who levies war against the United States, and he who adheres to their enemies, giving them aid and comfort, are traitors, and none other, by the very positive and plain language of this compact. Does the constitution say that he who advises these acts, that he who receives or comforts any person who has done either of these acts, is guilty of treason? No person will say that he who counselled an act of war to be done is the person who actually did it. No person will say that he who advises another to adhere to the enemies of his country is the person who actually did adhere to them. He who advises, procures, or persuades, he who receives, comforts, or protects, or even he who has been active in aiding and assisting, but absent at a remote distance from the scene of action, is not the actor. The parts which these persons perform are all essentially different. Have the judges who judicially expound this constitution any authority to make the act of advising or comforting treasonable by construction? Is it not by construction that a man is made guilty of having levied war who only advised it? Is it not by construction that he is rendered guilty of levying war who only gave a night's lodging to a person who did assist in levying it? Is it not by construction that giving a dinner to a man in distress is tortured into levying of war? It is not by construction extravagantly extended that they make a party absent at a great distance constructively present and constructively guilty of the acts of others? Is the constitution of the United States to be taken by construction contrary to its own plain and explicit words? It is the same as if the constitution had expressly said that there should be no constructive treason, no constructive presence, no constructive agent.

The gentlemen went on to show that the common law could not be brought to aid them to make that treason which was not so before; to make an act of accessorial agency amount to treason, though not so without it. They have admitted fully that the common law cannot be received for the purpose of making that a crime which is not so by the constitution of the United States and

laws made in pursuance thereof. But they admit that the common law, by the adoption of certain technical phrases in the constitution, is so far in force as to direct the sense or meaning of certain crimes, and the mode of proceeding on trials for those crimes. For instance, if a statute say that "if a man commit murder he shall be punished so and so, and the constitution say that the trial of all crimes (except in cases of impeachment) shall be by jury," the common law must be resorted to for the meaning of the word "murder"; and as the party accused is to be tried by a jury, the common law must be resorted to for the purpose of ascertaining the meaning of the word "trial" and the word "jury." The common law informs how many men shall constitute a jury; that it shall consist of twelve. It says that no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act or on confession in open court. The common law must be resorted to for the meaning of the word "convicted." It explains it to mean that the jury must be unanimous to find him guilty. But that beyond the effect of those technical phrases, which express the powers delegated to the government, the common law has not been adopted under the government of the United States. Does it not follow, as a necessary consequence, that no man can be guilty of an offence against the United States merely at common law? Is it not clear that the principles of the common law, as existing in Great Britain, cannot be applied here so as to make that an offence which is not so by the constitution and laws of the United States? Can the common law be resorted to in order to explain the constitution so as to make that a crime which would not be so without it? On that point I can readily declare to the gentlemen that I have always been of the same opinion which they declare themselves to hold. I never did consider that anything could be prosecuted as a crime against the United States, unless it were made so by the constitution, or some law enacted pursuant to it. I perfectly agree with the opinion of Judge Chase, declared in the case of U. S v. Worrall for an attempt to bribe Tench Coxe, the commissioner of the revenue, reported in 2 Dall. [2 U. S.] 384. He said that though this offence was highly injurious to morals and deserving the severest punishment, yet it was not punishable by the constitution or laws of the United States; and therefore, as it was an indictment at common law, it could not be maintained in the federal courts. He would not say whether the offence at that time were punishable in a state court. It has, however, been held that these sorts of offences may be punished in the state courts, and it is so held by the party in power.

One of the counsel for the prosecution (Mr. Wirt) had made some very illiberal animadversions upon a position stated by Mr. Wick-

ham, that the rule "that when a felony is created by statute, accessories to it, though not named, are punishable, and that all legal consequences of felony are attached to it by the common law, except where the special nature of the act leads to a different conclusion," is illustrated by a decision on the 28 Hen. VIII. c. 15, which makes piracy, an offence not punishable at common law, felony; that it has been solemnly adjudged that as this was not a common law offence, and not made in imitation or supply of it, it should not be construed according to the rules of the common law; and therefore that accessories to it are not punishable. Hawkins (in volume 1, P. C. c. 37, §§ 6, 7, page 153), says that "in the exposition of this statute it has been holden, first, that it does not alter the nature of the offence so as to make that which was before a felony only by the civil law now become a felony by the common law; for it must be still alleged as done upon the sea, and is no way cognizable by the common law, but only by virtue of this statute." "From the same ground, also, it follows that no persons shall, in respect of the statute, be construed to be or punished as accessories to piracies before or after, as they might have been if it had been made a felony by the statute—that accessories to piracy being neither expressly named in the statute, nor by construction included in it, remain as before." This statute declares that "all felonies and robberies, &c., upon the sea, &c., where the admiralty have power, authority, or jurisdiction, shall be inquired, tried, heard, determined, and judged in such shires and places in the realm, in like form and condition as if such offence or offences had been committed or done in or upon the land." It proceeds further to state that the commissions to the admirals and others to be appointed should "authorize them to hear and determine such offences after the common course of the law of the land, used for felonies or robberies done and committed upon the same." It further provides that they shall be proceeded against as felons for felonies committed on the land; and that those that should be convicted of any such offence by verdict, confession, &c., "shall have and suffer such pains of death, losses of lands, goods, and chattels, as if they had been attainted and convicted of such offence done upon the land." Here is an act declaring that persons guilty of piracy shall suffer the same pains and forfeitures as if they had committed these acts of violence and robbery on the land; but it makes no mention of accessories before or after the fact; and therefore the courts of that country construed it not to extend to them. The constitution declares certain specific acts to be punishable: the making of actual war, and an actual adherence to the enemies of the country, giving them aid and comfort. But the constitution does not say that advising, procuring, &c., those acts to be com-

mitted shall be treason. The inference, therefore, is natural and inevitable, that such advisers and procurers are not traitors within the true meaning of the constitution, according to the maxim, "Expressio unius est exclusio alterius." But even if, as they have argued, common law principles were to be applied to expound the constitution, if I understand them rightly, they are a strong authority to show that accessories are not punishable, and that those persons only who do the acts of levying war and adherence to enemies are so. No principle of the common law is more clearly understood than that the expression of one thing is an exclusion of another, especially in penal laws.

Again, sir, a most powerful argument, to prove the legislative exposition of the constitution, is deducible from the act of congress referred to by the gentleman who introduced this subject. He observed that it was clear and evident, from a law passed soon after the adoption of the constitution, that the legislature did not consider that an accessory would be guilty as a traitor under the constitution as he would be in Great Britain; because they made a special provision that if any person should break gaol and rescue therefrom any person convicted of treason, he should be punished with death. Sir, in Great Britain the rescuing of a person convicted of treason is treason; and if the construction for which the counsel for the prosecution now contend had been deemed correct by the legislature, this provision would have been superfluous, and therefore would not have been made. But this act of congress goes still further, and provides that if any person shall by force set at liberty or rescue any person committed but not convicted for any of the offences aforesaid (treason being included,) every person so offending shall, on conviction, be punished in a small fine—only the sum of five hundred dollars, and imprisonment a year. Sir, in Great Britain the man who breaks open a gaol and lets out a person committed therein for treason is a traitor, provided the person let out or rescued be afterwards convicted of treason. If our legislature had considered a rescuer as guilty of treason and punishable with death, would they have passed a law inflicting on him only the trivial punishment of a year's imprisonment and a fine of five hundred dollars? and yet he cannot be punished twice for it. If in truth and reality the receiver and protector of a traitor were guilty of treason under the constitution, how came the legislature to provide so small a punishment for the person who breaks open gaol and rescues a traitor? How inconsistent and improper is the infliction of so moderate a punishment on the gaolbreaker and rescuer, if the mere receiver or comforter of a traitor before he is put in prison at all is punishable with death. He who forcibly opposes the laws and rescues a traitor from gaol is only punished with imprisonment not

exceeding a year and a fine not exceeding five hundred dollars; while he who merely receives or comforts the traitor before he is committed for the crime or after he has made his escape is punishable with death! because in Great Britain he who receives or comforts persons guilty of treason is a traitor and punished with death, as the unfortunate Lady Lisle was. And if our constitution embraces no other acts as amounting to treason than what are expressly mentioned in it, it results of necessity that only the two offences of actually levying war against, and of adhering to the enemies of the United States, constitute treason. This is in my mind conclusive to show that our construction is correct, and that accessories before or after the fact were not contemplated by the constitution as traitors.

Mr. Martin replied at length to the arguments of counsel on the other side, that the pending motion was unprecedented, and called upon the court to usurp unwarranted powers, in derogation of the rights of the jury. [11] He concluded his argument on this point by the following remarks in reply to what Mr. Hay had said touching the fearful consequences that were to be apprehended from encroachments by the court on the rights and duties of the jury:

But the gentleman feels no solicitude for the fate of traitors. No more did the bloodthirsty Jeffreys. That sanguinary and cruel judge treated every man who came to be tried before him as a traitor. He thought none innocent, and condemned all he could. But the man must be lost to all humanity who would not drop the tear of pity whilst he wielded the sword of justice. But this inexorable tyrant had no feeling, and regarded no principle. Sir, does not the gentleman know that any man, however innocent, may be hunted down as a traitor? Does he not know that any man may be oppressed by a charge brought against him before a court and jury, without any knowledge of the facts of which he is accused? Is not the case of such a person sufficient to excite solicitude in the bosom of every person? Does he suppose that no man can be charged who is innocent? Does not the law presume him to be innocent till he be convicted by the court and jury? He ought not to be proceeded against if he be not a traitor but an innocent man. Ought not the court, therefore, to feel the utmost solicitude to prevent the oppression of innocence? He wishes to introduce all the evidence before the jury; and we wish to prevent it. I have no doubt but he wishes it; but if his wish be wrong, it is the sacred duty of your honors to prevent it from being gratified, and to reject im-

---

[11] As this is a mere question of practice, it has not been deemed important to give the arguments of counsel on either side upon it. It will be found briefly but satisfactorily disposed of in the concluding part of the final opinion pronounced by the chief justice.

pertinent and irrelevant testimony on a trial for life and death. The gentleman has himself recognized this principle. He did observe that when evidence is brought forward, the court will restrain it if impertinent to the issue tried before it. This is the very position for which we contend. It is too clear to admit of controversy, and decisive of the question before the court. The evidence of transactions out of this state does not establish what was done on Blennerhassett's Island; and therefore the testimony which they offer does not apply to the issue taken on the charge in the indictment.

I shall submit one observation on another point which I had like to have forgotten, and make a candid representation of what Mr. Wickham said about Blennerhassett. None of us said that we considered Blennerhassett to be guilty, as has been unjustly insinuated. He only stated what the law was. He denied that any person was guilty; alleged that no overt act was committed by any person; but still insisted on the legal consequences of the absence of Colonel Burr. I believe Blennerhassett to be as innocent as the books or instruments of music to which he is said to be so passionately addicted. But the gentleman expressed, with great zeal and pathos, that he pledged his own life and the lives of his children and posterity on the propriety of the doctrine which he advocated: that if they avoid conspiracies, that if they be innocent, they will be safe. Most delusive doctrine! It does not follow that because a man is innocent he will be safe. The experience of all ages forbids so extravagant an expectation. Without a rigid adherence to those rules which have been wisely established for the protection of innocence, there never can be safety. I pray God that neither his own life nor the lives of his children or posterity may depend on the propriety or permanency of his doctrines. He should reflect on the instability of human affairs, the vicissitudes of fortune, and the mutability of popular applause. Permanent security can only result from a wise system, calculated for all times, and to promote the happiness of all parties. If he be now "in the full tide of successful experiment," in the enjoyment of the approbation of his country and government, so was. not long ago, the gentleman whom I advocate. He was as highly distinguished by the kind favor of the people as he could be by their suffrages.[12] It was then incredible that their favor should so soon be changed by the calumny and rancor of party into the most malignant hatred. The gentleman may now think himself perfectly safe, by the prevalence of his party and principles; but the day very possibly may come. when he may find himself as obnoxious as the gentleman

whom I defend. He may, possibly, by the same means, the malice, injustice. and violence of party spirit, like my client. not only find himself reviled and calumniated. but his dearest friends abused and persecuted. I should be sorry that such prediction should be realized with respect to any gentleman; but such are the natural consequences of his own pernicious doctrines; and these we oppose. It is for the security of innocence that we contend. If innocence had never been persecuted, if innocence were never in danger, why were so many checks provided in the constitution for its security? We know the summary and sanguinary proceedings of former times. as recorded in faithful history. In those times of oppression and cruelty, they never troubled courts or juries with their accusations, proofs and legal forms. but declared the intended victim guilty of treason, and proceeded to execution at once. We wish to prevent a repetition of those scenes of injustice and horror.

Mr. Martin closed his long and exhaustive argument by the following remarks:

Before concluding, let me observe that it has been my intention to argue the cause correctly, without hurting the feelings of any person in the world. We are unfortunately situated. We labor against great prejudices against my client, which tend to prevent him from having a fair trial. I have with pain heard it said that such are the public prejudices against Colonel Burr, that a jury, even should they be satisfied of his innocence, must have considerable firmness of mind to pronounce him not guilty. I have heard it not without horror. God of heaven! have we already under our form of government (which we have so often been told is best calculated of all governments to secure all our rights) arrived at a period when a trial in a court of justice, where life is at stake, shall be but a solemn mockery, a mere idle form and ceremony to transfer innocence from the gaol to the gibbet, to gratify popular indignation. excited by bloodthirsty enemies! But if it require in such a situation firmness in a jury, so does it equally require fortitude in judges to perform their duty. And here permit me again, most solemnly, and at the same time most respectfully, to observe that, in the case of life and death, where there remains one single doubt in the minds of the jury as to facts, or of the court as to law, it is their duty to decide in favor of life. If they do not, and the prisoner fall a victim, they are guilty of murder in foro cœli whatever their guilt may be in foro legis. When the sun mildly shines upon us, when the gentle zephyrs play around us, we can easily proceed forward in the straight path of our duty; but when bleak clouds enshroud the sky with darkness, when the tempest rages. the winds howl, and the waves break over us—when the thunders awfully roar over our heads and the lightnings of heaven blaze around us—it is then that all the energies of the human soul are called into

---

[12] Alluding to his having had an equal number of suffrages with Mr. Jefferson for the presidential chair; which rendered a choice between them by the house of representatives of the United States necessary.

action. It is then that the truly brave man stands firm at his post. It is then that, by an unshaken performance of his duty, man approaches the nearest possible to the Divinity. Nor is there any object in the creation on which the Supreme Being can look down with more delight and approbation than on a human being in such a situation and thus acting. May that God who now looks upon us, who has in his infinite wisdom called you into existence and placed you in that seat to dispense justice to your fellow citizens, to preserve and protect innocence against persecution—may that God so illuminate your understandings that you may know what is right; and may he nerve your souls with firmness and fortitude to act according to that knowledge.

(August 31, 1807.)

MARSHALL, Chief Justice, delivered the opinion of the court as follows:

The question now to be decided has been argued in a manner worthy of its importance, and with an earnestness evincing the strong conviction felt by the counsel on each side that the law is with them. A degree of eloquence seldom displayed on any occasion has embellished a solidity of argument and a depth of research by which the court has been greatly aided in forming the opinion it is about to deliver. The testimony adduced on the part of the United States to prove the overt act laid in the indictment having shown, and the attorney for the United States having admitted, that the prisoner was not present when that act, whatever may be its character, was committed, and there being no reason to doubt but that he was at a great distance, and in a different state, it is objected to the testimony offered on the part of the United States to connect him with those who committed the overt act, that such testimony is totally irrelevant, and must, therefore, be rejected. The arguments in support of this motion respect in part the merits of the case as it may be supposed to stand independent of the pleadings, and in part as exhibited by the pleadings.

On the first division of the subject two points are made: 1st. That, conformably to the constitution of the United States, no man can be convicted of treason who was not present when the war was levied. 2d. That if this construction be erroneous, no testimony can be received to charge one man with the overt acts of others until those overt acts as laid in the indictment be proved to the satisfaction of the court. The question which arises on the construction of the constitution, in every point of view in which it can be contemplated, is of infinite moment to the people of this country and to their government, and requires the most temperate and the most deliberate consideration. "Treason against the United States shall consist only in levying war against them." What is the natural import of the words "levying war?" and who may be said

to levy it? Had their first application to treason been made by our constitution they would certainly have admitted of some latitude of construction. Taken most literally, they are, perhaps, of the same import with the words "raising or creating war"; but as those who join after the commencement are equally the objects of punishment, there would probably be a general admission that the term also comprehended making war or carrying on war. In the construction which courts would be required to give these words, it is not improbable that those who should raise, create, make, or carry on war, might be comprehended. The various acts which would be considered as coming within the term would be settled by a course of decisions; and it would be affirming boldly to say that those only who actually constituted a portion of the military force appearing in arms could be considered as levying war. There is no difficulty in affirming that there must be a war or the crime of levying it cannot exist; but there would often be considerable difficulty in affirming that a particular act did or did not involve the person committing it in the guilt and in the fact of levying war. If, for example, an army should be actually raised for the avowed purpose of carrying on open war against the United States and subverting their government, the point must be weighed very deliberately, before a judge would venture to decide that an overt act of levying war had not been committed by a commissary of purchases, who never saw the army, but who, knowing its object, and leaguing himself with the rebels, supplied that army with provisions, or, by a recruiting officer holding a commission in the rebel service, who, though never in camp, executed the particular duty assigned to him.[13]

But the term is not for the first time applied to treason by the constitution of the United States. It is a technical term. It is used in a very old statute of that country whose language is our language, and whose laws form the substratum of our laws. It is scarcely conceivable that the term was not employed by the framers of our constitution in the sense which had been affixed to it by those from whom we borrowed it. So far as the meaning of any terms, particularly terms of art, is completely ascertained, those by whom they are employed must be considered as employing them in that ascertained meaning, unless the contrary be proved by the context. It is, therefore, reasonable to suppose, unless it be incompatible with other expressions of the constitution, that the term "levying war" is used in that instrument in the same sense in which it was understood in England, and in this country, to have been used in the statute of the 25th of Edw. III. from which it was borrowed. It is said that this meaning is to be collected only from adjudged cases. But this position cannot be

13 See note A at the end of this opinion, (section 2).

conceded to the extent in which it is laid down. The superior authority of adjudged cases will never be controverted. But those celebrated elementary writers who have stated the principles of the law, whose statements have received the common approbation of legal men, are not to be disregarded. Principles laid down by such writers as Coke, Hale, Foster, and Blackstone, are not lightly to be rejected. These books are in the hands of every student. Legal opinions are formed upon them; and those opinions are afterwards carried to the bar, the bench and the legislature. In the exposition of terms, therefore, used in instruments of the present day, the definitions and the dicta of those authors, if not contradicted by adjudications, and if compatible with the words of the statute, are entitled to respect. It is to be regretted that they do not shed as much light on this part of the subject as is to be wished. Coke does not give a complete definition of the term, but puts cases which amount to levying war. "An actual rebellion or insurrection, he says, is a levying of war." In whom? Coke does not say whether in those only who appear in arms, or in all those who take part in the rebellion or insurrection by real open deed. Hale, in treating on the same subject, puts many cases which shall constitute a levying of war, without which no act can amount to treason; but he does not particularize the parts to be performed by the different persons concerned in that war, which shall be sufficient to fix on each the guilt of levying it. Foster says: "The joining with rebels in an act of rebellion, or with enemies in acts of hostility, will make a man a traitor." "Furnishing rebels or enemies with money, arms, ammunition or other necessaries will prima facie make a man a traitor." Foster does not say that he would be a traitor under the words of the statute, independent of the legal rule which attaches the guilt of the principal to an accessory, nor that his treason is occasioned by that rule. In England this discrimination need not be made except for the purpose of framing the indictment; and, therefore, in the English books we do not perceive any effort to make it. Thus, surrendering a castle to rebels, being in confederacy with them, is said by Hale and Foster to be treason under the clause of levying war; but whether it be levying war in fact, or aiding those who levy it, is not said. Upon this point Blackstone is not more satisfactory. Although we find among the commentators upon treason enough to satisfy the inquiry, what is a state of internal war? yet no precise information can be acquired from them which would enable us to decide with clearness whether persons not in arms, but taking part in a rebellion, could be said to levy war, independently of that doctrine which attaches to the accessory the guilt of his principal. If in adjudged cases this question have been taken up and directly decided, the court has not seen those cases. The argument which may be drawn from the form of the indictment, though strong, is not conclusive. In the precedent found in Tremaine, Mary Speake, who was indicted for furnishing provisions to the party of the Duke of Monmouth, is indicted for furnishing provisions to those who were levying war, not for levying war herself. It may correctly be argued that, had this act amounted to levying war, she would have been indicted for levying war; and the furnishing of provisions would have been laid as the overt act. The court felt this when the precedent was produced But the argument, though strong, is not conclusive, because, in England, the inquiry, whether she had become a traitor by levying war, or by giving aid and comfort to those who were levying war,[14] was unimportant; and because, too, it does not appear from the indictment that she was actually concerned in the rebellion—that she belonged to the rebel party, or was guilty of anything further than a criminal speculation in selling them provisions.

It is not deemed necessary to trace the doctrine, that in treason all are principals, to its source. Its origin is most probably stated correctly by Judge Tucker in a work, the merit of which is with pleasure acknowledged. But if a spurious doctrine have been introduced into the common law, and have for centuries been admitted as genuine, it would require great hardihood in a judge to reject it. Accordingly, we find those of the English jurists who seem to disapprove the principle declaring that it is now too firmly settled to be shaken. It is unnecessary to trace this doctrine to its source for another reason: the terms of the constitution comprise no question respecting principal and accessory, so far as either may be truly and in fact said to levy war. Whether in England a person would be indicted in express terms for levying war or for assisting others in levying war, yet if in correct and legal language he can be said to have levied war, and if it have never been decided that the act would not amount to levying war, his case may, without violent construction, be brought within the letter and the plain meaning of the constitution. In examining these words, the argument which may be drawn from felonies, as, for example, from murder, is not more conclusive. Murder is the single act of killing with malice aforethought. But war is a complex operation, composed of many parts, co-operating with each other. No one man or body of men can perform them all if the war be of any continuance. Although, then, in correct and

---

[14] If she was indicted under that clause of the statute of Edw. III. which relates to adhering to the enemies of the king, giving them aid and comfort, the indictment was certainly bad, according to the settled construction of that clause by the English courts. The authorities are uniform, that no person can be guilty of treason under that clause for adhering and giving aid and comfort to British subjects in rebellion. In other words, the term "enemies" means foreign enemies, and not rebels.

in law language, he alone is said to have murdered another who has perpetrated the fact of killing, or has been present aiding that fact, it does not follow that he alone can have levied war who has borne arms. All those who perform the various and essential military parts of prosecuting the war, which must be assigned to different persons. may with correctness and accuracy be said to levy war. Taking this view of the subject, it appears to the court that those who perform a part in the prosecution of the war may correctly be said to levy war and to commit treason under the constitution. It will be observed that this opinion does not extend to the case of a person who performs no act in the prosecution of the war—who counsels and advises it—or who, being engaged in the conspiracy, fails to perform his part. Whether such persons may be implicated by the doctrine that whatever would make a man an accessory in felony makes him a principal in treason, or are excluded because that doctrine is inapplicable to the United States, the constitution having declared that treason shall consist only in levying war, and having made the proof of overt acts necessary to conviction, is a question of vast importance, which it would be proper for the supreme court to take a fit occasion to decide, but which an inferior tribunal would not willingly determine unless the case before them should require it.[15]

It may now be proper to notice the opinion of the supreme court in the case of the United States against Bollman and Swartwout. It is said that this opinion, in declaring that those who do not bear arms may yet be guilty of treason, is contrary to law, and is not obligatory because it is extra-judicial and was delivered on a point not argued. This court is therefore required to depart from the principle there laid down. It is true that, in that case, after forming the opinion that no treason could be committed because no treasonable assemblage had taken place, the court might have dispensed with proceeding further in the doctrines of treason. But it is to be remembered that the judges might act separately, and perhaps at the same time on the various prosecutions which might be instituted, and that no appeal lay from their decisions. Opposite judgments on the point would have presented a state of things infinitely to be deplored by all. It was not surprising, then, that they should have made some attempt to settle principles which would probably occur, and which were in some degree connected with the point before them. The court had employed some reasoning to show that without the actual embodying of men war could not be levied. It might have been inferred from this that those only who were so embodied could be guilty of treason. Not only to exclude this inference, but also to affirm the contrary, the court proceeded to

observe: "It is not the intention of the court to say that no individual can be guilty of this crime who has not appeared in arms against his country. On the contrary, if war be actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable object, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." This court is told that if this opinion be incorrect it ought not to be obeyed, because it was extra-judicial. For myself, I can say that I could not lightly be prevailed on to disobey it, were I even convinced that it was erroneous; but I would certainly use any means which the law placed in my power to carry the question again before the supreme court for reconsideration, in a case in which it would directly occur and be fully argued. The court which gave this opinion was composed of four judges. At the time I thought them unanimous, but I have since had reason to suspect that one of them, whose opinion is entitled to great respect, and whose indisposition prevented his entering into the discussions, on some of those points which were not essential to the decision of the very case under consideration, did not concur in this particular point with his brethren. Had the opinion been unanimous, it would have been given by a majority of the judges. But should the three who were absent concur with that judge who was present, and who perhaps dissents from what was then the opinion of the court, a majority of the judges may overrule this decision. I should, therefore, feel no objection, although I then thought and still think the opinion perfectly correct, to carry the point, if possible, again before the supreme court, if the case should depend upon it. In saying that I still think the opinion perfectly correct, I do not consider myself as going further than the preceding reasoning goes. Some gentlemen have argued as if the supreme court had adopted the whole doctrine of the English books on the subject of accessories to treason.[16] But certainly such is not the fact. Those only who perform a part, and who are leagued in the conspiracy, are declared to be traitors. To complete the definition both circumstances must concur. They must "perform a part," which will furnish the overt act; and they must be "leagued in conspiracy." The person who comes within this description in the opinion of the court levies war. The present motion, however, does not rest upon this point; for if under this indictment the United States might be let in to prove the part performed by the prisoner, if he did perform any part, the court could not stop the testimony, in its present stage.[17]

2d. The second point involves the char-

---

[15] See note A, § 1. at the end of this opinion.    [16] See note A, § 1.    [17] See note A, § 4.

acter of the overt act which has been given in evidence, and calls upon the court to declare whether that act can amount to levying war. Although the court ought now to avoid any analysis of the testimony which has been offered in this case, provided the decision of the motion should not rest upon it, yet many reasons concur in giving peculiar propriety to a delivery, in the course of these trials, of a detailed opinion on the question, what is levying war? As this question has been argued at great length, it may probably save much trouble to the counsel now to give that opinion.

In opening the case, it was contended by the attorney for the United States, and has since been maintained on the part of the prosecution, that neither arms nor the application of force or violence are indispensably necessary to constitute the fact of levying war. To illustrate these positions, several cases have been stated, many of which would clearly amount to treason. In all of them, except that which was probably intended to be this case, and on which no observation will be made, the object of the assemblage was clearly treasonable. Its character was unequivocal, and was demonstrated by evidence furnished by the assemblage itself. There was no necessity to rely upon information drawn from extrinsic sources, or, in order to understand the fact, to pursue a course of intricate reasoning, and to conjecture motives. A force is supposed to be collected for an avowed treasonable object, in a condition to attempt that object, and to have commenced the attempt by moving towards it. I state these particulars, because although the cases put may establish the doctrine they are intended to support—may prove that the absence of arms, or the failure to apply force to sensible objects by the actual commission of violence on those objects, may be supplied by other circumstances—yet they also serve to show that the mind requires those circumstances to be satisfied that war is levied. Their construction of the opinion of the supreme court is, I think, thus far correct. It is certainly the opinion which was at the time entertained by myself; and which is still entertained. If a rebel army, avowing its hostility to the sovereign power, should front that of the government, should march and countermarch before it, should manoeuvre in its face, and should then disperse from any cause whatever without firing a gun—I confess I could not, without some surprise, hear gentlemen seriously contend that this could not amount to an act of levying war. A case equally strong may be put with respect to the absence of military weapons. If the party be in a condition to execute the purposed treason without the usual implements of war, I can perceive no reason for requiring those implements in order to constitute the crime.

It is argued that no adjudged case can be produced from the English books where actual violence has not been committed. Suppose this were true. No adjudged case has, or, it is believed, can be produced from those books in which it has been laid down that war cannot be levied without the actual application of violence to external objects.[18] The silence of the reporters on this point may be readily accounted for. In cases of actual rebellion against the government, the most active and influential leaders are generally most actively engaged in the war; and as the object can never be to extend punishment to extermination, a sufficient number are found among those who have committed actual hostilities to satisfy the avenging arm of justice. In cases of constructive treason, such as pulling down meeting-houses, where the direct and avowed object is not the destruction of the sovereign power, some act of violence might be generally required to give to the crime a sufficient degree of malignity to convert it into treason, to render the guilt of any individual unequivocal. But Vaughan's Case is a case where there was no real application of violence, and where the act was adjudged to be treason. Gentlemen argue that Vaughan was only guilty of adhering to the king's enemies, but they have not the authority of the court for so saying. The judges unquestionably treat the cruising of Vaughan as an overt act of levying war. The opinions of the best elementary writers concur in declaring that where a body of men are assembled for the purpose of making war against the government, and are in a condition to make that war, the assemblage is an act of levying war. These opinions are contradicted by no adjudged case, and are supported by Vaughan's Case. This court is not inclined to controvert them. But although, in this respect, the opinion of the supreme court has not been misunderstood on the part of the prosecution, that opinion seems not to have been fully adverted to in a very essential point in which it is said to have been misconceived by others. The opinion, I am informed, has been construed to mean that any assemblage whatever for a treasonable purpose, whether in force or not in force, whether in a condition to use violence or not in that condition, is a levying of war. It is this construction, which has not, indeed, been expressly advanced at the bar, but which is said to have been adopted elsewhere, that the court deems it necessary to examine.

Independent of authority, trusting only to the dictates of reason, and expounding terms according to their ordinary signification, we should probably all concur in the declaration that war could not be levied without the employment and exhibition of force. War is an appeal from reason to the sword; and he who makes the appeal evidences the fact

---

18 See note B, § 1.

by the use of the means. His intention to go to war may be proved by words; but the actual going to war is a fact which is to be proved by open deed. The end is to be effected by force; and it would seem that in cases where no declaration is to be made, the state of actual war could only be created by the employment of force, or being in a condition to employ it. But the term, having been adopted by our constitution, must be understood in that sense in which it was universally received in this country when the constitution was framed. The sense in which it was received is to be collected from the most approved authorities of that nation from which we have borrowed the term. Lord Coke says that levying war against the king was treason at the common law. "A compassing or conspiracy to levy war, he adds, is no treason, for there must be a levying of war in fact." He proceeds to state cases of constructive levying war, where the direct design is not to overturn the government, but to effect some general object by force. The terms he employs, in stating these cases, are such as indicate an impression on his mind that actual violence is a necessary ingredient in constituting the fact of levying war. He then proceeds to say: "An actual rebellion or insurrection is a levying of war within this fact." "If any with strength and weapons invasive and defensive doth hold and defend a castle or fort against the king and his power, this is levying of war against the king." These cases are put to illustrate what he denominates "a war in fact." It is not easy to conceive "an actual invasion or insurrection" unconnected with force; nor can "a castle or fort be defended with strength and weapons invasive and defensive" without the employment of actual force. It would seem, then, to have been the opinion of Lord Coke that to levy war there must be an assemblage of men in a condition and with an intention to employ force. He certainly puts no case of a different description. Lord Hale says (1 Hale, P. C. p. 149, pl. 6:) "What shall be said a levying of war is partly a question of fact, for it is not every unlawful or riotous assembly of many persons to do an unlawful act, though de facto they commit the act they intend, that makes a levying of war; for then every riot would be treason, &c.," "but it must be such an assembly as carries with it speciem belli, the appearance of war: as if they ride or march vexillis explicatis, with colors flying, or if they be formed into companies or furnished with military officers, or if they are armed with military weapons, as swords, guns, bills, halberds, pikes, and are so circumstanced that it may be reasonably concluded they are in a posture of war; which circumstances are so various that it is hard to describe them all particularly." "Only the general expressions in all the indictments of this nature that I have seen are more guerrino arraiati,"

arrayed in warlike manner. He afterwards adds: "If there be a war levied as is above declared, viz, an assembly arrayed in warlike manner, and so in the posture of war for any treasonable attempt, it is bellum levatum but not percussum." It is obvious that Lord Hale supposed an assemblage of men in force, in a military posture, to be necessary to constitute the fact of levying war. The idea, he appears to suggest, that the apparatus of war is necessary, has been very justly combated by an able judge who has written a valuable treatise on the subject of treason; but, it is not recollected that his position, that the assembly should be in a posture of war for any treasonable attempt, has ever been denied. Hawkins (chapter 17, § 23), says "that not only those who rebel against the king, and take up arms to dethrone him, but, also, in many other cases, those who, in a violent and forcible manner, withstand his lawful authority, are said to levy war against him, and therefore those that hold a fort or castle against the king's forces, or keep together armed numbers of men, against the king's express command, have been adjudged to levy war against him." The cases put by Hawkins are all cases of actual force and violence. "Those who rebel against the king, and take up arms to dethrone him." In many other cases those "who, in a violent and forcible manner, withstand his lawful authority." "Those that hold a fort or castle against his forces, or keep together armed numbers of men against his express command." These cases are obviously cases of force and violence. Hawkins next proceeds to describe cases in which war is understood to be levied under the statute, although it was not directly made against the government. This Lord Hale terms an interpretative or constructive levying of war: and it will be perceived that he puts no case in which actual force is dispensed with. "Those also, he says, who make an insurrection in order to redress a public grievance, whether it be a real or pretended one, and of their own authority attempt with force to redress it, are said to levy war against the king, although they have no direct design against his person, inasmuch as they insolently invade his prerogative by attempting to do that by private authority which he, by public justice, ought to do; which manifestly tends to a downright rebellion. As where great numbers by force attempt to remove certain persons from the king," &c. The cases here put by Hawkins, of a constructive levying of war, do in terms require force as a constituent part of the description of the offence.

Judge Foster, in his valuable treatise on Treason, states the opinion which has been quoted from Lord Hale, and differs from that writer so far as the latter might seem to require swords, drums, colors, &c., what he terms the pomp and pageantry of war, as essential circumstances to constitute the fact of

levying war. In the Cases of Damaree and Purchase, he says: "The want of those circumstances weighed nothing with the court, although the prisoner's counsel insisted much on that matter." But he adds: "The number of the insurgents supplied the want of military weapons; and they were provided with axes, crows, and other tools of the like nature, proper for the mischief they intended to effect. Furor arma ministrat." It is apparent that Judge Foster here alludes to an assemblage in force, or, as Lord Hale terms it, "in a warlike posture;" that is, in a condition to attempt or proceed upon the treason which had been contemplated. The same author afterwards states at large the Cases of Damaree and Purchase from 8 State Trials; and they are cases where the insurgents not only assembled in force, in the posture of war, or in a condition to execute the treasonable design, but they did actually carry it into execution, and did resist the guards who were sent to disperse them. Judge Foster states (section 4) all insurrections to effect certain innovations of a public and general concern, by an armed force, to be, in construction of law, high treason within the clause of levying war. The cases put by Foster of constructive levying of war all contain, as a material ingredient, the actual employment of force. After going through this branch of his subject, he proceeds to state the law in a case of actual levying war: that is, where the war is intended directly against the government. He says (section 9): "An assembly armed and arrayed in a warlike manner for a treasonable purpose is bellum levatum, though not bellum percussum. Listing and marching are sufficient overt acts, without coming to a battle or action. So cruising on the king's subjects under a French commission, France being then at war with us, was held to be adhering to the king's enemies, though no other act of hostility be proved." "An assembly armed and arrayed in a warlike manner for any treasonable purpose" is certainly in a state of force: in a condition to execute the treason for which they assembled. The words, "enlisting and marching," which are overt acts of levying war, do, in the arrangement of the sentence, also imply a state of force; though that state is not expressed in terms; for the succeeding words, which state a particular event as not having happened, prove that event to have been the next circumstance to those which had happened; they are "without coming to a battle or action." "If men be enlisted and march," (that is, if they march prepared for battle or in a condition for action; for marching is a technical term applied to the movement of a military corps,) it is an overt act of levying war, though they do not come to a battle or action. This exposition is rendered the stronger by what seems to be put in the same sentence as a parallel case with respect to adhering to an enemy. It is cruising under a commission from an enemy without committing any other act of hostility. Cruising is the act of sailing in warlike form

and in a condition to assail those of whom the cruiser is in quest. This exposition, which seems to be that intended by Judge Foster, is rendered the more certain by a reference to the case in the State Trials from which the extracts are taken. The words used by the chief justice are: "When men form themselves into a body and march rank and file with weapons offensive and defensive, this is levying of war with open force, if the design be public." Mr. Phipps, the counsel for the prisoner, afterwards observed: "Intending to levy war is not treason unless a war be actually levied." To this the chief justice answered: "Is it not actually levying of war if they actually provide arms and levy men, and in a warlike manner set out and cruise and come with a design to destroy our ships?" Mr. Phipps still insisted "it would not be an actual levying of war unless they committed some act of hostility." "Yes, indeed," said the chief justice, "the going on board and being in a posture to attack the king's ships." Mr. Baron Powis added: "But for you to say that because they did not actually fight it is not a levying of war! Is it not plain what they did intend? that they came with that intention? that they came in that posture? that they came armed, and had guns and blunderbusses, and surrounded the ship twice? They came with an armed force; that is strong evidence of the design."

The point insisted on by counsel in the Case of Vaughan, as in this case, was, that war could not be levied without actual fighting. In this the counsel was very properly overruled; but it is apparent that the judges proceeded entirely on the idea that a warlike posture was indispensable to the fact of levying war. Judge Foster proceeds to give other instances of levying war: "Attacking the king's forces in opposition to his authority upon a march or in quarters is levying war." "Holding a castle or fort against the king or his forces, if actual force be used in order to keep possession, is levying war. But a bare detainer, as, suppose, by shutting the gates against the king or his forces, without any other force from within, Lord Hale conceiveth will not amount to treason." The whole doctrine of Judge Foster on this subject seems to demonstrate a clear opinion that a state of force or violence, a posture of war, must exist to constitute technically as well as really the fact of levying war.

Judge Blackstone seems to concur with his predecessors. Speaking of levying war, he says: "This may be done by taking arms, not only to dethrone the king, but under pretense to reform religion or the laws, or to remove evil counsellors or other grievances, whether real or pretended. For the law does not, neither can it, permit any private man or set of men to interfere forcibly in matters of such high importance." He proceeds to give examples of levying war, which show that he contemplated actual force as a necessary ingredient in the composition of this crime. It

would seem, then, from the English authorities, that the words "levying war" have not received a technical different from their natural meaning, so far as respects the character of the assemblage of men which may constitute the fact. It must be a warlike assemblage, carrying the appearance of force, and in a situation to practice hostility.

Several judges of the United States have given opinions at their circuits on the subject, all of which deserve, and will receive the particular attention of this court.

In his charge to the grand jury, when John Fries was indicted in consequence of a forcible opposition to the direct tax, Judge Iredell is understood to have said: "I think I am warranted in saying that if, in the case of the insurgents who may come under your consideration, the intention was to prevent by force of arms the execution of an act of the congress of the United States altogether, any forcible opposition, calculated to carry that intention into effect, was a levying of war against the United States, and, of course, an act of treason." To levy war, then, according to this opinion of Judge Iredell, required the actual exertion of force. Judge Patterson, in his opinions delivered in two different cases, seems not to differ from Judge Iredell. He does not, indeed, precisely state the employment of force as necessary to constitute a levying war, but in giving his opinion, in cases in which force was actually employed, he considers the crime in one case as dependent on the intention; and in the other case he says: "Combining these facts and this design," (that is, combining actual force with a treasonable design,) "the crime is high treason." Judge Peters has also indicated the opinion that force was necessary to constitute the crime of levying war. Judge Chase has been particularly clear and explicit. In an opinion which he appears to have prepared on great consideration, he says: "The court are of opinion that if a body of people conspire and meditate an insurrection to resist or oppose the execution of a statute of the United States by force, they are only guilty of a high misdemeanor; but if they proceed to carry such intention into execution by force, that they are guilty of the treason of levying war; and the quantum of the force employed neither increases nor diminishes the crime; whether by one hundred or one thousand persons is wholly immaterial. The court are of opinion that a combination or conspiracy to levy war against the United States is not treason unless combined with an attempt to carry such combination or conspiracy into execution; some actual force or violence must be used in pursuance of such design to levy war; but that it is altogether immaterial whether the force used be sufficient to effectuate the object. Any force connected with the intention will constitute the crime of levying of war." In various parts of the opinion delivered by Judge Chase, in the case of Fries, the same sentiments are to be found. It is to be observed that these judges are not

content that troops should be assembled in a condition to employ force. According to them some degree of force must have been actually employed. The judges of the United States, then, so far as their opinions have been quoted, seem to have required still more to constitute the fact of levying war than has been required by the English books. Our judges seem to have required the actual exercise of force, the actual employment of some degree of violence. This, however, may be, and probably is, because, in the cases in which their opinions were given, the design not having been to overturn the government, but to resist the execution of a law, such an assemblage as would be sufficient for the purpose would require the actual employment of force to render the object unequivocal.

But it is said all these authorities have been overruled by the decision of the supreme court in the case of U. S. v. Swartwout [4 Cranch (8 U. S.) 75]. If the supreme court have indeed extended the doctrine of treason further than it has heretofore been carried by the judges of England or of this country, their decision would be submitted to. At least this court could go no further than to endeavor again to bring the point directly before them. It would, however, be expected that an opinion which is to overrule all former precedents, and to establish a principle never before recognized, should be expressed in plain and explicit terms. A mere implication ought not to prostrate a principle which seems to have been so well established. Had the intention been entertained to make so material a change in this respect, the court ought to have expressly declared that any assemblage of men whatever, who had formed a treasonable design, whether in force or not, whether in a condition to attempt the design or not, whether attended with warlike appearances or not, constitutes the fact of levying war. Yet no declaration to this amount is made. Not an expression of this kind is to be found in the opinion of the supreme court. The foundation on which this argument rests is the omission of the court to state that the assemblage which constitutes the fact of levying war ought to be in force, and some passages which show that the question respecting the nature of the assemblage was not in the mind of the court when the opinion was drawn; which passages are mingled with others which at least show that there was no intention to depart from the course of the precedents in cases of treason by levying war. Every opinion, to be correctly understood, ought to be considered with a view to the case in which it was delivered. In the case of the United States against Bollman and Swartwout, there was no evidence that even two men had ever met for the purpose of executing the plan in which those persons were charged with having participated. It was, therefore, sufficient for the court to say that unless men were assembled, war could not be levied. That case was decided by this declaration. The court might

indeed have defined the species of assemblage which would amount to levying of war; but, as this opinion was not a treatise on treason, but a decision of a particular case, expressions of doubtful import should be construed in reference to the case itself, and the mere omission to state that a particular circumstance was necessary to the consummation of the crime ought not to be construed into a declaration that the circumstance was unimportant. General expressions ought not to be considered as overruling settled principles, without a direct declaration to that effect. After these preliminary observations, the court will proceed to examine the opinion which has occasioned them.

. The first expression in it bearing on the present question is, "To constitute that specific crime for which the prisoner now before the court has been committed, war must be actually levied against the United States. However flagitious may be the crime of conspiracy to subvert by force the government of our country, such conspiracy is not treason. To conspire to levy war and actually to levy war are distinct offences. The first must be brought into operation by the assemblage of men for a purpose treasonable in itself, or the fact of levying war cannot have been committed." Although it is not expressly stated that the assemblage of men for the purpose of carrying into operation the treasonable intent which will amount to levying war must be an assemblage in force, yet it is fairly to be inferred from the context; and nothing like dispensing with force appears in this paragraph. The expressions are, "to constitute the crime, war must be actually levied." A conspiracy to levy war is spoken of as "a conspiracy to subvert by force the government of our country." Speaking in general terms of an assemblage of men for this or for any other purpose, a person would naturally be understood as speaking of an assemblage in some degree adapted to the purpose. An assemblage to subvert by force the government of our country, and amounting to a levying of war, should be an assemblage in force. In a subsequent paragraph the court says: "It is not the intention of the court to say that no individual can be guilty of this crime who has not appeared in arms against his country. On the contrary, if war be actually levied, that is, if a body of men be actually assembled in order to effect by force a treasonable purpose, all those who perform any part, however minute, &c., and who are actually leagued in the general conspiracy, are traitors. But there must be an actual assembling of men for the treasonable purpose to constitute a levying of war." The observations made on the preceding paragraph apply to this. "A body of men actually assembled, in order to effect by force a treasonable purpose," must be a body assembled with such appearance of force as would warrant the opinion that they were assembled for the particular purpose. An assemblage to constitute an actual levying of war should be an assemblage with such appearance of force as would justify the opinion that they met for the purpose. This explanation, which is believed to be the natural, certainly not a strained explanation of the words, derives some additional aid from the terms in which the paragraph last quoted commences: "It is not the intention of the court to say that no individual can be guilty of treason who has not appeared in arms against his country." These words seem intended to obviate an inference which might otherwise have been drawn from the preceding paragraph. They indicate that in the mind of the court the assemblage stated in that paragraph was an assemblage in arms; that the individuals who composed it had appeared in arms against their country; that is, in other words, that the assemblage was a military, a warlike assemblage. The succeeding paragraph in the opinion relates to a conspiracy, and serves to show that force and violence were in the mind of the court, and that there was no idea of extending the crime of treason by construction beyond the constitutional definition which had been given of it.

Returning to the case actually before the court, it is said: "A design to overturn the government of the United States in New Orleans by force would have been unquestionably a design which if carried into execution would have been treason; and the assemblage of a body of men for the purpose of carrying it into execution would amount to levying of war against the United States." Now what could reasonably be said to be an assemblage of a body of men for the purpose of overturning the government of the United States in New Orleans by force? Certainly an assemblage in force; an assemblage prepared, and intending to act with force; a military assemblage. The decisions theretofore made by the judges of the United States are, then, declared to be in conformity with the principles laid down by the supreme court. Is this declaration compatible with the idea of departing from those opinions on a point within the contemplation of the court? The opinions of Judge Patterson and Judge Iredell are said "to imply an actual assembling of men, though they rather designed to remark on the purpose to which the force was to be applied than on the nature of the force itself." This observation certainly indicates that the necessity of an assemblage of men was the particular point the court meant to establish, and that the idea of force was never separated from this assemblage.

The opinion of Judge Chase is next quoted with approbation. This opinion in terms requires the employment of force. After stating the verbal communication said to have been made by Mr. Swartwout to General Wilkinson, the court says, "If these words

import that the government of New Orleans was to be revolutionized by force, although merely as a step to, or a means of, executing some greater projects, the design was unquestionably treasonable; and any assemblage of men for that purpose would amount to a levying of war. The words "any assemblage of men," if construed to affirm that any two or three of the conspirators who might be found together after this plan had been formed would be the act of levying war, would certainly be misconstrued. The sense of the expression, "any assemblage of men," is restricted by the words "for this purpose." Now, could it be in the contemplation of the court that a body of men would assemble for the purpose of revolutionizing New Orleans by force, who should not themselves be in force? After noticing some difference of opinion among the judges respecting the import of the words said to have been used by Mr. Swartwout, the court proceeds to observe: "But whether this treasonable intention be really imputable to the plan or not, it is admitted that it must have been carried into execution by an open assemblage for that purpose, previous to the arrest of the prisoner, in order to consummate the crime as to him." Could the court have conceived "an open assemblage" "for the purpose of overturning the government of New Orleans by force," to be only equivalent to a secret, furtive assemblage without the appearance of force? After quoting the words of Mr. Swartwout, from the affidavit, in which it was stated that Mr. Burr was levying an army of 7,000 men, and observing that the treason to be inferred from these words would depend on the intention with which it was levied, and on the progress which had been made in levying it, the court says: "The question, then, is whether this evidence prove Colonel Burr to have advanced so far in levying an army as actually to have assembled them." Actually to assemble an army of 7,000 men is unquestionably to place those who are so assembled in a state of open force. But as the mode of expression used in this passage might be misconstrued so far as to countenance the opinion that it would be necessary to assemble the whole army in order to constitute the fact of levying war, the court proceeds to say: "It is argued that since it cannot be necessary that the whole 7,000 men should be assembled, their commencing their march by detachments to the place of rendezvous must be sufficient to constitute the crime. This position is correct with some qualification. It cannot be necessary that the whole army should assemble, and that the various parts which are to compose it should have combined. But it is necessary there should be an actual assemblage; and therefore this evidence should make the fact unequivocal. The travelling of individuals to the place of rendezvous would, perhaps, not be sufficient. This would be an equivocal act, and

has no warlike appearance. The meeting of particular bodies of men, and their march from places of partial to a place of general rendezvous, would be such an assemblage." The position here stated by the counsel for the prosecution is that the army "commencing its march by detachments to the place of rendezvous (that is, of the army) must be sufficient to constitute the crime." This position is not admitted by the court to be universally correct. It is said to be "correct with some qualification." What is that qualification? "The travelling of individuals to the place of rendezvous (and by this term is not to be understood one individual by himself, but several individuals, either separately or together, but not in military form) would perhaps not be sufficient." Why not sufficient? Because, says the court, "this would be an equivocal act and has no warlike appearance." The act, then, should be unequivocal and should have a warlike appearance. It must exhibit, in the words of Sir Matthew Hale, speciem belli, the appearance of war. This construction is rendered in some measure necessary when we observe that the court is qualifying the position, "that the army commencing their march by detachments to the place of rendezvous must be sufficient to constitute the crime." In qualifying this position they say, "the travelling of individuals would perhaps not be sufficient." Now, a solitary individual travelling to any point, with any intent, could not, without a total disregard of language, be termed a marching detachment. The court, therefore, must have contemplated several individuals travelling together, and the words being used in reference to the position they intended to qualify, would seem to indicate the distinction between the appearances attending the usual movement of a company of men for civil purposes, and that military movement which might, in correct language, be denominated "marching by detachments." The court then proceeded to say: "The meeting of particular bodies of men, and their marching from places of partial to a place of general rendezvous, would be such an assemblage."

It is obvious from the context that the court must have intended to state a case which would in itself be unequivocal, because it would have a warlike appearance. The case stated is that of distinct bodies of men assembling at different places, and marching from these places of partial to a place of general rendezvous. When this has been done an assemblage is produced which would in itself be unequivocal. But when is it done? What is the assemblage here described? The assemblage formed of the different bodies of partial at a place of general rendezvous. In describing the mode of coming to this assemblage the civil term "travelling" is dropped, and the military term "marching" is employed. If this were intended as a definition of an assemblage which

would amount to levying war, the definition requires an assemblage at a place of general rendezvous, composed of bodies of men who had previously assembled at places of partial rendezvous. But this is not intended as a definition; for clearly if there should be no places of partial rendezvous, if troops should embody in the first instance in great force for the purpose of subverting the government by violence, the act would be unequivocal; it would have a warlike appearance; and it would, according to the opinion of the supreme court, properly construed, and according to English authorities, amount to levying war. But this, though not a definition, is put as an example, and surely it may be safely taken as an example. If different bodies of men, in pursuance of a treasonable design, plainly proved, should assemble in warlike appearance at places of partial rendezvous, and should march from those places to a place of general rendezvous, it is difficult to conceive how such a transaction could take place without exhibiting the appearance of war, without an obvious display of force. At any rate, a court in stating generally such a military assemblage as would amount to levying war, and having a case before it in which there was no assemblage whatever, cannot reasonably be understood, in putting such an example, to dispense with those appearances of war which seem to be required by the general current of authorities. Certainly it ought not to be so understood when it says in express terms that "it is more safe as well as more consonant to the principles of our constitution that the crime of treason should not be extended by construction to doubtful cases; and that crimes not clearly within the constitutional definition should receive such punishment as the legislature in its wisdom may provide."

After this analysis of the opinion of the supreme court, it will be observed that the direct question, whether an assemblage of men which might be construed to amount to a levying of war must appear in force or in military form, was not in argument or in fact before the court, and does not appear to have been in terms decided. The opinion seems to have been drawn without particularly adverting to this question; and, therefore, upon a transient view of particular expressions, might inspire the idea that a display of force, that appearances of war, were not necessary ingredients to constitute the fact of levying war. But upon a more intent and more accurate investigation of this opinion, although the terms force and violence are not employed as descriptive of the assemblage, such requisites are declared to be indispensable as can scarcely exist without the appearance of war and the existence of real force. It is said that war must be levied in fact; that the object must be one which is to be effected by force; that the assemblage must be such as to prove that this is its object; that it must not be an equivocal act,

without a warlike appearance; that it must be an open assemblage for the purpose of force. In the course of this opinion, decisions are quoted and approved which require the employment of force to constitute the crime. It seems extremely difficult, if not impossible, to reconcile these various declarations with the idea that the supreme court considered a secret, unarmed meeting, although that meeting be of conspirators, and although it met with a treasonable intent, as an actual levying of war. Without saying that the assemblage must be in force or in warlike form, it expresses itself so as to show that this idea was never discarded; and it uses terms which cannot be otherwise satisfied. The opinion of a single judge certainly weighs as nothing if opposed to that of the supreme court; but if he were one of the judges who assisted in framing that opinion, if while the impression under which it was framed was yet fresh upon his mind he delivered an opinion on the same testimony, not contradictory to that which had been given by all the judges together, but showing the sense in which he understood terms that might be differently expounded, it may fairly be said to be in some measure explanatory of the opinion itself. To the judge before whom the charge against the prisoner at the bar was first brought the same testimony was offered with that which had been exhibited before the supreme court; and he was required to give an opinion in almost the same case. Upon this occasion he said "war can only be levied by the employment of actual force. Troops must be embodied, men must be assembled, in order to levy war." Again he observed: "The fact to be proved in this case is an act of public notoriety. It must exist in the view of the world, or it cannot exist at all. The assembling of forces to levy war is a visible transaction; and numbers must witness it." It is not easy to doubt what kind of assemblage was in the mind of the judge who used these expressions; and it is to be recollected that he had just returned from the supreme court, and was speaking on the very facts on which the opinion of that court was delivered. The same judge, in his charge to the grand jury who found this bill, observed: "To constitute the fact of levying war it is not necessary that hostilities shall have actually commenced by engaging the military force of the United States, or that measures of violence against the government shall have been carried into execution. But levying war is a fact, in the constitution of which force is an indispensable ingredient. Any combination to subvert by force the government of the United States, violently to dismember the Union, to compel a change in the administration, to coerce the repeal or adoption of a general law, is a conspiracy to levy war; and if the conspiracy be carried into effect by the actual employment of force, by the embodying and assembling of men for the

purpose of executing the treasonable design which was previously conceived, it amounts to levying of war. It has been held that arms are not essential to levying war, provided the force assembled be sufficient to attain, or, perhaps, to justify attempting the object without them." This paragraph is immediately followed by a reference to the opinion of the supreme court.

It requires no commentary upon these words to show that, in the opinion of the judge who uttered them, an assemblage of men which should constitute the fact of levying war must be an assemblage in force. and that he so understood the opinion of the supreme court. If in that opinion there may be found in some passages a want of precision. and an indefiniteness of expression, which has occasioned it to be differently understood by different persons, that may well be accounted for when it is recollected that in the particular case there was no assemblage whatever. In expounding that opinion the whole should be taken together. and in reference to the particular case in which it was delivered. It is, however. not improbable that the misunderstanding has arisen from this circumstance: The court unquestionably did not consider arms as an indispensable requisite to levying war. An assemblage adapted to the object might be in a condition to effect or to attempt it without them. Nor did the court consider the actual application of the force to the object as at all times an indispensable requisite; for an assemblage might be in a condition to apply force, might be in a state adapted to real war, without having made the actual application of that force. From these positions, which are to be found in the opinion, it may have been inferred, it is thought too hastily, that the nature of the assemblage was unimportant. and that war might be considered as actually levied by any meeting of men, if a criminal intention can be imputed to them by testimony of any kind whatever.

It has been thought proper to discuss this question at large, and to review the opinion of the supreme court, although this court would be more disposed to leave the question of fact, whether an overt act of levying war were committed on Blennerhassett's Island to the jury, under this explanation of the law, and to instruct them that unless the assemblage on Blennerhassett's Island was an assemblage in force. was a military assemblage in a condition to make war. it was not a levying of war, and that they could not construe it into an act of war, than to arrest the further testimony which might be offered to connect the prisoner with that assemblage, or to prove the intention of those who assembled together at that place. This point, however, is not to be understood as decided. It will. perhaps, constitute an essential inquiry in another case.

Before leaving the opinion of the supreme court entirely, on the question of the nature of the assemblage which will constitute an act of levying war, this court cannot forbear to ask, why is an assemblage absolutely required? Is it not to judge in some measure of the end by the proportion which the means bear to the end? Why is it that a single armed individual entering a boat, and sailing down the Ohio for the avowed purpose of attacking New Orleans, could not be said to levy war? Is it not that he is apparently not in a condition to levy war? If this be so, ought not the assemblage to furnish some evidence of its intention and capacity to levy war before it can amount to levying war? And ought not the supreme court, when speaking of an assemblage for the purpose of effecting a treasonable object by force, be understood to indicate an assemblage exhibiting the appearance of force? The definition of the attorney for the United States deserves notice in this respect. It is, "When there is an assemblage of men, convened for the purpose of effecting by force a treasonable object, which force is meant to be employed before the assemblage disperses, this is treason." To read this definition without adverting to the argument, we should infer that the assemblage was itself to effect by force the treasonable object, not to join itself to some other bodies of men and then to effect the object by their combined force. Under this construction, it would be expected the appearance of the assemblage would bear some proportion to the object, and would indicate the intention; at any rate, that it would be an assemblage in force. This construction is most certainly not that which was intended; but it serves to show that general phrases must always be understood in reference to the subject-matter and to the general principles of law.

On that division of the subject which respects the merits of the case connected with the pleadings, two points are also made: 1st. That this indictment, having charged the prisoner with levying war on Blennerhassett's Island, and containing no other overt act, cannot be supported by proof that war was levied at that place by other persons in the absence of the prisoner, even admitting those persons to be connected with him in one common treasonable conspiracy. 2dly. That admitting such an indictment could be supported by such evidence, the previous conviction of some person, who committed the act which is said to amount to levying war, is indispensable to the conviction of a person who advised or procured that act.

As to the first point, the indictment contains two counts. one of which charges that the prisoner, with a number of persons unknown, levied war on Blennerhassett's Island, in the county of Wood. in the district of Virginia; and the other adds the circumstance of their proceeding from that island down the river for the purpose of seizing New Orleans by force. In point of fact, the prisoner was not on Blennerhassett's Island, nor in the county

of Wood, nor in the district of Virginia. In considering this point, the court is led first to inquire whether an indictment for levying war must specify an overt act, or would be sufficient if it merely charged the prisoner in general terms with having levied War, omitting the expression of place or circumstance. The place in which a crime was committed is essential to an indictment, were it only to show the jurisdiction of the court. It is, also, essential for the purpose of enabling the prisoner to make his defence. That at common law an indictment would have been defective which did not mention the place in which the crime was committed can scarcely be doubted. For this, it is sufficient to refer to Hawk. P. C. bk. 2, c. 25, § 84, and Id. chapter 23, § 91. This necessity is rendered the stronger by the constitutional provision that the offender "shall be tried in the state and district wherein the crime shall have been committed," and by the act of congress which requires that twelve petit jurors at least shall be summoned from the county where the offence was committed. A description of the particular manner in which the war was levied seems, also, essential to enable the accused to make his defence. The law does not expect a man to be prepared to defend every act of his life which may be suddenly and without notice alleged against him. In common justice, the particular fact with which he is charged ought to be stated, and stated in such a manner as to afford a reasonable certainty of the nature of the accusation and the circumstances which will be adduced against him. The general doctrine on the subject of indictments is full to this point. Foster (Crown Law, p. 194), speaking of the treason of compassing the king's death, says: "From what has been said, it followeth that in every indictment for this species of treason, and, indeed, for levying war and adhering to the king's enemies, an overt act must be alleged and proved. For the overt act is the charge to which the prisoner must apply his defence." In page 220 Foster repeats this declaration. It is, also, laid down in Hawk. P. C. bk. 8, c. 17, § 29; 1 Hale, P. C. 121; 1 East. P. C. 116, and by the other authorities cited, especially Vaughan's Case. In corroboration of this opinion, it may be observed that treason can only be established by the proof of overt acts, and that by the common law as well as by the statute of 7 Wm. III. those overt acts only which are charged in the indictment can be given in evidence, unless, perhaps, as corroborative testimony after the overt acts are proved. That clause in the constitution, too, which says that in all criminal prosecutions the accused shall enjoy the right "to be informed of the nature and cause of the accusation," is considered as having a direct bearing on this point. It secures to him such information as will enable him to prepare for his defence. It seems, then, to be perfectly clear that it would not

be sufficient for an indictment to allege generally that the accused had levied war against the United States. The charge must be more particularly specified by laying what is termed an overt act of levying war. The law relative to an appeal as cited from Stamford, is strongly corroborative of this opinion.

If it be necessary to specify the charge in the indictment, it would seem to follow, irresistibly, that the charge must be proved as laid. All the authorities which require an overt act, require also that this overt act should be proved. The decision in Vaughan's Case is particularly in point. Might it be otherwise, the charge of an overt act would be a mischief instead of an advantage to the accused. It would lead him from the true cause and nature of the accusation, instead of informing him respecting it. But it is contended on the part of the prosecution that, although the accused had never been with the party which assembled at Blennerhassett's Island, and was, at that time, at a great distance, and in a different state, he was yet legally present, and, therefore, may properly be charged in the indictment as being present in fact. It is, therefore, necessary to inquire whether in this case the doctrine of constructive presence can apply. It is conceived by the court to be possible that a person may be concerned in a treasonable conspiracy, and yet be legally as well as actually absent while some one act of the treason is perpetrated. If a rebellion should be so extensive as to spread through every state in the Union, it will scarcely be contended that every individual concerned in it is legally present at every overt act committed in the course of that rebellion. It would be a very violent presumption indeed, too violent to be made without clear authority, to presume that even the chief of the rebel army was legally present at every such overt act. If the main rebel army, with the chief at its head, should be prosecuting war at one extremity of our territory, say in New Hampshire; if this chief should be there captured and sent to the other extremity for the purpose of trial; if his indictment, instead of alleging an overt act which was true in point of fact, should allege that he had assembled some small party which in truth he had not seen, and had levied war by engaging in a skirmish in Georgia at a time when, in reality, he was fighting a battle in New Hampshire; if such evidence would support such an indictment by the fiction that he was legally present, though really absent, all would ask to what purpose are those provisions in the constitution, which direct the place of trial and ordain that the accused shall be informed of the nature and cause of the accusation?[19] But that a man may be legally absent who has counselled or procured a treasonable act is proved by all those books which treat upon the subject, and which concur in declaring that such a person is a principal traitor, not because he was legally present, but

[19] Note A, § 6.

because in treason all are principals. Yet the indictment, speaking upon general principles, would charge him according to the truth of the case. Lord Coke says: "If many conspire to levy war, and some of them do levy the same according to the conspiracy, this is high treason in all." Why? because all were legally present when the war was levied? No. "For in treason," continues Lord Coke, "all be principals, and war is levied." In this case the indictment, reasoning from analogy, would not charge that the absent conspirators were present, but would state the truth of the case. If the conspirator had done nothing which amounted to levying of war, and if by our constitution the doctrine that an accessory becomes a principal be not adopted, in consequence of which the conspirator could not be condemned under an indictment stating the truth of the case, it would be going very far to say that this defect, if it be termed one, may be cured by an indictment stating the case untruly.

This doctrine of Lord Coke has been adopted by all subsequent writers, and it is generally laid down in the English books that whatever will make a man an accessory in felony, will make him a principal in treason; but it is nowhere suggested that he is by construction to be considered as present when in point of fact he was absent. Foster has been particularly quoted, and certainly he is precisely in point. "It is well known," says Foster, "that in the language of the law there are no accessories in high treason: all are principals. Every instance of incitement, aid, or protection, which in the case of felony will render a man an accessory before or after the fact, in the case of high treason, whether it be treason at common law or by statute, will make him a principal in treason." The cases of incitement and aid are cases put as examples of a man's becoming a principal in treason, not because he was legally present, but by force of that maxim in the common law, that whatever will render a man an accessory at common law will render him a principal in treason. In other passages the words "command" or "procure" are used to indicate the same state of things; that is, a treasonable assemblage produced by a man who is not himself in that assemblage. In point of law, then, the man who incites, aids, or procures a treasonable act, is not, merely in consequence of that incitement, aid, or procurement, legally present when that act is committed. If it do not result, from the nature of the crime, that all who are concerned in it are legally present at every overt act, then each case depends upon its own circumstances; and to judge how far the circumstances of any case can make him legally present, who is in fact absent, the doctrine of constructive presence must be examined.

Hale in volume 1, p. 615, says: "Regularly no man can be a principal in felony unless he be present." In the same page he says: "An accessory before is he that, being absent at the time of the felony committed, doth yet procure, counsel, or command another to commit a felony." The books are full of passages which state this to be the law. Foster, in showing what acts of concurrence will make a man a principal, says: "He must be present at the perpetration, otherwise he can be no more than an accessory before the fact." These strong distinctions would be idle, at any rate they would be inapplicable to treason, if they were to be entirely lost in the doctrine of constructive presence. Foster adds (page 349): "When the law requireth the presence of the accomplice at the perpetration of the fact in order to render him a principal, it doth not require a strict actual immediate presence, such a presence as would make him an eye or ear witness of what passeth." The terms used by Foster are such as would be employed by a man intending to show the necessity that the absent person should be near at hand, although from the nature of the thing no precise distance could be marked out. An inspection of the cases from which Foster drew this general principle will serve to illustrate it. Hale, P. C. p. 439. In all these cases, put by Hale, the whole party set out together to commit the very fact charged in the indictment; or to commit some other unlawful act, in which they are all to be personally concerned at the same time and place, and are, at the very time when the criminal fact is committed, near enough to give actual personal aid and assistance to the man who perpetrated it. Hale, in page 449, giving the reason for the decision in the case of the Lord Dacre, says: "They all came with an intent to steal the deer; and consequently the law supposes that they came all with the intent to oppose all that should hinder them in that design." The original case says this was their resolution. This opposition would be a personal opposition. This case, even as stated by Hale, would clearly not comprehend any man who entered into the combination, but who, instead of going to the park where the murder was committed, should not set out with the others, should go to a different park, or should even lose his way. In both these cases stated in Hale, P. C. p. 534, the persons actually set out together, and were near enough to assist in the commission of the fact. That in the Case of Pudsey the felony was, as stated by Hale, a different felony from that originally intended, is unimportant in regard to the particular principle now under consideration; so far as respected distance, as respected capacity to assist in case of resistance, it is the same as if the robbery had been that which was originally designed. The case in the original report shows that the felony committed was in fact in pursuance of that originally designed. Foster (page 350) plainly supposes the same particular design, not a general design composed of many particular distinct facts. He supposes them to be co-operating with respect to that particular design. This may be illustrated by a case

which is, perhaps, common. Suppose a band of robbers confederated for the general purpose of robbing. They set out together, or in parties, to rob a particular individual; and each performs the part assigned to him. Some ride up to the individual, and demand his purse. Others watch out of sight to intercept those who might be coming to assist the man on whom the robbery is to be committed. If murder or robbery actually take place, all are principals; and all in construction of law are present. But suppose they set out at the same time or at different times, by different roads, to attack and rob different individuals or different companies; to commit distinct acts of robbery. It has never been contended that those who committed one act of robbery, or who failed altogether, were constructively present at the act of those who were associated with them in the common object of robbery, who were to share the plunder, but who did not assist at the particular fact. They do, indeed, belong to the general party; but they are not of the particular party which committed this fact. Foster concludes this subject by observing that "in order to render a person an accomplice and a · principal in felony, he must be aiding and abetting at the fact, or ready to afford assistance if necessary:" that is, at the particular fact which is charged. He must be ready to render assistance to those who are committing that fact. He must, as is stated by Hawkins, be ready to give immediate and direct assistance. All the cases to be found in the books go to the same point. Let them be applied to that under consideration.

The whole treason laid in this indictment is the levying of war in Blennerhassett's Island; and the whole question to which the inquiry of the court is now directed is whether the prisoner was legally present at that fact. I say this is the whole question; because the prisoner can only be convicted on the overt act laid in the indictment. With respect to this prosecution, it is as if no other overt act existed. If other overt acts can be inquired into, it is for the sole purpose of proving the particular fact charged. It is an evidence of the crime consisting of this particular fact, not as establishing the general crime by a distinct fact. The counsel for the prosecution have charged those engaged in the defence with considering the overt act as treason, whereas it ought to be considered solely as the evidence of the treason; but the counsel for the prosecution seem themselves not to have sufficiently adverted to this clear principle; that though the overt act may not be itself the treason, it is the sole act of that treason which can produce conviction. It is the sole point in issue between the parties. And the only division of that point, if the expression be allowed, which the court is now examining, is the constructive presence of the prisoner at the fact charged.

To return, then, to the application of the cases. Had the prisoner set out with the party from Beaver for Blennerhassett's Island, or perhaps had he set out for that place, though not from Beaver, and had arrived in the island, he would have been present at the fact. Had he not arrived in the island, but had taken a position near enough to co-operate with those on the island, to assist them in any act · of hostility, or to aid them if attacked, the question whether he was constructively present would be a question compounded of law and fact, which would be decided by the jury, with the aid of the court, so far as respected the law. In this case the accused would have been of the particular party assembled on the island, and would have been associated with them in the particular act of levying war said to have been committed on the island. But if he was not with the party at any time before they reached the island; if he did not join them there, or intend to join them there; if his personal co-operation in the general plan was to be afforded elsewhere, at a great distance, in a different state; if the overt acts of treason to be performed by him were to be distinct overt acts—then he was not· of the particular party assembled at Blennerhassett's Island, and was not constructively present, aiding and assisting in the particular act which was there committed.[20] The testimony on this point, so far as it has been delivered. is not equivocal. There is not only no evidence that the accused was of the particular party which assembled on Blennerhassett's Island, but, the whole evidence shows he was not of that party. In felony, then, admitting the crime to have been completed on the island, and to have been advised, procured, or commanded by the accused, he would have been incontestably an accessory and not a principal. But in treason, it is said, the law is otherwise, because the theatre of action is more extensive. The reasoning applies in England as strongly as in the United States. While in '15 and '45 the family of Stuart sought to regain the crown they had forfeited, the struggle was for the whole kingdom, yet no man was ever considered as legally present at one place, when actually at another; or as aiding in one transaction while actually employed in another. With the perfect knowledge that the whole nation may be the theatre of action, the English books unite in declaring that he who counsels, procures, or aids treason, is guilty accessorially, and solely in virtue of the common law principle that what will make a man an accessory in felony makes him a principal in treason. So far from considering a man as constructively present at every overt act of the general treason in which he may have been concerned, the whole doctrine of the books limits the proof against him to those particular overt acts of levying war with which he is charged. What would be the effect of a different doctrine? Clearly that which has been stated.

[20] Note A, § 5.

If a person levying war in Kentucky may be said to be constructively present and assembled with a party carrying on war in Virginia at a great distance from him, then he is present at every overt act performed anywhere. He may be tried in any state on the continent, where any overt act has been committed. He may be proved to be guilty of an overt act laid in the indictment in which he had no personal participation, by proving that he advised it, or that he committed other acts. This is, perhaps, too extravagant to be in terms maintained. Certainly it cannot be supported by the doctrines of the English law.

The opinion of Judge Patterson in Mitchell's Case has been cited on this point, 2 Dall. [2 U. S.] 348. The indictment is not specially stated, but from the case as reported, it must have been either general for levying war in the county of Allegany, and the overt act must have been the assemblage of men and levying of war in that county, or it must have given a particular detail of the treasonable transactions in that county. The first supposition is the most probable, but let the indictment be in the one form or the other, and the result is the same. The facts of the case are that a large body of men, of whom Mitchell was one, assembled at Braddock's field, in the county of Allegany, for the purpose of committing acts of violence at Pittsburg; that there was also an assemblage at a different time at Couch's fort, at which the prisoner also attended. The general and avowed object of that meeting was to concert measures for resisting the execution of a public law. At Couch's fort the resolution was taken to attack the house of the inspector, and the body there assembled marched to that house and attacked it. It was proved by the competent number of witnesses that he was at Couch's fort armed: that he offered to reconnoitre the house to be attacked; that he marched with the insurgents towards the house; that he was with them after the action attending the body of one of his comrades who was killed in it. One witness swore positively that he was present at the burning of the house; and a second witness said that "it run in his head that he had seen him there." That a doubt should exist in such a case as this is strong evidence of the necessity that the overt act should be unequivocally proved by two witnesses.

But what was the opinion of the judge in this case? Couch's fort and Neville's house being in the same county, the assemblage having been at Couch's fort, and the resolution to attack the house having been there taken, the body having for the avowed purpose moved in execution of that resolution towards the house to be attacked, he inclined to think that the act of marching was in itself levying war. If it was, then the overt act laid in the indictment was consummated by the assemblage at Couch's and the marching from thence; and Mitchell was proved to be guilty by more than two positive wit-

nesses. But without deciding this to be the law, he proceeded to consider the meeting at Couch's, the immediate marching to Neville's house, and the attack and burning of the house, as one transaction. Mitchell was proved by more than two positive witnesses to have been in that transaction, to have taken an active part in it; and the judge declared it to be unnecessary that all should have seen him at the same time and place. But suppose not a single witness had proved Mitchell to have been at Couch's, or on the march, or at Neville's. Suppose he had been at the time notoriously absent in a different state. Can it be believed by any person who observes the caution with which Judge Patterson required the constitutional proof of two witnesses to the same overt act, that he would have said Mitchell was constructively present, and might, on that straining of a legal fiction, be found guilty of treason? Had he delivered such an opinion, what would have been the language of this country respecting it? Had he given this opinion, it would have required all the correctness of his life to strike his name from that bloody list in which the name of Jeffreys is enrolled.

But to estimate the opinion in Mitchell's Case, let its circumstances be transferred to Burr's Case. Suppose the body of men assembled in Blennerhassett's Island had previously met at some other place in the same county; that Burr had been proved to be with them by four witnesses; that the resolution to march to Blennerhassett's Island for a treasonable purpose had been there taken; that he had been seen on the march with them; that one witness had seen him on the island; that another thought he had seen him there; that he had been seen with the party directly after leaving the island; that this indictment had charged the levying of war in Wood county generally—the cases would, then, have been precisely parallel; and the decision would have been the same. In conformity with principle and with authority, then, the prisoner at the bar was neither legally nor actually present at Blennerhassett's Island; and the court is strongly inclined to the opinion that without proving an actual or legal presence by two witnesses, the overt act laid in this indictment cannot be proved.

But this opinion is controverted on two grounds: The first is, that the indictment does not charge the prisoner to have been present. The second, that although he was absent, yet if he caused the assemblage, he may be indicted as being present, and convicted on evidence that he caused the treasonable act. The first position is to be decided by the indictment itself. The court understands the allegation differently from the attorney for the United States. The court understands it to be directly charged that the prisoner did assemble with the multitude, and did march with them. Nothing will more clearly test this construction than putting the case into a shape which it may possibly take. Suppose

The law be that the indictment would be defective unless it alleged the presence of the person indicted at the act of treason. If, upon a special verdict, facts should be found which amounted to a levying of war by the accused, and his counsel should insist that he could not be condemned because the indictment was defective in not charging that he was himself one of the assemblage which constituted the treason, or because it alleged the procurement defectively, would the attorney admit this construction of his indictment to be correct? I am persuaded he would not, and that he ought not to make such a concession. If, after a verdict, the indictment ought to be construed to allege that the prisoner was one of the assemblage at Blennerhassett's Island, it ought to be so construed now. But this is unimportant; for if the indictment alleges that the prisoner procured the assemblage, that procurement becomes part of the overt act, and must be proved, as will be shown hereafter. The second position is founded on 1 Hale, P. C. 214, 288, and 1 East, P. C. 127.

While I declare that this doctrine contradicts every idea I had ever entertained on the subject of indictments, (since it admits that one case may be stated, and a very different case may be proved,) I will acknowledge that it is countenanced by the authorities adduced in its support. To counsel or advise a treasonable assemblage, and to be one of that assemblage, are certainly distinct acts, and, therefore, ought not to be charged as the same act. The great objection to this mode of proceeding is, that the proof essentially varies from the charge in the character and essence of the offence, and in the testimony by which the accused is to defend himself. These dicta of Lord Hale, therefore, taken in the extent in which they are understood by the counsel for the United States, seem to be repugnant to the declarations we find everywhere that an overt act must be laid, and must be proved. No case is cited by Hale in support of them, and I am strongly inclined to the opinion that had the public received his corrected instead of his original manuscript, they would, if not expunged, have been restrained in their application to cases of a particular description. Laid down generally, and applied universally to all cases of treason, they are repugnant to the principles for which Hale contends, for which all the elementary writers contend, and from which courts have in no case, either directly reported or referred to in the books, ever departed. These principles are, that the indictment must give notice of the offence; that the accused is only bound to answer the particular charge which the indictment contains, and that the overt act laid is that particular charge. Under such circumstances, it is only doing justice to Hale to examine his dicta, and if they admit of being understood in a limited sense, not repugnant to his own doctrines nor to

the general principles of law, to understand them in that sense. "If many conspire to counterfeit, or counsel or abet it, and one of them doth the fact upon that counselling or conspiracy, it is treason in all, and they may be all indicted for counterfeiting generally within this statute, for in such case in treason all are principals." This is laid down as applicable singly to the treason of counterfeiting the coin, and is not applied by Hale to other treasons. Had he designed to apply the principle universally he would have stated it as a general proposition; he would have laid it down in treating on other branches of the statute as well as in the chapter respecting the coin; he would have laid it down when treating on indictments generally. But he has done neither. Every sentiment bearing in any manner on this point, which is to be found in Lord Hale while on the doctrine of levying war or on the general doctrine of indictments, militates against the opinion that he considered the proposition as more extensive than he has declared it to be. No court could be justified in extending the dictum of a judge beyond its terms to cases which he had expressly treated, in which he has not himself applied it, and on which he, as well as others, has delivered opinions which that dictum would overrule. This would be the less justifiable if there should be a clear legal distinction indicated by the very terms in which the judge has expressed himself between the particular case to which alone he has applied the dictum and other cases to which the court is required to extend it. There is this clear legal distinction: "They may," says Judge Hale, "be indicted for counterfeiting generally." But if many conspire to levy war, and some actually levy it, they may not be indicted for levying war generally. The books concur in declaring that they cannot be so indicted. A special overt act of levying war must be laid. This distinction between counterfeiting the coins and that class of treasons among which levying war is placed is taken in the statute of Edward III. That statute requires an overt act of levying war to be laid in the indictment, and does not require an overt act of counterfeiting the coin to be laid. If in a particular case, in which a general indictment is sufficient, it be stated that the crime may be charged generally according to the legal effect of the act, it does not follow that in other cases, where a general indictment would not be sufficient, where an overt act must be laid, that this overt act need not be laid according to the real fact. Hale, then, is to be reconciled to himself and with the general principles of the law only by permitting the limits which he has himself given to his own dictum to remain where he has placed them. In page 238, Hale is speaking generally to the receiver of a traitor, and is stating in what such a receiver partakes of an accessory: 1st. "His indict-

ment must be special of the receipt. and not generally that he did the thing, which may be otherwise in case of one that is procurer, counsellor, or consenter." The words "may be otherwise" do not clearly convey the idea that it is universally otherwise. In all cases of a receiver, the indictment must be special on the receipt, and not general. The words "may be otherwise in case of a procurer," &c., signify that it may be otherwise in all treasons. or that it may be otherwise in some treasons. If it may be otherwise in some treasons without contradicting the doctrines of Hale himself as well as of other writers. but cannot be otherwise in all treasons without such contradiction. the fair construction is, that Hale used these words in their restricted sense; that he used them in reference to treasons in which a general indictment would lie, not to treasons where a general indictment would not lie. but an overt act of the treason must be charged. The two passages of Hale thus construed may, perhaps, be law, and may leave him consistent with himself. It appears to the court to be the fair way of construing them.

These observations relative to the passages quoted from Hale apply to that quoted from East, who obviously copies from Hale and relies upon his authority. Upon this point, J. Kelyng, 26, and 1 Hale. P. C. p. 626. have also been relied upon. It is stated in both that if a man be indicted as a principal and acquitted, he cannot afterwards be indicted as an accessory before the fact—whence it is inferred. not without reason, that evidence of accessorial guilt may be received on such an indictment. Yet no case is found in which the question has been made and decided. The objection has never been taken at a trial and overruled. nor do the books say it would be overruled. Were such a case produced its application would be questionable. Kelyng says an accessory before the fact is quodam modo in some manner guilty of the fact. The law may not require that the manner should be stated, for in felony it does not require that an overt act should be laid. The indictment, therefore, may be general; but an overt act of levying war must be laid. These cases, then. prove in their utmost extent no more than the cases previously cited from Hale and East. This distinction between indictments which may state the fact generally, and those which must lay it specially, bear some analogy to a general and a special action on the case. In a general action the declaration may lay the assumpsit according to the legal effect of the transaction, but in a special action on the case the declaration must state the material circumstances truly, and they must be proved as stated. This distinction also derives some aid from a passage in Hale (page 625) immediately preceding that which has been cited at the bar. He says: "If A be indicted as principal and B as accessory before or after, and both be acquitted, yet B

may be indicted as principal, and the former acquittal as accessory is no bar." The crimes, then, are not the same, and may not indifferently be tried under the same indictment. But why is it that an acquittal as principal may be pleaded in bar to an indictment as accessory, while an acquittal as accessory may not be pleaded in bar to an indictment as principal? If it be answered that the accessorial crime may be given in evidence on an indictment as principal, but that the principal crime may not be given in evidence on an indictment as accessory, the question recurs, on what legal ground does this distinction stand? I can imagine only this: an accessory being quodam modo a principal in indictments where the law does not require the manner to be stated. which need not be special, evidence of accessorial guilt, if the punishment be the same. may possibly be received: but every indictment as accessory must be special. The very allegation that he is an accessory must be a special allegation, and must show how be became an accessory. The charges of this special indictment, therefore. must be proved as laid, and no evidence which proves the crime in a form substantially different can be received. If this be the legal reason for the distinction, it supports the exposition of these dicta which has been given. If it be not the legal reason, I can conceive no other.

But suppose the law to be as is contended by the counsel for the United States. Suppose an indictment charging an individual with personally assembling among others, and thus levying war, may be satisfied with the proof that he caused the assemblage. What effect will this law have upon this case? The guilt of the accused. if there be any guilt, does not consist in the assemblage. for he was not a member of it. The simple fact of assemblage no more affects one absent man than another. His guilt, then, consists in procuring the assemblage, and upon this fact depends his criminality. The proof relative to the character of an assemblage must be the same whether a man be present or absent. In the general, to charge any individual with the guilt of an assemblage, the fact of his presence must be proved: it constitutes an essential part of the overt act. If, then. the procurement be substituted in the place of presence, does it not also constitute an essential part of the overt act? Must it not also be proved? Must it not be proved in the same manner that presence must be proved? If in one case the presence of the individual make the guilt of the assemblage his guilt. and in the other case the procurement by the individual make the guilt of the assemblage his guilt, then presence and procurement are equally component parts of the overt act. and equally require two witnesses. Collateral points may. say the books, be proved according to the course of the common law; but is this a collateral point? Is the fact, without which

the accused does not participate in the guilt of the assemblage if it was guilty, a collateral point? This cannot be. The presence of the party, where presence is necessary, being a part of the overt act, must be positively proved by two witnesses. No presumptive evidence, no facts from which presence may be conjectured or inferred, will satisfy the constitution and the law. If procurement take the place of presence and become part of the overt act, then no presumptive evidence, no facts from which the procurement may be conjectured or inferred, can satisfy the constitution and the law. The mind is not to be led to the conclusion that the individual was present by a train of conjectures, of inferences, or of reasoning; the fact must be proved by two witnesses. Neither, where procurement supplies the want of presence, is the mind to be conducted to the conclusion that the accused procured the assembly by a train of conjectures or inferences, or of reasoning; the fact itself must be proved by two witnesses, and must have been committed within the district. If it be said that the advising or procurement of treason is a secret transaction, which can scarcely ever be proved in the manner required by this opinion, the answer which will readily suggest itself is, that the difficulty of proving a fact will not justify conviction without proof. Certainly it will not justify conviction without a direct and positive witness in a case where the constitution requires two. The more correct inference from this circumstance would seem to be, that the advising of the fact is not within the constitutional definition of the crime. To advise or procure a treason is in the nature of conspiring or plotting treason, which is not treason in itself. If, then, the doctrines of Kelyng, Hale, and East, be understood in the sense in which they are pressed by the counsel for the prosecution, and are applicable in the United States, the fact that the accused procured the assemblage on Blennerhassett's Island must be proved, not circumstantially, but positively, by two witnesses, to charge him with that assemblage. But there are still other most important considerations which must be well weighed before this doctrine can be applied to the United States.

The 8th amendment to the constitution has been pressed with great force, and it is impossible not to feel its application to this point. The accused cannot be said to be "informed of the nature and cause of the accusation" unless the indictment give him that notice which may reasonably suggest to him the point on which the accusation turns, so that he may know the course to be pursued in his defence. It is also well worthy of consideration, that this doctrine, so far as it respects treason, is entirely supported by the operation of the common law, which is said to convert the accessory before the fact into the principal, and to make the act of the principal his act. The accessory before the

fact is not said to have levied war. He is not said to be guilty under the statute, but the common law attaches to him the guilt of that fact which he has advised or procured; and, as contended, makes it his act. This is the operation of the common law, not the operation of the statute. It is an operation, then, which can only be performed where the common law exists to perform it. It is the creature of the common law, and the creature presupposes its creator. To decide, then, that this doctrine is applicable to the United States would seem to imply the decision that the United States, as a nation, have a common law which creates and defines the punishment of crimes accessorial in their nature. It would imply the further decision that these accessorial crimes are not, in the case of treason, excluded by the definition of treason given in the constitution. I will not pretend that I have not individually an opinion on these points; but it is one which I should give only in a case which absolutely required it, unless I could confer respecting it with the judges of the supreme court.[21]

I have said that this doctrine cannot apply to the United States without implying those decisions respecting the common law which I have stated; because, should it be true, as is contended, that the constitutional definition of treason comprehends him who advises or procures an assemblage that levies war, it would not follow that such adviser or procurer might be charged as having been present at the assemblage. If the adviser or procurer be within the definition of levying war, and, independent of the agency of the common law, do actually levy war, then the advisement or procurement is an overt act of levying war. If it be the overt act on which he is to be convicted, then it must be charged in the indictment; for he can only be convicted on proof of the overt acts which are charged. To render this distinction more intelligible, let it be recollected that, although it should be conceded that since the statute of William and Mary he who advises or procures a treason may, in England, be charged as having committed that treason, by virtue of the common law operation, which is said, so far as respects the indictment, to unite the accessorial to the principal offence and permit them to be charged as one, yet it can never be conceded that he who commits one overt act under the statute of Edward can be charged and convicted on proof of another overt act. If, then, procurement be an overt act of treason under the constitution, no man can be convicted for the procurement under an indictment charging him with actually assembling, whatever may be the doctrine of the common law in the case of an accessorial offender.

It may not be improper in this place again

--------

21 See note A, § 1.

to advert to the opinion of the supreme court, and to show that it contains nothing contrary to the doctrine now laid down. That opinion is, that an individual may be guilty of treason "who has not appeared in arms against his country; that if war be actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable object, all those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in the general conspiracy, are to be considered as traitors." This opinion does not touch the case of a person who advises or procures an assemblage, and does nothing further. The advising, certainly, and perhaps the procuring, is more in the nature of a conspiracy to levy war than of the actual levying of war. According to the opinion, it is not enough to be leagued in the conspiracy, and that war be levied, but it is also necessary to perform a part: that part is the act of levying war. That part, it is true, may be minute, it may not be the actual appearance in arms, and it may be remote from the scene of action, that is, from the place where the army is assembled; but it must be a part, and that part must be performed by a person who is leagued in the conspiracy. This part, however minute or remote, constitutes the overt act of which alone the person who performs it can be convicted.[22] The opinion does not declare that the person who has performed this remote and minute part may be indicted for a part which was, in truth, performed by others, and convicted on their overt acts. It amounts to this and nothing more, that when war is actually levied, not only those who bear arms, but those also who are leagued in the conspiracy, and who perform the various distinct parts which are necessary for the prosecution of war, do, in the sense of the constitution, levy war. It may possibly be the opinion of the supreme court that those who procure a treason and do nothing further are guilty under the constitution. I only say that opinion has not yet been given, still less has it been indicated that he who advises shall be indicted as having performed the fact.

It is, then, the opinion of the court that this indictment can be supported only by testimony which proves the accused to have been actually or constructively present when the assemblage took place on Blennerhassett's Island; or by the admission of the doctrine that he who procures an act may be indicted as having performed that act.

It is further the opinion of the court that there is no testimony whatever which tends to prove that the accused was actually or constructively present when that assemblage did take place; indeed, the contrary is most apparent. With respect to admitting proof of procurement to establish a charge of actual presence, the court is of opinion that if this be admissible in England on an indictment for levying war, which is far from being conceded, it is admissible only by virtue of the operation of the common law upon the statute, and therefore is not admissible in this country unless by virtue of a similar operation—a point far from being established, but on which, for the present, no opinion is given. If, however, this point be established, still the procurement must be proved in the same manner and by the same kind of testimony which would be required to prove actual presence.

The second point in this division of the subject is the necessity of adducing the record of the previous conviction of some one person who committed the fact alleged to be treasonable. This point presupposes the treason of the accused, if any have been committed, to be accessorial in its nature. Its being of this description, according to the British authorities, depends on the presence or absence of the accused at the time the fact was committed. The doctrine on this subject is well understood, has been most copiously explained, and need not be repeated. That there is no evidence of his actual or legal presence is a point already discussed and decided. It is, then, apparent that but for the exception to the general principle which is made in cases of treason, those who assembled at Blennerhassett's Island, if that assemblage were such as to constitute the crime, would be principals, and those who might really have caused that assemblage, although in truth the chief traitors, would in law be accessories. It is a settled principle in the law that the accessory cannot be guilty of a greater offence than his principal. The maxim is "Accessorius sequitur naturam sui principalis"—"The accessory follows the nature of his principal." Hence results the necessity of establishing the guilt of the principal before the accessory can be tried; for the degree of guilt which is incurred by counselling or commanding the commission of a crime depends upon the actual commission of that crime. No man is an accessory to murder unless the fact has been committed. The fact can only be established in a prosecution against the person by whom a crime has been perpetrated. The law supposes a man more capable of defending his own conduct than any other person, and will not tolerate that the guilt of A shall be established in a prosecution against B. Consequently, if the guilt of B depends on the guilt of A, A must be convicted before B can be tried. It would exhibit a monstrous deformity indeed in our system, if B might be executed for being accessory to a murder committed by A, and A should afterwards, upon a full trial, be acquitted of the fact. For this obvious reason, although the punishment of a principal and accessory was originally the same, and although in many instances it is still the same, the accessory could in no case be tried before the conviction of his principal, nor can he yet be tried previous to such conviction, unless he re-

_____

[22] See note A, § 2.

quire it, or unless a special provision to that effect be made by statute. If, then, this were a felony, the prisoner at the bar could not be tried until the crime were established by the conviction of the person by whom it was actually perpetrated.

Is the law otherwise in this case, because in treason all are principals? Let this question be answered by reason and by authority. Why is it that in felonies, however atrocious, the trial of the accessory can never precede the conviction of the principal? Not because the one is denominated the principal and the other the accessory; for that would be ground on which a great law principle could never stand. Not because there was, in fact, a difference in the degree of moral guilt: for in the case of murder committed by a hardy villain for a bribe, the person plotting the murder and giving the bribe is, perhaps, of the two, the blacker criminal; and were it otherwise, this would furnish no argument for precedence in trial. What, then, is the reason? It has been already given. The legal guilt of the accessory depends on the guilt of the principal; and the guilt of the principal can only be established in a prosecution against himself. Does not this reason apply in full force to a case of treason? The legal guilt of the person who planned the assemblage on Blennerhassett's Island depends not simply on the criminality of the previous conspiracy, but on the criminality of that assemblage. If those who perpetrated the fact be not traitors, he who advised the fact cannot be a traitor. His guilt, then, in contemplation of law, depends on theirs; and their guilt can only be established in a prosecution against themselves. Whether the adviser of this assemblage be punishable with death as a principal or as an accessory, his liability to punishment depends on the degree of guilt attached to an act which has been perpetrated by others; and which, if it be a criminal act, renders them guilty also. His guilt, therefore, depends on theirs; and their guilt cannot be legally established in a prosecution against him.

The whole reason of the law, then, relative to the principal and accessory, so far as respects the order of trial, seems to apply in full force to a case of treason committed by one body of men in conspiracy with others who are absent. If from reason we pass to authority, we find it laid down by Hale, Foster, and East, in the most explicit terms, that the conviction of some one who has committed the treason must precede the trial of him who has advised or procured it. This position is also maintained by Leach in his notes on Hawkins, and is not, so far as the court has discovered, anywhere contradicted. These authorities have been read and commented on at such length that it cannot be necessary for the court to bring them again into view. It is the less necessary because it is not understood that the law is controverted by the counsel for the United States. It is, however, contended that the prisoner has waived his right to demand the conviction of some one person who was present at the fact, by pleading to his indictment. Had this indictment even charged the prisoner according to the truth of the case, the court would feel some difficulty in deciding that he had, by implication, waived his right to demand a species of testimony essential to his conviction. The court is not prepared to say that the act which is to operate against his rights did not require that it should be performed with a full knowledge of its operation. It would seem consonant to the usual course of proceeding in other respects in criminal cases, that the prisoner should be informed that he had a right to refuse to be tried until some person who committed the act should be convicted; and that he ought not to be considered as waiving the right to demand the record of conviction, unless with the full knowledge of that right he consented to be tried. The court, however, does not decide what the law would be in such a case. It is unnecessary to decide it; because pleading to an indictment, in which a man is charged as having committed an act, cannot be construed to waive a right which he would have possessed had he been charged with having advised the act. No person indicted as a principal can be expected to say, "I am not a principal. I am an accessory. I did not commit, I only advised the act."

The authority of the English cases on this subject depends, in a great measure, on the adoption of the common law doctrine of accessorial treasons. If that doctrine be excluded, this branch of it may not be directly applicable to treasons committed within the United States. If the crime of advising or procuring a levying of war be within the constitutional definition of treason, then he who advises or procures it must be indicted on the very fact; and the question whether the treasonableness of the act may be decided in the first instance in the trial of him who procured it, or must be decided in the trial of one who committed it, will depend upon the reason, as it respects the law of evidence, which produced the British decisions with regard to the trial of principal and accessory, rather than on the positive authority of those decisions. This question is not essential in the present case: because if the crime be within the constitutional definition, it is an overt act of levying war, and, to produce a conviction, ought to have been charged in the indictment.

The law of the case being thus far settled, what ought to be the decision of the court on the present motion? Ought the court to sit and hear testimony which cannot affect the prisoner, or ought the court to arrest that testimony? On this question much has been said —much that may perhaps be ascribed to a misconception of the point really under consideration. The motion has been treated as a motion confessedly made to stop irrelevant testimony; and, in the course of the argument, it has been repeatedly stated, by those who

oppose the motion, that irrelevant testimony may and ought to be stopped. That this statement is perfectly correct is one of those fundamental principles in judicial proceedings which is acknowledged by all, and is founded in the absolute necessity of the thing. No person will contend that, in a civil or criminal case, either party is at liberty to introduce what testimony he pleases, legal or illegal, and to consume the whole term in details of facts unconnected with the particular case. Some tribunal, then, must decide on the admissibility of testimony. The parties cannot constitute this tribunal; for they do not agree. The jury cannot constitute it; for the question is whether they shall hear the testimony or not. Who, then, but the court can constitute it? It is of necessity the peculiar province of the court to judge of the admissibility of testimony. If the court admit improper or reject proper testimony, it is an error of judgment; but it is an error committed in the direct exercise of their judicial functions. The present indictment charges the prisoner with levying war against the United States, and alleges an overt act of levying war. That overt act must be proved, according to the mandates of the constitution and of the act of congress, by two witnesses. It is not proved by a single witness. The presence of the accused has been stated to be an essential component part of the overt act in this indictment, unless the common law principle respecting accessories should render it unnecessary; and there is not only no witness who has proved his actual or legal presence, but the fact of his absence is not controverted. The counsel for the prosecution offer to give in evidence subsequent transactions at a different place and in a different state, in order to prove—what? The overt act laid in the indictment? That the prisoner was one of those who assembled at Blennerhassett's Island? No: that is not alleged. It is well known that such testimony is not competent to establish such a fact. The constitution and law require that the fact should be established by two witnesses; not by the establishment of other facts from which the jury might reason to this fact. The testimony, then, is not relevant. If it can be introduced, it is only in the character of corroborative or confirmatory testimony, after the overt act has been proved by two witnesses in such manner that the question of fact ought to be left with the jury. The conclusion that in this state of things no testimony can be admissible is so inevitable that the counsel for the United States could not resist it. I do not understand them to deny that, if the overt act be not proved by two witnesses so as to be submitted to the jury, all other testimony must be irrelevant; because no other testimony can prove the act. Now, an assemblage on Blennerhassett's Island is proved by the requisite number of witnesses; and the court might submit it to the jury whether that assemblage amounted to a levying of war; but the presence of the accused at that assemblage being

nowhere alleged except in the indictment, the overt act is not proved by a single witness; and, of consequence, all other testimony must be irrelevant. The only difference between this motion as made, and the motion in the form which the counsel for the United States would admit to be regular, is this: It is now general for the rejection of all testimony. It might be particular with respect to each witness as adduced. But can this be wished, or can it be deemed necessary? If enough be proved to show that the indictment cannot be supported, and that no testimony, unless it be of that description which the attorney for the United States declares himself not to possess, can be relevant, why should a question be taken on each witness? The opinion of this court on the order of testimony has frequently been adverted to as deciding this question against the motion. If a contradiction between the two opinions exist, the court cannot perceive it. It was said that levying war is an act compounded of law and fact, of which the jury, aided by the court, must judge. To that declaration the court still adheres. It was said that if the overt act were not proved by two witnesses, no testimony in its nature corroborative or confirmatory was admissible, or could be relevant. From that declaration there is certainly no departure. It has been asked, in allusion to the present case, if a general commanding an army should detach troops for a distant service, would the men composing that detachment be traitors, and would the commander-in-chief escape punishment? Let the opinion which has been given answer this question. Appearing at the head of an army would, according to this opinion, be an overt act of levying war. Detaching a military corps from it for military purposes might, also, be an overt act of levying war. It is not pretended that he would not be punishable for these acts. It is only said that he may be tried and convicted on his own acts in the state where those acts were committed, not on the acts of others in the state where those others acted.[23]

Much has been said in the course of the argument on points on which the court feels no inclination to comment particularly; but which may, perhaps not improperly, receive some notice. That this court dares not usurp power is most true. That this court dares not shrink from its duty is not less true. No man is desirous of placing himself in a disagreeable situation. No man is desirous of becoming the peculiar subject of calumny. No man might he let the bitter cup pass from him without self-reproach, would drain it to the bottom. But if he have no choice in the case, if there be no alternative presented to him but a dereliction of duty or the opprobrium of those who are denominated the world, he merits the contempt as well as the indignation of his country who can hesitate which to embrace. That gentlemen, in a case the most interesting, in the zeal with which they advocate particular

—  -   ·   ·   ·   ·   ·  · —————————————
[23] See note A, §§ 3, 7.

opinions, and under the conviction in some measure produced by that zeal, should, on each side, press their arguments too far, should be impatient at any deliberation in the court, and should suspect or fear the operation of motives to which alone they can ascribe that deliberation, is, perhaps, a frailty incident to human nature; but if any conduct on the part of the court could warrant a sentiment that it would deviate to the one side or the other from the line prescribed by duty and by law, that conduct would be viewed by the judges themselves with an eye of extreme severity, and would long be recollected with deep and serious regret.

The arguments on both sides have been intently and deliberately considered. Those which could not be noticed, since to notice every argument and authority would swell this opinion to a volume, have not been disregarded. The result of the whole is a conviction, as complete as the mind of the court is capable of receiving on a complex subject, that the motion must prevail. No testimony relative to the conduct or declarations of the prisoner elsewhere, and subsequent to the transaction on Blennerhassett's Island, can be admitted; because such testimony, being in its nature merely corroborative and incompetent to prove the overt act in itself, is irrelevant until there be proof of the overt act by two witnesses. This opinion does not comprehend the proof by two witnesses that the meeting on Blennerhassett's Island was procured by the prisoner. On that point the court for the present withholds its opinion for reasons which have been already assigned; and as it is understood from the statements made on the part of the prosecution that no such testimony exists, if there be such let it be offered, and the court will decide upon it.

The jury have now heard the opinion of the court on the law of the case. They will apply that law to the facts, and will find a verdict of guilty or not guilty as their own consciences may direct.

As soon as the CHIEF JUSTICE had concluded, Mr. Hay observed that the opinion just delivered by the court furnished matter for the serious consideration of the counsel for the prosecution; and he hoped the court would grant them time to consider it. After some desultory conversation, the CHIEF JUSTICE, at Mr. Hay's request, delivered him the opinion, that he might read and consider it.

The court adjourned till six o'clock in the afternoon.

At six o'clock the court met, and adjourned till Tuesday.

Tuesday, September 1, 1807.

Mr. Hay informed the court that he had nothing to offer to the jury of evidence or argument; that he had examined the opinion of the court, and must leave the case with the jury. The jury accordingly retired, and in a short time returned with the following verdict, which was read by Colonel Carrington,

their foreman: "We of the jury say that Aaron Burr is not proved to be guilty under this indictment by any evidence submitted to us. We therefore find him not guilty." This verdict was objected to by Colonel Burr and his counsel as unusual, informal, and irregular. Colonel Burr observed that wherever a verdict is informal the court will either send back the jury to alter it, or correct it itself; that they had no right to depart from the usual form; that the rule universally is to ask them on their return, "How say you? is he guilty or not guilty?" to which they give a direct answer of "guilty," or "not guilty." That this is correct and responsive to the charge always read to them by the clerk, "If you find him guilty, you are to say so, &c; if you find him not guilty, you are to say so and no more."

Mr. Hay thought the verdict ought to be recorded as found by the jury, which was substantially a verdict of acquittal; and that no principle of humanity, policy, or law, forbade its being received in the very terms used by the jury; that they were not bound to find a verdict in the shortest possible way; that the form did not affect the substance.

Mr. Martin said that it was like the whole play, "Much Ado about Nothing;" that this was a verdict of acquittal; that there was nothing to do but to answer the question of guilty or not guilty; that it was the case with every jury in every instance; they had or had not evidence before them. Did they wish to have the verdict entered in this form on the record, as a censure on the court for suppressing irrelevant testimony? That he was conscious they had no such meaning; and as they had not, the jury ought to answer the question judicially addressed to them simply by a verdict of not guilty, as that was their intention.

Colonel Carrington, one of the jury, observed that it was said among themselves that if the verdict was informal they would alter it; that it was, in fact, a verdict of acquittal.

The CHIEF JUSTICE said that the verdict was, in effect, the same as a verdict of acquittal; that it might stand on the bill as it was if the jury wished it; and an entry should be made on the record of "not guilty."

Mr. Parker, another of the jury, said that if he were to be sent back he would find the same verdict; that they all knew that it was not in the usual form, but it was more satisfactory to the jury as they had found it; and that he would not agree to alter it.

After some further desultory remarks by several of the counsel, Mr. Hay, in answer to the observation that the only correct form was guilty or not guilty, reminded the court of the case of Rex v. Woodfall [5 Burrows, 2661], for a libel, where the jury departed from the usual form, added other words, and found a verdict in these words: "We find the defendant guilty of publishing only." This form, though preferred by the jury, was probably disapproved of by the counsel; but it was taken by the court as they presented it; and,

in the case of Rex v. Williams [unreported], cited in Woodfall's Case by the court, the jury added other words to the usual form of finding the defendant guilty; and as it did not affect the substance, it was entered up by the clerk "Guilty;" and no objection was ever made.

The court then decided that the verdict should remain as found by the jury; and that an entry should be made on the record of "Not Guilty."

The CHIEF JUSTICE politely thanked the jury for their patient attention during the whole course of this long trial, and then discharged them.

NOTE A. 1. The important question whether, under our constitution, a person can commit the crime of treason by merely advising and inciting others to levy war against the United States, without being personally present where war is actually levied by an assemblage of men in a "posture of war," and without doing any overt act constituting a "part" in the fact of levying war, still remains undetermined by any express adjudication. The argument that the constitutional definition of treason can not be extended beyond the plain, natural import of the words, by the interpolation of the common law rule, that whatever will make a man an accessory in felony will render him a principal in treason, is certainly a forcible one; but not conclusive to the minds of all who have investigated the subject. While Chief Justice Marshall, in this case, carefully abstained from pronouncing, judicially, any opinion upon this question, he intimated that, individually, he entertained one; and he stated the argument in favor of the more limited construction so forcibly as to leave little doubt as to what that individual opinion was. Some loose dicta may be found, both prior and subsequent to this trial, recognizing the doctrine that the common law rule above referred to is in full force in this country; but nothing having the semblance of judicial authority. Judge Chase, in his charge to the jury on the second trial of Fries, said: "In treason, all the participes criminis are principals; there are no accessories in this crime. Every act which in the case of felony would render a man an accessory, will, in the case of treason, make him a principal." Professor Greenleaf, in his valuable and generally accurate work on the Law of Evidence (volume 3, § 245), has attached undue importance to this extra-judicial remark. In his text he lays down, as a rule of law, the precise proposition above quoted, and in a note referring to the case of Fries, says: "No exception was taken to this doctrine, in that case, though the prisoner was defended by the ablest counsel of that day, and the case was one of deep political interest." This is certainly a remarkable error, in view of the notorious historical fact that on said second trial Fries was wholly without counsel. His counsel in the former trial, Messrs. Lewis and Dallas, withdrew from the case before the jury were sworn, on the second trial; and it was the announcement of Judge Chase that he should deliver to the jury, at the commencement of the trial, the very opinion from which the above quotation is made, and not permit counsel to controvert any of its positions, that caused them to abandon the defence. And this arbitrary conduct on the part of Judge Chase is the basis of the first charge in the first article of impeachment on which he was subsequently tried before the United States senate. But even if Fries had been defended by counsel, they would not have had the slightest occasion to except to this doctrine, as it could not possibly have any bearing on his case, he having been, according to his own admission, not only present when the war

was alleged to have been levied, but the leader and commander of the band of insurgents who committed the hostile acts charged in the indictment. It is here worthy of remark, that while this very question commanded a large share of the attention of the counsel and the court throughout the trial of Colonel Burr, and Fries's Case was frequently cited on other points, the remark of Judge Chase above quoted was never once referred to in support of the position that the common law rule in regard to accessories in treason was in force in this country. Mr. Wickham referred to it once, but only to show its inconsistency with the position assumed by the same judge in the same trial; that English authorities were not to be regarded as precedents in our courts, in prosecutions for treason. But the opinion of Judge Chase in Warrall's Case, 2 Dall. [2 U. S.] 384, was frequently referred to, and urged with much force, in support of the contrary doctrine, viz.: that the federal courts have no common law jurisdiction in criminal cases; and hence that the constitutional definition of treason could not be extended by the application of common law rules. In fact, no judge ever more stoutly contended against the doctrine that common law crimes were cognizable in the federal courts (unless made so by express statute) than he did. He notified the counsel of Fries, before the trial commenced, "that he would not suffer the decisions at common law, and those under the statute of Edward III., to be read." Testimony of Wm. Lewis, 1 Chase, Tr. p. 129. And this was the basis of another charge in his impeachment. An essay on the law of treason, in the Boston Law Reporter of 1851 (volume 14, p. 416), and which has been cited in some of our standard elementary works on criminal law, lays down the proposition in still more positive terms. The writer says: "It is now too well settled to admit of question, that the law knows no accessories in treason; but that every one who, if it were a felony, would be an accessory, is, in the law of treason, a principal traitor. This rule, being now a constituent part of the law of treason, as administered in this country ever since its settlement, and in England for several centuries, its origin and history are of no importance. It is sufficient for us that it is a part of the law of the land." And yet in support of this broad assertion not a single adjudication of any American court is or can be cited. The writer refers only to the dictum of Judge Chase above quoted. Judge Grier, in Hanway's Case. 2 Wall. [69 U. S.] 144, said, in his charge to the jury: "An abettor in murder, in order to be held liable as a principal in the felony, must be present at the transaction; if absent he may be an accessory. But in treason all are principals, and a man may be guilty of aiding and abetting, though not present." This language, strangely enough, has been understood by some as expressing an opinion upon the very question which Chief Justice Marshall so cautiously reserved. But when carefully examined it will be found not to go a single step further than Judge Marshall went. He expressly held, in Burr's Case, that all who are guilty of treason at all, under the constitution and statute, are guilty as principals. He expressly held, too, that a man may be guilty of aiding and abetting in treason, though not present; "however remote from the scene of action." The question upon which he reserved his opinion was, whether a man can be guilty of treason by merely advising, inciting, and instigating others to commit it; and upon this question Judge Grier expressed no opinion in Hanway's Case [supra]. He did not say, as Judge Chase had said, that "every act which in case of felony would render a man an accessory, will, in the case of treason, make him a principal." It is to be presumed that he deliberately stopped short of this; for mere advising and inciting will render a man an accessory in felony, without the performance of any overt act. There was nothing in the facts of Hanway's Case to call for an opinion on the

question which Chief Justice Marshall deemed of such "vast importance" that no tribunal inferior to the supreme court of the United States ought to express an opinion upon it. unless a pending case should absolutely require it; inasmuch as Hanway was notoriously present, taking a leading part in the transactions which were charged as a levying of war. It may be safely asserted, that no decision in this country, having the weight of judicial authority, has gone a single step beyond the proposition laid down in the opinion of the supreme court, per Marshall, C. J.. in the Case of Bollman and Swartwout. And that proposition. as interpreted by the same eminent jurist in Burr's Case, is in substance this: That when war is actually levied by an "assemblage of men;" in a "posture of war." for a treasonable object. any one who, being leagued in the general conspiracy, performs any overt act constituting a "part" in such fact of levying war, however remote from the scene of action. or however minute that part. is guilty as a principal traitor. The learned chief justice was very careful to explain, in Burr's Case, that the person "remote" from the scene of war. but performing a "part" therein. was not implicated in the crime of treason by virtue of the common law rule that "in treason all are principals." but on the ground that the fact of levying war may consist of a multiplicity of acts, performed in different places, by different persons. After laying down the proposition "that those who perform a part in the prosecution of the war may correctly be said to levy war and to commit treason under the constitution." he adds: "It will be observed that this opinion does not extend to the case of a person who performs no act in the prosecution of the war—who counsels and advises it—or who, being engaged in the conspiracy, fails to perform his part. Whether such persons may be implicated by the doctrine, that whatever would make a man an accessory in felony makes him a principal in treason. or are excluded because that doctrine is inapplicable to the United States, the constitution having declared that treason shall consist only in levying war. and having made the proof of overt acts necessary to a conviction, is a question of vast importance, which it would be proper for the supreme court to take a fit occasion to decide, but which an inferior tribunal would not willingly determine unless the case before them should require it." In another place, referring to the opinion of the supreme court in the Case of Bollman and Swartwout, he says: "This opinion does not touch the case of a person who advises or procures an assemblage. and does nothing more." And subsequently, in an opinion delivered during the pendency of the motion to commit Burr, Blennerhassett and Smith, he took occasion very emphatically to deny that the proposition laid down by the supreme court. that "a man leagued in the conspiracy may become a traitor by performing a part distinct from that of appearing in arms," involved the adoption of the common law doctrine in relation to accessorial acts in treason. Carp. Rep. 3 Burr. Tr. p. 152. The distinction is this: At common law an accessory may become a principal in treason without performing any overt act, mere advising or inciting being sufficient to implicate him as a principal in the crime of those who do commit the overt act. But the proposition laid down by the supreme court requires the actual commission of an overt act, constituting. a "part" in the fact of levying war. to implicate an absent person in the crime. This distinction. however, appears to have been wholly lost sight of by Judge Kane. in a charge delivered to the grand jury in Philadelphia, in 1851. at the term in which Hanway was indicted. He says: "Though he [the accused] was absent at the time of its actual perpetration. yet if he directed the act. devised, or knowingly furnished the means for carrying it into effect. instigating others to perform it, he shares their guilt. In treason there are no accessories." In another place he says: "Successfully to instigate

treason is to commit treason." These mere obiter dicta of a district judge. thrown out in a charge to the grand jury, derive their only consequence from the fact that Judge Grier. subsequently. in his charge to the petit jury in Hanway's Case. expressed his general concurrence in the doctrines and sentiments of said charge to the grand jury delivered by Judge Kane. But, as has been before stated, there was nothing in Hanway's Case to call for any opinion on the question now under consideration; and it is not to be presumed that Judge Grier intended to affirm the doctrines laid down by Judge Kane in his charge to the grand jury. except in so far as they had some bearing on the case before him.

2. Whether a particular act. performed by an absentee, will constitute a "part" in the fact of levying war in another place. within the meaning of the supreme court. may of course sometimes be the subject of grave doubt. The same difficulty will arise that is always liable to arise in applying general rules to special cases. It must. however. be an "overt act," and must be directly and immediately ancillary to the principal act of war specified in the indictment; otherwise it cannot constitute a "part" thereof. Chief Justice Marshall says: "This part. however ever remote or minute. constitutes the overt act of which alone the person who performs it can be convicted." It is manifest. however, that he did not mean to say that it must be such an act as of itself would constitute the crime of treason: for in another place he says: "If. for example. an army should be actually raised for the avowed purpose of carrying on an open war against the United States and subverting their government. the point must be weighed very deliberately, before a judge would venture to decide that an overt act of levying war had not been committed by a commissary of purchases. who never saw the army, but who, knowing its object. and leaguing himself with the rebels, supplied that army with provisions; or by a recruiting officer holding a commission in the rebel service, who, though never in camp. executed the particular duty assigned to him." Yet it is clear that neither the purchasing of military supplies, nor the enlisting of soldiers. though for a treasonable object, will constitute the crime of treason, unless done in connection with and ancillary to some more positive act of war. There must at least be an actual "assembling of men" in "a posture of war," to which such acts have relation, and are ancillary. before they can constitute the crime of treason. In England, as remarked by Chief Justice Marshall. the courts have had no occasion to distinguish between such acts, performed by a person remote from the scene of actual war, as constitute a "part" in the fact of levying war. and so would make him a principal independently of the common law rule which converts all accessories in treason into principals. and such as are purely accessorial in their character: because the operation of that rule renders any such distinction wholly unnecessary. But if said common law rule is not in force in this country. the distinction must be drawn; and in some cases it will be found an extremely subtile one. It is clear that independently of the common law rule above referred to. mere advising and inciting others to levy war would not constitute the crime of treason, though war should actually be levied pursuant to such advice or incitement. It is not so clear, however. that commanding others to levy war, by a person in a situation to enforce obedience to his commands. would not constitute an overt act in the war actually levied in pursuance of such command. Yet in England the distinction between an imperative command and mere advice or incitement is an immaterial one. and hence no attempt has been made to define it. In the foregoing remarks it has not been the object of the writer to show what the decisions of our courts ought to be, on the question under consideration. but simply to show that the English

doctrine, that whatever will render a man an accessory in felony will make him a principal in treason, has never yet been established by judicial authority as the law of treason in this country, and that the question is still an open one, notwithstanding the dicta of some judges and elementary writers to the contrary.

3. It is manifest that while the treasonable assemblage which alone can constitute a levying of war may be limited to a particular place in a particular state or district, an auxiliary act, constituting a part in the war there levied, may be performed in a different state or district. For instance. while the rebel army is besieging a fort or a city in one state, a confederate may be forwarding to that army reinforcements, arms, ammunition and supplies from another state, hundreds of miles distant. In such a case there can scarcely be a doubt that the acts of the distant confederate would constitute such a part in the war levied by the besieging army as would. within the meaning of the supreme court in the Case of Bollman and Swartwout. and of Chief Justice Marshall in Burr's Case. implicate him in the crime of treason there consummated. But in neither of said cases is it expressly stated in what district such "remote" abettor would be liable to prosecution: whether in that where he performed the auxiliary part. or that in which the principal act of levying war was actually committed. It would seem to be fairly inferable from some portions of the opinion delivered in Burr's Case, that unless the person performing such auxiliary part was near enough to the scene of hostile demonstration to be "of the particular party" there assembled. and in such a situation of ability to render them immediate aid as would make him a principal in the second degree in case of felony, he would only be subject to prosecution in the district where he performed the auxiliary acts implicating him in the crime. Other passages in the same opinion quite as clearly indicate that on an indictment specially charging the facts, he might be prosecuted in the district where the principal act of levying war was committed. though not present at the treasonable assemblage, and though he performed in a distant state or district the part implicating him in the crime. For instance, in one part of the opinion the chief justice says: "If. under this indictment. the United States might be let in to prove the part performed by the prisoner. if he did perform any part, the court could not stop the testimony in its present stage." The implication is clear. that the prisoner might have performed, in Kentucky. a part in a war prosecuted on Blennerhassett's Island. It is equally clear that evidence of the performance of such part was only inadmissible on account of the generality of the indictment. charging him as if actually present with the party on the island; and, as a necessary corollary. that he might have been prosecuted in Virginia for an auxiliary part performed in Kentucky, on a proper indictment, specially charging the facts. This may become a very important question in connection with the current rebellion, and therefore deserves consideration. If a person. performing in one district an act constituting an auxiliary part in the fact of levying war in another district, is liable to prosecution in the place where the principal act is committed, then in case the chief of the rebel conspiracy, or his secretary of war, or any of his principal coadjutors. should ever fall into our hands, all that would be necessary to convict either of them of treason in Maryland. Pennsylvania, Ohio, or Indiana. would be to prove that he had performed in Virginia some act immediately ancillary to the invasions of the two former states by the rebel army under Lee or Early. or of the two latter by the marauders under John Morgan. If (as has been decided by the supreme court) a person performing in one place an act auxiliary to the fact of levying war in another place. "however remote," thereby becomes a principal in the crime of treason, it is

believed that. on well established general principles. he will be subject to prosecution in the place where the principal act of levying war. to which his auxiliary act relates. is committed; whatever may have been the opinion entertained by Chief Justice Marshall on the subject. The general principle is believed to be well established, that where a crime is commenced in one place and consummated in another, or where it consists of several acts performed by different persons and in different places, any person implicated as a principal in the crime is liable to prosecution in the place where the crime is consummated, or where the principal act, which gives character to the crime. is committed. Numerous authorities in support of this principle will be found cited in the standard elementary books on criminal law: and the most important are referred to in the case particularly noticed in the succeeding paragraph. The case of People v. Adams, 3 Denio. 190: Id.. 1 Comst. [1 N. Y.] 173. is an authority precisely in point on the question under consideration. Adams was indicted in the city of New York for obtaining a large sum of money from a firm in that city by means of fictitious receipts signed by a forwarder in Ohio, falsely acknowledging the delivery to him of a quantity of pork and lard for the use and subject to the order of said firm. He pleaded specially to the indictment, that he was a natural born citizen of Ohio. and had always resided there. and had never been in the state of New York: that the receipts were drawn and signed in Ohio, and that the offence was committed by their being presented in New York by innocent agents employed by the defendant in Ohio. This plea was demurred to, and after elaborate argument by the ablest counsel that money could command. the demurrer was sustained. first in the supreme court, and subsequently in the court of appeals. The decision turned upon the point that Adams. having employed innocent agents to consummate the crime in New York. was guilty as a principal. (there being no other guilty person to whose crime his acts could be accessorial;) and being guilty as a principal. he was liable to prosecution in the place where the crime was consummated. though not present. nor even within the general jurisdiction of the state. Now let us apply the principles of this case to the question under consideration. The supreme court has decided that when the crime of treason is consummated by an open act of war committed in one place. whoever performs a part in that war, "however minute or remote from the scene of action." thereby becomes a principal in the crime of treason. And in the New York case just cited, it was decided that whoever is guilty as a principal in any crime is liable to prosecution in the place where the crime is consummated. though not present at that place. Does it not follow. that any one who. in Richmond or elsewhere. performed any act immediately ancillary to the war which was prosecuted in Pennsylvania by the rebel army. in 1863. and thereby became a principal in the crime of treason there consummated, is liable to prosecution in Pennsylvania?

4. Professor Greenleaf, in his work on the Law of Evidence (volume 3, § 243). says it is on the ground of constructive presence "that if war is levied with an organized military force. vexillis explicatis. all those who perform the various military parts of prosecuting the war. which must be assigned to different persons. may justly be said to levy war;" and adds: "All that is necessary to implicate them is, to prove that they were leagued in the conspiracy. and performed a part in that which constituted the overt act. or was immediately ancillary thereto:" (citing Burr's Case.) The author of the essay on the law of treason in the Boston Law Reporter of 1851. (hereinbefore referred to.) takes the same ground: also citing Burr's Case. But however logical it might be to hold that, when war is actually levied by an organized military force

in one place, any one who, being leagued in the general conspiracy, performs any part therein, at another and "remote" place, should be considered as constructively present where the principal act of levying war is committed, it is far from being clear that Chief Justice Marshall intended to assert or admit this principle. Indeed, many expressions in his opinion would seem to imply that he held directly the contrary doctrine. It is true that his argument was mainly addressed to the broader proposition, that any one who advises or procures a treasonable assemblage, constituting an overt act of levying war, is to be considered as constructively present at that assemblage, though in fact hundreds of miles distant. But it is difficult to reconcile his ruling, as well as many of his expressions, with any other opinion than that, where an auxiliary act constituting a part in the fact of levying war is performed at a great distance from the scene of the treasonable assemblage, the absent abettor cannot be considered as constructively present at the assemblage. If he could be held constructively present, evidence of his auxiliary acts would be admissible under an indictment charging him generally, as if actually present; for there is no principle in criminal pleading better settled, than that a principal in the second degree, who is constructively, but not actually present at the fact, may be charged generally with committing the fact. But in Burr's Case it was decided that the evidence of acts done at a great distance from Blennerhassett's Island was inadmissible, because the indictment charged the defendant as being present at the island where the treasonable assemblage was alleged to have taken place. The passage from Chief Justice Marshall's opinion above quoted, where he says, "If, under this indictment, the United States might be let in to prove the part performed by the prisoner, if he did perform any part, the court could not stop the testimony in its present stage," seems to be susceptible of no other interpretation than this. The reader will find in that opinion other passages equally difficult to reconcile with the doctrine that all who are implicated in the crime of levying war are to be considered as constructively present at the principal scene of the hostile demonstration. While, as has been shown, the theory that in treason the doctrine of constructive presence is to be so extended as to embrace all who perform any part in the fact of levying war by an organized military force, "however remote from the scene of action," does not seem to be sustained either by the reasoning or the ruling of the court in Burr's Case, yet so far as the question now under consideration is concerned, it is deemed to be wholly immaterial upon what theory the absent abettor becomes a principal in the crime, provided he becomes so independently of the common law rule which converts all accessories in treason into principals. It is sufficient that he is a principal, and being such the general rule applies, that he is liable to prosecution where the crime is actually consummated. Whether he becomes a principal on the theory of constructive presence, or on some other theory, independent of the common law rule above referred to, is only important as a question of pleading. If constructively present, he may be charged in the indictment as if actually present. Otherwise the indictment must be special, showing his absence; as was held to be necessary in Burr's Case.

5. It has been supposed by some writers that there is a very great hardship involved in holding a man liable to prosecution for treason in a state or district where he never may have been in his life. But this hardship, if it be one, is not peculiar to prosecutions for treason. Nor is it perceived what reasonable cause any man can have to complain that he is subjected to a prosecution in the place where his criminal acts take effect, and where he intended that they should take effect, though, from the nature of the crime, it was susceptible of being initiated at another place, and was consummated without

his personal presence. Professor Tucker puts the case of a person in Maryland, hearing of Fries's insurrection in Pennsylvania, and lending a horse or money to a person avowedly going to join the insurgents, in order to assist him on his journey; and asks if this would amount to levying war in Pennsylvania, where the lender never was? 4 Tuck. Bl. Comm. Append. B. It may be answered, that if the lender was leagued in the general conspiracy, and furnished the horse or the money for the purpose of reinforcing the insurgents by sending them a recruit, he would clearly be guilty of treason, according to the doctrine announced by the supreme court in the Case of Bollman and Swartwout, and by Chief Justice Marshall in Burr's Case. And yet the act would be treason in Maryland only in virtue of its relation to and connection with the insurrection in Pennsylvania, where it was intended to take effect and do its mischief. Suppose, instead of lending a horse or money to a recruit, he should send a wagon load of arms and ammunition to the insurgents, to be used by them in the war they were then prosecuting for the subversion of the government; would it be a peculiarly hard case that he should be subjected to prosecution in the state where lives were actually destroyed by his act, and in pursuance of his intentions? If a person in Baltimore should send by express to a person in Philadelphia, with intent to destroy his life, an "infernal machine" concealed in a box, and the receiver, on opening the box, should be killed by the explosion, it is beyond question that the author of the crime would be liable to prosecution for murder in Philadelphia, although he may never have been in that city, or in the state of Pennsylvania in his life. But suppose instead of sending an "infernal machine," intended to destroy the life of one man, he should send a box of arms and ammunition to a rebel army in open war, intended not only to destroy the lives of many men, but to aid in subverting the government; would not the reasons for holding him subject to prosecution in Pennsylvania (independent of all arbitrary rules of law) be quite as strong as in the other case? If, therefore, it is a general rule of law applicable to other crimes, that whoever is implicated as a principal is liable to prosecution in the state or district where the crime is consummated, there can be no good reason for making an exception to the general rule in the case of treason, on the ground that it will work a peculiar hardship to the accused.

6. Chief Justice Marshall, in his opinion in Burr's Case, says: "If a rebellion should be so extensive as to spread through every state in the Union, it will scarcely be contended that every individual concerned in it is legally present at every overt act committed in the course of that rebellion. It would be a very violent presumption indeed—too violent to be made without clear authority—to presume that even the chief of the rebel army was legally present at every such overt act. If the main rebel army, with the chief at its head, should be prosecuting war at one extremity of our territory, say in New Hampshire; if this chief should be there captured and sent to the other extremity for the purpose of trial; if his indictment, instead of alleging an overt act, which was true in point of fact, should allege that he had assembled some small party, which in truth he had not seen, and had levied war by engaging in a skirmish in Georgia at a time when in reality he was fighting a battle in New Hampshire; if such evidence would support such an indictment by the fiction that he was legally present though really absent, all would ask to what purpose are those provisions in the constitution which direct the place of trial and ordain that the accused shall be informed of the nature and cause of the accusation?" Although the question to which these remarks had immediate application was as to the form of the indictment, it is perhaps fairly to be inferred that, in the opinion of the chief justice, in the case supposed, the chief of the rebel army would

not be subject to prosecution in Georgia, under any form of indictment. And if (as is rather implied than expressed) it is to be supposed that he had no direct agency in prosecuting the skirmish in Georgia, and performed no part therein, this would undoubtedly be true. But let us suppose another case: Let us suppose that the chief of the rebel army in Georgia, during the present rebellion, should detach a portion of the troops under his command and send them by sea to attack and capture one of the seaboard towns of New Hampshire, furnishing them with all the arms and munitions of war necessary to that end; and that the expedition should succeed in accomplishing its object. Would not the rebel commander perform such a part in the capture of the town as would render him a principal in the crime of treason there consummated? And would he not, on general principles, be liable to prosecution in New Hampshire? If not, then an American citizen who should go into a foreign country—one of the West India Islands for instance—and there fit out, arm, equip, and man a fleet of war vessels, and send them to bombard and capture any one of our Atlantic cities, but remain behind himself, would be guilty of treason nowhere, and might return to the United States with impunity. Suppose that while the battles of South Mountain and Antietam were going on, the chief of ordnance of the rebel army had been stationed at Martinsburg, Virginia, from which point he was sending arms and ammunition to his confederates, engaged in battle in Maryland; would he not have been guilty of levying war in Maryland? If so, could it make any difference that he was similarly engaged at Richmond instead of Martinsburg? In either case the hostile acts would take effect and do their mischief in Maryland; and it is believed that the author of them would be answerable in Maryland, just as much as if, standing on the Virginia side of the Potomac, he had fired a gun into the ranks of our army stationed on the Maryland side of the river.

7. If the principle here contended for be tenable, it does not follow that an abettor, performing an auxiliary part in a war actually levied in another state, would be liable to prosecution only in the state where the principal act of levying war was committed. It is a general, though not a universal rule of law, that when a crime consists of several acts performed in different places, or is commenced in one place and consummated in another, any person implicated as a principal in the crime may be prosecuted either in the place where the crime is consummated, or that in which he personally performs the act which implicates him in it. Rex v. Brisac, 4 East, 164; Rex v. Burdett, 4 Barn. & Ald. 95; Girdwood's Case, 2 East. P. C. 1120; Fost. P. C. 349; People v. Mather, 4 Wend. 229. Upon the authority of these cases, and many others that might be cited, there can be no doubt that a person who, being leagued in the rebel conspiracy, should in Maryland purchase supplies or enlist men and forward them to the rebel army in Virginia, would be liable to prosecution for treason in Maryland. To the rule last laid down there is, however, at least one exception. The crime may have been commenced, or the auxiliary act which implicates the accused in it may have been performed in a foreign country, out of the general jurisdiction of the United States; in which case he could only be prosecuted in the state or district where the crime was consummated. In the case of People v. Adams, above cited, the acts performed by the defendant, in person, were all performed in a foreign state, and therefore he was not liable to prosecution at all in the place where he committed those acts; at least not liable under the laws of New York.

NOTE B. The reasonableness of the doctrine that treason by levying war may be committed without "the actual application of violence to external objects," is forcibly illustrated by the history of the current Rebellion in this country. It is believed that in some of the revolting states the authority of the federal government was completely subverted, and a revolutionary government, de facto, carried into full effect, without the commission of any acts of violence within their limits. Ordinances of secession were passed, renouncing all connection with or subordination to the federal government, and instituting new forms of government entirely independent thereof, which were carried into practical effect without the slightest physical opposition. Such was the unanimity of public sentiment, or the terror inspired by the energy, activity, and preparation of the leading conspirators, that no opposition was attempted by any portion of the people of those states, and there being no federal troops there to enforce the authority of the general government, these revolutionary measures were effectuated without "the application of violence to external objects," simply because there were no external objects present which it became necessary to employ force or violence against. Undoubtedly, in all these cases, the acts above referred to were accompanied by some concurrent acts of preparation for war, such as the organization and embodiment of troops; so that there was, perhaps, an actual "military array," and "posture of war." But according to the doctrine contended for by Mr. Burr's counsel, (especially Mr. Martin,) there could have been no treason committed in such states until there was actual violence committed. We may, indeed, imagine a case where the authority of the general government would be completely subverted in a state, without even a display of any such potential force as is said to consist in the "assembling and marching of troops," and in assuming "a posture of war." The legislature or a state convention might pass an ordinance of secession, and institute a revolutionary government, without making the slightest preparation for maintaining their position by military force. The state might be so surrounded by other revolted states, and public sentiment among its own citizens might be so unanimous, that any immediate preparation for maintaining their position by military force might be deemed unnecessary. All local federal officers might join in the conspiracy, or cease to perform their functions through fear; and so the authority of the federal government might be completely subverted, not only without any actual war, but without any preparation for war. It is not probable that any state assuming to secede from the Union so utterly neglected all preparations for war as this; but in every other respect the supposed case is only a statement of what actually did occur in more than one state. In the case supposed, could the legitimate government be entirely subverted throughout the state, without the guilt of treason being incurred by any one of its citizens? The proposition that it could be a startling one; and yet there would be no such overt act of levying war as, according to the decisions of the courts, would seem to be an indispensable element in the crime of treason. It might be supposed, by unprofessional readers at least, that the persons by whose acts the authority of the federal government in a state was thus subverted, would be guilty of treason under that clause of the constitution which relates to "adhering to the enemies of the United States, giving them aid and comfort." But conceding that in this Rebellion, every state which passed an ordinance of secession, did, by that act alone, give aid and comfort to the rebels in arms, and that the passing of an ordinance of secession, is an act of adhesion to the rebel cause, it is doubtful, to say the least, whether the crime of treason can be committed in this country by adhering and giving aid and comfort to rebels. In England, under that clause of the statute of 25 Edw. III., from which this clause of our constitution is copied, it has always been held that treason could not be committed by adhering and giving aid and comfort to British subjects in rebellion. In other words,

that the "enemies" referred to in that clause of the statute are foreign enemies, and not rebels. It is true that in England a person giving aid and comfort to rebels in arms against the government might be guilty of treason; but according to the decisions of the courts it would be treason in compassing the death of the king, or by reason of being accessorial to the levying of war, and not under the clause of the statute which relates to adhering to the king's enemies, giving them aid and comfort. As our constitution has adopted the words of this statute, our courts will give to those words the same construction which the courts of Great Britain had given to them previous to their adoption. No one has ever contended that our courts should give them a broader construction. No question as to the construction of this clause of the constitutional definition of treason arose in the trial of Col. Burr, as he was not indicted under it. But in reference to the other clause, Chief Justice Marshall said it was "scarcely conceivable that the term 'levying war' was not employed by the framers of our constitution in the same sense which had been affixed to it by those from whom we borrowed it." It is believed that in no decision of any of our courts has any construction of this second clause of the constitutional definition of treason ever been given. It has been reported that Mr. Justice Swayne, of the supreme court, early in this Rebellion, in a case which came before him in the Southern district of Ohio, held that treason under this clause of the constitution could not be committed by giving aid and comfort to the rebels; but in fact, as the writer has been informed by Judge Swayne himself, his decision did not turn on that question. It is believed, however, that the courts will be constrained so to decide whenever the question shall come directly before them. It was in view of this doctrine, probably, that congress passed the second section of the act of July 17, 1862, entitled "An act to suppress insurrection, to punish treason and rebellion," &c. (chapter 95 [12 Stat. 589]), which provides: "That if any person shall hereafter incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States, or the laws thereof, or shall engage in, or give aid or comfort to any such existing rebellion or insurrection, and be convicted thereof, such person shall be punished by imprisonment for a period not exceeding ten years, or by fine not exceeding ten thousand dollars, and by the liberation of all his slaves, or by both of said punishments, at the discretion of the court." In view of the constructions which the courts of this country have given, and will probably be constrained to give, to the constitutional definition of treason, this is a most important statute, in reference to the existing Rebellion. Adherents to the rebel cause are numerous in some of the loyal states, and are daily doing acts which give aid and comfort to the Rebellion. Military arrests for acts of this description are very common; but as yet there have been comparatively few prosecutions in our civil courts of criminal jurisdiction. Perhaps if grand juries and district attorneys were more vigilant, there would be less necessity for military arrests and military trials in such cases; although, as long as the war lasts, it cannot be expected that military trials will be superseded by prosecutions in the civil courts. Without the aid of the law above cited, it is at least doubtful whether many of the acts of aid and encouragement to the Rebellion which it unquestionably covers, could be punished at all by prosecutions in our civil tribunals; especially if it should be finally decided that the common law rule which makes all accessories in treason principals, is not in force in this country. But this statute clearly reaches all cases, as well of mere advice or incitement of treason in levying war, as of aid and comfort to rebels in arms. It will therefore be the safest course, in all prosecutions against persons who have not clearly been guilty of levying war against the United States, according to

the strictest construction of the constitution, to proceed under this statute, rather than for treason. It is true that the penalty prescribed by this statute is less severe than may be inflicted on conviction of treason. But the first section of the same act gives the court a discretion to inflict even a less penalty for treason than may be inflicted on a conviction under said second section. And since this discretion has been vested in the courts, it is not probable that the death penalty would ever be inflicted upon any but the most notorious and culpable traitors, even if convicted of treason. Another reason for proceeding under the statute of 1862, instead of prosecuting for treason, in all doubtful cases, is, that the defendant will not have the right to challenge, peremptorily, thirty-five jurors.

NOTE C. Although the question did not arise in Burr's Case, it may not be amiss here to remark, that some difference of opinion formerly prevailed in this country, whether the crime of treason can be committed without a levying of war with intent entirely to subvert the government of the United States. Mr. Martin, in a part of his final speech in Burr's Case which is not here given, expressed a very decided opinion that the decisions of the courts in Pennsylvania, in the prosecutions growing out of "what were called the whisky and hot water insurrections," were erroneous: that the insurgents in those cases were not guilty of treason, because "there was no design to subvert the government." "Such a thought," he said, "was not entertained. It was the expression of their disapprobation of a particular law, and opposition to the execution of that unpopular law; and the intentions of those people went no further than to induce its repeal." Rob. Rep. 2 Burr. Tr. p. 274. But the doctrines laid down by the courts in the cases referred to, instead of being shaken by time, have been affirmed by several judges of the supreme court of the present day; and it may now be regarded as entirely settled, that any combination and assemblage of men, in force, to oppose generally the execution of any law, will be treasonable. But a combination and assemblage to resist the execution of a law in a particular case, as to prevent the arrest of a particular individual, if the intention be not to oppose the execution of the law in all cases, will only amount to a great riot, or to murder if lives are destroyed. The law was thus laid down by Mr. Justice Grier, in Hanway's Case, in perfect consistence with all the earlier decisions. Mr. Justice Curtis said, in a charge to the grand jury in 1851: "If a person against whom process has issued from a court of the United States, should assemble and arm his friends, forcibly to prevent an arrest, and, in pursuance of such design, resistance should be made by those there assembled, they would be guilty of a very high crime; but it would not be treason, if their combination had reference solely to that case. But if process of arrest issues under a law of the United States, and individuals assemble forcibly to prevent an arrest under such process, pursuant to a design to prevent any person from being arrested under that law, and, pursuant to such intent force is used by them for that purpose, they are guilty of treason. The law does not distinguish between a purpose to prevent the execution of one, or several, or all laws. Indeed, such a distinction would be found impracticable, if it were attempted. If this crime could not be committed by forcibly resisting one law, how many laws should be thus resisted, to constitute it? Should it be two, or three, or what particular number? And if all, how easy would it be for the most of treasons to escape punishment, simply by excepting out of the reasonable design, some one law. So that a combination, formed to oppose the execution of a law by force, with the design of acting in any case which may occur and be within the reach of such combination, is a treasonable conspiracy, and constitutes one of the elements of this crime."